STEPHEN W MANNING, OSB No. 013373
stephen@innovationlawlab.org,
smanning@ilgrp.com
TESS HELLGREN, OSB No. 191622
tess@innovationlawlab.org
RACHEL LANDRY, Mass. No. 713320*
rachel@innovationlawlab.org
NELLY GARCIA ORJUELA, OSB No. 223308
nelly@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

ESTHER H SUNG, Cal. No. 255962*
esther.sung@justiceactioncenter.org
KAREN C TUMLIN, Cal. No. 234961*
karen.tumlin@justisceactioncenter.org
HILLARY LI, Ga. No. 898375*
hillary.li@justiceactioncenter.org
LAURA FLORES-PERILLA, Cal No.
355645*
laura.flores-perilla@justiceactioncenter.org
BRANDON GALLI-GRAVES, Tx No.
24132050*
brandon.galli-graves@justiceactioncenter.org
JUSTICE ACTION CENTER
PO Box 27280
Los Angeles, CA 90027
Telephone: +1 323-450-7272

Attorneys for Plaintiffs
*Pro hac vice applications forthcoming

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

|  |  |
|---|---|
| PINEROS Y CAMPESINOS UNIDOS DEL NOROESTE; AUGUSTANA LUTHERAN CHURCH; OUR LADY OF GUADALUPE PARISH; SAN FRANCISCO INTERFAITH COUNCIL; and WESTMINSTER PRESBYTERIAN CHURCH, | |
| *Plaintiffs,* | Case No. 6:25-cv-699 |
| v. | |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; PETE FLORES in his official capacity as Acting | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

Commissioner of Customs and Border
Protection; U.S. CUSTOMS AND BORDER
PROTECTION,

    *Defendants.*

---

## INTRODUCTION

1.  Civic gatherings, houses of worship, schools, and health clinics should be places for adults and children to assemble, celebrate, worship, learn, and heal—not zones for deportation enforcement.

2.  Havens like these are sacred to the human experience because they are necessary for a functioning civil society. They allow people to nourish themselves spiritually, mentally, and physically so that they can thrive within, and contribute to, their communities for everyone's mutual benefit.

3.  For more than thirty years, this country's rules around immigration enforcement at these spaces have mirrored these values for a functioning civil society as well as this nation's foundational principles guaranteeing the free exercise of religion; the right to assembly; and the unalienable rights to life, liberty, and the pursuit of happiness. Longstanding federal policy under both Republican and Democratic administrations has consistently affirmed the importance of protecting havens—such as houses of worship, schools, health care clinics, social services and community-based organizations, and other public places where adults and children gather—from immigration enforcement activity except in limited circumstances.

4.  On January 20, 2025, Defendants abruptly and arbitrarily reversed course on more than three continuous decades of precedent and historical practice, stripping the protections that tightly circumscribed immigration enforcement in sacred spaces, known as "sensitive" or 'protected"

locations. These spaces are now exposed to immigration enforcement at the unfettered discretion of immigration agents.

5.   In a matter of months, these agents have taken steps to remove hundreds of Venezuelans and Salvadorans without due process to Cuba's Guantanamo Bay and a notorious mega-prison in El Salvador under an unprecedented use of the Alien Enemies Act; unlawfully deported a U.S. resident with lawful status to that same mega-prison due to an "administrative error" and blatantly defied court orders to facilitate his return; sent notices to hundreds of individuals lawfully paroled into the country, informing each that "it is time for you to leave the United States" and giving them at most seven days to do so; and—in some instances, without warrants—arrested university students in the street or at citizenship interviews, revoked their visas, and attempted to transfer them from detention center to detention center to evade legal review and effectuate their deportations.

6.   As a result of the administration's new policy, sacred spaces have become sources of extreme anxiety rather than places of healing, expression, reflection, celebration, and refuge. Community members are deprived of social services and places where they gather to celebrate, educate, and advocate; parishioners are afraid to attend religious ceremonies; and essential services to the most vulnerable—from health care to education to disaster relief—have been disrupted. Defendants' actions are not only unlawful, but they strike the heart of what allows a civil society to flourish—its sacred spaces.

7.   From Oregon to Florida, Plaintiffs and their constituents and members span the breadth of the United States. Every day, in their service to their members, constituents, and communities, the Plaintiff organizations are striving for a more perfect nation in which no person should be forced to forgo their religious practice, give up their right to assemble, skip school, cancel their doctor's

appointment, or otherwise withdraw from participation in essential services because they are afraid of being arrested and swept away into a massive immigration enforcement system that can result in deportation to an indefinite detention in a maximum security prison outside U.S. borders.

8. The Plaintiff organizations' purposes and missions are thwarted by the Trump administration's abrupt and unexplained change in the rules, which have imbued previously safe spaces with fear. They face mounting difficulties in carrying out their missions to welcome, serve, educate, and heal. Their efforts to cultivate sacred spaces where their communities may gather freely have been turned upside down because they must decide if, by providing such spaces, they are offering their friends and neighbors not safety, but an unacceptable risk of unchecked and unfair immigration enforcement that could tear their families apart.

9. Defendants' policy is unconstitutional and unlawful. It violates the First Amendment of the U.S. Constitution, the Religious Freedom Restoration Act, and the Administrative Procedure Act. It injures the Plaintiff organizations' missions, their core activities, and their constituents. The Court should declare the Defendants' rescission of protections for sensitive locations unconstitutional and unlawful, vacate the policy, and enjoin Defendants from implementing or enforcing it.

## JURISDICTION AND VENUE

10. This Court has federal question jurisdiction under 28 U.S.C. § 1331. Plaintiffs allege violations of the Administrative Procedure Act, 5 U.S.C. § 701 et seq. ("APA"); the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-2000bb-4 ("RFRA"); and the First Amendment of the United States Constitution, U.S. Const. Amend. I.

11. Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States and federal officers of the United States acting in their official capacities, and

because at least one of the plaintiffs resides in this district and no real property is involved in the action.

12. For these same reasons, divisional venue is proper under Local Rule 3-2.

13. This Court has the authority to grant the relief requested by Plaintiffs under the Administrative Procedure Act, 5. U.S.C. § 701, *et seq.*; Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable authority.

## PARTIES

14. Plaintiff **Pineros y Campesinos Unidos del Noroeste ("PCUN")** is the largest Latinx organization in the state of Oregon and is based in the city of Woodburn in Marion County, Oregon. Founded in the 1980s as a nonprofit labor union, PCUN is now a membership organization whose membership largely consists of farmworkers and Latinx working families; its programs and services also serve Oregon's Latinx community at large through its main membership organization as well as its affiliates. It advocates for and empowers Oregon farmworkers and working Latinx families to advance their community interests and enact systemic change through organizing and increasing political representation and participation. PCUN's main programs are worker outreach and member organizing, informational radio programs, systems change and grassroots policy advocacy, promotion of healthy workplaces, and civic engagement. PCUN's core work consists of labor organizing, promoting civic engagement, coordinating rallies and demonstrations, referrals to services, providing disaster relief assistance and workers' rights education, and assisting members in enrolling in state-funded assistance programs. As a community-based organization that organizes public rallies and demonstrations and provides essential services, PCUN's headquarters and events have long been considered protected or sensitive locations for

immigration enforcement purposes. PCUN and its members have been harmed by Defendants' rescission of protections for sensitive locations.

15. Plaintiff **Augustana Lutheran Church ("Augustana")** is a multicultural, multinational congregation in Portland, Oregon. Augustana has over 850 members in its congregation, including tribal nation members, members from all fifty states, members from twenty-three different countries, and undocumented congregants. Augustana was founded in 1906 as a Swedish congregation of immigrants to the United States. Augustana holds weekly services in English and in Spanish, as well as "Sanctuary Sundays" once or twice each month where community members and congregants come to learn what they can do to help immigrants who fear immigration enforcement. Augustana is a congregation of justice-seekers and peacemakers and a place of sanctuary for all, including undocumented migrants. As a leading sanctuary congregation since 1996, Augustana has consulted with hundreds of congregations regarding sanctuary and is the birthplace of the resolution that in 2019 led the Evangelical Lutheran Church in America (ELCA) to declare itself one of the first sanctuary denominations in the country. The church campus, consisting of the main sanctuary and an educational building, is also home to several nonprofit organizations, including a preschool, a Latino radio station, and partner community organizations that fight for justice and systemic change across a range of issues. As a house of worship, Augustana has long been considered a protected location and has been harmed by Defendants' rescission of protections for sensitive locations.

16. Plaintiff **Our Lady of Guadalupe Parish ("OLG")** is a welcoming Catholic community in San Diego, California. Founded in 1917, and as the former Mexican national parish of San Diego, OLG has a long history and special focus on making immigrants from Mexico, Latin America, and other Spanish-speaking countries feel at home and empowered to work for their own

liberation, justice, and dignity. OLG considers itself an immigrant parish, and its parishioners have a wide variety of immigration statuses. OLG also operates a Catholic school for kindergarten through eighth grade as well as a migrant shelter for adult male asylum seekers. OLG has long been considered a sensitive location, and the church, its parishioners, the students in its school, and its individuals seeking shelter have been harmed by Defendants' rescission of protections for sensitive locations.

17. Plaintiff **San Francisco Interfaith Council ("SFIC")** is an interfaith organization based in San Francisco, California that serves as the "go-to" organization for mobilizing the city's religious communities. SFIC counts as its constituents 800 religious nonprofits in the City and County of San Francisco, including congregations and their respective judicatories, educational institutions, and faith-based social service agencies that provide both humanitarian and legal services. SFIC's constituents represent people of many faith traditions, including Christianity, Judaism, Islam, Hinduism, and more. SFIC aims to bring people of different faith traditions in San Francisco together to, among other things, provide spiritual comfort at times of crisis, coordinate services to the citizens of San Francisco, and advocate on behalf of constituents and the people they serve on issues like civil and human rights, housing affordability, and immigration. SFIC's constituent organizations are each sensitive locations and have been considered so for decades, and they are harmed by Defendants' rescission of protections for sensitive locations.

18. Plaintiff **Westminster Presbyterian Church ("Westminster Presbyterian")** is a member of the Presbyterian Church (U.S.A.). It was founded in 1967, branching off from the First Presbyterian Church of Gainesville to serve as a Presbyterian witness for the community of northwest Gainesville, Florida, then was subsequently chartered as a congregation in 1968 and legally incorporated in 1969. The mission of Westminster Presbyterian is to nurture, equip and

send out disciples to be Christ's ministers of compassion, healing and peace in their daily lives. To accomplish this mission, Westminster Presbyterian is committed to a number of core principles: to follow Jesus wherever he leads; be deliberately diverse and fully inclusive; be outward reaching; serve people in need; be committed to change unfair systems; work for peace and justice; and partner with people of all faith traditions. Another of the church's core beliefs is to provide sanctuary to immigrants in their community, following over forty years of tradition in the sanctuary movement which began, in part, in Presbyterian churches. Westminster Presbyterian believes that people should feel welcomed and safe no matter their immigration status. As a house of worship, Westminster Presbyterian has long been considered a protected location and has been harmed by Defendants' rescission of protections for sensitive locations.

19. Defendant **Kristi Noem** is sued in her official capacity as the Secretary of the U.S. Department of Homeland Security. Secretary Noem is responsible for the administration of U.S. immigration laws. She directs each of DHS's components, including the components responsible for the apprehension, detention, and removal of noncitizens pursuant to the rescission of protections for sensitive locations at issue in this case.

20. Defendant **U.S. Department of Homeland Security ("DHS")** is a federal cabinet-level department of the U.S. government. DHS is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1). It is the largest federal law enforcement agency, and it is responsible for administering U.S. immigration laws under the Immigration and Nationality Act ("INA") and federal regulations, including those relating to the apprehension, detention, and removal of noncitizens. Its components include U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"). DHS is responsible for the rescission and replacement of the previous sensitive locations guidelines for ICE and CBP.

21. Defendant **Todd Lyons** is sued in his official capacity as the Acting Director of Immigration and Customs Enforcement. Mr. Lyons oversees all ICE personnel and is a supervisory official responsible for overseeing immigration enforcement, including apprehension, detention, and removal of noncitizens both near the border and in the interior of the United States pursuant to the rescission of sensitive locations protections at issue in this case.

22. Defendant **U.S. Immigration and Customs Enforcement ("ICE")** is a sub-agency of DHS and an "agency" within the meaning of the APA. 5 U.S.C. § 551(1). It is responsible for apprehension, detention, and removal of noncitizens both near the border and in the interior of the United States.

23. Defendant **Pete R. Flores** is sued in his official capacity as the Acting Commissioner of Customs and Border Protection. Mr. Flores oversees all CBP personnel and is responsible for overseeing the apprehension, detention, and removal of noncitizens within 100 air miles of external boundaries of the United States, including pursuant to the rescission of sensitive locations protections at issue in this case.

24. Defendant **U.S. Customs and Border Protection ("CBP")** is a sub-agency of DHS and an "agency" within the meaning of the APA. 5 U.S.C. § 551(1). It is responsible for the apprehension, detention, and removal of noncitizens within a "reasonable distance" of any external boundary of the United States, typically defined as 100 air miles.

## FACTUAL BACKGROUND

### For Over Thirty Years, DHS Maintained a Consistent Nonenforcement Policy at or near Sensitive Locations

25. For at least the last three decades, the government has applied an immigration nonenforcement policy at or near "protected areas," also referred to as "sensitive locations."

26. Throughout this time, this policy has remained largely unchanged (except to clarify categories of nonenforcement, provide more detailed guidance, and expand the types of locations protected) through both Republican and Democratic administrations.

27. Every iteration of this policy has included an explanation and justification for the general policy of nonenforcement at sensitive locations, with exceptions for when exigent circumstances necessitate.

28. **1993 Puleo Memo.** In 1993, Acting Associate Commissioner of the legacy Immigration and Naturalization Service ("INS")[1] James Puleo set out the "policy of [INS] to attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies" (the "1993 Puleo Memo").[2] For enforcement operations "likely to involve apprehensions" at such locations, "advance written approval was required, which in turn required assessing "[t]he availability of alternative measures," "[t]he importance of the enforcement objective," and "measures which [could] be taken to minimize the impact on operation of the school or place of worship."[3]

29. The 1993 Puleo Memo also contemplated situations in which advance written approval would not be possible. Where "exigent circumstances require[d] a deviation from this policy," the matter was required to be reported up the chain of command immediately following the

---

[1] Following the passage of the Homeland Security Act of 2002, 6 U.S.C. §§ 211, 252, 271, 291, the INS was dissolved and replaced by three separate agencies within the Department of Homeland Security: U.S. Citizenship and Immigration Services ("USCIS") for processing immigration applications, U.S. Customs and Border Protection ("CBP") for border security, and U.S. Immigration and Customs Enforcement ("ICE") for immigration enforcement activities.
[2] Memorandum from James A. Puleo, Immigr. & Naturalization Serv. Acting Assoc. Comm'r, "Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies" HQ 807-P, at 1 (May 17, 1993).
[3] *Id.* at 1–2.

enforcement action.[4] All officers were to be "well-versed in and able to apply" the criteria for engaging in actions required by exigent circumstances.[5]

30. **2007 Forman Memo.** In 2007, Marcy Forman, Director of the ICE Office of Investigations, reiterated the federal government's nonenforcement policy at schools and "venues generally where children and their families may be present" (the "2007 Forman memo").[6] Director Forman emphasized "that great care and forethought [should] be applied before undertaking any investigative or enforcement type action" in such locations given "the public's interest in ICE's mission" and that enforcement in these locations "has always been a point of particular sensitivity."[7]

31. As before, this memo also required advance approval for most enforcement actions and included limited carve-outs for situations in which advance approval was not needed, such as for "requesting information from school officials," "retrieving records," and "terrorism-related investigations, cases of public safety or other cases that can be articulated."[8]

32. **2007 ICE VAWA Memo.** On January 22, 2007, ICE Office of Detention and Removal Operations Director John Torres and ICE Office of Investigations Director Marcy Forman issued joint guidance regarding officer procedure following the enactment of the Violence Against Women Act ("VAWA") of 2005 (the "2007 ICE VAWA Memo").[9] The 2007 ICE VAWA Memo discourages ICE officers from making arrests at sensitive locations where noncitizens are likely to

---

[4] *Id.*

[5] *Id.*

[6] Memorandum from Marcy M. Forman, Immigr. & Customs Enf't Director of Office of Investigations, "Enforcement Actions at Schools" (Dec. 26, 2007).

[7] *Id.*

[8] *Id.*

[9] Memorandum from John P. Torres & Marcy M. Forman, U.S. Immigr. & Customs Enf't, "Interim Guidance Relating to Officer Procedure Following Enactment of VAWA 2005" (Jan. 22, 2007).

be VAWA petitioners, including at domestic violence shelters, rape crisis centers, family justice centers, and community-based organizations.[10]

33. **2008 Myers Memo.** In 2008, Assistant Secretary of ICE Julie Myers reiterated once again the importance of refraining from enforcement or investigative activities "at or near sensitive community locations such as schools, places of worship, and funerals or other religious ceremonies, except in limited circumstances" (the "2008 Myers Memo).[11] "Precedent for this approach," Assistant Secretary Myers noted, "is clear," citing both the 1993 Puleo and the 2007 Forman Memos.[12]

34. The 2008 Myers Memo emphasized "strik[ing] a balance between our law enforcement responsibilities and the public confidence in the way ICE executes its mission" by ensuring agents' conduct was "safe and respectful of all persons," and that personnel were "cognizant of the impact of their activity . . . and act[ed] with an appropriate level of compassion in light of the location."[13]

35. The 2008 Myers Memo retained the same exceptions and exigencies contemplated by the previous memoranda and stated that the direction of the 1993 Puleo Memo "remains in effect."[14]

36. **2011 Morton Memo.** On October 24, 2011, ICE Director John Morton issued a memorandum (the "2011 Morton Memo") superseding the 1993, 2007, and 2008 memos, again reinforcing that enforcement actions were not to occur at or around sensitive locations, including

---

[10] *Id.* at 3–4. This requirement is based on the fact that VAWA 2005 added INA § 239(e)," which "requires ICE to certify that the agency has independently verified [per the requirements of 8 U.S.C. § 1367 and this memo] the inadmissibility or deportability of a [noncitizen] that was encountered at specific sensitive locations." *Id.*

[11] Memorandum from Julie L. Myers, Assistant Sec'y, U.S. Immigr. & Customs Enf't, "Field Guidance on Enforcement Actions or Investigative Activities At or Near Sensitive Community Locations" 10029.1, at 1 (July 3, 2008).

[12] *Id.*

[13] *Id.* at 1–2.

[14] *Id.* at 2.

schools; houses of worship; hospitals; the sites of funerals, weddings or other public religious ceremonies; and sites of public demonstration, absent prior written approval or limited exigent circumstances (such as terrorism, imminent risk of death, pursuit of a dangerous felon, or an imminent risk of destruction of evidence material to a criminal case).[15] This policy provided detailed guidance to "ensure that ICE agents exercise sound judgment" and "avoid unnecessarily alarming local communities."[16]

37. Under this memo, where ICE agents conduct enforcement actions at or near sensitive locations under extraordinary circumstances, or are led to a sensitive location during the course of an enforcement action, they are required to "conduct themselves as discretely as possible," "make every effort to limit the time at or focused on the sensitive location," "maintain surveillance if no threat to officer safety exists, and immediately consult their supervisor prior to taking other enforcement action(s)."[17] "Extra care," "caution," and "particular care" were advised throughout the memo, especially when dealing with organizations "assisting children, pregnant women, victims of crime or abuse, or individuals with significant mental or physical disabilities."[18] The policy also required employees to receive annual online and in-person training to ensure they were well-versed in enforcement protocol.[19] This memo remained in effect through most of the Obama administration's tenure as well as that of the entire first Trump administration.

---

[15] Memorandum from John T. Morton, Director, U.S. Immigr. & Customs Enf't, "Enforcement Actions at or Focused on Sensitive Locations" 10029.2 (Oct. 24, 2011).
[16] *Id.* at 2. The 2011 Morton Memo did not supersede the 2007 ICE VAWA Memo. *Id.* at 1 n.1.
[17] *Id.* at 3.
[18] *Id.* at 2.
[19] *Id.* at 3.

38. **2013 Aguilar Memo**. In 2013, David Aguilar, CBP Deputy Commissioner, issued a memo similarly limiting CBP operations at or near sensitive locations (the "2013 Aguilar Memo").[20] This memo likewise remained in effect for the remainder of the Obama administration and the entire first Trump administration.

39. **2021 Mayorkas Memo.** In 2021, DHS Secretary Alejandro Mayorkas issued a new memorandum to ICE and CBP, superseding and rescinding the previous 2011 and 2013 agency-specific memoranda (the "2021 Mayorkas Memo").[21] This memo recognized the "fundamental" principle crystallized over thirty years of sensitive locations policies that DHS "should not take an enforcement action in or near a location that would restrain people's access to essential services or engagement in essential activities."[22] Rather, DHS "can accomplish [its] enforcement mission without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more."[23] Adherence to this "foundational principle," Secretary Mayorkas emphasized, "is one bedrock of our stature as public servants."[24]

40. Accordingly, the 2021 Mayorkas Memo makes clear that ICE and CBP agents have the "obligation to refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area."[25] This obligation derives from the human impacts and repercussions indiscriminate enforcement can have in such areas: "[f]or example, if we take an action at an

---

[20] *See* Memorandum from David V. Aguilar, U.S. Customs & Border Prot., "U.S. Customs and Border Protection Enforcement at or Near Certain Community Locations" (Jan. 13, 2013).
[21] Memorandum from Alejandro N. Mayorkas, Sec'y, Dep't of Homeland Sec., "Guidelines for Enforcement Actions in or Near Protected Areas" (Oct. 27, 2021).
[22] *Id.* at 2.
[23] *Id.*
[24] *Id.*
[25] *Id.* at 3.

emergency shelter, it is possible that noncitizens, including children, will be hesitant to visit the shelter and receive needed food and water, urgent medical attention, or other humanitarian care."[26] Accordingly, it is vital to "understand the activities that take place [at a given location], the importance of those activities to the well-being of people and the communities of which they are a part, and the impact an enforcement action would have on people's willingness to be in the protected area and receive or engage in the essential services or activities that occur there."[27]

41. As before, ICE and CBP officers were required to obtain prior approval from agency headquarters for enforcement actions in sensitive locations, except in limited exigent circumstances, which instead required consultation with headquarters following the action. These "limited circumstances" included threats to national and public security, imminent risk of death or physical harm, hot pursuit of a personally observed "border crosser," or imminent risk of destruction of criminal case evidence.[28] And regardless of exception or exigency, "any enforcement action in or near a protected area should be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing the protected area."[29] The 2021 Mayorkas Memo therefore provided substantive and procedural protections for sensitive locations.

**Congress Requires ICE to Report on Enforcement at Sensitive Locations**

42. As part of the 2020 DHS Appropriations Act,[30] Congress recognized that "it is ICE's policy that enforcement actions at or near sensitive locations . . . should generally be avoided," and that this "policy is intended to ensure that anyone seeking to participate in activities or utilize services

---

[26] *Id.*
[27] *Id.* at 2.
[28] *Id.* at 4.
[29] *Id.*
[30] H.R. Rep. No. 116-180 (2020), part of the Fiscal Year 2020 Department of Homeland Security Appropriations Act (P.L. 116-93).

provided at such locations are free to do so without fear or hesitation."[31] Congress directed ICE to provide a public report on enforcement actions taken at sensitive locations for the previous three years.[32] The report was to "include the total number of enforcement actions at sensitive locations, broken down by field office; type of sensitive location; whether prior approval was given; what type of exigent circumstances existed, if any; and the number of non-targeted individuals who were also apprehended."[33] Additionally, the Congressional Committee directed ICE to broaden the scope of the places considered as sensitive locations to include "courthouses; bus stops; USCIS offices; mental health, emergency, and social services centers; and other locations where community impacts should be better balanced against ICE law enforcement requirements."[34]

### DHS Abruptly Reverses Longstanding Policy

43. On January 21, 2025, Fox News reported the not-yet-public rescission of the 2021 Mayorkas Memo.[35] ICE agents who spoke to Fox News expressed that rescinding the memo would "free them up" to conduct more aggressive enforcement operations.[36]

44. Later that day, DHS officially announced the revocation of the 2021 Mayorkas Memo, "to protect Americans" from the alleged "invasion of the US" by "murders [sic] and rapists" who "hide in America's schools and churches to avoid arrest."[37] DHS's statement announcing the

---

[31] *Id.* at 35.

[32] Dep't of Homeland Sec., *Immigration Enforcement at Sensitive Locations, Fiscal Year 2020 Report to Congress* at 1 (April 18, 2022), https://www.dhs.gov/sites/default/files/2022-06/ICE%20-%20Immigration%20Enforcement%20at%20Sensitive%20Locations.pdf.

[33] *Id.*

[34] *Id.*

[35] Adam Shaw & Bill Melugin, *Trump DHS Repeals Key Mayorkas Memo Limiting ICE Agents, Orders Parole Review*, Fox News (Jan. 21, 2025), https://www.foxnews.com/politics/trump-dhs-repeals-key-mayorkas-memo-limiting-ice-agents-orders-review-parole-use.

[36] *Id.*

[37] Dep't of Homeland Sec., *Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole* (Jan. 21, 2025),

reversal provided that past guidelines and guardrails would be removed as to "not tie the hands of law enforcement," and instead, DHS would trust individual agents "to use common sense."[38]

45. **2025 Huffman Memo.** The official memo issued by former Acting DHS Secretary Benjamine Huffman on January 20, 2025 (the "2025 Huffman Memo") is a nine-sentence fiat purporting to eliminate the last three decades of consistent agency action and comprehensive justifications provided throughout the years, including any designation of protected areas, approval requirements and exigent circumstances required for enforcement, and public-interest sensitivities recognized by political appointees of both parties. Effective as of January 20, the 2025 Huffman Memo supersedes and rescinds the 2021 Mayorkas Memo, eschewing "bright line rules" for unfettered discretion "along with a healthy dose of common sense."[39]

46. **2025 Vitello Memo.** On January 31, 2025, former Acting ICE Director Caleb Vitello issued a memo pursuant to Defendants' rescission of protections for sensitive locations, entitled "Common Sense Enforcement Actions in or Near Protected Areas" (the "2025 Vitello Memo").[40] This memo, given the Director's "great faith in the judgment of our law enforcement personnel," charged ICE Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) with determining whether, where, and when to conduct immigration enforcement in or near a protected area.[41]

---

https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-law-enforcement-and-ending-abuse.
[38] *Id.*
[39] Memorandum from Benjamine C. Huffman, Acting Sec'y, Dep't of Homeland Sec., "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025).
[40] Memorandum from Caleb Vitello, Acting Director, U.S. Immigr. & Customs Enf't, "Common Sense Enforcement Actions in or Near Protected Areas" (Jan. 31, 2025).
[41] *Id.* at 2.

47. Through the 2025 Huffman Memo, Defendants have ended protections from immigration enforcement at sensitive locations. Through this rescission of the 2021 Mayorkas Memo and the subsequent 2025 Vitello Memo, Defendants have replaced longstanding, detailed guidelines pertaining to sacred civic spaces with guidance directing agents to "use common sense" when carrying out enforcement actions, including in or near previously protected areas.

### Defendants' Ending of Protections for Sensitive Locations Has Harmed Plaintiffs and Other Protected Areas

48. The announcement of the revocation of the 2021 Mayorkas Memo by the 2025 Huffman Memo has led to widespread fear in communities across the country. Following Defendants' revocation of protections for sensitive locations, many entities such as schools, daycares, medical facilities, foodbanks, community-based organizations, social services agencies, and places of worship serving large immigrant populations witnessed a decline in the number of people attending events and seeking services, which has impaired entities' missions and abilities to provide community care. Teachers reported that attendance rates dropped in half and school administrators saw an influx of parents picking their children up from school in the middle of the day after hearing reports that immigration officials were in the area.[42] Healthcare facilities serving neighborhoods with a high concentration of immigrants are navigating canceled appointments and empty waiting rooms as patients are scared to continue with planned treatments or to seek life-saving medical care—affecting not only patients but the financial viability of healthcare institutions.[43]

---

[42] Jasmine Garsd, *The Prospect of Immigration Agents Entering Schools is Sending Shockwaves Among Communities*, NPR (Feb. 4, 2025), https://www.npr.org/2025/02/04/nx-s1-5277170/schools-ice-immigration.
[43] Eduardo Cuevas, *People are Becoming Wary of Hospitals, Leaving Waiting Rooms Empty and Doctors Concerned*, USA Today (Feb. 7, 2025), https://www.usatoday.com/story/life/health-wellness/2025/02/07/ice-immigration-policy-impacting-hospitals/78299746007/; Eilís O'Neill, *Amid Fears of Deportation, Immigrants are Missing Appointments at Seattle-Area Clinics*, KUOW NPR (Feb. 18, 2025), https://www.kuow.org/stories/fearing-deportation-immigrants-are-missing-appointments-at-seattle-area-clinics.

49. Sensitive locations have also been forced to implement new measures such as providing new trainings and changing their programs and practices to keep their locations safe.[44] The creation of these new policies and plans, along with the time spent reassuring people seeking services and community members, has consumed limited resources.

50. Sensitive locations have also become the target of enforcement actions. For example, days after the recission of the 2021 Mayorkas Memo was announced, ICE officials arrested a man attending a Sunday morning service at his church, Fuente de Vida, in Tucker, Georgia.[45] On April 7, 2025, Homeland Security officials arrived unannounced at two Los Angeles elementary schools requesting to speak with several undocumented students. The officials falsely represented to school officials that they had the consent of the children's parents to do so.[46]

51. Plaintiffs are among the organizations and individuals harmed by Defendants' termination of protections for sensitive locations.

52. **Plaintiff Pineros y Campesinos Unidos del Noroeste ("PCUN")** is the largest farmworker and Latinx organization in Oregon. Founded in the 1980s, PCUN's work is inspired by the "Sí, se puede" ("Yes, we can") spirit of Dolores Huerta and Cesar Chavez. Their mission is to empower farmworkers and working Latinx families in Oregon by building community, increasing Latinx representation in elections, and engaging in policy advocacy on both the national

---

[44] *See e.g.*, Adam Edelman & Daniella Silva, *Public Schools Try to Protect Undocumented Students from Trump Immigration Raids*, NBC News (Jan. 28, 2025), https://www.nbcnews.com/politics/immigration/public-schools-undocumented-students-trump-immigration-raids-rcna189466.

[45] Billal Rahman, *Ice Strikes During Church Service to Arrest Migrant*, Newsweek (Jan. 30, 2025), https://www.newsweek.com/ice-strikes-church-service-migrant-arrested-immigration-2023392.

[46] Billal Rahman, *California Stops Homeland Security Agents Entering Elementary Schools*, Newsweek (Apr. 11, 2025), https://www.newsweek.com/california-agents-elementary-schools-homeland-security-2058493.

and state levels. PCUN is known for its organizing work, outreach, and community events that promote workers' rights, immigrant rights, environmental justice, and gender justice. PCUN has been doing community work for forty years by hosting key events throughout the year and working with other community organizations to provide services and advocacy opportunities for their members and the community at large. Although PCUN's membership is mostly comprised of individual farmworkers—many of whom are noncitizens—its programming also serves Oregon's Latinx community more broadly.

53. The end of protections for sensitive locations has had a widespread impact on PCUN's members. Many of PCUN's members have been placed in an untenable situation where they must choose whether to get necessary medical care, send their children to school, attend church services to practice their religion, or request other social assistance when doing so could subject themselves or their loved ones to immigration enforcement. The members have made this harm known to PCUN, who has received numerous calls and questions during meetings from frightened members since the 2021 Mayorkas Memo was rescinded.

54. For PCUN's members, access to emergency healthcare is very important. Farmworkers have a high rate of lesions and injuries at work, and farm work is among the top ten most dangerous jobs in the country. PCUN's members, most of whom work in this industry, risk their lives every day by working jobs that could permanently injure them, cause long-term illnesses and conditions, or kill them. Since Defendants ended protections for sensitive locations, these workers have been afraid to seek out emergency health services because of the new threat of immigration enforcement. This has dramatic consequences for the workers' health and, if they are severely injured, for their ability to do their jobs and provide for their families. During the past couple of monthly membership meetings, PCUN members have raised concerns about the ending of

protections for sensitive locations. One member, an elderly woman, expressed that if it was not safe to continue to receive care at the hospital, she would reconsider getting care at all.

55. Education is also very important to PCUN's members. Many of PCUN's members are farmworker parents who aspire for their children to obtain the education that they did not have the opportunity to get and want their children to work in something other than the fields, because being a farmworker is a poorly compensated job and is not treated with the respect it deserves. PCUN has already heard from members that they are afraid to send their children to school because of Defendants' ending of protections for sensitive locations. Many farmworkers, particularly women, rely on being able to send their children to school so they can go to work and provide for their families while their children are safe and cared for the day. They now must choose between facing the risk of immigration detention or staying at home with their children and forfeiting their income. This has caused financial harm to PCUN's members and their families. During a recent membership meeting, one member expressed that her children were afraid and reluctant to go to school because they were afraid of ICE showing up and separating their family.

56. The organization itself is likewise impacted. PCUN will soon host its main yearly event on May 1—the May Day rally. But for the first time in decades, PCUN will not be able to guarantee its members' and attendees' safety, having newly become a potential target for ICE enforcement. This significant change for the organization chills participation and limits PCUN's ability to carry out its core programming and its mission of empowering the farmworker community. PCUN is aware that members and communities are afraid to show up to exercise their right to free speech and demonstrate at the May Day rally for fear of an encounter with ICE. PCUN has spoken to union and community members who have expressed that they will not be attending the rally because they do not feel safe, even if they are citizens or have status..

57. Since the 2021 Mayorkas Memo was rescinded, PCUN has had to invest additional resources into increasing security measures for the organization. Now that PCUN's headquarters are no longer considered protected, PCUN has had to make physical modifications to its offices to restrict access so that ICE cannot freely walk into the space and only people with a key code can enter. The new policy has forced PCUN to change the way it functions, from a welcoming, "open door" policy to a restricted space, going against its fundamental values of being an accessible community space. PCUN has had to require additional staff time to discuss and implement secure access policies and trainings, and to consult with attorneys, all things it was not doing before. All this additional investment and effort aims to place PCUN staff in a position where they can react safely and legally to protect themselves and PCUN members in the event of ICE enforcement. For all its membership meetings and events, PCUN is now requiring RSVP-only access and careful vetting of the guest list.

58. PCUN has also had to adjust its core programming as a result of the ending of protections for sensitive locations. They have had to modify existing programming to address new inquiries about the risks of immigration enforcement and whether its members and communities are able to safely access sensitive locations. For example, PCUN has experienced a significant decline in people attending other programs and events, such as the tax clinic PCUN hosts every year. PCUN assists with preparation service to those attending the clinic to help them file their taxes, which is pivotal for economic empowerment and stability for farmworkers. Since members and community are afraid they could be detained, many were discouraged to attend the clinic. Thus, PCUN was unable to serve its mission this tax season.

59. In addition to the changes above, PCUN has been forced to divert their limited staff time to address new community concerns instead of focus on its original yearly plan. For the 2025

legislative session in Oregon, which started on January 21, PCUN had planned to focus on promoting new legislation to create a Farmworker Standards Board. This project is very important for the farmworker community since it would allow farmworkers to advocate and set standards in an official bargaining setting. Instead, PCUN has had to turn staff to lead a campaign to keep schools as safe spaces for their members' children because of the ending of protections for sensitive locations. Initially PCUN had planned to have two or three people working on the legislature conversations for the Farmworker Standards Board, but with the programming adjustment, they can only afford to have one staffer work on them. While as an organization they would like to focus more staff on lobbying in the legislature, safety in schools has become one of PCUN's members' main concerns since January 21, 2025. By not fully advocating for their members in the legislature to advance systemic change, PCUN is harmed and cannot carry out its mission and purpose.

60. **Plaintiff Augustana Lutheran Church ("Augustana")** is a thriving, multicultural, multinational, and welcoming congregation of justice seekers and peacemakers. The staff at Augustana is led by Senior Pastor Rev. Dr. W.J. Mark Knutson ("Pastor Mark") and consists of eight other paid part-time staff members of diverse backgrounds and three paid part-time musicians. Pastor Mark has been Senior Pastor since 1995 and prior to that served as the Churchwide (national) Director of Youth Ministries and Lutheran Youth Organization (LYO) for the 5.3-million-member Evangelical Lutheran Church in America, during which time young leaders from the U.S. engaged in support of youth in Central America. Augustana is called by Christ to its mission of sharing the good news of God's love for all people, which includes welcoming and affirming every person as a creation of God, made in God's image, and celebrating each other's ethnicity, gender, age, culture, and gender expansiveness, and seeing this country's

diversity as a gift. Anyone can walk into Augustana knowing that it is an inclusive place of worship. There are over 850 members in Augustana's congregation, plus many others who simply attend and participate in the church's activities. Congregants are of all backgrounds, including from twenty-three different countries of birth. While Pastor Mark does not ask about the immigration status of his congregants, at least ten congregants have confided their undocumented status to him and undoubtedly many more are at risk of deportation.

61. Augustana's campus in Portland, Oregon is comprised of two buildings: (1) the sanctuary where services are held and (2) the Christian Education Building where educational activities and worship services take place and several nonprofit organizations operate as partners in the Augustana Center for Peace and Justice Collaborative.

62. Augustana accomplishes its mission through weekly church services; pastoral care to congregants and community members; programs born of love for the poor and most vulnerable in society; youth and family ministry and outreach for the community; a solar project to use God's gift of sunshine to restore the natural world for generations to come; Christian education; community outreach; hosting two schools and several non-profits seeking justice and systemic change, i.e., for firearm safety, worker's rights, LGBTQ and women's rights, and holistic well-being for Latino families and underserved communities, among other causes on its campus; serving as the meeting place for Alcoholics Anonymous (AA), Narcotics Anonymous (NA), smokeless mothers, and other support groups; participating in interfaith work; and fostering a place of sanctuary. Pastoral care includes home visits to bring communion and faith counseling to elderly or sick congregants and community members and supporting members of the congregation and the community on their faith journeys.

63. Augustana is a central gathering place for school, music and community events at no cost to its community partners. It is a leading hub of ecumenical and interfaith work for justice and peace with strong ties to the Native American, Muslim, Jewish, Hindu, Buddhist and other communities of faith and people and community institutions of good will, all of whom feel safe because of Augustana's sanctuary status, which is now in jeopardy.

64. To Augustana, providing sanctuary is part of its faith-based mission; it is not a political act. It is about providing a safe place for all—including undocumented immigrants—to breathe and be free. It means that Augustana's entire physical space is sacred, and that Augustana would not allow any violence inside of it, including by ICE. In 2014, Augustana provided sanctuary for over 80 days to an undocumented man who feared deportation—allowing him to sleep under the altar. Whenever there are ICE raids in the community, Augustana lets people know that the church is there to offer sanctuary. In line with its mission, Augustana is prepared to offer sanctuary to those who need it, but with Defendants' rescission of sensitive locations protections, it can no longer provide the same level of safety from ICE enforcement to those in need.

65. Once the 2021 Mayorkas Memo was rescinded, Augustana had to redirect a significant amount of its core work to focus on keeping the church a safe space from the new threat of ICE enforcement. Congregants have always trusted that churches are safe spaces, and Augustana sees it as its duty to maintain that trust and safety even as the rescission of the 2021 Mayorkas Memo makes churches less safe. To Augustana, when its physical sanctuary is no longer guaranteed to be a safe space for all, the church's faith-based mission is in jeopardy. Through Augustana's advocacy, including on gun safety reform, marriage equality, Black Lives Matter, and sanctuary and immigration work, the church has received threats; but Augustana previously felt reassured that if one of these threats materialized or someone broke into the church with a gun, the church

could call upon local law enforcement for assistance and de-escalation. But if federal law enforcement officers can now come to the church without restrictions to apprehend and detain an individual, Augustana doubts that it will be able to call on local law enforcement to intervene and protect those who are present. For decades, Augustana has relied on the sacred status of sanctuary and the assurance of being a sensitive location to carry out its faith-based work. Defendants' end of protections at sensitive locations creates a tremendous amount of fear that the church, its congregants, and its community members are no longer safe.

66. Augustana has dedicated considerable staff time to respond to this change because it must be ready now at any moment for ICE to come through its doors. It has held staff meetings that would ordinarily cover a range of issues that are now focused solely on safety; established safety and security protocols for office staff, church ushers, and church volunteers to follow; revised its system for keeping doors locked and granting access to its buildings; and put up signage to indicate that its buildings are private property, among other measures. These measures in the name of maintaining safety, including to keep doors locked and to put up signage, could be considered intimidating and are in deep tension with Augustana's mission of welcome and appearing welcoming to all newcomers and individuals who may be in need, especially the most vulnerable in our society. Historically, the church has been an open space because it has been a safe space.

67. Augustana has also spent time notifying the entire congregation of these protocols, so all of its members are prepared. The work to train congregants and volunteers is ongoing and takes considerable time. Augustana's staff now field phone calls about whether Augustana remains a place of sanctuary. Augustana also now hosts a "sanctuary Sunday" meeting at least once per month dedicated to learning, training, and education, including to keep the church safe and maintain a sanctuary for all. At the core, this work is motivated by the Biblical practices of love

and compassion and Dr. Martin Luther King's principles of non-violent direct action.[47] This effort in the name of safety impacts Augustana's other critical faith work.

68. In his work week, Pastor Mark is now dedicating substantial time to helping keep the church, its congregants, and the community safe. This effort has become one of the congregation's primary areas of focus, detracting from other parts of Augustana's work as a result. For example, Pastor Mark's pastoral care duties have suffered. Previously, Pastor Mark generally brought communion and spiritual counsel to around forty elderly members' homes on about a bi-monthly basis; one member's home is far away. Now, Pastor Mark's home visits have been cut dramatically. Pastor Mark has not had the time to train additional lay volunteers to meet the need left by the fewer pastoral visits Pastor Mark is able to carry out. Elderly members in need of home visits are therefore going without regular pastoral visits with the holy sacrament of communion and spiritual counsel. Pastor Mark has also not been able to dedicate the time he ordinarily would to youth and family ministry; Christian education, like Bible study; and outreach, stewardship, or spiritual counsel to help congregants deepen their faith journey.

69. Augustana has been outspoken to let the community know that it will not be deterred from following the commitment of its faith to serve as a sanctuary for all in need, particularly individuals in fear of being arrested or deported for simply seeking safety and asylum. While Pastor Mark continues to preach on a range of issues consistent with the Church—for example, compassion, generosity, hope, faith, love for one another, and standing with the poor and most vulnerable—he now finds that in every service he needs to devote some time to Augustana's role as a sanctuary congregation and the safety of its immigrant siblings and measures at large.

---

[47] *See* Martin Luther King Jr., *Stride Toward Freedom*: *The Montgomery Story* 84–86 (1958) (outlining principles of non-violence).

70. The sense of insecurity since the rescission of the 2021 Mayorkas Memo impacts the congregation spiritually. Members of the congregation who fear ICE enforcement and deportation including situations where the deportation could result in their death because they are seeking asylum have expressed worry about coming to the church and how they will be protected at church. At Augustana, the end of sanctuary for immigrants is the end of sanctuary for everyone in the congregation. The people who could be targeted and arrested by ICE and deported back to harm are the church's friends, neighbors, and siblings in Christ. Members of the congregation are on heightened alert and afraid of ICE coming through the doors, whether for themselves or for their fellow parishioners. This type of fear hinders the spiritual growth and healing that Augustana was founded to foster and nurture.

71. As part of Augustana's commitment to serving the most vulnerable, it houses several nonprofits, hosts support groups and large community concerts and events. Being located on a church campus has also historically provided these groups and gatherings with a sense of safety. But now Augustana's ability to serve the most vulnerable is hindered because it is harder for Augustana to guarantee that safe space. For example, one of the nonprofit partners that operates out of its church campus that provides social services, including food equity, to the Latino community has cancelled at least three cooking classes since the termination of protections at churches because people have been afraid to attend.

72. Augustana believes that if it does not stand by its undocumented brothers and sisters, they will be killed after they are deported. It goes against every principle in Augustana's faith tradition to deport people back to their deaths. Augustana's role is to bring people together and protect human life through its sanctuary and ministry, and Defendants' rescission of protections for sensitive locations has put that calling in jeopardy.

73. Founded in 1917, **Plaintiff Our Lady of Guadalupe Parish ("OLG")** is a welcoming Catholic community in San Diego, California for those seeking a personal encounter and relationship with Jesus. As a Catholic parish and church, its mission is to be a place of welcome where people can come together in unity, worship, and outwardly express faith through religious ceremonies. The team at OLG is led by Pastor Scott Santarosa ("Pastor Scott") and consists of four other priests and one deacon.

74. Our Lady of Guadalupe is located less than twenty miles from the U.S.-Mexico border. As the former Mexican national parish of San Diego—and often referred to as the Mexican basilica of San Diego—OLG has a long history and special focus on making immigrants from Mexico, Latin America, and other Spanish-speaking countries feel at home and empowered to work for their own liberation, justice, and dignity. OLG considers itself an immigrant parish, and its parishioners have a wide variety of immigration statuses. All belong at OLG—documented, undocumented, baptized, and unbaptized.

75. OLG also operates a Catholic school called "Our Lady's School." The school is comprised of two campuses: a transitional kindergarten through second grade, which adjoins Our Lady of Guadalupe Church; and third grade through eighth grade, which adjoins a sister church, Our Lady of the Angels. OLG maintains full responsibility for the school. As OLG's single largest annual expense, it is a core part of OLG's mission—it has maintained a school since 1946, and OLG has seen the life-changing effect that Catholic schools can have in the lives of children and families. Our Lady's School has a student body of about 160 children.

76. Since 2023, OLG has also operated a "Migrant Ministry" program, which provides adult male migrants needing shelter a place to sleep and to receive food, water, and access to bathrooms

and showers for up to thirty days, serving as a vital bridge for recently arrived asylum seekers. However, in February 2025, OLG temporarily suspended operation of its migrant shelter.

77. When the rescission of the sensitive locations policy was announced, Pastor Scott felt like the world was falling apart. OLG parishioners and migrant guests in its shelter were shocked and terrified. On February 26, 2025, Pastor Scott published an op-ed in the San Diego Union-Tribune.[48] In that article, he explained that "never in my life has the change of a president had such an immediate effect in my life as this recent one. . . . Recent executive orders that declared churches are no longer exempt from ICE enforcement have left our parishioners and migrant guests in our shelter literally trembling in great fear, questioning whether the place they have considered their second home—our church—is safe for them."[49]

78. OLG regularly holds food sales to help the parish financially. OLG was forced to cancel the first food sale after the announcement of the enforcement policy because people were too afraid to come, resulting in economic loss to the parish and a loss of community.

79. During the first three weeks following the announcement of the new enforcement policy, 80–100% of Pastor Scott's time became occupied by emergency response to the policy instead of carrying out his core religious responsibilities. For Pastor Scott, his new responsibilities imposed by Defendants' rescission of protections for sensitive locations felt like someone came into his office, cleared his desk, and told him that this was now his full-time job.

80. At first, OLG considered whether it should shutter its doors for a time to keep its parishioners safe. However, thousands of people in the San Diego area rely on the church for their

---

[48] Scott Santarosa, *Changes in ICE Enforcement Have My Parishioners Trembling in Fear*, San Diego Union-Tribune (Feb. 26, 2025), https://www.sandiegouniontribune.com/2025/02/26/opinion-changes-in-ice-enforcement-have-my-parishioners-trembling-in-fear/.
[49] *Id.*

spiritual and temporal needs, and OLG determined it could not leave them without support. Instead, the team invested significant resources and time into preparing for ICE raids. Shortly after the rollout of the enforcement policy, the church invited representatives from Alliance San Diego, an immigrant rights group, to provide Know Your Rights presentations and "red cards" for interested community members after Sunday Mass. The first presentation had around 800 attendants. Presentations continued and regularly had hundreds of attendants. As an immigrant parish itself, and with its religious mission to ensure welcome for all, OLG felt these measures were necessary to protect its congregants and community, and to treat them with the dignity Christ would treat them with.

81. OLG also coordinated with California District 80 Assemblymember David Alvarez and California Western School of Law to organize pop-up legal clinics at the church to help parents prepare caregiver affidavits in case they are summarily deported away from their children. The church also established emergency response plans in case of ICE attempts to enter religious meetings, Our Lady's School, or OLG's migrant shelter, which included posting a staff member to monitor the sites at all times to ensure ICE would not enter unannounced and disrupt the children's schooling or threaten their safety. The church also conducted media outreach and created a list of nine media outlets it could contact for immediate journalist deployment and reporting if ICE were to show up.

82. On February 9, 2025, in coordination with the Catholic Diocese of San Diego, the parish held a march to reclaim the Sabbath—for in the words of Pastor Scott, "if ICE can enter our churches on the day of Sabbath, they are no longer places of rest and safety." Between 1,200–1,500 people attended the march from the cathedral to the federal building. Nonetheless, many parishioners also expressed extreme fear about participating in the march for fear of immigration

enforcement in what used to be a protected activity. OLG even seriously weighed the idea of advising undocumented individuals not to attend the march. Many individuals who were heavily involved in planning the march but were personally vulnerable to enforcement did not attend it out of fear.

83. Even now, months later, ensuring his parishioners remain safe and welcome in response to the enforcement policy remains an arduous undertaking, occupying 50–60% of Pastor Scott's time. Every time Pastor Scott or any of the other priests speaks at church, and in every weekly bulletin, they make sure to reiterate that all are welcome and needed notwithstanding the new enforcement policy, and that the church will do everything possible to protect its parishioners in the sacred space.

84. OLG continues outreach to other dioceses, bishops, and communities of faith, and spends enough time organizing with San Diego Organizing Project—a nonpartisan, multi-faith network of twenty-eight congregations representing over 70,000 families in San Diego—to constitute a part-time job. All of this extra work continues to detract from the time the church has to engage in other efforts, such as preparations for Holy Week, for which the church has not been able to adequately prepare.

85. For all of these reasons, Defendants' rescission of sensitive locations protections has resulted in great logistical, financial, and emotional cost to OLG and its parishioners.

86. **Plaintiff San Francisco Interfaith Council ("SFIC")** was founded in 1989 in response to two significant humanitarian crises in San Francisco—an emerging homelessness crisis and an earthquake—that necessitated a unified response from the religious community. SFIC brought people of different faith traditions in San Francisco together to provide humanitarian services to people in need, and to amplify the voices of the faith community to advocate for more support for

these important issues. Still today, SFIC continues to bring its constituents together to celebrate the diversity of San Francisco's religious community; provide services and support to vulnerable populations, including immigrants and people experiencing homelessness; and advocate on civil rights and social justice issues, including immigration.

87. SFIC counts as its constituents 800 religious nonprofit organizations in San Francisco that include congregations, judicatories, educational institutions, and faith-based social services agencies that represent many different faith traditions. SFIC serves as the connection point between its constituents and the City of San Francisco; SFIC's constituents rely on SFIC to represent them both with the city and in broader advocacy. Their constituents turn to them for resources, referral and representation, and SFIC's robust relationships and communications network, which includes an email list of over 5,300 subscribers. All of SFIC's many events throughout the year, including interfaith services, breakfasts, and an Interfaith Winter Shelter for the homeless, are also hosted in collaboration with its organizational constituents.

88. SFIC has a longstanding policy of reserving SFIC Board of Directors seats for representatives of its constituents, and it relies on those directors to help formulate and direct the organization's policies. A portion of SFIC's funding also comes from constituents. The social service agencies that are a part of SFIC's constituency pay an annual fee to provide SFIC with more capacity to serve them, and many other constituents, including large judicatories that represent many parishes, churches, or temples, make annual contributions to the organization as well. SFIC has funding specifically designated for serving its constituents, so its employees are paid to serve them.

89. Historically, and as a practice, SFIC has spoken on behalf of constituents, particularly when they are being harmed by policy changes. For example, during the first Trump administration, the

government threatened to withhold funds from the City and County of San Francisco because of their sanctuary status. The withholding of the funds would have adversely impacted the faith-based social service agencies that are part of SFIC's constituency and provide the safety net for the city's most vulnerable residents, including immigrants. SFIC signed onto amicus briefs in support of the lawsuits filed by the San Francisco City Attorney against the administration for these actions, to lift up the concerns of its constituents.

90. SFIC's constituents are directly and concretely harmed by Defendants' rescission of sensitive locations protections, as many of them serve large immigrant populations by providing religious services and counsel, legal and social services, or rapid response and sanctuary support. Many leaders of constituents have come to SFIC with concerns given the harm they have already experienced.

91. SFIC's constituents that are faith-based social service agencies have experienced a decrease in the number of noncitizens who are willing to seek critical services, including immigration legal services. For example, Catholic Charities of the Archdiocese of San Francisco ("Catholic Charities SF"), an SFIC constituent, provides immigration legal services to noncitizens, either at its office in San Francisco or at local churches, as a core part of its mission rooted in faith traditions of charity and justice to serve the most vulnerable in the community. Catholic Charities SF also holds Know Your Rights presentations for noncitizens and provides legal consultations afterwards. Due to the rescission of the 2021 Mayorkas Memo, Catholic Charities SF has seen fewer people come to seek legal services, attend presentations, or seek consultations after presentations. They are fearful of the increased risk of immigration enforcement either at the Catholic Charities SF office, as a social services organization, or at the churches. Before, Catholic Charities SF provided its legal services at churches following mass or other religious services to

make them easier to access. Now, noncitizens do not feel safe getting the help they need, even at churches. Many do not feel safe anywhere but their own homes. This decline in noncitizens seeking legal services has also had a financial impact on Catholic Charities SF. Fewer people seeking services means fewer people paying the low bono (discounted) fee that the organization charges clients for services, which means less funding for the organization. The impact is so large that Catholic Charities is contemplating cutting the legal services program altogether.

92. In addition, following Defendants' rescission of protections for sensitive locations, one third of Catholic Charities SF's immigration legal services staff members have quit because they themselves are vulnerable to immigration enforcement. The rescission of protections for sensitive locations has directly impacted Catholic Charities' ability to provide services in furtherance of its mission, as well as obstructed its staff's and clients' ability to congregate, associate, and seek resources.

93. In an effort to help the organization's staff and clients feel safer, Catholic Charities SF has spent significant time and resources speaking with clients and staff to provide the most updated information and Know Your Rights materials. The organization has provided internal trainings for its staff and implemented increased security protocols for its office, including buying and installing more security cameras. Tending to these activities, which are not part of Catholic Charities SF's usual work, means their staff have lowered capacity to attend to their core activities.

94. SFIC's constituents that are places of worship have also seen a decrease in immigrants' attendance at their services. Many of SFIC's constituents that are churches or ministries consider welcoming immigrants and other vulnerable populations as part of their religious mission and faith, and Defendants' rescission of sensitive locations protections has impeded that mission. Immigrants are extremely afraid to attend church services or seek out critical resources like food,

housing support, education, and other social services, which interferes with constituents' ability to welcome the community and provide a safe space for all people.

95. For example, as part of its religious mission and faith, Calvary Presbyterian Church (U.S.A.), San Francisco, an SFIC constituent, supports immigrants, refugees, and asylum seekers by accompanying them to court hearings; connecting them to social and legal support services; providing emotional and religious support; and offering events and resources at the church. Because of the rescission of the 2021 Mayorkas Memo, the church has experienced a decrease in the number of immigrants who are willing to come to events, workshops, and gatherings at the church. They are afraid to participate because of the possibility of immigration enforcement at or near the church. This not only interferes with Calvary's ability to carry out its mission and practice its faith, but it also interferes with the ability of its members and congregants to congregate, associate, and freely express themselves and their faith.

96. Another one of SFIC's constituents, a regional religious judicatory governing body that represents multiple individual social ministries, a seminary, and a camp, and congregations that are also constituents of SFIC, observed that their ministries throughout the region have perceived a financial impact from this decreased participation. When fewer people attend services, the churches receive fewer donations and offerings, which directly harms the churches' budgets and financial stability. Additionally, participation in youth and food assistance programs has decreased, suggesting that parents are keeping kids at home and clients staying away. For the regional judicatory, the 2021 Mayorkas Memo created a sense of respect and safety that congregations and ministries could continue to do their core religious work responding to the needs of immigrants and refugees without threat, that places of worship were places of refuge, and that the government understood the faithful actions of religious people in loving and serving their

36

neighbors in need. The rescission of protections for sensitive locations has created an atmosphere of fear and hostility where faith leaders no longer know if their outreach and support of immigrant communities is safe, and they fear being punished for their core religious work and ministry.

97. Many SFIC constituents that are places of worship have therefore spent time, resources, and money to help immigrants feel safer attending events and seeking support in their spaces, including adding signs to designate private or public spaces, or implementing other enhanced security protocol. This detracts from their core activities as religious institutions that are focused on fostering long-term spiritual growth and care. For example, like multiple other constituents, Calvary has provided increased trainings for staff, congregants, and impacted families on what it means for Calvary to be a sanctuary church, and on Know Your Rights around immigration enforcement. Calvary has also established security protocols for staff to follow if immigration agents try to enter the church, and it has a Living Sanctuary Team that stays up to date on changing government policies and connects impacted families with information, resources, and support. This kind of rapid response means Calvary has less time and resources to provide the other religious and support services that are part of its mission.

98. **Plaintiff Westminster Presbyterian Church ("Westminster Presbyterian")** serves as a Presbyterian witness for the community of northwest Gainesville, Florida. It was founded in 1967 following a mission of nurturing, equipping, and sending out disciples to be Christ's ministers of compassion, healing, and peace in their daily lives. Its core principles include following Jesus, being deliberately diverse and inclusive, serving people in need, commitment to changing unfair systems, and working for peace and justice. Providing sanctuary to immigrants is also a core belief of Westminster Presbyterian, as the sanctuary movement has been a longstanding tradition and began, in part, in Presbyterian churches such as Westminster Presbyterian. It believes that people

should feel welcomed and safe no matter their immigration status, and especially if they are undocumented. When the church decided to build a physical structure, it was with the specific intention that the building itself—a dedicated, physical space to gather and worship—would further Westminster Presbyterian's mission by supporting the broader Gainesville community, including undocumented immigrants.

99. Part of Westminster Presbyterian's calling is to stand up for its beliefs, even when that means pushing back against worldly powers. Westminster Presbyterian does not identify as anywhere on the political spectrum, but it follows Jesus's teachings to be good and kind. Westminster Presbyterian has received online threats against its programs before, but now that churches are no longer protected spaces, it fears that this change in policy will embolden private citizens to retaliate further against it for supporting the immigrant community.

100.     Westminster Presbyterian believes that all individuals should be able to access essential spaces, including hospitals and schools. Following its religious beliefs in Jesus Christ, who healed those who came to him, Westminster Presbyterian believes that all individuals should have access to essential medical services that allow them to be healed without fear. Many of Westminster Presbyterian's members and leadership board are retired or current healthcare workers, and they understand firsthand the need for all individuals to have safe and equal access to medical services. Similarly, supporting access to education is also a hallmark of Westminster Presbyterian's Presbyterian tradition of advocating for literacy so that people can read the Bible. Westminster Presbyterian believes that education makes for better people and helps them develop more in the image of God.

101.     Westminster Presbyterian is steadfast in its commitment to using its physical space to further its mission of outreach and ministry. The Westminster Presbyterian congregation has

approximately ninety members, but approximately 700–1,000 people pass through the church campus every week to attend various community events on its premises. These events include Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") meetings, meetings for the adult children of alcoholics, university group meetings, trainings for young people with autism, community identification ("ID") programs, and legal and support services for Gainesville's immigrant community members. Westminster Presbyterian also rents out space and hosts events for immigrant support organizations like the Rural Women's Health Project ("RWHP"). Westminster Presbyterian hosts events that allow all community members to apply for a local form of community identification, as well as know-your-rights workshops and legal clinics for immigrant community members, including clinics that help immigrant community members sign power of attorney documents to protect their children in the event of separation from their parents due to immigration enforcement. Attendance at these events has dropped precipitously since late January 2025. Westminster Presbyterian also supports the National Farm Worker Ministry and has partnered very closely with this ministry in the past, including by inviting speakers to visit its congregation. With the rescission of protections for sensitive locations, this collaboration will likely change, and speakers might not be comfortable going into Westminster Presbyterian's space because they are not safe from immigration enforcement.

102.     Westminster Presbyterian has also served as a sanctuary church. On one occasion, Westminster Presbyterian hosted a young man from the Middle East who had been threatened in his birth country because of his sexuality and was seeking asylum in the United States. Westminster Presbyterian has invested significant time and resources to implement this program, including by preparing a building to be used as a sanctuary space, developing relevant policies, and engaging with interfaith and non-religious partners.

103.     Westminster Presbyterian had for so many years been able to minister effectively and provide services, events, and resources to its community because people were able to go to the church campus without fear. Now, it can no longer promise safety to its community or to the organizations it hosts. In the weeks following the rescission of the 2021 Mayorkas Memo, Westminster Presbyterian has tried keep the church spaces safe and protected by incurring great costs to purchase security cameras and spending hours preparing and attending trainings, meetings, and webinars to understand the legal implications of the new policy. Westminster Presbyterian has also been requiring church members to be onsite for events to ensure that it is present in case an immigration enforcement action occurs. That means that Westminster Presbyterian's members are often working longer days and, for evening events, incurring other costs such as for childcare.

104.     The rescission of sensitive locations protections prevents Westminster Presbyterian from being able to offer community services that it can guarantee are safe for all community members to attend, irrespective of immigration status. Westminster Presbyterian provides programming to welcome and serve the entire community, including immigrant neighbors, and if it can no longer do so safely, its ability to carry out its mission and beliefs is jeopardized. Defendants' rescission of sensitive locations protections is also at odds with Westminster Presbyterian's core beliefs that all individuals should be able to safely access essential services, including healthcare and education.

105.     The rescission of sensitive locations protections has also made it harder for Westminster Presbyterian to minister to its congregants and offer them the support they need. Westminster Presbyterian has members who are healthcare workers, teachers, and individuals who work with farmworkers. For many of them, those positions are not just jobs, but their vocations, which the rescission of the 2021 Mayorkas Memo and the risk of immigration enforcement

threaten to obstruct. When congregants come to the church for counsel, advice, and comfort, Westminster Presbyterian is restricted in offering these services.

106.     Westminster Presbyterian believes that everyone should be able to worship without fear and to access their programs without fear. The rescission of protections for sensitive locations harms individuals in Westminster Presbyterian's community deeply and harms Westminster Presbyterian's ability to serve community members in accordance with the tenets of its faith.

## CLAIMS FOR RELIEF

## COUNT I

**Violation of the First Amendment of the United States Constitution**

**Interference with Freedom of Association and Facially Overbroad**

(For All Plaintiffs Against All Defendants)

107.     Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

108.     The right to expressive association is "implicit in the right to engage in activities protected by the First Amendment." *Roberts v. Jaycees*, 468 U.S. 609, 622 (1984). A group that "engage[s] in some form of expression, whether it is public or private," has a protectable right of expressive association. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

109.     The First Amendment extends to all persons in the United States, not just citizens. *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1064 (9th Cir. 1995).

110.     Plaintiffs and their members engage in protected conduct and expressive association for political, social, economic, educational, religious, and cultural ends. For example, PCUN and its members hold rallies, outreach events, and other programming to organize around social justice issues and support the Oregon Latinx community. Augustana Lutheran Church, Our

Lady of Guadalupe Parish, San Francisco Interfaith Council and its members, and Westminster Presbyterian Church also hold religious ceremonies and services, as well as educational, legal, and cultural events for their diverse communities.

111.    Plaintiffs and their members wish to continue engaging in their First Amendment-protected activities and association to the fullest extent possible, but because of Defendants' conduct, are deterred from doing so.

112.    Defendants' rescission of sensitive locations protections enables immigration enforcement to target sensitive locations and events commonly associated with expression, directly and substantially interfering with the ability of Plaintiffs and their members to associate freely.

113.    Following the rescission of protections for sensitive locations, Defendants have shown that immigration enforcement actions will be carried out to punish individuals at sensitive locations from engaging in expressive activity with which Defendants disagree.[50] The rescission of sensitive locations protections has already led to fear and discouragement of participation in planned protests, events, and activities, as well as religious ceremonies.

114.    Defendants' rescission of sensitive locations protections and adoption of "common sense" enforcement is also facially overbroad because it creates an unacceptable risk of the suppression of ideas. *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 949 (9th Cir. 1997).

115.    Defendants' actions do not serve a compelling governmental interest, nor do they reflect the least restrictive means of engaging in immigration enforcement activities in or near

---

[50] *See, e.g.*, Prem Thakker, *DHS Detains Palestinian Student from Columbia Encampment*, Zeteo (Mar. 9, 2025), https://zeteo.com/p/breaking-dhs-detains-palestinian (indicating arrest occurred at Columbia University housing); Larry Neumeister, *Immigration Officials Arrest Second Person Who Participated in Pro-Palestinian Protests at Columbia*, Associated Press (Mar. 14, 2025), https://apnews.com/article/columbia-university-mahmoud-khalil-ice-arrests-3a8db6e646b786a721089a6f0bc8d9fc ("On Thursday, ICE agents also visited the university-owned residences of two other students at Columbia University, but did not make any arrests.").

protected areas. Indeed, Defendants have carried out their immigration policies for thirty years while protections for sensitive locations were in place; there is no reason Defendants cannot continue to obtain advance approval to conduct immigration enforcement activities near or at sensitive locations absent any exigent circumstances.

116.     Defendants' rescission of protections for sensitive locations chills Plaintiffs' and their members' conduct and ability to associate, causing them significant harm in violation of the First Amendment of the United States Constitution.

117.     Defendants' rescission of protections for sensitive locations also chills the speech of anyone who would otherwise engage in expressive conduct at the protected areas, which are now vulnerable to immigration enforcement.

### COUNT II

**Violation of the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb–2000bb-4**

(For Augustana Lutheran Church, Our Lady of Guadalupe Parish, San Francisco Interfaith Council, and Westminster Presbyterian Church Against All Defendants)

118.     Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

119.     42 U.S.C. § 2000bb protects the free exercise of religion by ensuring that even "neutral" laws that "may burden religious exercise" are prohibited.

120.     The "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

121.    Defendants' rescission of protections for sensitive locations permits ICE and CBP agents to conduct immigration enforcement activity, including arrests, investigations, and surveillance, at and near houses of worship, locations where houses of worship provide community services, and during religious ceremonies.

122.    Such conduct has deterred and will continue to deter membership, attendance, and participation in religious services and related events for all individuals, including lawful permanent residents and U.S. citizens. ICE enforcement will also be likely to disrupt activities and events held by places of worship, including religious ceremonies. The conduct has impacted the free exercise rights of members of the Augustana Lutheran Church; Our Lady of Guadalupe Parish, San Francisco Interfaith Council, and Westminster Presbyterian Church. Plaintiffs' core work of carrying out religious ceremonies and providing pastoral care to parishioners to further their faith has been disrupted by the need to now prioritize maintaining the safety of their sanctuaries.

123.    Defendants' actions do not serve a compelling governmental interest, nor do they reflect the least restrictive means of engaging in immigration enforcement activities in or near protected areas. Indeed, Defendants have enforced their immigration policies for thirty years while protections for sensitive locations were in place; there is no reason Defendants cannot continue to get advance approval to conduct immigration enforcement activities near or at sensitive locations absent any exigent circumstances.

124.    Defendants' actions cause Plaintiffs significant harm, including chilling Plaintiffs' conduct and ability to freely exercise their religions.

125.    Defendants' rescission of protections for sensitive locations thus substantially burdens the exercise of religion in violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(b).

## COUNT III

### Violation of the Administrative Procedure Act – 706(2)(A) Arbitrary and Capricious Agency Action

(For All Plaintiffs Against All Defendants)

126.    Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

127.    The APA requires courts to hold unlawful or set aside agency final action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

128.    Defendants' rescission of the 2021 Mayorkas Memo through the 2025 Huffman Memo constitutes final agency action within the meaning of the APA. 5 U.S.C. § 704. Defendants' nine-sentence rescission provided no explanation for departing from more than thirty years of consistent policies limiting immigration enforcement around sensitive locations. Nor did Defendants' rescission consider the reliance interests of individuals and organizations, including Plaintiffs and their members, who for decades have depended on enforcement limits at sensitive locations to feel safe and secure when accessing essential services at these sites.

129.    The 2025 Huffman Memo is the Defendants' "last word" on immigration enforcement at sensitive locations and activities, and it has the legal effect of denying substantive and procedural protections that were in place for over thirty years, including as provided in the 2021 Mayorkas Memo.

130.    Defendants issued the 2025 Huffman Memo without considering important relevant factors, including the facts and reasoning supporting the 2021 Mayorkas Memo and prior memos or why those past policies were not sufficient; what circumstances necessitated the sudden departure or why the public policy and safety concerns cited by past agency heads no longer

applied; evaluation of alternative approaches; or the impact of conducting immigration enforcement activities near or at sensitive locations on affected stakeholders, including religious organizations, healthcare providers, social services providers, and schools, as well as the people who have come to rely on them.

131.     The 2025 Huffman Memo is also not in accordance with law because it violates First Amendment rights and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* For the reasons above, the 2025 Huffman Memo is also arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law in violation of the APA. 5 U.S.C. § 706(2)(A).

## COUNT IV

### Violation of the Administrative Procedure Act – 706(2)(B)

### Action Contrary to Constitutional Rights

(For All Plaintiffs Against All Defendants)

132.     Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

133.     The APA requires courts to hold unlawful or set aside agency final action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

134.     Defendants' 2025 Huffman Memo, which rescinds and supersedes the 2021 Mayorkas Memo, constitutes final agency action within the meaning of the APA. 5 U.S.C. § 704.

135.     Defendants rescinded the 2021 Mayorkas Memo and issued the 2025 Huffman Memo, which interferes with and chills individuals' rights to free speech, freedom of association, and free exercise of religion. As alleged above, the conduct has impacted these First Amendment rights of Plaintiffs and/or their members.

136.     The 2025 Huffman Memo violates the First Amendment and is thus "contrary to constitutional right, power, privilege, or immunity" in violation of the APA, 5 U.S.C. § 706(2)(B).

## PRAYER FOR RELIEF

Plaintiffs pray for the following relief:

137.     An order declaring Defendants' rescission of protections for sensitive locations unconstitutional, void, and of no effect;

138.     An order declaring that the 2025 Huffman Memo is unlawful because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

139.     An order declaring that Defendants' rescission of protections for sensitive locations violates the Religious Freedom Restoration Act.

140.     An order vacating the 2025 Huffman Memo in its entirety;

141.     An order enjoining Defendants from taking any immigration enforcement actions that are not authorized in accordance with the 2021 Mayorkas Memo;

142.     An order awarding Plaintiffs costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable statute or regulation; and

143.     An order granting such further relief as the Court deems just, equitable, and proper.

///

//

/

Dated: April 28, 2025

Respectfully submitted,

*/s/  Stephen W Manning*

ESTHER H SUNG, Cal. No. 255962*
esther.sung@justiceactioncenter.org
KAREN C TUMLIN, Cal. No. 234961*
karen.tumlin@justisceactioncenter.org
HILLARY LI, Ga. No. 898375*
hillary.li@justiceactioncenter.org
LAURA FLORES-PERILLA, Cal No.
355645*
laura.flores-perilla@justiceactioncenter.org
BRANDON GALLI-GRAVES, Tx No.
24132050*
brandon.galli-graves@justiceactioncenter.org
JUSTICE ACTION CENTER
PO Box 27280
Los Angeles, CA 90027
Telephone: +1 323-450-7272

STEPHEN W MANNING, OSB No. 013373
stephen@innovationlawlab.org,
smanning@ilgrp.com
TESS HELLGREN, OSB No. 191622
tess@innovationlawlab.org
RACHEL LANDRY, Mass. No. 713320*
rachel@innovationlawlab.org
NELLY GARCIA ORJUELA, OSB No. 223308
nelly@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

Attorneys for Plaintiffs
*Pro hac vice applications forthcoming*