1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLORADO

3    Civil Action No. 25-cv-474-DDD

4    DENVER PUBLIC SCHOOLS,

5          Plaintiff,

6          vs.

7    KRISTI NOEM et al.,

8          Defendants.

9    ----------------------------------------------------------------

10                   REPORTER'S TRANSCRIPT

11                     Hearing on TRO

12   ----------------------------------------------------------------

13          Proceedings before the HONORABLE DANIEL D. DOMENICO,
     Judge, United States District Court for the District of
14   Colorado, commencing on the 7th day of March, 2025, in Courtroom
     A1002, United States Courthouse, Denver, Colorado.

15

16                        APPEARANCES
     For the Plaintiff:
17   CLAIR E. MUELLER, STEPHEN A. SNOW, TESS HAND-BENDER, EMILY L.
     WASSERMAN, BROOKE M. ROGERS, HANNAH McCRORY, and NICHOLAS
18   MOSKEVICH, Davis Graham & Stubbs LLP, 3400 Walnut Street, Suite
     700, Denver, CO 80205

19

20
     For the Defendants:
21   KEVIN T. TRASKOS, THOMAS A. ISLER, KATHERINE A. ROSS, and
     NICHOLAS A. DEUSCHLE, United States Attorney's Office, 1801
22   California Street, Suite 1600, Denver, CO 80202

23

24
     Reported by KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room
25   A259, Denver, CO 80294, (303)335-2358

         Proceedings reported by mechanical stenography; transcription
                      produced via computer.

**Exhibit 6**

                    25-cv-474-DDD    Hearing on TRO    03-07-2025

 1                    P R O C E E D I N G S

 2      (Proceedings commenced at 2:03 p.m.)

 3              THE COURT:  We are here for a hearing on the

 4      plaintiff's preliminary injunction -- a motion for a preliminary

 5      injunction in case 25-cv-474, Denver Public Schools versus Noem

 6      et al.  I'm going to begin by asking counsel to introduce

 7      yourselves for the record, and then we can discuss logistics,

 8      and then get going.  For the plaintiff?

 9              MS. MUELLER:  Good afternoon, Your Honor.  Claire

10      Mueller for the plaintiff.  With me here at counsel table is

11      Emily Wasserman; Brooke Rogers; Tess Hand-Bender; Stephen Snow;

12      our client, Aaron Thompson, general counsel of DPS; and two

13      additional attorneys, Nicholas Moskevich and Hannah McCrory.

14              THE COURT:  Thank you.  Welcome.  For the defendants?

15              MR. TRASKOS:  Your Honor, Kevin Traskos for the

16      defendants.  With me is Thomas Isler, Nicholas Deuschle, and

17      Katherine Ross.

18              THE COURT:  Thank you all for being here.  So, first

19      of all, I will just let you know my plan for today as we

20      indicated in the order setting this hearing is to give each side

21      30 minutes for essentially oral argument.  I have reviewed all

22      of the briefing and all of the declarations that have been filed

23      by both -- well, actually, the declarations only on behalf of

24      the plaintiffs.  So, you don't need to go back over all of that,

25      obviously.  Just highlight those things.

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1    The reason I decided, after initially thinking I

2    wouldn't, that we should have a hearing is because I do have a

3    few questions for each side that I hope to get some

4    clarification on today.  So, this process will be sort of you to

5    get up, I will try to give you a chance to say what you want to

6    say, highlight the things you want to say, but also I will be

7    interrupting you and asking questions.

8        The plaintiffs can reserve some amount of their time

9    for rebuttal.  I will ask Ms. Guerra to give you a five-minute

10    warning, but if you want to reserve time, that's kind of up to

11    you to keep track of it.  The other thing, I do think I will try

12    to rule from the bench today.  So, that was another reason to

13    have the hearing.  I will probably take a short recess after the

14    hour of discussion, go back, make sure I feel comfortable with

15    the ruling, and then come back and do that from the bench.

16        So, that's my plan for today.  With that, for the

17    plaintiff?

18        MS. MUELLER:  Good afternoon, Your Honor.  And thank

19    you for hearing us today.  May it please the Court, for more

20    than 30 years, schools have been classified as protected areas

21    when it comes to immigration enforcement activities.  A

22    classification that's based on a recognition that as a society,

23    we value schools, education, and protecting our children.  As

24    crystalized in the 2021 iteration of that policy, to the fullest

25    extent possible, defendants should not take an enforcement

**Exhibit 6**

25-cv-474-DDD     Hearing on TRO     03-07-2025

 1   action in or near a location that would restrain people's access

 2   to essential services because of the resultant negative impacts.

 3           This is a, quote, fundamental principle that under the

 4   2021 policy was safeguarded by DHS's allowance of enforcement

 5   actions at schools only in limited circumstances.  For decades,

 6   school districts such as DPS and their communities of students

 7   and families have relied on those protections.

 8           In January of this year, defendants rescinded the

 9   thoroughly reasoned 2021 policy and replaced it with the 2025

10   policy.  That policy is arbitrary and capricious, something

11   defendants do not dispute.  It does away with 30 years of

12   protections without any reasoning, relevant data, acknowledgment

13   of past reliance, and without consideration of whether its goals

14   could have been accomplished within the then existing policy.

15           The 2025 policy is guided by nothing more than

16   directions for defendants and their component agencies to use,

17   quote, common sense.  The uncertainty of that guidance has

18   caused actual demonstratable harms to DPS.  As such, DPS has

19   brought an APA challenge to the 2025 policy.  In the meantime,

20   DPS seeks a preliminary injunction requiring defendants to

21   return to the status quo under the 2021 policy until the merits

22   of defendant's arbitrary and capricious actions can be ruled

23   upon by this Court.  Because DPS has standing under Article III

24   and has established its right to judicial review under the APA,

25   DPS asks that you enter the requested injunction.

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

```
 1          Unless Your Honor would like to begin somewhere else, I
 2     plan to begin with the threshold issue of standing, which --
 3          THE COURT:  Yeah.  Let me just get a couple of bits of
 4     clarification out of the way first before we dive into some of
 5     the deep legal questions.  Number one, this is just a challenge
 6     under the APA; right?  There's no challenge of allegation of a
 7     violation of the immigration statutes or any other statute.  No
 8     constitutional claims here; right?
 9          MS. MUELLER:  No constitutional claims, and just an
10     APA.
11          THE COURT:  And for purposes of today, at least, of
12     the injunction, you no longer are pressing your FOIA claim; is
13     that right?
14          MS. MUELLER:  That's correct, Your Honor.
15          THE COURT:  All right.  And then so somewhat more
16     difficult question, but really a key question for me is what do
17     you view as the actual legal difference between the 21 -- 2021
18     policy and the current 2025 policy?  Because I understand there
19     is a lot of confusion and uncertainty, but I am concerned with
20     the actual legal differences.  So, if you could highlight for me
21     what you think is actually legally different between life under
22     the 2021 memo and today, I think that's where I'd like to start.
23          MS. MUELLER:  Of course, Your Honor.  So, the 2021
24     memo policy allowed, we admit, obviously, enforcement actions at
25     schools or near schools in certain circumstances, but those
```

**Exhibit 6**

25-cv-474-DDD     Hearing on TRO     03-07-2025

1  circumstances were enumerated and quite limited.  Exigent

2  circumstances were one, of course.  But other actions required

3  prior approval from ICE or agency headquarters before

4  implementing those actions, and those sorts of guardrails were

5  what gave DPS the ability to assure its students that at least

6  to an -- to a certain extent enforcement actions would not be

7  happening in schools.

8          And by that I mean routine immigration sweeps, for

9  example, would not be occurring at school under -- on a off or

10  regular basis.  And it is the removal of those guidelines, ones

11  that DPS has relied on for years, that is causing the harm.

12  Now, under the 2025 policy, all that's required is that agents,

13  maybe lieutenant level -- there might be some approval maybe

14  required at a lieutenant level, but it's --

15          THE COURT:  I mean, to me, the approval is actually

16  clearer -- who has to make the approval is actually clearer in

17  the current Vitello memo than under the 2021, which just said,

18  if you want to do something else, you have to get prior approval

19  from agency headquarters or as you otherwise delegate, and the

20  current policy has actual -- says who should make these

21  decisions.  Why is that a big, significant --

22          MS. MUELLER:  Maybe the rank of who is giving the

23  approval is not the cause of the harm, but I think what is more

24  of the issue is that under the 2021 policy, when considering

25  whether or not to give that approval, the 2021 policy was very

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1  clear about what to consider, including those -- that

2  fundamental principle that we don't want to interrupt essential

3  services, we don't want to interfere with people's rights to

4  access those essential services or to participate in essential

5  activities.  And it was an enumerated list of these are the

6  circumstances when immigration priorities might overweigh --

7  outweigh those more societal interests.

8      But here, there's no information, no guidance, no

9  understanding, and no clarity about what these supervisors would

10  be considering when they make these decisions.  So, the

11  consideration -- the approval was enumerated and clear under the

12  2021 policy, and now we are left to the whim of a lieutenant who

13  decides that under his common sense approach to immigration

14  action, a raid of the school makes sense.

15      THE COURT:  But the prior policy, the '21 policy

16  actually says both as to what constitutes a protected area,

17  which I think under the current memo is very similar, at least,

18  but that list is not complete, and you have to use judgment.

19  When it describes these factors that you should consider or

20  reasons when a immigration action in one of those areas might be

21  appropriate, the 2021 memo says this list is not complete.  It

22  includes only examples.  Here again, the exercise of judgment is

23  required.  So, it's not really as definitive as you're making it

24  out to be by its terms.  Perhaps it was implemented in a way

25  that was more definitive.  Is that the argument?

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1          MS. MUELLER:  That is a part of the argument, for

2    sure, because, you know, under the 2021 policy, DPS was able to

3    rely on these guardrails and was able to provide some amount of

4    assurance to its families that only under those circumstances

5    should they be concerned; right?  Here, DPS is not able to do

6    that.  And more so, as demonstrated in the declarations that we

7    have submitted, people recognize a difference.  Students are

8    afraid to come to school.  Parents are afraid to send their kids

9    to school.  There are multiple false reports of ICE actions at

10   schools, something that never happened under the 2021 policy.

11          THE COURT:  Let me -- I do want to get into that, but

12   I just -- I want to get us back to the actual legal differences,

13   because as you acknowledge, those are false rumors or false --

14   false statements that there are going to be raids.  And there

15   haven't been any actual raids, at least your client's -- or

16   actions, I should say, on any of your client's schools or in

17   anything that would be covered by near a school as far as you

18   have provided me; is that right?

19          MS. MUELLER:  The nearness, I would maybe dispute.

20   The February 5th raid that occurred at the Cedar Run apartments

21   was within one to two miles of, I believe four to five different

22   schools.  A DPS bus stop was blocked by prison buses.

23          THE COURT:  So, let me -- all right.  We are getting

24   off track from where either one of us wanted to go, which is

25   fine.  Which is fine.  But let me ask you about that.  So, is

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   your position that if I had issued this injunction earlier, that
2   that would have been prohibited, that raid at Cedar Run would
3   have violated an injunction if I had imposed it before then?
4          MS. MUELLER:  Not necessarily.  I think it would
5   depend on the circumstances.  As you -- as you point out, there
6   was -- there was some level of discretion, obviously, under even
7   the 2021 policy.  But what I think is the issue, you know, DPS
8   is not saying this immigration action is okay, and this one
9   isn't.  We're not asking for the Government to change its
10  immigration enforcement priorities.  We're not saying arrest
11  fewer people or arrest more people.  All the harm that DPS has
12  incurred has become specifically from the lack of reasoning and
13  the uncertainty that has resolved -- has resulted from the
14  enactment of the 2025 policy without any insight into what the
15  agency was thinking or, you know, any accounting for the fact
16  that for 30 years or more, schools like DPS have relied on the
17  fact that they are a protected space.
18          And I understand the 2025 memo has a footnote that
19  mentions schools are still protected, but under the memo, that
20  feels like a very empty designation.  It doesn't occur -- it's
21  not clear that there's any real protection in the sort of
22  guided, principled, reasoned way that the 2021 policy provided.
23          THE COURT:  Well, I understand that.  And I do want to
24  let you talk about standing, and this will maybe give you an
25  opening to do that, but isn't your sort of inability to tell me

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   clearly, yes, that raid at an apartment complex violates an

2   injunction that you enforce, doesn't that kind of highlight that

3   we don't really know what a lot of this confusion and harm is

4   coming from?  There are a lot of changes going on, obviously, in

5   regards to immigration enforcement.  There are people rightfully

6   afraid and nervous about how this might affect them, but very

7   little of that is actually based on the change between the

8   '21 -- 2021 memo and the 2025 memo.

9        How do I distinguish between just generalized fear that

10  a lot more enforcement is going to go on, or enforcement at say

11  an apartment complex that gets in the way or that scares people,

12  that wouldn't be prohibited, perhaps, versus what would be

13  prohibited?  And so just the fact that people are nervous about

14  increased enforcement doesn't answer the question I have to

15  answer, which is how much of that harm that you allege has been

16  caused to your client is actually caused by the differences

17  between these two memos versus all the other things that are

18  going on?

19        MS. MUELLER:  Yeah.  I would respond in two ways.

20  First, I would point this Court to the district of Maryland's

21  recent ruling in the *Yearly Meeting* case, which obviously

22  interpreted this same policy or, you know, granted an injunction

23  in that case for specific religious groups.  And there, the

24  Court said, yes, there -- you know, there is an argument that

25  some people are generally concerned about enforcement actions,

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1    but the evidence in that case, as is in this case, demonstrates

2    that it is traceable.  There are people who are specifically

3    saying, things have changed.  I used to feel comfortable sending

4    my kids to school.  I do not anymore, and the only thing that's

5    changed is the difference in the policy.

6         And when we're talking about traceabilities and

7    causation in this context, when it depends in a way on

8    third-party decision-making, all the Supreme Court requires is

9    that the actions of those third parties be predictable -- a

10   predictable reaction to government action; right?  And in that

11   sense, I would point the Court to the -- excuse me -- the

12   *Department of Commerce* case, where in that case the secretary

13   wanted to add a question to the census about citizenship.  There

14   it was future harm that was alleged.  It was states and

15   districts alleging that people would be afraid to answer that

16   question.  Therefore they would have undercounted populations,

17   and therefore they wouldn't get as much federal funding; right?

18   All future harm.

19        But even there, the Court said that's sufficient,

20   because it's a predictable result of this citizenship question

21   that people who are concerned about their legal status won't

22   answer that question.  That's predictable.  And here is the same

23   and more, because we have actual evidence that it has already

24   happened.  People are already having those predictable

25   reactions.

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1          And secondly, I think it's hard to -- I would encourage

2     this Court to view the evidence not in a vacuum, but in the

3     context of the defendant's own statements.  The policy -- the

4     first indication that they had rescinded the 2021 policy was a

5     press statement from the Department of Homeland Security which

6     said essentially, no longer will criminals, including murderers

7     and rapists, be allowed to hide in schools; right?  We have

8     multimillion ad campaigns being pushed out by defendants saying,

9     if you don't leave, we will find you, and we will deport you.

10          THE COURT:  Right.  But nothing I do will change any

11    of that; right?  They can still do all that.

12          MS. MUELLER:  Of course.

13          THE COURT:  And even if I agree with you completely,

14    they can still do all that.  They can just have -- whoever they

15    delegate the decision-making to under the 2021 memo can say,

16    yup, go ahead and do everything, I agree completely; right?  I

17    mean, under the 2021 memo, the decision maker could do all those

18    things and approve everything you're afraid of; right?

19          MS. MUELLER:  I suppose in principle, but in practice,

20    it didn't happen, and I think that's the difference.

21          THE COURT:  Well, it didn't happen, but the decision

22    makers are different now; right?  And I mean, in some ways, the

23    decision maker under the new policy is more likely to be a

24    career agent, and less likely to be a political appointee, would

25    seem potentially, at least, to be neutral or favorable, I guess.

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1    MS. MUELLER:  I think when we talk about who is making

2  the -- again, maybe I shouldn't have relied on who is making the

3  decision.  I think what's missing in the 2025 policy that

4  existed in the 2021 policy is this, quote, fundamental principle

5  that to the fullest extent possible, immigration action --

6  enforcement actions must -- should be avoided; right?  And that

7  sort of -- I don't want to use guarantee, but that provision,

8  that policy, that principle was at the core of the 2021 policy,

9  and the decades of its iterations in the past.

10      And here, that has been completely removed.  There is

11  no -- there is no similar recognition of the desire to avoid

12  actions at schools.  And now, it's been blown open, the

13  possibilities.  And that is -- I mean, again, DPS is not

14  saying -- it's not asking for a ruling on the merits of that

15  policy decision.  It is just saying the uncertainty that has

16  been created is what is now causing harm to DPS, because it's

17  interfering with our abilities to educate children.  It's

18  forcing us to react to missing children.

19      Are they here because -- are they gone because they're

20  sick?  Are they gone because they've been deported?  DPS has an

21  obligation to follow up on those things, and not just

22  new-to-country students are impacted by this.  When DPS is

23  sending community resources officers to, you know, check out the

24  raid that's happening down the streets, students with normal

25  preexisting hurdles are not being serviced.  And so it's that

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   sort of interference with the core function of education, which

2   was able to exist without these distractions under the 2021

3   policy.

4           THE COURT:  Look, I get it.  My mom was a public

5   schoolteacher, taught English as a second language to a lot of

6   immigrant families.  It is a hard thing to do to run a school

7   district, to run a school.  But again, and I want to go back and

8   try to get you to tell me whether you really think I would be

9   effectively enjoining the action at a place like the Cedar Run

10  apartments, I think it is, that -- because that to me is -- as

11  you just pointed out, there's a lot going on.  People's families

12  are being -- their apartment complexes are being surrounded, as

13  you've alleged, by immigration enforcement officers.  But if

14  that's not prohibited by this injunction, then I'm not doing

15  anything to redress that harm.

16          And so again, I'm trying to go back to not just -- I

17  think you've -- there's plenty of evidence here that DPS is

18  having to incur all of those expenses in terms of time and

19  effort and potentially money that you've addressed.  What I'm

20  having trouble is tracing that to the precise issue we're

21  addressing here, rather than more aggressive enforcement in

22  general, because that's going to still exist.  You're going

23  to -- your client is going to have to do all of those things

24  anyway; right?  Unless -- I mean, I guess, as the defense points

25  out, taken literally, basically the whole city is a protected

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1  area, because everything is near a school, if a mile is close

2  enough or within -- is near a bus stop for sure, because there's

3  hundreds of those.

4        So, if -- I mean, I guess if that's the case, then

5  maybe we would be doing something.  But I guess I'm having

6  trouble seeing if all these other things are going to be going

7  on, how saying, yeah, you gotta go back to this particular

8  bureaucratic process is going to solve any of those problems for

9  you.

10       MS. MUELLER:  I just think it would, because it did in

11  the past.  I mean, when -- when -- under the -- let me be clear,

12  DPS obviously is not asking for this Court to enjoin a

13  particular, you know, enforcement actions, necessarily.  We're

14  asking just for a return to the status quo until we can figure

15  out what the reasoning was behind this 2025 policy.

16       THE COURT:  While you bring up the status quo, do you

17  dispute that this is a disfavored injunction?  I mean, the

18  status quo today is that the 2025 memo is in place; right?

19       MS. MUELLER:  I believe as the Tenth Circuit has

20  defined it, the status quo is the last uncontested time.  So,

21  yes.  And I would -- we do dispute that this would be a

22  disfavored under the status quo element, as well as I think

23  defendants argue that we would be asking for all relief we could

24  eventually get at trial, which we dispute as well.  We are

25  asking here for a temporary injunction to return to the status

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   quo while we determine the merits.  At the end of the case, you

2   know, we would be seeking an order to set aside the policy as

3   arbitrary and capricious.

4        But this is a temporary sort of pause.  I would also

5   note that under section 705, I believe of the APA, the Court is

6   entitled to delay the effective date of a new policy.  So, we

7   would be welcome to a remedy under that section as well that

8   would postpone the effective date of the 2025 policy pending

9   judicial review.

10        So, now I forgot what your question was.

11        THE COURT:  I think you actually did a pretty good job

12   of answering it nonetheless, but let me give you two other

13   things to consider responding to.  Number one is the 2021 memo,

14   all these memos explicitly tell everyone at the end that this

15   guidance is not intended to, does not, and may not be relied

16   upon to create any right or benefit, substantive or procedural,

17   enforceable at law by any party in any administrative civil or

18   criminal matter.

19        Why is that -- why does that not apply?

20        MS. MUELLER:  I think, for that point, I would turn

21   the Court to the *Department of Homeland Security* -- sorry.  The

22   *Regents of the University* -- the *DACA* case; right?  They are on

23   pages 30 to 31.  The Court discusses these disclaimers and says

24   that they are pertinent in considering the strength of reliance

25   interests, but not as a sort of bar to review in the first

Kevin P. Carlin, RMR, CRR

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1    instance.  In fact, they say that the strength or not of those

2    reliance interests is something the agency itself needs to

3    consider when it promulgates new --

4          THE COURT:  Then why don't you explain why you think

5    this is a final action, because it doesn't seem at all like the

6    *DACA* action.  It doesn't seem at all like the *Waters of the*

7    *United States* jurisdictional determination which creates a

8    binding -- at least temporarily binding decision.  It really --

9    the safe harbor cases that you cited, this doesn't seem to

10   create any safe harbor for anyone.  It just creates kind of an

11   explanation of how, as you said, decision makers should factor

12   various things into their decision, which is not in my view

13   typically viewed as a final agency action.

14         MS. MUELLER:  No.  So, final agency action is -- you

15   know, I think we should remind the Court that it's a pragmatic

16   and flexible standard, and it's one that can encompass into

17   non-legislative rules like the one we have here.  The standards

18   there are a consummation of decision-making process and, you

19   know, legal consequences flowing therefrom.

20         Defendants don't dispute that this was a consummation

21   of a decision-making process.  They only say that there are no

22   legal consequences.  But in that regard, DPS would argue that

23   legal consequences can bind both the agency and others; right?

24         And here, I would point to the *Bennett* case, which sets

25   up that standard.  There, the Court notes that when an action

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   changes the legal regime under which an agency acts, that can

2   create legal consequences.  Here, we have a change to the legal

3   regime of how agencies decide to or not enforce immigration

4   actions.  They once were bound by clear guardrails and clear

5   considerations and a clear statement of avoiding these things at

6   all costs, whereas now it's unbridled and unclear and unguided.

7          And just because it's unguided doesn't mean it's

8   binding.  It's just as binding as the 2021 policy.  So, we would

9   say that legal consequences flow because the agency itself is

10  bound by this action.

11         And I agree that the safe harbor cases were distinctive

12  in a way, but in practicality, the 2021 policy and the decades

13  of the protected area policy did create a safe harbor of sorts.

14  Not statutorily, I suppose, but in practice, and one that DPS

15  has relied on for decades.

16         Because by, you know, private -- by providing these

17  like sort of predictable guidelines that governed enforcement

18  actions, parties like DPS were able to rely on it as a norm or a

19  safe harbor by which to shape their actions.  And, you know, a

20  defendant -- there are Courts who recognize the practical

21  consequences.  Not necessarily just legal -- you know, legal

22  consequences under statute necessarily, but the practical

23  effects.  The practical effects under this pragmatic approach

24  can be considered, and we would urge the Court to consider them

25  here, because it -- it has had, as you note, Your Honor, serious

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   and demonstratable practical effects on DPS and its mission.

2          So, I guess that is -- that is why I would say it's a

3   final agency action.  To say that, you know, a policy that's

4   been in place for 30 years is not fight -- the rescindment of

5   that longstanding policy is not final, I don't know.  Just urges

6   some sort of form over substance, I suppose.  And I am close to

7   wanting to reserve my time for rebuttal.

8          THE COURT:  Let me just give you -- if you want to

9   take a minute of it to overcome my extreme reluctance to

10  consider a nationwide injunction.  I have been -- tried in my

11  time on the bench to be as careful as possible about only

12  issuing injunctions that serve the actual purpose of a

13  preliminary injunction in particular as meant to preserve the

14  status quo between the parties until we can resolve an issue on

15  the merits.  A nationwide injunction seems to go well beyond

16  that.

17         I do want to just give you a moment, if you want, to

18  try to convince me.  I mean, I know everybody has kind of

19  switched sides on nationwide injunctions and their propriety in

20  the last few weeks, but I'm trying to be consistent.

21         MS. MUELLER:  Yeah.  I think we would state that it's

22  actually hard to imagine that schools across the country aren't

23  in the same position.  You know, they -- you have the broad

24  discretion to craft those remedies, and it's appropriate here

25  when it would sort of create inequitable treatment as to other

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   districts if Denver is protected, but for example Aurora, who is

2   sometimes literally across the street, does not have the same

3   protection, then that sort of inequitable result is what urges a

4   nationwide injunction, because the harms are similar across the

5   board.

6           THE COURT:  All right.  Thank you.  I will let you

7   reserve the rest of your time.

8           MS. MUELLER:  Thank you, Your Honor.

9           THE COURT:  Mr. Traskos?

10          MR. TRASKOS:  Your Honor, I have a preliminary

11  question.  We had hoped to, to the extent possible, divide

12  arguments on standing and the APA between myself and Mr. Isler.

13  Would the Court have any objection to doing that?

14          THE COURT:  No.  We can try that.  Go ahead.

15          MR. TRASKOS:  Okay.  Thank you, Your Honor.  Counsel.

16  The change in guidance at issue in this case implicates three

17  different areas where Courts have recognized that judicial

18  review is restricted.  It involves internal guidance directed to

19  executive branch employees, not external rules imposing duties

20  on the public.  It involves law enforcement discretion about how

21  to enforce federal law.  It involves immigration enforcement,

22  which implicates not only law enforcement, but foreign policy

23  objectives.  And in this context, we don't think that DPS has

24  met its heavy burden for an injunction.

25          THE COURT:  So, all of those things I agree with you

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   are areas where Courts have been particularly reluctant, but I

2   think you would agree none of those are bright lines that would

3   say you can't issue an injunction ever if it touches on one or

4   more of those areas.

5        MR. TRASKOS:  I agree that not touching on those

6   issues is not enough, but I do think that the principles that

7   apply in some specific contexts do restrict judicial review

8   here.  And I will start with the first prong, cognizable injury,

9   and the Supreme Court's decision in *U.S. versus Texas*, because I

10  think that it shows that DPS does not have any legally

11  cognizable injury.  And that case, like this one, involved 2021

12  guidelines by DHS.  The states argued that those guidelines had

13  adverse effects on them, and the Court didn't really dispute the

14  adverse effects, but what it said is that those states lacked a

15  legally cognizable injury.

16       And it acknowledged in footnote two that the target of

17  enforcement may have a cognizable injury and enforcement, but it

18  held that other parties can't claim cognizable injury.  And it

19  relied on its decision in *Linda RS* that a private citizen lacks

20  a judicially cognizable interest in the prosecution or

21  non-prosecution of another.  And the Court relied on several --

22  explained it had several good reasons for reaching this

23  conclusion, not just one.  It noted the Article Two problems

24  raised by judicial review of the guidelines.  It noted the

25  longstanding principle of enforcement discretion.  It explained

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1    that this principle extends to the immigration context, which

2    implicates not just law enforcement, but foreign policy

3    objectives.  It observed the executive branch in devising

4    immigration enforcement has to take into account public safety

5    and public welfare needs.

6            THE COURT:  Sorry to interrupt you.  Isn't plaintiff

7    right that that decision is really focused on an effort to

8    demand additional enforcement, and the Court was pretty focused

9    on how that sort of a request to get the Government to do more

10   to prosecute someone else is basically unprecedented?  Isn't

11   that what the Court said in that case?

12           MR. TRASKOS:  I think that's the Court's holding.  I

13   don't think that's a fair characterization of the Court's logic.

14   And it indicated in several different ways that its logic was

15   not just about that particular claim.  It said that it wasn't

16   really about this nonenforcement decisions when it relied on

17   *Linda RS*, which is about the prosecution or non-prosecution of

18   another.  It explained that that holding applies to the

19   executive branch's exercise of enforcement discretion over

20   whether to arrest or prosecute, not just one -- it's not the

21   outcome.  It's the nature of the decision.

22           And to point out that the plaintiffs have a heavy

23   burden to show injury when it results from the regulation or

24   lack of regulation of someone else.  So, I don't think it's

25   simply focused on the nonenforcement decision.  And I think that

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   the Court in *Philadelphia Yearly* read that case too narrowly.

2   It said that -- in *Philadelphia Yearly*, the Court there pointed

3   out that someone -- when there's an arrest, there actually may

4   be enforcement that's subject to challenge.  And it relied on

5   footnote two of the *Texas* case, but that footnote, as I

6   mentioned, really points out that the object of the

7   enforcement -- the person facing arrest may have a cognizable

8   injury.

9          The rest of the decision relies on broader principles

10  saying that others can't decide to challenge that enforcement

11  discretion, and it's -- general discussion of immigration

12  enforcement discretion is not really limited to principles that

13  are specific to arrest.  It covers essentially the broader

14  Article Two powers of the Government in making enforcement --

15  what it described as enforcement choices in this area.

16         And I think that that logic extends more broadly than

17  just to the particular claim that was asserted in that case.  I

18  think if it had been the opposite claim, the Court would have

19  found -- and the Court lists a bunch of exceptions to the rule

20  in the *Texas* case, but none of them suggest that this particular

21  decision here, the guidance would have been covered.

22         We would say even aside from the *Texas* decision, DPS

23  can't show injury to itself as an organization based on reduced

24  attendance, for a few reasons.  One defect with this attendance

25  theory is that the harm that it claims is not direct.  In

**Exhibit 6**

25-cv-474-DDD     Hearing on TRO     03-07-2025

1    *Hippocratic Medicine*, the Supreme Court approved standing under

2    the *Havens Realty* test, where it's a defendant's conduct

3    directly affected and interfered with the plaintiff's core

4    business activities.  In that case, the defendant directly lied

5    to the plaintiff's employees.

6         And here I think it's clear that the theory is

7    indirect.  It's that the threat of enforcement raises concerns

8    in third parties, which then harms DPS's function of teaching

9    them.  And I think that's an indirect theory rather than the

10   direct theory in *Havens Realty*.

11        And I think there's also a separate issue, which is

12   that there are lots of special standing rules that govern

13   parties that seek to challenge a threat of future enforcement.

14   Plaintiff has to show that the injury is imminent, certainly

15   pending, concrete.  And the Supreme Court in *Clapper* rejected an

16   argument that the party challenging potential enforcement can

17   rely on an injury that's the product --

18             THE COURT REPORTER:  Counsel, you're losing me.

19             MR. TRASKOS:  The Supreme Court in *Clapper* rejected an

20   argument that the party challenging potential enforcement could

21   rely on a product of the fears of that enforcement.  And here I

22   think the injury again relies on a product of the fears.  DPS is

23   taking a noncognizable injury, which is the fears of enforcement

24   of third parties, and then saying that as an organization,

25   because it's -- has downstream effects from those fears, it is

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1  then again a cognizable injury.  And I think that logic sort of

2  disregards *Clapper*.

3        THE COURT:  Why isn't the census case a good analogy?

4        MR. TRASKOS:  So, I think there are two reasons.  One

5  is I think the census case is a little different, because that

6  is not a claim challenging the threat of potential enforcement.

7  It's a claim that -- the actual substantive claim in that case

8  is challenging the citizenship question which was going to be

9  sent to people.  So, I think that that sort of claim is

10  different, and I think it's also important to look at the more

11  recent description of that case from the *Murthy versus Missouri*

12  case, in footnote I think seven or eight of that case.

13        The *Murthy* case talks about that analysis in explaining

14  why that same analysis doesn't apply.  What it points out is

15  that -- really it's talking about it on the causation prong, but

16  it says that in *Department of Commerce* there was a trial that

17  pinpointed that that specific question being issued would

18  actually cause the harm.  And that's different from in the

19  *Murthy* case, they said if you have more murky evidence -- and

20  "murky" was the sort of phrase that *Murthy* used -- that you may

21  not reach the same results.  So, it suggested that the

22  Department of Commerce -- I mean, you still can consider it, but

23  I think it has to be particularly strong evidence to get past

24  the *Murthy* standard.

25        It dealt with that I think in particular in dealing

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   with traceability, but I guess I just want to make sort of one

2   more point on the injury point, which is that I think that the

3   Court in *Hippocratic Medicine* pretty flatly stated that it was

4   incorrect that an organization can show an injury to itself

5   based on the decision to divert resources.  And the division

6   here is DPS's decision.  It's -- the 2025 guidance is internal,

7   and it doesn't direct schools to conform their conduct in any

8   way.

9           I'm going to turn to causation and traceability.  And

10  one point on causation and traceability is that under

11  *Hippocratic Medicine*, some theories of traceability and

12  causation, even if the causal chain could be established, are

13  simply too sweeping.  What the Court pointed out there is that

14  if the FDA approves a drug, that might in fact affect doctors

15  downstream, but the Court said that that causal chain is just

16  too sweeping for it to accept.  And it indicated that many

17  professions are affected by government decisions, and as a

18  specific example it highlighted that teachers might try to sue

19  to challenge lax immigration policies that they claimed led to

20  overcrowded classrooms.

21          And the Court made clear that that kind of theory would

22  have been too sweeping, even if there was an actual causal

23  chain.  And so that example highlights that -- I mean, a few

24  years ago, if a school district had challenged the 2021 guidance

25  saying that it was affecting their classrooms, the Court would

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1  have rejected that causal chain, and the same logic and result

2  here should apply to DPS's theory.  So, even if there is a

3  causal chain, it's too sweeping and limitless under *Hippocratic*

4  *Medicine*.

5        But I think even if the Court focuses just on whether

6  the causal chain works, I think that the Supreme Court clarified

7  in *Haaland versus Brackeen* that the injury has to be traceable

8  to the defendant's unlawful conduct.  And the Court explained in

9  *Murthy* in footnote eight that it's not enough if it's murky.

10  And here -- and I guess one other point is that in *Clapper*, it

11  made clear that the third party's fear of enforcement can

12  disrupt the causal chain.

13        So, in *Clapper*, in footnote seven, the plaintiffs

14  argued that a cause of their injury was that the Government

15  surveillance was causing third parties not to speak with them,

16  and the Court in footnote seven rejected that, saying even if

17  that wasn't conjecture, essentially even if the causal chain

18  worked, the injury was still not traceable to the surveillance,

19  because it was based on third-party subjective fear of

20  surveillance.  And so again, here, the causal chain goes through

21  the subjective concerns of third parties.

22        And I think as the Court alluded to, there's a lot of

23  factors here.  There's a national increase in immigration

24  enforcement.  There are government statements that are separate

25  from the guidance itself.  There's recent immigration

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   enforcement that did not actually occur in a school.  There's

2   false reports of immigration enforcement at schools.  And I

3   think that that type of the -- many different factors separate

4   this case from the situation in the *Department of Commerce*.

5            THE COURT:  Let me just get you to respond to the sort

6   of argument that was highlighted today about that the actual

7   harm that DPS is complaining of comes less from sort of the

8   specific process and more from the removal of kind of clear

9   guidelines from the 2021 memo about when enforcement might

10  occur.  Why is that not sufficient?

11           MR. TRASKOS:  I think that given the number of other

12  factors here, and given that as the Court noted, that it's not

13  even clear that the particular enforcement action that happened,

14  that the apartment complex couldn't have happened otherwise

15  under the 2021 guidance, it's hard to trace that and pinpoint it

16  as coming from the changing guidance as opposed to all the other

17  factors.

18           THE COURT:  Okay.

19           MR. TRASKOS:  On the last point on redressability on

20  standing, one of the things that the Court highlighted in

21  *Brackeen* is that the Court has to examine whether it can give

22  the plaintiff a legally enforceable protection from the harm.

23  And the harm -- any order the Court issued here would be limited

24  in several ways in terms of what it could do for DPS.  Because

25  of 1252(f)(1), it couldn't, I think, bar arrests at schools

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   under 1226 or 1231.  Reinstating the 2021 guidance wouldn't stop

2   ICE enforcement out in the community.  It would not prevent

3   false reports.  It would not provide any absolute guarantee

4   against immigration enforcement at schools, which was never

5   prohibited under the 2021 guidance.

6            And even if the Court ordered DHS not to rely on the

7   2025 guidance, that doesn't mean that it would be ordering it to

8   follow the 2021 guidance.  An order that directed it to follow

9   the 2021 guidance would essentially be taking internal guidance

10  and elevating it to a court order.

11           Restoring the guidance essentially wouldn't give DPS

12  any enforceable rights, since it never actually originally had

13  the right to require DHS to adhere to that guidance.  So, with

14  all of these limits, any order wouldn't clearly give DPS some

15  legally enforceable protection from the harms that it claims.

16           It might have public impact, but the Court in *Brackeen*

17  made clear that just sort of the impact of the Court's decision

18  is not enough.  It has to be that the Court's order itself is

19  going to provide the legally enforceable protection from the

20  harm.  And I think the Court in *Philadelphia Yearly* didn't look

21  at that requirement at all in reaching the conclusion.  So, here

22  the Court would need to consider those limitations in deciding

23  whether it was actually really giving DPS a legally enforceable

24  right.

25           THE COURT:  Do we know of any instances where

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   someone -- a school or anyone else under the prior policy was

2   able to use that -- the 2021 memo or policy, whatever we want to

3   call it, in court as a legally enforceable right?

4           MR. TRASKOS:  I'm not aware of any.

5           THE COURT:  Okay.  Thank you.

6           MR. TRASKOS:  I will leave my time to Mr. Isler.

7   Thank you.  I apologize.

8           THE COURT:  Mr. Isler?

9           MR. ISLER:  Good afternoon, Your Honor.

10          THE COURT:  Good afternoon.

11          MR. ISLER:  I'd like to make just a few points with

12  the APA.  And it may make sense to start at final agency action

13  because of the discussion that you had with counsel earlier.

14  One point I would like to make on that is DPS has made the

15  argument that practical effects can lead to finality, but that

16  is not the test that the Supreme Court repeatedly has gone back

17  to.

18          And in fact, the case that DPS relies on, that *CSI

19  Aviation Services* case from the DC Circuit actually had pretty

20  clear legal consequences.  What happened in that case was the

21  Department of Transportation told CSI Aviation that they were in

22  violation of a statute, but if they ceased and desisted from

23  that conduct, that the DOT would refrain from taking an

24  enforcement action.

25          So, that's a pretty clear example of legal consequences

Kevin P. Carlin, RMR, CRR

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1    flowing from agency action.  It doesn't stand for the

2    preposition that just practical effects are enough to satisfy

3    the final agency action test under the Supreme Court cases.

4            The other cases that DPS rely on also have those

5    outward-facing legal consequences.  So, for instance, in the

6    *Texas versus EEOC* case from the Fifth Circuit, that guidance was

7    not just an internal guidance to its own -- to the agency's own

8    employees, but it was explicitly designed for employers to rely

9    on it and individuals who were potentially subject to illegal

10   hiring or promotion practices to rely on that guidance.

11           And that manual -- also, the Supreme Court -- the Fifth

12   Circuit pointed out that it left no room for the agency

13   employees to avoid certain decisions, and -- with respect to

14   certain types of employment problems.  It committed the agency,

15   in other words, to a specific approach, and that is what's

16   missing in this case.

17           THE COURT:  How so?  I mean, I think their argument is

18   that that's exactly what this does -- the 2021 did.  The 2025,

19   maybe their argument is, doesn't do that.

20           MR. ISLER:  The 2021 memo was not categorical, as you

21   pointed out.  I mean, it did have language suggesting that there

22   was a reluctance to do these enforcement actions, but it always

23   left open the possibility that there was room for the exercise

24   of discretion.  And it did include a list of some limited

25   circumstances, but that list was not exclusive.  And it again

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   gave advice to the law enforcement officers that they needed to

2   exercise their discretion.

3           So, absent exigent circumstances, those employees could

4   under the fact -- specific facts of an individual case, could

5   get approval from either headquarters or whoever else was

6   designated to give that supervisory approval, to go ahead and

7   make -- get those approvals for an individual enforcement

8   action.

9           One of the other cases that DPS relies on is the *Cohen*

10  case out of the DC Circuit.  A panel opinion, that panel opinion

11  was vacated to the extent that it was -- to the extent it

12  reversed or remanded the appellant's APA claim.  But even if

13  *Cohen* was still good law, it's distinguishable in the same way

14  as the *Texas versus EEOC* case, because the IRS declared that it

15  was going to follow the holdings of five circuit courts that

16  concluded how taxes should be collected with respect to certain

17  long distance telephone calls.  And the -- that had legal

18  consequences for both the people who collected the taxes and the

19  people who owed those taxes.

20          So, it was -- what we have in this case is you have an

21  internal memo that is not designed to go to outside parties.  It

22  is not directing outside parties' behavior.  It is not telling

23  them that if they meet certain criteria, they will then be

24  protected like you would in a safe harbor from certain

25  enforcement actions.

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

 1          You don't have the -- in the memo, it is not limiting
 2   the statutory right.  It's not interpreting the extent of the
 3   statutory authority for the agencies.  It is -- it is really
 4   just giving the guidance to its own individual employees.  And
 5   so that is -- makes it a different kind of -- different kind of
 6   advice when an agency is just giving its approach -- its
 7   preferred approach to its law enforcement agents.  That is what
 8   would not constitute the final agency action, because you don't
 9   have legal consequences flowing from that -- from that approach.
10          THE COURT:  Well, what if -- I mean, legal
11   consequences in some sense is kind of circular.  If I say it's
12   enforceable, then it has a legal consequence; right?  But if --
13   so, I guess my question is if -- what if the 2021 memo just said
14   we're never going to have immigration enforcement officers on
15   school grounds?  So, it's just nice and clear, then DPS could
16   have no question.  They're never going to have to worry about
17   ICE officers coming onto their grounds.  Would that still --
18   would your analysis still apply to that because it's just
19   internal?  You know, it's not directed at them.  It's directed
20   at ICE officers, but would that still not have legal
21   consequences?
22          MR. ISLER:  I don't think that it necessarily would
23   have legal consequences if it is just a memo coming down to law
24   enforcement officers.  If, say, that was elevated to the status
25   of a regulation that really had the force of law, then I think

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   that might be a different situation.  But I think, again, if

2   what the Courts do in these situations is they look at the

3   language of the guidance or the manuals or the notices, and

4   they -- they conduct an analysis of what would -- you know, is

5   the agency intending to have third parties rely on this

6   conduct -- rely on this advice?

7           And so I think that an internal memo that just said our

8   approach is going to be not to go into schools, I don't think

9   that that would still -- that would have the force and effect of

10  law.  And so I don't think that would necessarily on its own

11  just be a final agency action.

12          THE COURT:  Okay.

13          MR. ISLER:  One other point I'd like to address is

14  just on the -- one other issue related to the APA of committed

15  to agency discretion, and I'd like to focus a little bit on the

16  *Heckler v. Chaney* case, because what happened in *Heckler*, that

17  was the case about the FDA choosing not to commence an

18  enforcement action.  And what *Heckler* did was it drew a

19  distinction between those internal decisions of the agency, and

20  it made a contrast with that and actions that had a direct

21  concrete legal effect that could become a focus for judicial

22  review.

23          And so yes, the *Heckler* case did arise in a

24  nonenforcement context, but as Mr. Traskos said, the reasoning

25  of the Court was not so limited.  The Court said that the reason

Kevin P. Carlin, RMR, CRR

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   that the decision in *Heckler* was unsuitable for judicial review

2   was because it involved enforcement decisions that involved a

3   complicated balancing of a number of factors that were within

4   the agency's expertise.  And it specifically mentioned how

5   agency resources were spent, whether the agency felt it was

6   likely to succeed if it acted in a certain way, whether

7   enforcement best fit the agency's overall policies or advanced

8   its current priorities.  And the decisions for those reasons --

9   that decision was traditionally -- was found to be traditionally

10  admitted to the agency's discretion.

11          THE COURT:  Why wouldn't that mean that the *DACA*

12  decision -- shouldn't the *DACA* decision have come out the other

13  way, if that's the rule?

14          MR. ISLER:  So, the *DACA* decision actually ducked that

15  argument by the Government.  The Supreme Court said that it

16  didn't need to address that, because what was happening in

17  *Regents* was not just a nonenforcement case.  What happened in

18  *DACA* was that there was a program that had been developed, and

19  the USCIS was directed to receive applications.  I think it

20  was -- the number that was in the Supreme Court is from 700,000

21  people that they standardized a review process for that program,

22  and as a result of that, individuals were able to access

23  benefits.

24          So, the *Regents* case was not just about an internal

25  decision like what was being described in *Heckler*.  And what is

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1    present in the 2021 and 2025 --

2        THE COURT:  So, your view is that's kind of a

3    combination of the both internal policy governing your own

4    employees' assessment of things argument that we were just

5    talking about, coupled with this other issue regarding agency

6    discretion?  Because aren't we talking about the same basic

7    issues that are committed to the agency to ICE and to Department

8    of Homeland Security in both cases?

9        MR. ISLER:  That's right.  The *DACA* program was

10   directed to people outside the agency.  I mean, it was a program

11   for them to apply and potentially receive these benefits.  That

12   makes a stark contrast with the memos here, just about

13   expressing this is going to be our approach to immigration

14   enforcement.

15       One factual point I would like to make on that is if

16   you trace the policy back from 1993 through 2025, the policy is

17   actually not the same.  So, it's not quite accurate to say that

18   this policy has been in place for 30 years.  Originally, it was

19   limited only to apprehension of aliens in the 1993 memo.

20   Different people could give different supervisory approval as

21   you chase those memos through time.  And so, you know, that's

22   one other factor for the Court to consider when it's talking

23   about the reliance interests of DPS.

24       So, the other cases that DPS relies on for the agency

25   discretion is that the *Department of Commerce* case -- that --

**Exhibit 6**

25-cv-474-DDD     Hearing on TRO     03-07-2025

1   what happened there was the Supreme Court actually identified a

2   history of Courts making decisions about census-related

3   decision-making.  And then it also looked at the Census Act

4   itself and found that in the statute, the -- that in the statute

5   itself, the statute provided a meaningful standard by which the

6   Court could review the census question.

7          It said that the Census Act actually created a duty to

8   accurately and fairly account for the representation rights that

9   depend on census apportionment, and so the decision to reinstate

10  the citizenship question could be reviewed under that standard.

11         They also point to the *Weyerhaeuser versus U.S. Fish*

12  *and Wildlife Services* case from 2018 of the Supreme Court.

13  There you had the Endangered Species Act, which itself contained

14  factors that the secretary was supposed to consider in

15  designating land a critical habitat or not.  So, the statute

16  itself provided a guideline.  And what we don't have in this

17  case is the meaningful standard that comes from congress to show

18  that this is the -- that this kind of decision was meant to be

19  constrained.

20         What the guidance memos don't do is share those

21  characteristics of the *Weyerhaeuser* and the *Department of*

22  *Commerce* cases.  There's no legally binding definitive

23  adjudication of a plaintiff's rights.  The guidance was not

24  presented as a playbook for other parties outside of the agency

25  to adjust their conduct.  It didn't commit the agency or

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   prohibit the agency from taking a specific illegal approach in a
2   particular case.  It did not withdraw all employee discretion.
3   And so when you do not have that meaningful standard provided in
4   the statute, then those are the situations where the Supreme
5   Court and other Courts have recognized that those kinds of
6   decisions are meant to be left to the agency's discretion.
7        THE COURT:  I guess I'm not entirely sure how to apply
8   those cases here.  I mean, DPS is not arguing that substantively
9   your clients couldn't do essentially what they've done here.
10  They're making a pure kind of process argument about failing to
11  comply with the steps required under the APA.  So, it's not so
12  much that they're saying you didn't live up to some standard
13  under the immigration code.  So, I'm not totally sure how to
14  apply those cases to this kind of a challenge.
15       MR. ISLER:  That's right.  Courts have struggled with
16  that.  What the Courts have done, even in APA cases, is said
17  that the reference for the meaningful standard still has to come
18  from the statute that the -- that the enforcement action was
19  authorized under.  I can see if I have a --
20       THE COURTROOM DEPUTY:  Counsel, five-minute warning.
21       MR. ISLER:  Okay.  Thank you.  So, there still needs
22  to be that reference to what can it be reasonably assumed that
23  congress intended to do?  And because there is -- there is no
24  guidance from congress incabining the law enforcement
25  discretion -- I mean, those are the very cases in which the

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   agency has rein to come up with its own preferences for its

2   approach to the statutory powers that it enjoys.

3           THE COURT:  Say I disagree with you.  What do you

4   think would be required to survive the arbitrary and capricious

5   standard?  What -- for this sort of a policy, what kind of thing

6   would you have to show was undertaken to make this kind of

7   change?

8           MR. ISLER:  Right.  So, the clarification that we got

9   and what we see in the complaint is that the arbitrary and

10  capricious claim here is about what reasons were provided for

11  the decision, not necessarily that the 2025 guidance itself is

12  arbitrary and capricious.  DPS is not clear exactly what the

13  standards should be.  They cite to a lot of cases that are about

14  formal rulemaking, or they are formal opinion letters that are

15  different in kind from the memos that we are talking about.

16          If you look at the *FCC versus Fox Television Stations*

17  case that is cited in some of the papers, I think what the

18  standard would be would be a rational explanation that the

19  agency's path -- that the decision should be upheld if the path

20  is reasonably discerned, and that the agency doesn't have to

21  demonstrate that one approach is -- the new approach is better

22  than the old one, just that it's permissible under the statute,

23  and there are good reasons for it.

24          I mean, normally, this kind of decision would be made

25  on the full administrative record, which we don't have at this

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   moment.  But I think you can see that under that approach, there

2   are reasons given for the change.  Basically, both in the

3   Huffman Memo and the Vitello Memo, you see the agency saying,

4   you know, the work that our employees do involves the balancing

5   of difficult interests all the time, and so we don't think that

6   we need bright line rules in order for the employees to exercise

7   their discretion.

8          I mean, the 2025 policy does not in its terms jettison

9   the interests or say the new decision-making will not take into

10  account the kinds of interests that were applicable before.

11  What it says is that we don't think it's necessary for us to

12  create bright line rules, and so we are going to rely on the

13  expertise the -- the experience of our agents to carry out this

14  work in protected areas, which the ICE memo -- the Vitello Memo

15  still recognizes schools as protected areas.

16         So, I think that if you were to look at that rational

17  standard, that's what -- I think that it has been met in this

18  case.

19         THE COURT:  And is the position of the Government that

20  the current memo requires at least some level of approval of

21  actions in protected places, particularly schools here, about

22  when to conduct an action?  That it's not just whenever a

23  particular officer feels it's appropriate?  Is that right?

24         MR. ISLER:  So, according to the memos, that is

25  correct with respect to ICE.  There are different components of

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1    DHS here.  CPB [sic] did not issue its separate memo like the

2    Vitello Memo.  The supervisory approval requirement is in the

3    ICE memo.  But by way of example, I mean, the enforcement action

4    that happened at the Cedar Run apartment complex, that was run

5    by ICE, so that kind of decision would have been subject to the

6    2025 supervisory approval.

7            THE COURT:  Do you think that the Cedar Run action

8    would have violated an injunction of this type had it been in

9    place at the time?

10           MR. ISLER:  I think it's very difficult to say,

11   because of the discretion that's built into these memos -- if

12   you look at the 2021 memo, that says on itself -- on its face,

13   we are not defining what near a protected area means.  It sort

14   of depends on a lot of different factors, whether it's visible

15   from the location or not.  I think that if you're talking about

16   an apartment building that's more than half a mile from a

17   school, that -- you know, I think that probably would not have

18   been affected by an injunction here, because it was not in the

19   protected area.

20           The 2021 memo does have language about bus stops, but

21   of course DPS bus stops are not DPS property.  They're not

22   marked as bus stops.  And so I think that becomes a very tricky

23   element of defining what would be enjoined specifically, and

24   how -- and how the agency would be able to respect that when

25   you're talking about protected areas that don't have markers.

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1          THE COURT:  All right.  Thank you.  Your time is up.

2          MR. ISLER:  Thank you.

3          THE COURT:  Ms. Mueller?

4          MS. MUELLER:  I trust Ms. Rogers will tell me when to

5     stop talking.

6          THE COURT:  I will tell you.

7          MS. MUELLER:  Perfect.  Even better.  Okay.

8     Defendants touched on many things.  I think I will start with

9     some standing arguments.  As the Court noted, I don't think *U.S.*

10    *v. Texas* is applicable here for the reasons you note.  It's a

11    nonenforcement policy and was specifically decided based on sort

12    of that nonenforcement and lack of any coercive action --

13         THE COURT:  Isn't the principle -- well, two questions

14    about that case.  Isn't the harm very similar to the harm you're

15    alleging here, that we have to do things we couldn't do, we

16    spent time and money and effort on things that are -- we

17    shouldn't have to do if the Government was following the law?

18    Isn't that harm basically very analogous?

19         MS. MUELLER:  Potentially, I suppose, but I don't -- I

20    don't think the harm was the concern there.  As defendants

21    noted, I don't think the Court questions the harm in and of

22    itself.  I think the reasoning there was based on the judiciary

23    being unable to tell the executive to arrest more people as a

24    baseline.  That was the decision there.

25         And so I just don't think it's applicable, because

Kevin P. Carlin, RMR, CRR

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   that's not what we're asking here.  As for other standing issues

2   that defendants raised, they talked about *Clapper* and future

3   harm being insufficient, but *Clapper* of course was quite

4   distinctive from what we have here.  There were, I believe at

5   least five steps in what the Court called a speculative chain of

6   possibilities that would lead to any harm, and it was only

7   future harm identified there.  Of course here, DPS has

8   established that harm has already occurred.

9            THE COURT:  Well, but it's -- but there is some

10  similarity, because as we've talked about, the harm caused is

11  not clearly directly related to the changes that you're asking

12  me to undo.  I mean, in your own complaint, you attached a

13  document that shows that a -- that has, I don't know, four pages

14  of enforcement actions that took place in protected areas

15  under -- over a couple of years under the previous memo.

16           So, it's not true, as some of the declarations state,

17  that there was a guarantee that this could never happen.  I read

18  the Chicago article -- the article about the action in Chicago,

19  the school administrator says explicitly, we have training about

20  precisely how to handle these situations, which suggests that

21  everyone kind of knew that it's possible that this could happen,

22  even under the prior memo.

23           So, isn't it -- isn't it hard for me to say, yes, all

24  of this will go away if I only issue this injunction, or even

25  any of it will go away?  We can't say -- none of us here have

**Exhibit 6**

25-cv-474-DDD     Hearing on TRO     03-07-2025

1    been able to say whether I would have stopped the Cedar Run

2    action, which is the only thing that's been pointed to that's an

3    actual nonspeculative activity, and then we're speculating about

4    whether that would be even covered.  So, I can't -- I couldn't

5    give anybody the certainty that you're asking for.

6         MS. MUELLER:  Well, I think -- I do think *Clapper* is

7    quite different, because again, it's future.  Here we already

8    have actual harm that has happened, and we do have traceability.

9    We have people saying this is exactly why I'm not sending my

10   kids to school, and *Yearly Meeting* found that to be sufficient.

11        THE COURT:  See, I'm not sure I see a lot of that.  I

12   see people saying I'm scared to send my kids to school.  I agree

13   with that.  But I don't see a lot of them saying, because I'm

14   afraid they're going to be swept up at school by ICE.  What I

15   see is people concerned that while their kids are at school, the

16   parents might be separated from them, something like Cedar Run

17   might happen.  I don't really see too many people saying, my

18   kids are going to be, like, legitimate with fears that my kids

19   are going to be detained while at school.

20        And if they do, isn't that just the kind of speculative

21   fear of future activity that *Clapper* and a long line of cases

22   say is not sufficient?

23        MS. MUELLER:  I think we do have evidence of people

24   specifically saying -- I believe it's in Mr. Meyer's

25   declaration, parents saying my children have legal status, and

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1  yet I'm afraid to send them to school because of this policy.  I
2  don't think you're going to be able to establish it; right?
3  There are people -- specifically Ms. Shaler attested that the
4  drop in attendance -- from her understanding, you know, the
5  significant drop in attendance is directly related to the 2025
6  policy.  And again, those sorts of harms and the fears that
7  people are having, they're legitimate, especially in the context
8  of what this administration and defendants are saying they're
9  going to do.
10         So, I think there's nothing speculative about the harm
11  here, not speculative enough that should warrant, you know, a
12  denial of the injunction.  *Clapper* involved, you know,
13  surveillance of international people, foreign individuals, and
14  to establish harm to the plaintiffs, it would have required
15  showing that, one, the Government decided to surveil those
16  particular people, that they would do so under the actual
17  challenged law as opposed to a different mechanism, that the
18  judge -- because there was some level with judicial review,
19  would approve that warrant, that the Government would succeed in
20  those interceptions, and that plaintiffs would be the ones on
21  the other end of the line at the time.  So, that's the sort of
22  like speculative harm that's not allowed, that I don't think
23  applies here.
24         And knowing that my time is running short, I do also
25  want to address the organizational standing argument that

Kevin P. Carlin, RMR, CRR

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   defendants made.  Under sort of a constellation of *Hippocratic*

2   *Medicine* and *Arizona Alliance* and *Havens*, I understand

3   defendants to say a diversion of resources is not enough, but

4   that's not all that's happening here.  And *Havens* here is

5   instructive.  I believe counsel said that the harm there was

6   because defendants had directly lied to employees of the agency,

7   but the -- what the Court really found was that as an effect of

8   defendants lying to individuals and doing this sort of racial

9   steering away from certain apartment complexes, that directly

10  interfered with the core function of the organization, which was

11  to provide counseling and referral services.  I believe that's

12  analogous to what is happening here at DPS.

13          Counsel also mentioned a hypothetical that is talked

14  about in the *Hippocratic Medicine* case, where they -- the Court

15  says teachers in border states could sue to challenge allegedly

16  lax immigration policies.  That hypothetical, I don't think this

17  Court should put much credence in.  It's a hypothetical,

18  obviously, and it was raised in the context of the Court saying

19  what plaintiffs are asking us to do here is to create a new type

20  of standing, a doctor standing.

21          THE COURTROOM DEPUTY:  Counsel, five-minute warning.

22          MS. MUELLER:  Thank you.  So, I think that

23  hypothetical is not any indication that standing doesn't exist

24  in a case like this.  And in fact, again, I would point to

25  *Yearly Meeting* where that Court found the standing was

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1  established.

2           THE COURT:  I mean, isn't it significant that that's a

3  RFRA case that involves harms to a congregation's religious

4  activities as opposed to what we have here?

5           MS. MUELLER:  I don't think so.  I don't read *Yearly*

6  *Meeting* that standing only applies because you're churches.  The

7  harms there were quite similar.  It was a decrease in attendance

8  which led to some funding issues, led to some sort of less

9  volunteers for the volunteer projects that they do, an effect on

10  communal worship service.

11          Those absentee issues are present in the education

12  context as well.  Here, we have a frustration of the ability to

13  teach students, not only those who don't come because they're

14  scared, but maybe when they do show up, then they're behind,

15  teachers are distracted, the other students who have been all

16  along are bored, not engaged.  There's plenty of similarities

17  between those harms that I don't think depend on it being in a

18  religious context.

19          THE COURT:  How broad is that?  I mean, what if

20  it's -- what if it's a business owner in a neighborhood near the

21  same apartment complex we've been talking about, who his

22  clientele has been decreased because people have left or they're

23  afraid to go out?  Would a business owner have standing?

24          MS. MUELLER:  In that, the way you presented it, it

25  sounds like a no.  But I don't think that's what we have here

Kevin P. Carlin, RMR, CRR

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1  either.  It's not some sort of amorphous, you know, chilling

2  effect.  It's to the extent there is a chilling effect, that --

3  the chill -- the people not arriving, I mean, that is what

4  interferes with --

5          THE COURT:  Say he came in and said, my revenue is

6  down 50 percent since January 21st.

7          MS. MUELLER:  I just believe that would make it more

8  difficult -- a more difficult traceability question.  The

9  causation there seems more attenuated than it is here where we

10 have actual people telling us this is exactly why they're not

11 going to school.  And we have, you know, DPS employees --

12         THE COURT:  But again, I go back to, they're telling

13 you that, but what they're telling you is based on, at least in

14 large part, a misunderstanding of both previous -- the effect of

15 the 2021 memo, and I think to some extent the 2025 memo.  There

16 hasn't been a single instance on school property that you've

17 presented me of this new policy resulting in someone doing

18 something that wouldn't have happened under the prior policy.

19         The examples we do have -- well, you have a number of

20 examples of false rumors of actions, and then you have examples

21 of things that happened a mile or so away from school.  So, none

22 of these would have been prevented.  And so the fears that

23 people have are based, as far as I can tell, largely on other

24 things, and on a misunderstanding of both the previous memo and

25 the current memo.  Am I wrong about that?

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1       MS. MUELLER:  I would say so in a practical way, yes,

2   because while I don't think DPS ever guaranteed to people that

3   there were would not be enforcement actions, and to the extent

4   that language was used in declarations, I don't think they mean

5   it in a legal sense.  I think in practice, under the 2021

6   policy, there were no enforcement actions.  Even the exhibit

7   that -- the report from ICE that was given to congress of

8   enforcement actions that had happened in sensitive locations,

9   none were in Denver.  And, you know --

10      THE COURT:  Right.  So, none were in Denver before.

11  None have been in Denver after.  So, I'm not doing anything.

12      MS. MUELLER:  I'm not sure that none have -- that

13  that's true.  I do think the Cedar Run apartment, given that it

14  specifically was blocking -- you know, was at a DPS bus stop, I

15  do think that is a different level, and a new level of

16  enforcement action that has not been seen.

17      THE COURT:  So, what would you -- what would you --

18  say I today issued your injunction, and tomorrow something

19  identical to the Cedar Run thing happened.  Would you then be

20  asking me to hold someone in contempt for violating my court

21  order if that happened again, despite the fact that we're all

22  having a lot of trouble figuring out if that's actually covered?

23  Would I then come in and have to do some kind of big analysis of

24  whether it applied or not?

25      MS. MUELLER:  Hmm.  You might not like this answer,

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1    but it depends.  I think it would depend on -- if the order that

2    we got from this Court was what we asked for, which was a return

3    under the -- a return to the 2021 policy, and an immigration

4    action was taken without consideration of those factors or

5    without prior approval required there, then yes.  I believe that

6    would be a violation of that injunction.

7            THE COURT:  All right.  I will give you a minute.

8            MS. MUELLER:  Thank you.  My last point is just to

9    return to final agency action, just to urge the Court to

10   remember the context in which we are operating, which is, one,

11   the APA creates a presumption of reviewability that this Court

12   should consider.  It is also -- the APA also provides for

13   judicial review when plaintiffs have no other way to challenge,

14   no other recourse.  And I'm unaware of what DPS would do other

15   than challenge this under the APA.

16           And I believe my last point will be to the extent

17   defendants rely on this memo as just a internal guidance, I

18   think is contrary to the purposes of the APA, and it is --

19   should not be a means to evade judicial review, especially in a

20   context where some iteration of this policy has been in

21   existence for decades.

22           THE COURT:  Let me ask you two questions, quickly,

23   about that.  Number one, are you aware of anyone ever having

24   been able to rely on the 2021 memo or any of those prior memos

25   for -- as a legally enforceable safe harbor or otherwise?

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1        MS. MUELLER:  I am not.

2        THE COURT:  All right.  And then secondly, what would

3   DPS have done differently if -- DPS itself had done

4   differently -- what did it rely on -- how did it rely on the

5   previous memo?

6        MS. MUELLER:  I mean, I think it relied on it to the

7   extent that it knew there were only certain circumstances when

8   this -- when immigration officials could be at school.  So, that

9   gave the organization and its community a certain level of

10  security.  I think that it has relied on it -- that I suppose

11  would be the main way, in that it -- knowing that, you know, or

12  presuming that many of its population are new-to-country or

13  might have concerns like this, it was able to tell families, but

14  not here, probably.

15       THE COURT:  Okay.  Thank you.  Your time is up.  Let's

16  take a 10-minute recess, and I will come back, and I think I

17  will try to announce my ruling.

18     (Recess at 3:27 p.m., until 3:37 p.m.)

19       THE COURT:  All right.  So, as I indicated, I do want

20  to give you my ruling from the bench today.  I'm normally

21  reluctant to do that, because I prefer to give a more thorough

22  explanation of my thinking, but I think in this case, it's in

23  everyone's interest to have a decision sooner rather than later.

24  And my decision is that the extraordinary remedy of a

25  preliminary injunction is not appropriate here.

Kevin P. Carlin, RMR, CRR

**Exhibit 6**

25-cv-474-DDD     Hearing on TRO     03-07-2025

1        That standard does require DPS to meet a very high

2   burden, particularly here, where in my view, they are seeking an

3   injunction that alters the status quo and would give them the --

4   all of the relief they would be able to attain at trial, but

5   even under the typical high standard for a preliminary

6   injunction, the plaintiff is required to show clearly and

7   unequivocally that they are entitled to the injunction.

8        They must show that they're substantially likely to

9   succeed on the merits, that they will suffer irreparable injury,

10  and that their injury outweighs the opposing party's potential

11  injury, and that the injunction is not adverse to the public

12  interest.  In a case like this where the Government is opposing

13  the injunction, those third and fourth factors merge.

14       I focus my decision on the first, and then the third

15  and fourth factors.  I do not think DPS has met its high burden

16  in this case.

17       I base this decision on a number of factual findings,

18  including that DPS does serve over 90,000 students, has a

19  diverse student body reflecting a cross section of the city and

20  the Denver community.  It educates a number of students whose

21  families could be impacted by some form of immigration

22  enforcement.  I agree that DPS has shown that there are real

23  confusion and concerns and fears among some portion of those

24  families, and they have shown that they are having to expend

25  time and effort to address those concerns.

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1    For example, I do understand that attendance is down

2   from last year, particularly in schools with high populations of

3   immigrant families.  Teachers and administrators are having to

4   spend some portion of their time responding to these concerns

5   rather than other things they would otherwise do to advance

6   their core educational mission.

7    However, I do not think it has been shown how much if

8   any of those impacts are due to the actual change that's in

9   front of me here between the 2021 and 2025 memos on this issue,

10  as opposed to broader concerns about increased immigration

11  enforcement or misunderstandings about the scope of the

12  protections provided by these two memorandums.

13    For example, I do think that a number of the

14  declarations seem to be based on the idea that there was a

15  guarantee that there would be no enforcement action at DPS

16  properties under the prior memo.  I think we have established,

17  and the Exhibit 9 to the complaint shows that that is not the

18  case.  And I think the concern was that there would be no

19  limitations or no protections for schools necessarily, and that

20  under the new memo, that I think is an overstatement, and the

21  fact that there have been no actions on school property in the

22  time since the memo was released here, or as far as we know

23  anywhere else, highlights that fact.

24    I also find that if bus stops or school -- all schools

25  are included in the definition of protected area, as well as

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1    anywhere near them, then the entire city would be covered.  And

2    so a literal reading of those concepts, I think, cannot sit

3    with -- cannot be matched with anyone's position.

4            So, under those facts, I do think that the plaintiff

5    has not shown that it's likely to succeed for at least two

6    reasons.  First, I do not think it's likely that they will show

7    they have standing to challenge this particular change in the

8    law.  For the most part, the harms caused here are harms that

9    are indirect.  Those harms would be to individuals who actually

10   would be subject to an enforcement action, potentially on DPS

11   property.

12           I don't rely too heavily on *U.S. versus Texas*, other

13   than to recognize that it recognizes the general proposition

14   that standing is a personal inquiry.  People generally -- or

15   entities don't generally have the right to assert standing on

16   behalf of others.  I also think that much of the injury relied

17   on here by DPS is speculative based on fears of future action,

18   as the Government argued, that those kinds of harms are

19   typically not enough in this.

20           There is a concrete fear or a concrete belief that

21   enforcement is actual or imminent.  I think that we've heard of

22   enforcement fears that are based on mistaken reports or are

23   based on actions that took place elsewhere, and they're based

24   largely on broader immigration enforcement policy changes that

25   wouldn't be affected by anything I do here today.

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1    So, both those injuries I think for those reasons are

2    not fairly traceable to the action being challenged here.  For

3    the similar reasons, I don't think that they would be redressed

4    here.  I could not undo anything other than the narrow

5    differences between these two memoranda.  Both involve

6    significant amounts of discretion pursuant to its own terms.

7    The 2021 memo, both in its definition of protected areas and its

8    explanation of when enforcement action could take place in those

9    areas stressed that the examples were not complete lists, were

10   only examples, and that discretion and judgment would have to be

11   enforced.

12        That is similar if not the same as what's being said

13   now.  The level of where approval for certain actions would have

14   to take within the bureaucracy may have changed, but I don't

15   think that would alter any of the harms that have been presented

16   here.

17        And so that change does not -- would not redress any of

18   the harms that the plaintiffs have shown would take place here.

19   I think that the fears -- the understanding that some people had

20   about prior protections and their understanding about the

21   current situation both seem to be overstated.  I certainly

22   understand some statements about current enforcement may have

23   given rise to some of those fears, both from -- people on both

24   sides of the issue perhaps have an incentive to overstate how

25   significant the changes have been, but legally, the change is

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1   not as significant.

2          Maybe more importantly, the actual facts shown are that

3   there were some enforcement actions at or near schools under the

4   prior memorandum, and there have been none, at least in Denver

5   Public Schools under the current, unless you take an extremely

6   broad reading of the Canyon Run [sic] enforcement action, which

7   I don't think would fairly fit within the definition of the 2021

8   action.  And certainly for purposes of today, we could never get

9   to a clear understanding of whether that would be prohibited

10  under the 2021 memo, and that means -- that uncertainty is held

11  against the plaintiffs, given their heavy burden.

12         For similar reasons, I think that the actual harms

13  caused by the legal action being challenged here are not as

14  severe, and would not be fixed and redressed in the same way

15  that the plaintiffs suggest.  The actual harms that they're

16  suffering, I do think they have shown some actual harm, but as I

17  said before, most of that actual harm, I think, comes from

18  elsewhere, from broader policies, broader statements that would

19  not be affected by anything we do here today.

20         So, the harm that would be avoided by entering an

21  injunction is not as significant as the plaintiffs have

22  alleged -- have claimed.  On the other side, there are multiple

23  harms to a Court getting involved in a situation like this.  As

24  Mr. Traskos pointed out, there is multiple areas that the

25  Supreme Court has been very clear that lower courts, federal

**Exhibit 6**

25-cv-474-DDD    Hearing on TRO    03-07-2025

1    courts have to be very careful about interfering with that are

2    at play here.  Those include immigration enforcement in

3    particular, and getting involved in internal policy making.

4           So, I do think that the public interest would be harmed

5    by a federal court seeking to overturn immigration policy in

6    this way in this case, and the idea of me, one federal judge,

7    overseeing even just the Denver -- enforcement around Denver

8    schools, we got into some of the dangers about how that would

9    play out when the next enforcement at an apartment complex that

10   happens to be near a school would be very difficult to figure

11   out, let alone if I were to agree with the plaintiffs and enter

12   a nationwide injunction.

13          I think that those harms to the public interest

14   outweigh the more limited harms that changing the policy back

15   would be -- would outweigh those other harms.

16          So, since it's the plaintiff's burden to satisfy all of

17   the elements of the standard for all of the factors for a

18   extraordinary remedy of a preliminary injunction, I don't need

19   to address the other factors, and I do not.  So, the motion is

20   denied.  And I appreciate everyone's time and efforts.  I do

21   understand the importance of this issue to everyone and

22   appreciate the excellent lawyering that you presented on both

23   sides.  If there's nothing else, the Court will be in recess.

24   Thank you.

25          (Proceedings concluded at 3:51 p.m.)

**Exhibit 6**

58

<pre>
 1                    REPORTER'S CERTIFICATE

 2

 3

 4         I, KEVIN P. CARLIN, Official Court Reporter for the

 5   United States District Court for the District of Colorado, a

 6   Registered Merit Reporter and Certified Realtime Reporter, do

 7   hereby certify that I reported by machine shorthand the

 8   proceedings contained herein at the time and place

 9   aforementioned and that the foregoing pages constitute a full,

10   true, and correct transcript.

11         Dated this 14th day of March, 2025.

12

13

14

15

16                              _____
                                Kevin P. Carlin, RMR, CRR
17                              Official Court Reporter

18

19

20

21

22

23

24

25
</pre>

**Exhibit 6**