STEPHEN W MANNING, OSB No. 013373
stephen@innovationlawlab.org,
smanning@ilgrp.com
TESS HELLGREN, OSB No. 191622
tess@innovationlawlab.org
RACHEL LANDRY, Mass. No. 713320*
rachel@innovationlawlab.org
NELLY GARCIA ORJUELA, OSB No. 223308
nelly@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

ESTHER H SUNG, Cal. No. 255962*
esther.sung@justiceactioncenter.org
KAREN C TUMLIN, Cal. No. 234961*
karen.tumlin@justiseactioncenter.org
HILLARY LI, Ga. No. 898375*
hillary.li@justiceactioncenter.org
LAURA FLORES-PERILLA, Cal No.
355645*
laura.flores-perilla@justiceactioncenter.org
BRANDON GALLI-GRAVES, Tx No.
24132050*
brandon.galli-graves@justiceactioncenter.org
JUSTICE ACTION CENTER
PO Box 27280
Los Angeles, CA 90027
Telephone: +1 323-450-7272

Attorneys for Plaintiffs
*Admitted pro hac vice

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| PINEROS Y CAMPESINOS UNIDOS DEL NOROESTE, et al., | |
| *Plaintiffs,* | Case No. 6:25-cv-699 |
| v. | PLAINTIFFS' UNOPPOSED MOTION FOR LEAVE TO FILE AN AMENDED AND SUPPLEMENTAL COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES |
| KRISTI NOEM, et al., | |
| *Defendants.* | |

Pursuant to Fed. R. Civ. P. 15(a) and Fed. R. Civ. P. 15(d), Plaintiffs respectfully move the Court for leave to file an amended and supplemental complaint ("Amended and Supplemental Complaint," attached hereto as **Exhibit 1** pursuant to Local Rule 15-1(b)) clarifying the nature of certain allegations for the purposes of standing, setting forth events that have occurred subsequent to the filing of Plaintiffs' Complaint, and adding additional plaintiffs. The four legal claims have not changed. Pursuant to LR 7-1, Plaintiffs' counsel conferred with Defendants' counsel on August 13, 2025 by video conference and again from September 3 to 9, 2025, via email.

After reviewing the redline of the proposed Amended and Supplemental Complaint, Defendants' counsel indicated in an email that Defendants would not oppose Plaintiffs' motion for leave to amend and supplement the Complaint.

I.    **BACKGROUND**

On April 28, 2025, Plaintiffs filed a Complaint in this action challenging the rescission of the Department of Homeland Security's ("DHS") 2021 Mayorkas Memo. Plaintiffs allege that the rescission of the 2021 Mayorkas Memo violates the First Amendment to the U.S. Constitution, the Religious Freedom Restoration Act ("RFRA"), and the Administrative Procedure Act ("APA"). *See id.* ¶¶ 107–36.

Defendants filed a Motion to Dismiss in this case on July 21, 2025. ECF No. 17. On August 13, 2025, the Court granted Plaintiffs' Unopposed Motion for Extension of Time to File a Response to the Motion to Dismiss by September 19, 2025, to allow Plaintiffs to file a motion for leave to amend and supplement their Complaint to clarify the nature of certain allegations for standing purposes, and to add new facts and new plaintiffs. ECF Nos. 24–25. As described below and in **Exhibit 1**, since the filing of the initial Complaint, Plaintiffs seek to include additional facts to

support standing and to add new facts that have developed that warrant the filing of an Amended and Supplemental Complaint.

## II.    **LEGAL STANDARD**

Federal Rule of Civil Procedure Rule 15(a) provides that a party "may amend its pleading" with "the court's leave." Fed. R. Civ. P. 15(a)(2). Absent prejudice, or a "strong showing" of "undue delay, bad faith or dilatory motive," "there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Id.* at 1052. Rule 15(a)(2) permits amendment with the opposing party's written consent.

Federal Rule of Civil Procedure Rule 15(d) also permits a party, "[o]n motion and reasonable notice . . . to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). Trial courts have broad discretion to allow supplementation "absent a showing of prejudice" to Defendants. *Keith v. Volp*e, 858 F.2d 467, 475 (9th Cir. 1988).

## III.    **ARGUMENT**

The Court should grant Plaintiffs' motion. Plaintiffs have acted promptly and diligently in response to recent events to seek leave to amend and supplement their Complaint with new parties and additional facts that further support standing and establish actual and imminent harms caused by the rescission of the 2021 Mayorkas Memo. Allowing Plaintiffs to amend and supplement their Complaint will not cause any undue delay in this case or unduly prejudice Defendants who have indicated they would not oppose this motion.

**A.    Granting Leave to Amend and Supplement Will Not Cause Undue Delay or Unduly Prejudice Defendants.**

Plaintiffs' filing of the Amended and Supplemental Complaint will not cause any undue delay in this case. Plaintiffs have acted as promptly as possible in filing this motion and the litigation is still in the relatively early stages. A motion to dismiss has been filed but no further briefing has occurred, discovery has not started, and there is no trial set. Even if some delay might result, "undue delay alone is not a basis for denying leave to amend." *A.B. v. Interstate Mgmt. Co., LLC*, 746 F. Supp. 3d 997, 1011 (D. Or. 2024) (citing *In re Tracht Gut, LLC*, 836 F.3d 1146, 1155 n.4 (9th Cir. 2016); *Bowles v. Reade*, 198 F.3d 752, 758 (9th Cir. 1999)).

Moreover, Plaintiffs have been transparent with the Defendants and the Court about their desire to amend and supplement. *See* ECF No. 24. Plaintiffs have acted expeditiously to amend and supplement the Complaint in light of arguments outlined in Defendants' Motion to Dismiss and in light of recent immigration enforcement activity in or around sensitive locations that have transpired since the filing of the Complaint in this action and that motivated the new proposed plaintiffs to join the suit. *See Silvano v. Circa Hosp. Grp. III LLC*, No. 2-24-CV-01712-RFB-MDC, 2025 WL 1433386, at *1 (D. Nev. May 16, 2025) (observing that when "there is no evidence in the record that would indicate wrongful motive, there is no cause to uphold the denial of a leave to amend on the basis of bad faith or undue delay").

Nor is there undue prejudice to Defendants, who have indicated they would not oppose Plaintiffs' motion for leave to amend and supplement the Complaint after having reviewed the redline version of the Amended and Supplemental Complaint in Exhibit 1. *See Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, No. 3:03-CV-00213-PK, 2016 WL 11477037, at *2 (D. Or.

Mar. 9, 2016) ("Because every amendment and supplement will result in some prejudice, only 'undue' or 'substantial' prejudice will preclude an amendment or supplement.").

B.     **Plaintiffs Have Alleged Additional Facts Clarifying Certain Allegations in Light of the Arguments Raised in the Motion to Dismiss and Increased Enforcement Activity at Sensitive Locations.**

In response to Defendants' Motion to Dismiss, Plaintiffs seek to clarify the nature of certain allegations to further demonstrate why Plaintiffs have established standing, particularly in light of recent increased enforcement activity at sensitive locations. In the Amended and Supplemental Complaint, Plaintiffs Augustana Lutheran Church ("Augustana"), Our Lady of Guadalupe Parish ("OLG"), San Francisco Interfaith Council ("SFIC"), Pineros y Campesinos Unidos Del Noroeste ("PCUN"), and Westminster Presbyterian Church ("Westminster Presbyterian") have set forth additional facts in support of standing, including facts that describe these organizations' core activities more explicitly, following Plaintiffs' review of Defendants' Motion to Dismiss. *Roberts v. Carton*, No. 08-1071-AC, 2008 U.S. Dist. LEXIS 99090, at *34 (D. Or. Dec. 8, 2008) (granting leave to file an amended complaint where the plaintiff asserted that the proposed amended complaint would "better conform" with the defendant's motion to dismiss).

Additionally, in the wake of recent increased immigration enforcement at churches and other sensitive locations, Plaintiffs PCUN, Westminster Presbyterian, and OLG allege specific ongoing harms in the Amended and Supplemental Complaint related to further decreases in member attendance, community engagement, and additional costs incurred in response to increased enforcement. *See, e.g.*, *Cal. Bank & Trust v. Shilo Inn, Seaside East, LLC*, No. 3:12-cv-00506-HZ, 2012 WL 13055379, at *3 (D. Or. Oct. 1, 2012) (granting leave to file a supplemental

complaint where plaintiffs cited factual allegations that occurred after the filing of the complaint).

### C.     Proposed New Plaintiffs Also Allege Harm Due to Increased Immigration Enforcement.

Finally, in the face of increased immigration enforcement at schools, National Education Association ("NEA"), American Federation of Teachers ("AFT"), Amy Lomanto, Hanna Mae Anderson, Lauren Fong, and Caroline Keating-Medeiros have suffered harms that they seek to redress by joining this lawsuit.

NEA is the largest labor union in the United States, with more than 3 million members. NEA's members and the students, parents, and communities its members serve have been, and continue to be, harmed by Defendants' rescission of sensitive locations protections. Am. & Suppl. Compl. ¶¶ 130–53. NEA would join Count III. AFT is a national labor union that represents 1.8 million members spanning more than 40 state federations and 3,000 local affiliates across the country. *Id.* ¶ 154. AFT's ability to carry out its mission and core activities has been, and continues to be, harmed by Defendants' rescission of sensitive locations protections. *Id.* ¶ 161. AFT would join Counts I, III, and IV.

Amy Lomanto, Hanna Mae Anderson, Lauren Fong, and Caroline Keating-Medeiros are all individuals affiliated with Guidepost Montessori School in South Beaverton, Oregon. *Id.* ¶¶ 172, 184, 191, 199. On July 15, 2025, the Guidepost campus was rocked by a violent immigration enforcement during which ICE agents shattered a car window of a man while he was dropping off his two-year-old child—in full view of students, parents, teachers, and administrators. *Id.* 176–78. The enforcement action harmed these individuals (and others) personally and impacted

their ability to carry out their roles as administrators, teachers, and parents. *Id.* ¶¶ 179–83, 187–89, 194–98, 202–03. All four of these proposed plaintiffs would join Count III.

The addition of these new parties falls squarely within the ambit of Rule 15(d). As the Supreme Court has explained, "Rule 15(d) of the Federal Rules of Civil Procedure plainly permits supplemental amendments to cover events happening after suit, and it follows, of course, that persons participating in these new events may be added if necessary." *Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*, 377 U.S. 218, 227 (1964). Including these proposed additional plaintiffs in this action promotes judicial efficiency as they would not be required to file a separate lawsuit on the same grounds. *Keith*, 858 F.2d at 473.

## IV.    CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Unopposed Motion for Leave to File an Amended and Supplemental Complaint.

Dated: September 9, 2025                    Respectfully submitted,

                                           */s/ Brandon Galli-Graves*

STEPHEN W MANNING, OSB No. 013373    BRANDON GALLI-GRAVES, Tx No. 24132050
stephen@innovationlawlab.org,        brandon.galli-graves@justiceactioncenter.org
smanning@ilgrp.com                   ESTHER H SUNG, Cal. No. 255962*
TESS HELLGREN, OSB No. 191622        esther.sung@justiceactioncenter.org
tess@innovationlawlab.org            KAREN C TUMLIN, Cal. No. 234961*
RACHEL LANDRY, Mass. No. 713320*     karen.tumlin@justiceactioncenter.org
rachel@innovationlawlab.org          HILLARY LI, Ga. No. 898375*
NELLY GARCIA ORJUELA, OSB No. 22330  hillary.li@justiceactioncenter.org
nelly@innovationlawlab.org           LAURA FLORES-PERILLA, Cal No. 355645*
INNOVATION LAW LAB                   laura.flores-perilla@justiceactioncenter.org
333 SW 5th Ave., Suite 200           JUSTICE ACTION CENTER
Portland, OR 97204-1748              PO Box 27280
Telephone: +1 503-922-3042          Los Angeles, CA 90027
                                     Telephone: +1 323-450-7272

Attorneys for Plaintiffs
*Admitted pro hac vice*

7

# EXHIBIT 1

STEPHEN W MANNING, OSB No. 013373
stephen@innovationlawlab.org,
smanning@ilgrp.com
TESS HELLGREN, OSB No. 191622
tess@innovationlawlab.org
RACHEL LANDRY, Mass. No. 713320*
rachel@innovationlawlab.org
NELLY GARCIA ORJUELA, OSB No.
223308
nelly@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

ESTHER H SUNG, Cal. No. 255962*
esther.sung@justiceactioncenter.org
KAREN C TUMLIN, Cal. No. 234961*
karen.tumlin@justiceactioncenter.org
HILLARY LI, Ga. No. 898375*
hillary.li@justiceactioncenter.org
LAURA FLORES-PERILLA, Cal. No.
355645*
laura.flores-perilla@justiceactioncenter.org
BRANDON GALLI-GRAVES, Tx. No.
24132050*
brandon.galli-graves@justiceactioncenter.org
JUSTICE ACTION CENTER
PO Box 27280
Los Angeles, CA 90027
Telephone: +1 323-450-727

Attorneys for Plaintiffs


LUBNA A. ALAM, DC No. 982169**
lalam@nea.org
KATHERINE E. LAMM, DC No.
1006319**
klamm@nea.org
NATIONAL EDUCATION ASSOCIATION
1201 16th Street NW
Washington, DC 20036
(202) 822-7035

Attorneys for National Education
Association

DANIEL MCNEIL, D.C. No. 455712**
dmcneil@aft.org
CHANNING COOPER, Md. No. 1212110182**
ccooper@aft.org
AMERICAN FEDERATION OF TEACHERS
555 New Jersey Avenue, N.W.
Washington, D.C. 20001
Telephone: +1 202-879-4400

Attorneys for American Federation of Teachers


Attorneys for Plaintiffs
*Pro hac vice applications forthcoming
*Pro hac vice
**Pro hac vice applications forthcoming

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| PINEROS Y CAMPESINOS UNIDOS DEL NOROESTE; AUGUSTANA LUTHERAN CHURCH; OUR LADY OF GUADALUPE PARISH; SAN FRANCISCO INTERFAITH COUNCIL; and WESTMINSTER PRESBYTERIAN CHURCH; NATIONAL EDUCATION ASSOCIATION; AMERICAN FEDERATION OF TEACHERS; AMY LOMANTO; HANNA MAE ANDERSON; LAUREN FONG; and CAROLINE KEATING MEDEIROS, | |
| *Plaintiffs,* | Case No. 6:25-cv-699 |
| v. | |
| KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; PETE FLORESRODNEY S. SCOTT in his official capacity as Acting Commissioner of Customs and Border Protection; U.S. CUSTOMS AND BORDER PROTECTION, | AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| *Defendants.* | |

**INTRODUCTION**

1.    Civic gatherings, houses of worship, schools, and health clinics should be places for adults and children to assemble, celebrate, worship, learn, and heal—not zones for deportation enforcement. But in the past several months, that is exactly what the government has enabled.

2.    Havens like these are sacred to the human experience because they are necessary for a functioning civil society. They allow people to nourish themselves spiritually, mentally, and physically so that they can thrive within, and contribute to, their communities for everyone's mutual benefit.

3.    For more than thirty years, this country's rules around immigration enforcement at these spaces have mirrored these values for a functioning civil society, as well as this nation's foundational principles guaranteeing the free exercise of religion; the right to assembly; access to education; and the unalienable rights to life, liberty, and the pursuit of happiness. Longstanding federal policy under both Republican and Democratic administrations has consistently affirmed the importance of protecting havens—such as houses of worship, schools, health care clinics, social services and, community-based organizations, and other public places where adults and children gather—from immigration enforcement activity except in limited circumstances.

4.    On January 20, 2025, Defendants abruptly and arbitrarily reversed course on more than three continuous decades of precedent and historical practice, stripping the protections that tightly circumscribed immigration enforcement in sacred spaces, known as "sensitive" or ""protected" locations. These spaces are now exposed to immigration enforcement at the unfettered discretion of immigration agents.

5.    In a matter of months, these immigration agents have taken steps to remove hundreds of Venezuelans and Salvadorans noncitizens, without due process, to Cuba's Guantanamo Bay and a

notorious mega-prison in El Salvador under an unprecedented use of the Alien Enemies Act; unlawfully deported a U.S. resident with lawful status to that same mega-prison due to an "administrative error" and blatantly defied court orders to facilitate his return; sent notices to hundreds of thousands of individuals lawfully paroled into the country, informing each that "it is time for you to leave the United States" and giving them at most seven days to do so; arrested asylum seekers at courthouses after they attend their court hearings; targeted parents taking their children to school or children registering for school; and—in some instances, without warrants—arrested university students in the street or at citizenship interviews, revoked their visas, and attempted to transfer them from detention center to detention center to evade legal review and effectuate their deportations.

6.    As a result of the administration's new policyDefendants' rescission of longstanding protections, sacred spaces have become sources of extreme anxiety rather than places of healing, expression, reflection, celebration, and refuge. Community members are deprived of social services and places where they gather to celebrate, educate, and advocate; parishioners and community members are afraid to attend religious ceremoniesvisit houses of worship; and essential services to the most vulnerable—from health care to education to disaster relief—have been disrupted. Defendants' actions are not only unlawful, but they also strike at the heart of what allows a civil society to flourish—its sacred spaces.

7.    From Oregon to Florida, PlaintiffsPlaintiff organizations and their constituents and members span the breadth of the United States. Every day, in their service to their members, students, patients, constituents, and communities, the Plaintiff organizations are striving for a more perfect nation in which no person should be forced to forgo their religious practice, give up their right to assemble, skip school, cancel their doctor's appointment, or otherwise withdraw from participation in essential services because they are afraid of being arrested and swept away into a

4

massive immigration enforcement system—a system that can result in deportation to an, indefinite detention in a maximum-security prison outside U.S. borders, or exile to a third country in which they have never stepped foot.

8.   The Plaintiff organizations' purposes and, missions, and core activities are thwarted by the Trump administration'sDefendants' abrupt and unexplained change in the rules protecting sensitive locations, which have imbued previously safe spaces with fear. They face mounting difficulties in carrying out their missions to welcome, serve, educate, and heal. Their efforts to cultivate sacred spaces where their communities may gather freely have been turned upside down because they must decide if, by providing such spaces, they are offering their friends and neighbors not safety, but an unacceptable risk of unchecked and unfair immigration enforcement that could tear their families apart.

9.   Plaintiff organizations' members and constituents have likewise felt the direct impact of Defendants' policy change. Members who are themselves vulnerable to immigration enforcement, or who have family members who are, have stopped going to sensitive locations that are critical for their mental and physical health because of the administration's policy change. Members who are committed to serving immigrant communities as educators, social services and healthcare providers, and spiritual counselors are impacted by the fear and pain of their students, clients, patients, and congregants, including decreases in attendance that literally make it harder for them to do their jobs.

10.   Individual Plaintiffs have experienced firsthand the violent enforcement operations that Defendants carry out at sensitive locations because of the administration's policy change. These operations have disrupted their communities and taken away people's sense of safety at sensitive locations.

9.11.Defendants' rescission of the sensitive locations policy is unconstitutional and unlawful.

5

It violates the First Amendment of the U.S. Constitution, the Religious Freedom Restoration Act, and the Administrative Procedure Act. It injures ~~the~~individual Plaintiffs' ability to access and to serve at sensitive locations. It also harms Plaintiff organizations' missions~~, their~~ and core activities, their members, and their constituents. The Court should declare the Defendants' rescission of protections for sensitive locations unconstitutional and unlawful, vacate the policy, and enjoin Defendants from implementing or enforcing it.

## JURISDICTION AND VENUE

~~10.~~12.     This Court has federal question jurisdiction under 28 U.S.C. § 1331. Plaintiffs allege violations of the Administrative Procedure Act, 5 U.S.C. § 701 et seq. ("APA"); the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-2000bb-4 ("RFRA"); and the First Amendment of the United States Constitution, U.S. Const. Amend. I.

~~11.~~13.     Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States and federal officers of the United States acting in their official capacities, and because at least one of the plaintiffs resides in this district and no real property is involved in the action.

~~12.~~14.     For these same reasons, divisional venue is proper under Local Rule 3-2.

~~13.~~15.     This Court has the authority to grant the relief requested by Plaintiffs under the Administrative Procedure Act, 5. U.S.C. § 701, *et seq.*; Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable authority.

## PARTIES

14.16.      Plaintiff **Pineros y Campesinos Unidos del Noroeste ("PCUN")** is the largest Latinx organization in the state of Oregon and is based in the city of Woodburn in Marion County, Oregon. Founded in the 1980s as a nonprofit labor union, PCUN is now a membership organization whose membership largely consists of farmworkers and Latinx working families; its programs and services also serve Oregon's Latinx community at large through its main membership organization as well as its affiliates. It advocates for and empowers Oregon farmworkers and working Latinx families to advance their community interests and enact systemic change through organizing and increasing political representation and participation. PCUN's main programs are worker outreach and member organizing, informational radio programs, systems change and grassroots policy advocacy, promotion of healthy workplaces, and civic engagement. PCUN's core work consists of labor organizing, promoting civic engagement, coordinating rallies and demonstrations, referrals to services, providing disaster relief assistance and workers' rights education, and assisting members in enrolling in state-funded assistance programs. As a community-based organization that organizes public rallies and demonstrations and provides essential services, PCUN's headquarters and events have long been considered protected or sensitive locations for immigration enforcement purposes. PCUN and its members have been harmed by Defendants' rescission of protections for sensitive locations.

15.17.      Plaintiff **Augustana Lutheran Church ("Augustana")** is a multicultural, multinational congregation in Portland, Oregon. Augustana has over 850 members in its congregation, including tribal nation members, members from all fifty states, members from twenty-three different countries, and undocumented congregants. Augustana was founded in 1906 as a Swedish congregation of immigrants to the United States. Augustana holds weekly services in English and in Spanish, as well as "Sanctuary Sundays" once or twice each month where

~~community members and congregants come to learn what they can do to help immigrants who fear immigration enforcement. Augustana~~ is a congregation of justice-seekers and peacemakers and a place of sanctuary for all, including undocumented migrants. As a leading sanctuary congregation since 1996, Augustana has consulted with hundreds of congregations regarding sanctuary and is the birthplace of the resolution that in 2019 led the Evangelical Lutheran Church in America (ELCA) to declare itself one of the first sanctuary denominations in the country. ~~The church campus, consisting of the main sanctuary and an educational building, is also home to several nonprofit organizations, including a preschool, a Latino radio station, and partner community organizations that fight for justice and systemic change across a range of issues~~Augustana Lutheran Church is, first and foremost, a place or worship. Its core activities involve a wide variety of services in both English and Spanish, including "Sanctuary Sundays" programming where its congregation and community members attend to get involved and support immigrants in the area who are afraid of immigration enforcement. As a house of worship, Augustana has long been considered a protected location and has been harmed by Defendants' rescission of protections for sensitive locations.

~~16.~~18.    Plaintiff **Our Lady of Guadalupe Parish ("OLG")** is a welcoming Catholic community in San Diego, California. Founded in 1917, and as the former Mexican national parish of San Diego, OLG has a long history and special focus on making immigrants from Mexico, Latin America, and other Spanish-speaking countries feel at home and empowered to work for their own liberation, justice, and dignity. OLG considers itself an immigrant parish, and its parishioners have a wide variety of immigration statuses. OLG also operates a Catholic school for kindergarten through eighth grade ~~as well as~~and, until early 2025, a migrant shelter for adult male asylum seekers. Providing religious services and spiritual counsel; operating the Catholic school and migrant shelter; and holding community events are among OLG's core activities. OLG has long

been considered a sensitive location, and the church, its parishioners, the students in its school, and its individuals seeking shelter have been harmed by Defendants' rescission of protections for sensitive locations.

17.19.    Plaintiff **San Francisco Interfaith Council ("SFIC")** is an interfaith organization based in San Francisco, California that serves as the "go-to" organization for mobilizing the city's religious communities. SFIC counts as its constituents 800 religious nonprofits in the City and County of San Francisco, including congregations and their respective judicatories, educational institutions, and faith-based social service agencies that provide both humanitarian and legal services. Core activities of SFIC's constituents that are places of worship include ministry, community programming and events, and providing safe spaces for community members to worship and obtain social services. Core activities of SFIC's constituents that are faith-based social service agencies include providing social services to community members in need, including immigration legal services and grant support. SFIC's constituents represent people of many faith traditions, including Christianity, Judaism, Islam, Hinduism, and more. SFIC aims to bring people of different faith traditions in San Francisco together to, among other things, provide spiritual comfort at times of crisis, coordinate services to the citizens of San Francisco, and advocate on behalf of constituents and the people they serve on issues like civil and human rights, housing affordability, and immigration. SFIC's constituent organizations are each sensitive locations and have been considered so for decades, and they are harmed by Defendants' rescission of protections for sensitive locations.

18.20.    Plaintiff **Westminster Presbyterian Church ("Westminster Presbyterian")** is a member of the Presbyterian Church (U.S.A.). It was founded in 1967, branching off from the First Presbyterian Church of Gainesville to serve as a Presbyterian witness for the community of northwest Gainesville, Florida, then was subsequently chartered as a congregation in 1968 and

legally incorporated in 1969. The mission of Westminster Presbyterian is to nurture, equip and send out disciples to be Christ's ministers of compassion, healing and peace in their daily lives. To accomplish this mission, Westminster Presbyterian is committed to a number of core principles: to follow Jesus wherever he leads; be deliberately diverse and fully inclusive; be outward reaching; serve people in need; be committed to change unfair systems; work for peace and justice; and partner with people of all faith traditions. Another of the church's core beliefs is to provide sanctuary to immigrants in their community, following over forty years of tradition in the sanctuary movement which began, in part, in Presbyterian churches. Westminster Presbyterian believes that people should feel welcomed and safe no matter their immigration status. In line with its beliefs, Westminster Presbyterian's core activities consist of ministry; community programming; and providing a safe, inclusive space for community members to worship and access social services. As a house of worship, Westminster Presbyterian has long been considered a protected location and has been harmed by Defendants' rescission of protections for sensitive locations.

21. Plaintiff **National Education Association ("NEA")** is the largest labor union in the country. NEA has more than 3 million members who work at every level of education—including educators and staff in pre-K through 12th grade public schools and higher-education institutions, retired educators, and individuals training to become educators—and serve over 50 million students around the country. Founded in 1857 and headquartered in Washington, D.C., NEA has state affiliates in all fifty U.S. states, as well as local affiliates in more than 14,000 communities across the country. NEA's mission is to advocate for education professionals and unite its members and the nation to fulfill the promise of public education to prepare every student to succeed in a diverse and interdependent world. NEA believes that every student in America, regardless of family income or place of residence, deserves a quality education. In pursuing its mission, NEA focuses on improving the quality of teaching, increasing student achievement, and

10

making schools safer, better places to learn. NEA members work daily with immigrant students, families, and communities across the country. In addition, NEA's membership includes educators who are or were noncitizens themselves, including lawful permanent residents ("green card" holders) as well as recipients of Deferred Action for Childhood Arrivals ("DACA"), Temporary Protected Status ("TPS"), and various forms of visas. NEA's members and the individuals its members serve are directly harmed by the rescission of sensitive locations protections in or around schools and other places where children gather such as playgrounds, bus stops, and childcare centers.

    22.  Plaintiff **American Federation of Teachers ("AFT")** is a labor union and membership organization representing 1.8 million pre-K through 12th grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals. AFT was founded in 1916 and is headquartered in Washington, D.C. Its individual members belong to more than 3,000 local affiliates across all fifty U.S. states, Guam, and Puerto Rico. AFT's mission is to champion fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for students, their families, and the communities their members serve. Helping children and students is at the core of AFT's mission, as is fighting for economic opportunity, a living wage, and fairness in the workplace for its members. AFT's core activities include community engagement, organizing, collective bargaining and political activism, all on behalf of its members and to support the needs of its members. The vast majority of AFT's members work at schools, medical healthcare facilities, childcare centers, or social services establishments, which have long been considered protected or sensitive locations for immigration enforcement purposes. Many of them directly serve immigrants every day who are vulnerable to immigration enforcement, either in the classroom or in a healthcare setting. Some

11

AFT members who are noncitizens themselves are vulnerable to immigration enforcement as well. As part of its core activities, AFT also organizes public rallies and demonstrations to advocate for issues important to their members; the locations of these events were also previously considered sensitive locations. AFT and its members have been harmed by Defendants' rescission of protections for sensitive locations.

23.  Plaintiff **Amy Lomanto** is the Head of School at the Guidepost Montessori School in South Beaverton, Oregon ("Guidepost"). Guidepost is a private, early childhood education center whose mission is to guide and empower each child as they achieve their own independence. The school has a diverse population and many of the families that form the Guidepost community in Beaverton are of mixed immigration status, including visa holders. As the Head of School, Amy oversees the school's leadership and management and works with Guidepost's corporate headquarters to ensure the school's mission, vision, and goals are achieved. She also works directly with individual children at the school and their families as needed and provides training and resources for Guidepost teachers. Amy was present during a violent ICE enforcement action on the school grounds the morning of July 15, 2025, during which ICE shattered the car window of a student's father and detained him while he was dropping off his two-year-old child ("Guidepost Enforcement"). As the Head of School, Amy has coordinated the school's emergency response and continues to manage policies and fallout resulting from the incident. The rescission of protections for sensitive locations interferes with her duties, disrupts the children's education and development she fosters at Guidepost, and harms her and all those with whom she interacts in her professional role, including Guidepost itself, which has seen decreases in student attendance and in prospective interest from new families because of the incident.

24.  Plaintiff **Hanna Mae Anderson** is the Assistant Head of School at Guidepost. As the Assistant Head of School, she helps manage the day-to-day operations of the school, including

safety protocols; the coordination of school programming and curriculum, staff management, and Montessori principles implementation; and parent and teacher concerns. In her administrative role, she helped manage the emergency response of the school and staff in the immediate aftermath of the Guidepost Enforcement and continues to manage policies after the incident. The rescission of protections for sensitive locations interferes with her job duties, disrupts the students and teachers at Guidepost, and has caused her severe psychological harm.

25.  Plaintiff **Lauren Fong** is a Toddler Lead Guide at Guidepost. As lead teacher to a classroom of two-year-old students, Lauren teaches her students lessons in practical life; helps them develop psychosensory motor skills; empowers their independence; and supports them in acquiring language and verbalizing their needs, emotions, thoughts, and feelings. Her students include the young child whose father was detained during morning drop-off in the Guidepost Enforcement. In her role as a teacher, Lauren was responsible for leading her classroom during and after the Guidepost Enforcement and continues to help her students and their families navigate the aftermath of the arrest. The rescission of protections for sensitive locations has directly harmed her, as she has been responsible for helping manage students' and parents' emotions while also seeking to maintain her curriculum and working through her own trauma from the arrest that occurred at Guidepost in July.

26.  Plaintiff **Caroline Keating Medeiros** is a parent whose four-year-old child is enrolled at Guidepost. Her daughter has been attending Guidepost for over two years. Her child was present at the school's outdoor playground during the Guidepost Enforcement, which occurred in the school parking lot directly adjacent to the school's playground. Her daughter and her class were rushed into the building and placed on lockdown. This action disrupted the curriculum and programming for the following weeks, which harmed her daughter's educational development. Following the Guidepost Enforcement, Caroline has increased fear and anxiety that her daughter

13

could be further injured should another violent enforcement action occur.

19.27.    Defendant **Kristi Noem** is sued in her official capacity as the Secretary of the U.S. Department of Homeland Security. Secretary Noem is responsible for the administration of U.S. immigration laws. She directs each of DHS's components, including the components responsible for the apprehension, detention, and removal of noncitizens pursuant to the rescission of protections for sensitive locations at issue in this case.

20.28.    Defendant **U.S. Department of Homeland Security ("DHS")** is a federal cabinet-level department of the U.S. government. DHS is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1). It is the largest federal law enforcement agency, and it is responsible for administering U.S. immigration laws under the Immigration and Nationality Act ("INA") and federal regulations, including those relating to the apprehension, detention, and removal of noncitizens. Its components include U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"). DHS is responsible for the rescission and replacement of the previous sensitive locations guidelines for ICE and CBP.

21.29.    Defendant **Todd Lyons** is sued in his official capacity as the Acting Director of Immigration and Customs Enforcement. Mr. Lyons oversees all ICE personnel and is a supervisory official responsible for overseeing immigration enforcement, including apprehension, detention, and removal of noncitizens both near the border and in the interior of the United States pursuant to the rescission of sensitive locations protections at issue in this case.

22.30.    Defendant **U.S. Immigration and Customs Enforcement ("ICE")** is a sub-agency of DHS and an "agency" within the meaning of the APA. 5 U.S.C. § 551(1). It is responsible for apprehension, detention, and removal of noncitizens both near the border and in the interior of the United States.

23.31.    Defendant ~~Pete R. Flores~~**Rodney S. Scott** is sued in his official capacity as the

14

~~Acting~~ Commissioner of Customs and Border Protection. Mr. ~~Flores~~Scott oversees all CBP personnel and is responsible for overseeing the apprehension, detention, and removal of noncitizens within 100 air miles of external boundaries of the United States, including pursuant to the rescission of sensitive locations protections at issue in this case.

~~24.~~32.    Defendant **U.S. Customs and Border Protection ("CBP")** is a sub-agency of DHS and an "agency" within the meaning of the APA. 5 U.S.C. § 551(1). It is responsible for the apprehension, detention, and removal of noncitizens within a "reasonable distance" of any external boundary of the United States, typically defined as 100 air miles.

## FACTUAL BACKGROUND

**For Over Thirty Years, DHS Maintained a Consistent Nonenforcement Policy ~~at or near~~At or Near Sensitive Locations**

~~25.~~33.    For at least the last three decades, the government has applied an immigration nonenforcement policy at or near "protected areas," also referred to as "sensitive locations."

~~26.~~34.    Throughout this time, this policy has remained largely unchanged (except to clarify categories of nonenforcement, provide more detailed guidance, and expand the types of locations protected) through both Republican and Democratic administrations.

~~27.~~35.    Every iteration of this policy has included an explanation and justification for the general policy of nonenforcement at sensitive locations, with exceptions for when exigent circumstances necessitate.

~~28.~~36.    **1993 Puleo Memo.** In 1993, Acting Associate Commissioner of the legacy Immigration and Naturalization Service ("INS")[1] James Puleo set out the "policy of [INS] to

---

[1] Following the passage of the Homeland Security Act of 2002, 6 U.S.C. §§ 211, 252, 271, 291, the INS was dissolved and replaced by three separate agencies within the Department of Homeland Security: U.S. Citizenship and Immigration Services ("USCIS") for processing immigration applications, U.S. Customs and Border Protection ("CBP") for border security, and U.S.

attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies" (the "1993 Puleo Memo").[2] For enforcement operations "likely to involve apprehensions" at such locations, "advance written approval" was required, which in turn required assessing "[t]he availability of alternative measures," "[t]he importance of the enforcement objective," and "measures which [could] be taken to minimize the impact on operation of the school or place of worship."[3]

29.37.    The 1993 Puleo Memo also contemplated situations in which advance written approval would not be possible. Where "exigent circumstances require[d] a deviation from this policy," the matter was required to be reported up the chain of command immediately following the enforcement action.[4] All officers were to be "well-versed in and able to apply" the criteria for engaging in actions required by exigent circumstances.[5]

30.38.    **2007 Forman Memo.** In 2007, Marcy Forman, Director of the ICE Office of Investigations, reiterated the federal government's nonenforcement policy at schools and "venues generally where children and their families may be present" (the "2007 Forman memo").[6] Director Forman emphasized "that great care and forethought [should] be applied before undertaking any investigative or enforcement type action" in such locations given "the public's interest in ICE's mission" and that enforcement in these locations "has always been a point of particular

---

Immigration and Customs Enforcement ("ICE") for immigration enforcement activities.

[2] Memorandum from James A. Puleo, Immigr. & Naturalization Serv. Acting Assoc. Comm'r, "Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies" HQ 807-P, at 1 (May 17, 1993).

[3] *Id.* at 1–2.

[4] *Id.*

[5] *Id.*

[6] Memorandum from Marcy M. Forman, Immigr. & Customs Enf't Director of Office of Investigations, "Enforcement Actions at Schools" (Dec. 26, 2007).

sensitivity."[7]

31.39.     As before, this memo also required advance approval for most enforcement actions and included limited carve-outs for situations in which advance approval was not needed, such as for "requesting information from school officials," "retrieving records," and "terrorism-related investigations, cases of public safety or other cases that can be articulated."[8]

32.40.     **2007 ICE VAWA Memo.** On January 22, 2007, ICE Office of Detention and Removal Operations Director John Torres and ICE Office of Investigations Director Marcy Forman issued joint guidance regarding officer procedure following the enactment of the Violence Against Women Act ("VAWA") of 2005 (the "2007 ICE VAWA Memo").[9] The 2007 ICE VAWA Memo discourages ICE officers from making arrests at sensitive locations where noncitizens are likely to be VAWA petitioners, including at domestic violence shelters, rape crisis centers, family justice centers, and community-based organizations.[10]

33.41.     **2008 Myers Memo.** In 2008, Assistant Secretary of ICE Julie Myers reiterated once again the importance of refraining from enforcement or investigative activities "at or near sensitive community locations such as schools, places of worship, and funerals or other religious ceremonies, except in limited circumstances" (the "2008 Myers Memo").[11] "Precedent for this

---

[7] *Id.*

[8] *Id.*

[9] Memorandum from John P. Torres & Marcy M. Forman, U.S. Immigr. & Customs Enf't, "Interim Guidance Relating to Officer Procedure Following Enactment of VAWA 2005" (Jan. 22, 2007).

[10] *Id.* at 3–4. This requirement is based on the fact that VAWA 2005 added INA § 239(e), which "requires ICE to certify that the agency has independently verified [per the requirements of 8 U.S.C. § 1367 and this memo] the inadmissibility or deportability of a [noncitizen] that was encountered at specificthese specified sensitive locations." *Id.*

[11] Memorandum from Julie L. Myers, Assistant Sec'y, U.S. Immigr. & Customs Enf't, "Field Guidance on Enforcement Actions or Investigative Activities Atat or Near Sensitive Community Locations" 10029.1, at 1 (July 3, 2008).

approach," Assistant Secretary Myers noted, "is clear," citing both the 1993 Puleo and the 2007 Forman Memos.[12]

34.42.    The 2008 Myers Memo emphasized "strik[ing] a balance between our law enforcement responsibilities and the public confidence in the way ICE executes its mission" by ensuring agents' conduct was "safe and respectful of all persons," and that personnel were "cognizant of the impact of their activity . . . and act[ed] with an appropriate level of compassion in light of the location."[13]

35.43.    The 2008 Myers Memo retained the same exceptions and exigencies contemplated by the previous memoranda and stated that the direction of the 1993 Puleo Memo "remains in effect."[14]

36.44.    **2011 Morton Memo.** On October 24, 2011, ICE Director John Morton issued a memorandum (the "2011 Morton Memo") superseding the 1993, 2007, and 2008 memos, again reinforcing that enforcement actions were not to occur at or around sensitive locations, including schools; houses of worship; hospitals; the sites of funerals, weddings or other public religious ceremonies; and sites of public demonstration, absent prior written approval or limited exigent circumstances (such as terrorism, imminent risk of death, pursuit of a dangerous felon, or an imminent risk of destruction of evidence material to a criminal case).[15] This policy provided detailed guidance to "ensure that ICE agents exercise sound judgment" and "avoid unnecessarily

---

[12] *Id.*

[13] *Id.* at 1-2.

[14] *Id.* at 2.

[15] Memorandum from John T. Morton, Director, U.S. Immigr. & Customs Enf't, "Enforcement Actions at or Focused on Sensitive Locations" 10029.2 (Oct. 24, 2011).

alarming local communities."[16]

37.45.    Under this memo, where ICE agents conduct enforcement actions at or near sensitive locations under extraordinary circumstances, or are led to a sensitive location during the course of an enforcement action, they are required to "conduct themselves as discretely as possible," "make every effort to limit the time at or focused on the sensitive location," "maintain surveillance if no threat to officer safety exists, and immediately consult their supervisor prior to taking other enforcement action(s)."[17] "Extra care," "caution," and "particular care" were advised throughout the memo, especially when dealing with organizations "assisting children, pregnant women, victims of crime or abuse, or individuals with significant mental or physical disabilities."[18] The policy also required employees to receive annual online and in-person training to ensure they were well-versed in enforcement protocol.[19] This memo remained in effect through most of the Obama administration's tenure as well as that of the entire first Trump administration.

38.46.    **2013 Aguilar Memo**. In 2013, David Aguilar, CBP Deputy Commissioner, issued a memo similarly limiting CBP operations at or near sensitive locations (the "2013 Aguilar Memo").[20] This memo likewise remained in effect for the remainder of the Obama administration and the entire first Trump administration.

39.47.    **2021 Mayorkas Memo.** In 2021, DHS Secretary Alejandro Mayorkas issued a new memorandum to ICE and CBP, superseding and rescinding the previous 2011 and 2013

---

[16] *Id.* at 2. The 2011 Morton Memo did not supersede the 2007 ICE VAWA Memo. *Id.* at 1 n.1.

[17] *Id.* at 3.

[18] *Id.* at 2.

[19] *Id.* at 3.

[20] *See* Memorandum from David V. Aguilar, U.S. Customs & Border Prot., "U.S. Customs and Border Protection Enforcement at or Near Certain Community Locations" (Jan. 13, 2013).

agency-specific memoranda (the "2021 Mayorkas Memo").[21] This memo recognized the "fundamental" principle crystallized over thirty years of sensitive locations policies that DHS "should not take an enforcement action in or near a location that would restrain people's access to essential services or engagement in essential activities."[22] Rather, DHS "can accomplish [its] enforcement mission without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more."[23] Adherence to this "foundational principle," Secretary Mayorkas emphasized, "is one bedrock of our stature as public servants."[24]

40.48.    Accordingly, the 2021 Mayorkas Memo makes clear that ICE and CBP agents have the "obligation to refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area."[25] This obligation derives from the human impacts and repercussions indiscriminate enforcement can have in such areas: "[f]or example, if we take an action at an emergency shelter, it is possible that noncitizens, including children, will be hesitant to visit the shelter and receive needed food and water, urgent medical attention, or other humanitarian care."[26] Accordingly, it is vital to "understand the activities that take place [at a given location], the importance of those activities to the well-being of people and the communities of which they are a part, and the impact an enforcement action would have on people's willingness to be in the

---

[21] Memorandum from Alejandro N. Mayorkas, Sec'y, Dep't of Homeland Sec., "Guidelines for Enforcement Actions in or Near Protected Areas" (Oct. 27, 2021).

[22] *Id.* at 2.

[23] *Id.*

[24] *Id.*

[25] *Id.* at 3.

[26] *Id.*

protected area and receive or engage in the essential services or activities that occur there."[27]

41.49.    As before, ICE and CBP officers were required to obtain prior approval from agency headquarters for enforcement actions in sensitive locations, except in limited exigent circumstances, which instead required consultation with headquarters following the action. These "limited circumstances" included threats to national and public security, imminent risk of death or physical harm, hot pursuit of a personally observed "border crosser," or imminent risk of destruction of criminal case evidence.[28] And regardless of exception or exigency, "any enforcement action in or near a protected area should be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing the protected area."[29] The 2021 Mayorkas Memo therefore provided substantive and procedural protections for sensitive locations.

**Congress Requires ICE to Report on Enforcement at Sensitive Locations**

42.50.    As part of the 2020 DHS Appropriations Act,[30] Congress recognized that "it is ICE's policy that enforcement actions at or near sensitive locations . . . should generally be avoided," and that this "policy is intended to ensure that anyone seeking to participate in activities or utilize services provided at such locations are free to do so without fear or hesitation."[31] Congress directed ICE to provide a public report on enforcement actions taken at sensitive locations for the previous three years.[32] The report was to "include the total number of enforcement actions at sensitive

---

[27] *Id.* at 2.

[28] *Id.* at 4.

[29] *Id.*

[30] H.R. Rep. No. 116-180 (2020), part of the Fiscal Year 2020 Department of Homeland Security Appropriations Act (P.L. 116-93).

[31] *Id.* at 35.

[32] Dep't of Homeland Sec., *Immigration Enforcement at Sensitive Locations, Fiscal Year 2020 Report to Congress* at 1 (April 18, 2022), https://www.dhs.gov/sites/default/files/2022-

locations, broken down by field office; type of sensitive location; whether prior approval was given; what type of exigent circumstances existed, if any; and the number of non-targeted individuals who were also apprehended."[33] Additionally, the Congressional Committee directed ICE to broaden the scope of the places considered as sensitive locations to include "courthouses; bus stops; USCIS offices; mental health, emergency, and social services centers; and other locations where community impacts should be better balanced against ICE law enforcement requirements."[34]

### DHS Abruptly Reverses Longstanding Policy

43.51.    On January 21, 2025, Fox News reported the not-yet-public rescission of the 2021 Mayorkas Memo.[35] ICE agents who spoke to Fox News expressed that rescinding the memo would "free them up" to conduct more aggressive enforcement operations.[36]

44.52.    Later that day, DHS officially announced the revocation of the 2021 Mayorkas Memo, "to protect Americans" from the alleged "invasion of the US" by "murders [sic] and rapists" who "hide in America's schools and churches to avoid arrest."[37] DHS's statement announcing the reversal provided that past guidelines and guardrails would be removed as to "not tie the hands of law enforcement," and instead, DHS would trust individual agents "to use

---

06/ICE%20-%20Immigration%20Enforcement%20at%20Sensitive%20Locations.pdf.

[33] *Id.*

[34] *Id.*

[35] Adam Shaw & Bill Melugin, *Trump DHS Repeals Key Mayorkas Memo Limiting ICE Agents, Orders Parole Review*, Fox News (Jan. 21, 2025), https://www.foxnews.com/politics/trump-dhs-repeals-key-mayorkas-memo-limiting-ice-agents-orders-review-parole-use.

[36] *Id.*

[37] Dep't of Homeland Sec., *Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole* (Jan. 21, 2025), https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-law-enforcement-and-ending-abuse.

common sense."[38]

45.53.    **2025 Huffman Memo.** The official memo issued by former Acting DHS Secretary Benjamine Huffman on January 20, 2025 (the "2025 Huffman Memo") is a nine-sentence fiat purporting to eliminate the last three decades of consistent agency action and comprehensive justifications provided throughout the years, including any designation of protected areas, approval requirements and exigent circumstances required for enforcement, and public-interest sensitivities recognized by political appointees of both parties. Effective as of January 20, the 2025 Huffman Memo supersedes and rescinds the 2021 Mayorkas Memo, eschewing "bright line rules" for unfettered discretion "along with a healthy dose of common sense."[39]

46.54.    **2025 Vitello Memo.** On January 31, 2025, former Acting ICE Director Caleb Vitello issued a memo pursuant to Defendants' rescission of protections for sensitive locations, entitled "Common Sense Enforcement Actions in or Near Protected Areas" (the "2025 Vitello Memo").[40] This memo, given the Director's "great faith in the judgment of our law enforcement personnel," charged ICE Assistant Field Office Directors ("AFODs") and Assistant Special Agents in Charge ("ASACs") with determining whether, where, and when to conduct immigration enforcement in or near a protected area.[41]

47.55.    Through the 2025 Huffman Memo, Defendants have ended protections from immigration enforcement at sensitive locations. Through this rescission of the 2021 Mayorkas Memo and the subsequent 2025 Vitello Memo, Defendants have replaced longstanding, detailed

---

[38] *Id.*

[39] Memorandum from Benjamine C. Huffman, Acting Sec'y, Dep't of Homeland Sec., "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025).

[40] Memorandum from Caleb Vitello, Acting Director, U.S. Immigr. & Customs Enf't, "Common Sense Enforcement Actions in or Near Protected Areas" (Jan. 31, 2025).

[41] *Id.* at 2.

guidelines pertaining to sacred civic spaces with guidance directing agents to "use common sense" when carrying out enforcement actions, including in or near previously protected areas.

**Defendants' Ending of Protections for Sensitive Locations Has Harmed ~~Plaintiffs and Other~~ Protected Areas**

~~48.~~56.    The announcement of the revocation of the 2021 Mayorkas Memo by the 2025 Huffman Memo has led to widespread fear in communities across the country. Following Defendants' revocation of protections for sensitive locations, many entities such as schools, daycares, medical facilities, foodbanks, community-based organizations, social services agencies, and places of worship serving large immigrant populations witnessed a decline in the number of people attending events and seeking services, which has impaired entities' missions and abilities to provide community care. Teachers reported that attendance rates dropped in half and school administrators saw an influx of parents picking their children up from school in the middle of the day after hearing reports that immigration officials were in the area.[42] Healthcare facilities serving neighborhoods with a high concentration of immigrants are navigating canceled appointments and empty waiting rooms as patients are scared to continue with planned treatments or to seek life-saving medical care—affecting not only patients but the financial viability of healthcare institutions.[43]

~~49.~~57.    Sensitive locations have also been forced to implement new measures such as

---

[42] Jasmine Garsd, *The Prospect of Immigration Agents Entering Schools is Sending Shockwaves Among Communities*, NPR (Feb. 4, 2025), https://www.npr.org/2025/02/04/nx-s1-5277170/schools-ice-immigration.

[43] Eduardo Cuevas, *People are Becoming Wary of Hospitals, Leaving Waiting Rooms Empty and Doctors Concerned*, USA Today (Feb. 7, 2025), https://www.usatoday.com/story/life/health-wellness/2025/02/07/ice-immigration-policy-impacting-hospitals/78299746007/; Eilís O'Neill, *Amid Fears of Deportation, Immigrants are Missing Appointments at Seattle-Area Clinics*, KUOW NPR (Feb. 18, 2025), https://www.kuow.org/stories/fearing-deportation-immigrants-are- missing-appointments-at-seattle-area-clinics.

providing new trainings and changing their programs and practices to keep their locations safe.[44]
The creation of these new policies and plans, along with the time spent reassuring people seeking
services and community members, has consumed limited resources.

50.58.    Sensitive locations have also become the target of enforcement actions. For
example, days after the recissionrescission of the 2021 Mayorkas Memo was announced, ICE
officials arrested a man attending a Sunday morning service at his church, Fuente de Vida, in
Tucker, Georgia.[45] On April 7, 2025, Homeland Security officials arrived unannounced at two Los
Angeles elementary schools requesting to speak with several undocumented students. The officials
falsely represented to school officials that they had the consent of the children's parents to do so.[46]

59.    In recent months, Defendants have increasingly targeted individuals at sensitive
locations, prompting widespread concern by school, religious, and community leaders. For
example, in June 2025, a group of armed men with covered faces refused to identify which agency
they worked for and detained a Latino man outside a church in the Los Angeles suburb of
Downey.[47] As Reverend Tanya Lopez tried to shout instructions to the detained man, the agents
drew a rifle at her.[48] Another pastor, Al Lopez, told the agents that church leaders did not want

---

[44] *See e.g.*, Adam Edelman & Daniella Silva, *Public Schools Try to Protect Undocumented
Students from Trump Immigration Raids*, NBC News (Jan. 28, 2025),
https://www.nbcnews.com/politics/immigration/public-schools-undocumented-students-trump-
immigration-raids-rcna189466.

[45] Billal Rahman, *Ice Strikes During Church Service to Arrest Migrant*, Newsweek (Jan. 30, 2025),
https://www.newsweek.com/ice-strikes-church-service-migrant-arrested-immigration-2023392.

[46] Billal Rahman, *California Stops Homeland Security Agents Entering Elementary Schools*,
Newsweek (Apr. 11, 2025), https://www.newsweek.com/california-agents-elementary-schools-
homeland-security-2058493.

[47] Jesus Jimenez and Emily Baumgaertner Nunn, *Church Leaders Shaken After a Man Was
Detained in Their Parking Lot*, New York Times (June 11, 2025),
https://www.nytimes.com/2025/06/11/us/la-protests-ice-raids-church-arrest.html?smid=url-share.
[48] *Id.*

them on church property.[49] Mr. Lopez reported that one of the agents replied, "The whole country is our property."[50] Later in June, federal immigration agents conducted enforcement operations around churches in Southern California's San Bernardino Diocese. Federal agents detained a parishioner of Our Lady of Lourdes Church on church property on June 20, 2025.[51] Later that same day, agents pursued several men onto the church parking lot of St. Adelaide Parish.[52] In a rare step, Bishop Alberto Rojas of the San Bernardino Diocese—a diocese of about 1.2 million people—became the first in the nation to formally lift the obligation for Catholics to attend Sunday mass, given the arrests near churches and escalating concerns about immigration enforcement at places of worship.[53]

60.     School pick-ups and drop-offs have also become targets of recent immigration enforcement, requiring schools to provide counseling and other resources to families who witnessed the arrests. For example, in May 2025, federal immigration agents arrested the parent of a student blocks away from a school in Charlotte, North Carolina.[54] Other parents at that school

---

[49] *Id.*

[50] *Id.*

[51] Deborah Brennan, *ICE targets men on Inland Empire church grounds*, Cal Matters (July 2, 2025), https://calmatters.org/california-divide/2025/07/ice-targets-immigrants-church-grounds/.

[52] *Id.*

[53] Hannah Fry, Christopher Buchanan and Andrew J. Campa, A *crisis of faith: ICE raids force some churches to take 'extraordinary' action*, L.A. Times (July 11, 2025), https://www.latimes.com/california/story/2025-07-11/la-me-church-sweeps-worship; Aleja Hertzler-McCain, *Diocese of San Bernardino issues dispensation saying Catholics who fear ICE don't have to attend Mass,* NPR (July 9, 2025), https://www.npr.org/2025/07/09/nx-s1-5462837/diocese-of-san-bernardino-issues-dispensation-saying-catholics-who-fear-ice-dont-have-to-attend-mass.

[54] Matthew Ablon, Hank Lee & Jesse Pierre, *ICE releases name of man arrested near Charlotte school*, WCNC Charlotte (May 13, 2025), https://www.msn.com/en-us/news/us/ice-was-at-charlotte-school-drop-off-line-monday-district-confirms/ar-AA1EHjvN?ocid=BingNewsVerp.

expressed concern about the arrest occurring so close to the school.[55] The Charlotte Board of Education provided counseling support to staff and students who witnessed the incident from school grounds.[56] More recently, in August 2025, the Los Angeles Unified School District ("LAUSD") called for limits on immigration enforcement after, in a case of mistaken identity, a teenage boy with disabilities was arrested at gunpoint by federal agents in front of Arleta High School.[57] It was reported that agents left behind bullets on the sidewalk.[58] In response to recent enforcement near schools, LAUSD has distributed family preparedness packets that include Know Your Rights Information, contacted over 10,000 parents to provide resources on legal and financial support, and planned to deploy 1,000 workers from the district's central office on the first day of classes to "critical areas" that have seen immigration raids.[59]

61.    In August 2025 alone, there were four instances of immigration enforcement near San Diego schools.[60] Among these, on August 14, just four days into the school year, ICE detained a man as he was waiting to pick up his child from school.[61] The incident was witnessed by several

---

[55] *Id.*

[56] *Id.*

[57] Karla Rendon, *Teen with disabilities detained by federal agents at gunpoint in Arleta,* NBC Los Angeles (Aug. 12, 2025), https://www.msn.com/en-us/news/crime/teen-with-disabilities-detained-by-federal-agents-at-gunpoint-in-arleta/ar-AA1Kpzz4?ocid=BingNewsSerp.

[58] Howard Blume, *Safe zones to be expanded around LAUSD schools; agents detain student at gunpoint near campus,* L.A. Times (Aug. 11, 2025), https://www.latimes.com/california/story/2025-08-11/lausd-bass-pledge-back-to-school-protections-immigrant-families.

[59] Jaimie Ding, *Los Angeles school year begins amid fears over immigration enforcement*, AP News (Aug. 14, 2025), https://apnews.com/article/los-angeles-schools-immigration-raids-dac4f392edf84de642233fddcc5006db.

[60] Gustavo Solis, *Arrest near a South Bay high school is latest in a string of immigration enforcements close to schools*, KPBS (Aug. 22, 2025), https://www.kpbs.org/news/border-immigration/2025/08/22/arrest-near-a-south-bay-high-school-is-latest-in-a-string-of-immigration-enforcements-close-to-schools.

[61] Ashley Na, Kelly Hessedal, *Parent detained, taken by ICE near Linda Vista Elementary School,*

families as the arrest took place right before school let out for the day.[62] Responding to the wave of enforcement, community advocacy groups in San Diego organized community patrols to monitor ICE activity near schools and help families feel safer.[63]

62.   The Guidepost Enforcement was yet another instance of enforcement at a school. As described below by Plaintiffs Amy Lomanto, Hanna Mae Anderson, Lauren Fong, and Caroline Keating Medeiros, ICE violently arrested the parent of a student in the parking lot of the South Beaverton, Oregon, Guidepost Montessori, during morning drop-off hours.[64] The operation included agents breaking the parent's car window to detain him on school grounds and in front of children, families, and staffers, including Plaintiff Amy Lomanto, the Head of School.[65]

**Defendants' Ending of Protections for Sensitive Locations Has Harmed Plaintiffs**

51.63.   Plaintiffs are among the organizations and individuals harmed by Defendants' termination of protections for sensitive locations, and the recent increased enforcement demonstrates that further harm resulting from the change in policy is imminent for the Plaintiff organizations, their members, and the individual Plaintiffs.

52.64.   **Plaintiff Pineros y Campesinos Unidos del Noroeste ("PCUN")** is the largest farmworker and Latinx organization in Oregon. Founded in the 1980s, PCUN's work is inspired by the "Sí, se puede" ("Yes, we can") spirit of Dolores Huerta and Cesar Chavez. Their mission is

---

CBS 8 (Aug. 14, 2025), https://www.cbs8.com/article/news/local/parent-detained-ice-near-linda-vista-elementary-school/509-6721460a-6cc4-43ee-96b1-7839d5133cc1.

[62] *Id.*

[63] Dani Miskell, *Community members patrol San Diego schools as ICE detainments raise concerns*, ABC News San Diego (Aug. 20, 2025), https://www.10news.com/news/local-news/community-members-patrol-san-diego-schools-as-ice-detainments-raise-concerns.

[64] Claire Rush, *Immigration arrest outside Oregon preschool rattles parents*, AP News (July 19, 2025), https://apnews.com/article/immigrant-arrested-montessori-preschool-beaverton-oregon-aee104fa12299efa4cc821683b4b6cf2.

[65] *Id.*

to empower farmworkers and working Latinx families in Oregon by building community, increasing Latinx representation in elections, and engaging in policy advocacy on both the national and state levels. PCUN is known for its organizing work, outreach, and community events that promote workers' rights, immigrant rights, environmental justice, and gender justice. PCUN has been doing community work for forty years by hosting key events throughout the year and working with other community organizations to provide services and advocacy opportunities for their members and the community at large. Although PCUN's membership is mostly comprised of individual farmworkers—many of whom are noncitizens—its programming also serves Oregon's Latinx community more broadly, including farmworkers who are from Oregon but travel elsewhere for work.

53.65.     The end of protections for sensitive locations has had a widespread impact on PCUN's members. Many of PCUN's members have been placed in an untenable situation where they must choose whether to get necessary medical care, send their children to school, attend church services to practice their religion, or request other social assistance when doing so could subject themselves or their loved ones to immigration enforcement. The members have made this harm known to PCUN, who has received numerous calls and questions during meetings from frightened members since the 2021 Mayorkas Memo was rescinded.

54.66.     For PCUN's members, access to emergency healthcare is very important. Farmworkers have a high rate of lesions and injuries at work, and farm work is among the top ten most dangerous jobs in the country. PCUN's members, most of whom work in this industry, risk their lives every day by working jobs that could permanently injure them, cause long-term illnesses and conditions, or kill them. Since Defendants ended protections for sensitive locations, these workers have been afraid to seek out emergency health services because of the new threat of immigration enforcement. This has dramatic consequences for the workers' health and, if they are

severely injured, for their ability to do their jobs and provide for their families. During ~~the past couple of~~recent monthly membership meetings, PCUN members have raised concerns about the ending of protections for sensitive locations. One member, an elderly woman, expressed that if it was not safe to continue to receive care at the hospital, she would reconsider getting care at all.

~~55.~~67.    Education is also very important to PCUN's members. Many of PCUN's members are farmworker parents who aspire for their children to obtain the education that they did not have the opportunity to get and want their children to work in something other than the fields, because being a farmworker is a poorly compensated job and is not treated with the respect it deserves. PCUN has already heard from members that they are afraid to send their children to school because of Defendants' ending of protections for sensitive locations. Many farmworkers, particularly women, rely on being able to send their children to school so they can go to work and provide for their families while their children are safe and cared for during the day. They now must choose between facing the risk of immigration detention or staying at home with their children and forfeiting their income. This has caused financial harm to PCUN's members and their families. During ~~a recent~~ membership ~~meeting, one member~~meetings, members have expressed that ~~her~~their children were afraid and reluctant to go to school because they were afraid of ICE showing up and separating their family.

~~56.~~68.    The organization itself is likewise impacted. PCUN ~~will soon host~~hosted its main yearly event on May 1—the May Day rally. ~~But~~For this event, the organization implemented additional security protocols for the attendants but for the first time in decades, PCUN ~~will~~was not ~~be~~ able to guarantee its members' and attendees' safety~~, having newly become a potential target for ICE enforcement. This~~. While the rally was held without incident, the attendance of immigrant community members was significantly lower than in past years. This was a significant change for

the organization, and it shows how the rescission of protections for sensitive locations directly chills participation of PCUN's members and limits PCUN's ability to carry out its core programming and its mission of empowering the farmworker community. PCUN iswas specifically made aware that members and communities arewere afraid to show up to exercise their right to free speech and demonstrate at the May Day rally for fear of an encounter with ICE. PCUN has spoken to union and community members who have expressed that they will not be attending the rally because they do not feel safe, even if they are citizens or have status..because the demonstration was no longer protected from ICE enforcement.

57.69.    SinceAdditionally, since the 2021 Mayorkas Memo was rescinded, PCUN has had to invest additional resources into increasing security measures for the organization. Now that PCUN's headquarters are no longer considered protected, PCUN has had to make physical modifications to its offices to restrict access so that ICE cannot freely walk into the space and only people with a key code can enter. The new policy has forced PCUN to change the way it functions, from a welcoming, "open door" policy to a restricted space, going against its fundamental values of being an accessible community space. PCUN has had to require additional staff time to discuss and implement secure access policies and trainings, and to consult with attorneys, all things it was not doing before. All this additional investment and effort aimsaim to place PCUN staff in a position where they can react safely and legally to protect themselves and PCUN members in the event of ICE enforcement. For all its membership meetings and events, PCUN is now requiring RSVP-only access and careful vetting of the guest list.

58.70.    PCUN has also had to adjust its core programming as a result of the ending of protections for sensitive locations. They have had to modify existing programming to address new inquiries about the risks of immigration enforcement and whether its members and communities are able to safely access sensitive locations. For example, PCUN has experienced a significant

decline in people attending other programs and events, such as the tax clinic PCUN hosts every year. PCUN assists with preparation ~~service~~services to those attending the clinic to help them file their taxes, which is pivotal for economic empowerment and stability for farmworkers. Since members ~~and~~of the community are afraid they could be detained, many were discouraged ~~to attend~~from attending the clinic. Thus, PCUN was unable to serve its mission this tax season.

~~59.~~71.    In addition to the changes above, PCUN has been forced to ~~divert~~use their limited staff time to address new community concerns instead of ~~focus~~focusing on its original yearly plan. For the 2025 legislative session in Oregon, which started on January 21, PCUN had planned to focus on promoting new legislation to create a Farmworker Standards Board. This project is very important for the farmworker community since it would allow farmworkers to advocate and set standards in an official bargaining setting. Instead, PCUN has had to turn staff to lead a campaign to keep schools as safe spaces for their members' children because of the ending of protections for sensitive locations. Initially PCUN had planned to have two or three people working on the legislature conversations for the Farmworker Standards Board, but with the programming adjustment, they can only afford to have one staffer work on them. While as an organization they would like to focus more staff on lobbying in the legislature, safety in schools has become one of PCUN's members' main concerns since January 21, 2025. By ~~not fully advocating for their members in the legislature to advance systemic change~~the end of the legislative session, the proposal for the Farmworker Standards Board was rejected. This was a significant loss to PCUN, especially given they could not employ all of the staff resources they wanted to fully advocate for the proposal. For all of these reasons, PCUN is harmed and cannot fully carry out its mission and purpose.

~~60.~~72.    **Plaintiff Augustana Lutheran Church** ~~("Augustana")~~ is a thriving, multicultural, multinational, and welcoming congregation of justice seekers and peacemakers. The

staff at Augustana is led by Senior Pastor Rev. Dr. W.J. Mark Knutson ("Pastor Mark") and consists of eight other paid part-time staff members of diverse backgrounds and three paid part-time musicians. Pastor Mark has been Senior Pastor since 1995 and prior to that served as the Churchwide (national) Director of Youth Ministries and Lutheran Youth Organization ("LYO") for the 5.3-million-member Evangelical Lutheran Church in America, during which time young leaders from the U.S. engaged in support of youth in Central America. Augustana is called by Christ to its mission of sharing the good news of God's love for all people, which includes welcoming and affirming every person as a creation of God, made in God's image, and celebrating each other's ethnicity, gender, age, culture, and gender expansiveness, and seeing this country's diversity as a gift. Anyone can walk into Augustana knowing that it is an inclusive place of worship. There are over 850 members in Augustana's congregation, plus many others who simply attend and participate in the church's activities. Congregants are of all backgrounds, including from twenty-three different countries of birth. While Pastor Mark does not ask about the immigration status of his congregants, at least ten congregants have confided their undocumented status to him and undoubtedly many more are at risk of deportation.

61.73.     Augustana's campus in Portland, Oregon is comprised of two buildings: (1) the sanctuary where services are held and (2) the Christian Education Building where educational activities and worship services take place and several nonprofit organizations operate as partners in the Augustana Center for Peace and Justice Collaborative.

62.74.     Augustana accomplishes its mission through weekly church services; pastoral care to congregants and community members; programs born of love for the poor and most vulnerable in society; youth and family ministry and outreach for the community; a solar project to use God's gift of sunshine to restore the natural world for generations to come; Christian education; community outreach; hosting two schools and several non-profits seeking justice and systemic

change, i.e., for firearm safety, worker's rights, LGBTQ and women's rights, and holistic well-being for Latino families and underserved communities, among other causes on its campus; serving as the meeting place for Alcoholics Anonymous ("AA"), Narcotics Anonymous ("NA"), smokeless mothers, and other support groups; participating in interfaith work; and fostering a place of sanctuary. Pastoral care includes home visits to bring communion and faith counseling to elderly or sick congregants and community members and supporting members of the congregation and the community on their faith journeys.

63.75.    Augustana is a central gathering place for school, music, and community events at no cost to its community partners. It is a leading hub of ecumenical and interfaith work for justice and peace with strong ties to the Native American, Muslim, Jewish, Hindu, Buddhist, and other communities of faith and, people, and community institutions of good will, all of whom feel safe because of Augustana's sanctuary status, which is now in jeopardy.

64.76.    To Augustana, providing sanctuary is part of its faith-based mission; it is not a political act. It is about providing a safe place for all—including undocumented immigrants—to breathe and be free. It means that Augustana's entire physical space is sacred, and that Augustana would not allow any violence inside of it, including by ICE. In 2014, Augustana provided sanctuary for over 80 days to an undocumented man who feared deportation—allowing him to sleep under the altar. Whenever there are ICE raids in the community, Augustana lets people know that the church is there to offer sanctuary. In line with its mission, Augustana is prepared to offer sanctuary to those who need it, but with Defendants' rescission of sensitive locations protections, it can no longer provide the same level of safety from ICE enforcement to those in need.

65.77.    Once the 2021 Mayorkas Memo was rescinded, Augustana had to redirect a significant amount of its core work to focus on keeping the church a safe space from the new

34

threat of ICE enforcement. Congregants have always trusted that churches are safe spaces, and Augustana sees it as its duty to maintain that trust and safety even as the rescission of the 2021 Mayorkas Memo makes churches less safe. To Augustana, when its physical sanctuary is no longer guaranteed to be a safe space for all, the church's faith-based mission is in jeopardy. Through Augustana's advocacy, including on gun safety reform, marriage equality, Black Lives Matter, and sanctuary and immigration work, the church has received threats; but Augustana previously felt reassured that if one of these threats materialized or someone broke into the church with a gun, the church could call upon local law enforcement for assistance and de-escalation. But if federal law enforcement officers can now come to the church without restrictions to apprehend and detain an individual, Augustana doubts that it will be able to call on local law enforcement to intervene and protect those who are present. For decades, Augustana has relied on the sacred status of sanctuary and the assurance of being a sensitive location to carry out its faith-based work. Defendants' end of protections at sensitive locations creates a tremendous amount of fear that the church, its congregants, and its community members are no longer safe.

66.78.    Augustana has dedicated considerable staff time to respond to this change because it must be ready now at any moment for ICE to come through its doors. It has held staff meetings that would ordinarily cover a range of issues that are now focused solely on safety; established safety and security protocols for office staff, church ushers, and church volunteers to follow; revised its system for keeping doors locked and granting access to its buildings; and put up signage to indicate that its buildings are private property, among other measures. These measures in the name of maintaining safety, including to keep doors locked and to put up signage, could be considered intimidating and are in deep tension with Augustana's mission of welcome and appearing welcoming to all newcomers and individuals who may be in need, especially the most vulnerable in our society. Historically, the church has been an open space because it has been a

safe space.

67.79.    Augustana has also spent time notifying the entire congregation of these protocols, so all of its members are prepared. The work to train congregants and volunteers is ongoing and takes considerable time. Augustana's staff now field phone calls about whether Augustana remains a place of sanctuary. Augustana also now hosts a "sanctuary Sunday" meeting at least once per month dedicated to learning, training, and education, including to keep the church safe and maintain a sanctuary for all. At the core, this work is motivated by the Biblical practices of love and compassion and Dr. Martin Luther King's principles of non-violent direct action.[47][66] This effort in the name of safety impacts Augustana's other critical faith work.

68.80.    In his work week, Pastor Mark is now dedicating substantial time to helping keep the church, its congregants, and the community safe. This effort has become one of the congregation's primary areas of focus, detracting from other parts of Augustana's work as a result. For example, Pastor Mark's pastoral care duties have suffered. Previously, Pastor Mark generally brought communion and spiritual counsel to around forty elderly members' homes on about a bi-monthly basis; one member's home is far away. Now, Pastor Mark's home visits have been cut dramatically. Pastor Mark has not had the time to train additional lay volunteers to meet the need left by the fewer pastoral visits Pastor Mark is able to carry out. Elderly members in need of home visits are therefore going without regular pastoral visits with the holy sacrament of communion and spiritual counsel. Pastor Mark has also not been able to dedicate the time he ordinarily would to youth and family ministry; Christian education, like Bible study; and outreach, stewardship, or spiritual counsel to help congregants deepen their faith journey.

69.81.    Augustana has been outspoken to let the community know that it will not be

---

[47][66] *See* Martin Luther King Jr., *Stride Toward Freedom*: *The Montgomery Story* 84–86 (1958) (outlining principles of non-violence).

deterred from following the commitment of its faith to serve as a sanctuary for all in need, particularly individuals in fear of being arrested or deported for simply seeking safety and asylum. While Pastor Mark continues to preach on a range of issues consistent with the Church—for example, compassion, generosity, hope, faith, love for one another, and standing with the poor and most vulnerable—he now finds that in every service he needs to devote some time to Augustana's role as a sanctuary congregation and the safety of its immigrant siblings and measures at large.

70.82.    The sense of insecurity since the rescission of the 2021 Mayorkas Memo impacts the congregation spiritually. Members of the congregation who fear ICE enforcement and deportation, including situations where the deportation could result in their death because they are seeking asylum, have expressed worry about coming to the church and how they will be protected at church. At Augustana, the end of sanctuary for immigrants is the end of sanctuary for everyone in the congregation. The people who could be targeted and arrested by ICE and deported back to harm are the church's friends, neighbors, and siblings in Christ. Members of the congregation are on heightened alert and afraid of ICE coming through the doors, whether for themselves or for their fellow parishioners. This type of fear hinders the spiritual growth and healing that Augustana was founded to foster and nurture.

71.83.    As part of Augustana's commitment to serving the most vulnerable, it houses several nonprofits, and hosts support groups and large community concerts and events. Being located on a church campus has also historically provided these groups and gatherings with a sense of safety. But now Augustana's ability to serve the most vulnerable is hindered because it is harder for Augustana to guarantee that safe space. For example, one of the nonprofit partners that operates out of its church campus that provides social services, including food equity, to the Latino community has cancelled at least three cooking classes since the termination of

protections at churches because people have been afraid to attend.

72.84.    Augustana believes that if it does not stand by its undocumented brothers and sisters, they will be killed after they are deported. It goes against every principle in Augustana's faith tradition to deport people back to their deaths. Augustana's role is to bring people together and protect human life through its sanctuary and ministry, and Defendants' rescission of protections for sensitive locations has put that calling in jeopardy.

73.85.    Founded in 1917, **Plaintiff Our Lady of Guadalupe Parish** ("OLG") is a welcoming Catholic community in San Diego, California for those seeking a personal encounter and relationship with Jesus. As a Catholic parish and church, its mission is to be a place of welcome where people can come together in unity, worship, and outwardly express faith through religious ceremonies. The team at OLG is led by Pastor Scott Santarosa ("Pastor Scott") and consists of four other priests and one deacon.

74.86.    Our Lady of Guadalupe is located less than twenty miles from the U.S.-Mexico border. As the former Mexican national parish of San Diego—and often referred to as the Mexican basilica of San Diego—OLG has a long history of and special focus on making immigrants from Mexico, Latin America, and other Spanish-speaking countries feel at home and empowered to work for their own liberation, justice, and dignity. OLG considers itself an immigrant parish, and its parishioners have a wide variety of immigration statuses. All belong at OLG—documented, undocumented, baptized, and unbaptized.

75.87.    OLG also operates a Catholic school called "Our Lady's School." The school is comprised of two campuses: a transitional kindergarten through second grade, which adjoins Our Lady of Guadalupe Church; and third grade through eighth grade, which adjoins a sister church, Our Lady of the Angels. OLG maintains full responsibility for the school. As OLG's single largest annual expense, it is a core part of OLG's mission—it has maintained a school since

38

1946, and OLG has seen the life-changing effect that Catholic schools can have in the lives of children and families. Our Lady's School has a student body of about 160 children.

76.88.    Since 2023, OLG has also operated a "Migrant Ministry" program, which provides adult male migrants needing shelter a place to sleep and to receive food, water, and access to bathrooms and showers for up to thirty days, serving as a vital bridge for recently arrived asylum seekers. However, in February 2025, OLG temporarily suspended operation of its migrant shelter, which was previously one of its core activities, in part due to the increased risk of immigration enforcement stemming from the rescission of sensitive locations protections.

77.89.    When the rescission of the sensitive locations policy was announced, Pastor Scott felt like the world was falling apart. OLG parishioners and migrant guests in its shelter were shocked and terrified. On February 26, 2025, Pastor Scott published an op-ed in the San Diego Union-Tribune.[48][67] In that article, he explained that, "neverNever in my life has the change of a president had such an immediate effect in my life as this recent one.  ....Recent executive orders that declared churches are no longer exempt from ICE enforcement have left our parishioners and migrant guests in our shelter literally trembling in great fear, questioning whether the place they have considered their second home—our church—is safe for them."[49][68]

78.90.    OLG regularly holds food sales to help the parish financially. OLG was forced to cancel the first food sale after the announcement of the enforcement policy because people were too afraid to come, resulting in economic loss to the parish and a loss of community.

79.91.    During the first three weeks following the announcement of the new enforcement policy, 80–100% of Pastor Scott's time became occupied by emergency response to the policy

---

[48][67] Scott Santarosa, *Changes in ICE Enforcement Have My Parishioners Trembling in Fear*, San Diego Union-Tribune (Feb. 26, 2025), https://www.sandiegouniontribune.com/2025/02/26/opinion-changes-in-ice-enforcement-have- my-parishioners-trembling-in-fear/.

[49][68] *Id.*

instead of carrying out his core religious responsibilities. For Pastor Scott, his new responsibilities imposed by Defendants' rescission of protections for sensitive locations felt like someone came into his office, cleared his desk, and told him that this was now his full-time job.

80.92.    At first, OLG considered whether it should shutter its doors for a time to keep its parishioners safe. However, thousands of people in the San Diego area rely on the church for their spiritual and temporal needs, and OLG determined it could not leave them without support. Instead, the team invested significant resources and time into preparing for ICE raids. Shortly after the rollout of the enforcement policy, the church invited representatives from Alliance San Diego, an immigrant rights group, to provide Know Your Rights presentations and "red cards" for interested community members after Sunday Mass. The first presentation had around 800 attendants. Presentations continued and regularly had hundreds of attendants. As an immigrant parish itself, and with its religious mission to ensure welcome for all, OLG felt these measures were necessary to protect its congregants and community, and to treat them with the dignity Christ would treat them with.

81.93.    OLG also coordinated with California District 80 Assemblymember David Alvarez and California Western School of Law to organize pop-up legal clinics at the church to help parents prepare caregiver affidavits in case they are summarily deported away from their children. The church also established emergency response plans in case of ICE attempts to enter religious meetings, Our Lady's School, or OLG's migrant shelter, which included posting a staff member to monitor the sites at all times to ensure ICE would not enter unannounced and disrupt the children's schooling or threaten their safety. The church also conducted media outreach and created a list of nine media outlets it could contact for immediate journalist deployment and reporting if ICE were to show up.

82.94.    On February 9, 2025, in coordination with the Catholic Diocese of San Diego, the

parish held a march to reclaim the Sabbath—for in the words of Pastor Scott, "if ICE can enter our churches on the day of Sabbath, they are no longer places of rest and safety." Between 1,200–1,500 people attended the march from the cathedral to the federal building. Nonetheless, many parishioners also expressed extreme fear about participating in the march for fear of immigration enforcement in what used to be a protected activity. OLG even seriously weighed the idea of advising undocumented individuals not to attend the march. Many individuals who were heavily involved in planning the march but were personally vulnerable to enforcement did not attend it out of fear.

83.95.    Even now, many months later, ensuring his parishioners remain safe and welcome in response to the enforcement policy remains an arduous undertaking, occupying 50–60% of Pastor Scott's time. He spends a significant amount of his time and energy on Sundays ensuring parishioners feel safe, as opposed to ministering. Every time Pastor Scott or any of the other priests speaks at church, and in every weekly bulletin, they make sure to reiterate that all are welcome and needed notwithstanding the new enforcement policy, and that the church will do everything possible to protect its parishioners in the sacred space.

84.96.    OLG continues outreach to other dioceses, bishops, and communities of faith, and spends enough time organizing with San Diego Organizing Project—a nonpartisan, multi-faith network of twenty-eight congregations representing over 70,000 families in San Diego—to constitute a part-time job. All of this extra work continues to detract from the time the church has to engage in other efforts, such as preparations for Holy Week, for which the church haswas not been able to adequately prepare in the ways it has done so historically.

97. In June and July 2025, at the same time as an increase in immigration enforcement in Southern California, including at or near sensitive locations, OLG saw a decrease of approximately 15% in attendance at Sunday mass. Some congregants told Pastor Scott

41

specifically that their parents, who are vulnerable to immigration enforcement, were afraid to attend mass because they were afraid to be arrested or detained. Additionally, recent reports of ICE at or near schools in OLG's area have sown increased fear amongst the parents who drop their children off at Our Lady's School. OLG has been forced to change its school dismissal routine to minimize the time that parents and students are exposed to the risk of immigration enforcement. The principal of Our Lady's School requested that priests from OLG, including Pastor Scott, be present at school dismissal at both campuses to increase protections and the sense of safety for parents and children. This duty further diminishes the time Pastor Scott has for his other religious responsibilities.

98. Around this same time, OLG also instituted additional security measures to prepare for potential ICE raids on Sundays, including hiring and paying security personnel, implementing a rapid response plan, and closing the main doors of the church when mass begins. Closing the front doors makes Pastor Scott feel like the church has created a less welcoming environment for its parishioners.

99. OLG is also preparing to open an "Immigration Hub" at a former convent that is church property and directly across the street from Our Lady's School. The Hub will serve as a resource center for parishioners who are vulnerable to immigration enforcement, with a specific focus on legal services. This will be a significant expense for OLG, as it requires hiring legal service providers and recruiting volunteers. Father Scott predicts a budget of $500,000 annually simply to get the Hub running—and it will further decrease the amount of money and time OLG has to spend on its other core activities and ministry. Nonetheless, Father Scott feels that it is a necessary resource given the threats to his parishioners from immigration enforcement.

85.100.    For all of these reasons, Defendants' rescission of sensitive locations protections has resulted in great logistical, financial, and emotional cost to OLG and its parishioners.

86.101.    **Plaintiff San Francisco Interfaith Council** ("SFIC") was founded in 1989 in response to two significant humanitarian crises in San Francisco—an emerging homelessness crisis and an earthquake—that necessitated a unified response from the religious community. SFIC brought people of different faith traditions in San Francisco together to provide humanitarian services to people in need, and to amplify the voices of the faith community to advocate for more support for these important issues. Still today, SFIC continues to bring its constituents together to celebrate the diversity of San Francisco's religious community; provide services and support to vulnerable populations, including immigrants and people experiencing homelessness; and advocate on civil rights and social justice issues, including immigration.

87.102.    SFIC counts as its constituents 800 religious nonprofit organizations in San Francisco that include congregations, judicatories, educational institutions, and faith-based social services agencies that represent many different faith traditions. SFIC serves as the connection point between its constituents and the City of San Francisco; SFIC's constituents rely on SFIC to represent them both with the city and in broader advocacy. Their constituents turn to them for resources, referral and representation, and SFIC's robust relationships and communications network, which includes an email list of over 5,300 subscribers. All of SFIC's many events throughout the year, including interfaith services, breakfasts, and an Interfaith Winter Shelter for the homeless, are also hosted in collaboration with its organizational constituents.

88.103.    SFIC has a longstanding policy of reserving SFIC Board of Directors seats for representatives of its constituents, and it relies on those directors to help formulate and direct the organization's policies. A portion of SFIC's funding also comes from constituents. The social service agencies that are a part of SFIC's constituency pay an annual fee to provide SFIC with more capacity to serve them, and many other constituents, including large judicatories that represent many parishes, churches, or temples, make annual contributions to the organization as

well. SFIC has funding specifically designated for serving its constituents, so its employees are paid to serve them.

89.104.    Historically, and as a practice, SFIC has spoken on behalf of constituents, particularly when they are being harmed by policy changes. For example, during the first Trump administration, the government threatened to withhold funds from the City and County of San Francisco because of their sanctuary status. The withholding of the funds would have adversely impacted the faith-based social service agencies that are part of SFIC's constituency and provide the safety net for the city's most vulnerable residents, including immigrants. SFIC signed onto amicus briefs in support of the lawsuits filed by the San Francisco City Attorney against the administration for these actions, to lift upuplift the concerns of its constituents.

90.105.    SFIC's constituents are directly and concretely harmed by Defendants' rescission of sensitive locations protections, as many of them serve large immigrant populations by providing religious services and counsel, legal and social services, or rapid response and sanctuary support. Many leaders of constituents have come to SFIC with concerns given the harm they have already experienced.

91.106.    SFIC's constituents that are faith-based social service agencies have experienced a decrease in the number of noncitizens who are willing to seek critical services, including immigration legal services. For example, Catholic Charities of the Archdiocese of San Francisco ("Catholic Charities SF"), an SFIC constituent, provides immigration legal services to noncitizens, either at its office in San Francisco or at local churches, as a core part of its mission rooted in faith traditions of charity and justice to serve the most vulnerable in the community. Catholic Charities SF also holds Know Your Rights presentations for noncitizens and provides legal consultations afterwards. Due to the rescission of the 2021 Mayorkas Memo, Catholic Charities SF has seen fewer people come to seek legal services, attend presentations, or seek consultations after

presentations. They are fearful of the increased risk of immigration enforcement either at the Catholic Charities SF office, as a social services organization, or at the churches. Before, Catholic Charities SF provided its legal services at churches following mass or other religious services to make them easier to access. Now, noncitizens do not feel safe getting the help they need, even at churches. Some have specifically stated that they are afraid of being detained or arrested by ICE at the locations. Many do not feel safe anywhere but their own homes, and some have explicitly stated that they would feel more comfortable returning to the locations for legal services if the sensitive locations policy had not been rescinded. This fear is not limited to undocumented noncitizens. Noncitizens with lawful status and even some U.S. citizens have expressed concern about being targeted at sensitive locations like the Catholic Charities SF office and its partner churches. Some clients have requested phone or video meetings so they can avoid attending in person, but this has resulted in an overall reduction in the number of clients served given the more limited options that feel safe. Additionally, Catholic Charities SF holds in-person group presentations on legal services so they can assist more than one client at once, but since the rescission of sensitive locations policy, they have had lower demand for these meetings. This decline in ~~noncitizens~~clients seeking legal services has ~~also~~ had a financial impact on Catholic Charities SF. Fewer people seeking services means fewer people paying the low bono (discounted) fee that the organization charges clients for services, which means less funding for the organization. The impact is so large that Catholic Charities is contemplating cutting the legal services program altogether.

~~92.~~107.    In addition, following Defendants' rescission of protections for sensitive locations, one third of Catholic Charities SF's immigration legal services staff members have quit because they themselves are vulnerable to immigration enforcement. The rescission of protections for sensitive locations has directly impacted Catholic Charities' ability to provide services in

furtherance of its mission, as well as obstructed its staff's and clients' ability to congregate, associate, and seek resources.

93.108.    In an effort to help the organization's staff and clients feel safer, Catholic Charities SF has spent significant time and resources speaking with clients and staff to provide the most updated information and Know Your Rights materials. While previously they hosted more events, including Know Your Rights presentations, in person, recently they have increased the number of events they host online, to ensure continued access to information and resources while prioritizing the safety and comfort of their community members. Moving online reduces the number of people they can reach and the number of clients they can serve, while increasing the amount of time their team puts into trying to connect with community members, which results in increased costs for the organization. The organization has also provided internal trainings for its staff and implemented increased security protocols for its office, including buying and installing more security cameras. Tending to these activities, which are not part of Catholic Charities SF's usual work, means their staff have lowered capacity to attend to their core activities.

109. At least one SFIC constituent that is a faith-based social services agency distributes grants to smaller community-based social service nonprofits as part of their core activities, and they have had to increase the amounts of grants to meet increased client need since the rescission of the sensitive locations policy. They report that this is because individuals served by those nonprofits are staying at home more to avoid the risk of immigration enforcement and sacrificing the income they gain from going to work regularly. This has led to financial instability for them and their families and has affected their ability to pay rent and afford their utilities and other bills.

94.110.    SFIC's constituents that are places of worship have also seen a decrease in immigrants' attendance at their services. Many of SFIC's constituents that are churches or

ministries consider welcoming immigrants and other vulnerable populations as part of their religious mission and faith, and Defendants' rescission of sensitive locations protections has impeded that mission. Immigrants are extremely afraid to attend church services or seek out critical resources like food, housing support, education, and other social services, which interferes with constituents' ability to welcome the community and provide a safe space for all people. Some of SFIC's constituents have reported that immigrants have specifically stated that they are afraid of being detained or arrested on the church's property, as well as on their way to church. Some have also experienced a decrease in funding in the form of donations from congregants both because (1) congregants are fearful of attending worship services in person; and (2) congregants are sheltering in place (staying home) to avoid the risk of immigration enforcement and have experienced loss of income and financial instability from working less.

95.111.    For example, as part of its religious mission and faith, Calvary Presbyterian Church (U.S.A.), San Francisco, an SFIC constituent, supports immigrants, refugees, and asylum seekers by accompanying them to court hearings; connecting them to social and legal support services; providing emotional and religious support; and offering events and resources at the church. Because of the rescission of the 2021 Mayorkas Memo, the church has experienced a decrease in the number of immigrants who are willing to come to events, workshops, and gatherings at the church. They are afraid to participate because of the possibility of immigration enforcement at or near the church. Individuals have specifically expressed that they are afraid of being detained or arrested by ICE at the church, and some have stated that they would return to the church if sensitive locations protections were reinstated. One individual sees the Calvary community as one of the only places they feel God's love and presence and a sense of belonging and protection, and previously did volunteer work at the church during nearly every Sunday service during the summer, but after the rescission of the sensitive locations policy, they are afraid they will

encounter ICE at the church or its events, and so have been absent during numerous Sunday services in recent months.

112. Many of Calvary's congregants have also shared with Calvary's staff members that they are afraid to go to other sensitive locations that are crucial for their lives and well-being, including work, school, and immigration appointments. Given the severe anxiety and emotional distress that one family was having about an upcoming ICE check-in, Calvary staff, upon request, accompanied them to provide extra support. The individual mentioned above who has missed Sunday services at Calvary has also missed so much school out of fear of immigration enforcement that they have failed to meet their credit requirements, and they have had to seek medical care for their anxiety related to the threat of enforcement at sensitive locations like their school.

96.113.    This widespread fear and the decrease in attendance not only interferesinterfere with Calvary's ability to carry out its mission and practice its faith, but itthey also interferesinterfere with the ability of its members and congregants to congregate, associate, and freely express themselves and their faith.

97.114.    Another one of SFIC's constituents, a regional religious judicatory governing body that represents multiple individual social ministries, a seminary, and a camp, and congregations that are also constituents of SFIC, observed that their ministries throughout the region have perceived a financial impact from this decreased participation. When fewer people attend services, the churches receive fewer donations and offerings, which directly harms the churches' budgets and financial stability. Additionally, participation in youth and food assistance programs has decreased, suggesting that parents are keeping kids at home and clients staying away. For the regional judicatory, the 2021 Mayorkas Memo created a sense of respect and safety that congregations and ministries could continue to do their core religious work responding to the needs

48

of immigrants and refugees without threat, that places of worship were places of refuge, and that the government understood the faithful actions of religious people in loving and serving their neighbors in need. The rescission of protections for sensitive locations has created an atmosphere of fear and hostility where faith leaders no longer know if their outreach and support of immigrant communities is safe, and they fear being punished for their core religious work and ministry.

98.115.    Many SFIC constituents that are places of worship have therefore spent time, resources, and money to help immigrants feel safer attending events and seeking support in their spaces, including adding signs to designate private or public spaces, training congregants and volunteers to respond if ICE conducts a raid at the place of worship, or implementing other enhanced security protocolprotocols. This detracts from their core activities as religious institutions that are focused on fostering long-term spiritual growth and care. For example, like multiple other constituents, Calvary has provided increased trainings for staff, congregants, and impacted families on what it means for Calvary to be a sanctuary church, and on Know Your Rights around immigration enforcement. Calvary has also posted signage identifying "private" spaces on its property and established security protocols for staff to follow if immigration agents try to enter the church, and it has a Living Sanctuary Team that stays up to date on changing government policies and connects impacted families with information, resources, and support. This kind of rapid response means Calvary has less time and resources to provide the other religious and support services that are part of its mission. To try and help their congregants feel safer attending gatherings at the church, Calvary has also begun keeping locations of gatherings more private instead of advertising them widely, and holding meetings with families outside of the church or by phone. This has a direct impact on Calvary's ability to engage with their community and provide ministry and counsel to their members.

99.116.    **Plaintiff Westminster Presbyterian Church** ("Westminster Presbyterian")

49

serves as a Presbyterian witness for the community of northwest Gainesville, Florida. It was founded in 1967 following a mission of nurturing, equipping, and sending out disciples to be Christ's ministers of compassion, healing, and peace in their daily lives. Its core principles include following Jesus, being deliberately diverse and inclusive, serving people in need, commitment to changing unfair systems, and working for peace and justice. Providing sanctuary to immigrants is also a core belief of Westminster Presbyterian, as the sanctuary movement has been a longstanding tradition and began, in part, in Presbyterian churches such as Westminster Presbyterian. It believes that people should feel welcomed and safe no matter their immigration status, and especially if they are undocumented. When the church decided to build a physical structure, it was with the specific intention that the building itself—a dedicated, physical space to gather and worship—would further Westminster Presbyterian's mission by supporting the broader Gainesville community, including undocumented immigrants.

~~100.~~117.   Part of Westminster Presbyterian's calling is to stand up for its beliefs, even when that means pushing back against worldly powers. Westminster Presbyterian does not identify as anywhere on the political spectrum, but it follows Jesus's teachings to be good and kind. Westminster Presbyterian has received online threats against its programs before, but now that churches are no longer protected spaces, it fears that this change in policy will embolden private citizens to retaliate further against it for supporting the immigrant community.

~~101.~~118.   Westminster Presbyterian believes that all individuals should be able to access essential spaces, including hospitals and schools. Following its religious beliefs in Jesus Christ, who healed those who came to him, Westminster Presbyterian believes that all individuals should have access to essential medical services that allow them to be healed without fear. Many of Westminster Presbyterian's members and leadership board are retired or current healthcare workers, and they understand firsthand the need for all individuals to have safe and equal access

50

to medical services. Similarly, supporting access to education is also a hallmark of Westminster Presbyterian's Presbyterian tradition of advocating for literacy so that people can read the Bible. Westminster Presbyterian believes that education makes for better people and helps them develop more in the image of God.

102.119.    Westminster Presbyterian is steadfast in its commitment to using its physical space to further its mission of outreach and ministry. The Westminster Presbyterian congregation has approximately ninety members, but approximately 700–1,000 people pass through the church campus every week to attend various community events on its premises. These events include Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") meetings, meetings for the adult children of alcoholics, university group meetings, trainings for young people with autism, community identification ("ID") programs, and legal and support services for Gainesville's immigrant community members. Westminster Presbyterian also rents out space and hosts events for immigrant support organizations like the Rural Women's Health Project ("RWHP").

103.120.    Westminster Presbyterian hosts events that allow all community members to apply for a local form of community identification, as well as know-your-rights workshops and legal clinics for immigrant community members, including clinics that help immigrant community members sign power of attorney documents to protect their children in the event of separation from their parents due to immigration enforcement. Attendance at these events has dropped precipitously since late January 2025. While community ID events typically are attended by thirty people or more, that number was down to around ten attendees in July and only three attendees at the event in August. Event organizers understand that these decreases in attendance are because immigrant community members no longer feel safe coming to the church premises. When fear of immigration enforcement prevents attendance at such events, it impairs Westminster Presbyterian's ability to serve its local community.

104.121.    Westminster Presbyterian also supports the National Farm Worker Ministry and has partnered very closely with this ministry in the past, including by inviting speakers to visit its congregation. With the rescission of protections for sensitive locations, this collaboration will likely change, and speakers might not be comfortable going into Westminster Presbyterian's space because they are not safe from immigration enforcement.

105.122.    Westminster Presbyterian has also served as a sanctuary church. On one occasion, Westminster Presbyterian hosted a young man from the Middle East who had been threatened in his birth country because of his sexuality and was seeking asylum in the United States. Westminster Presbyterian has invested significant time and resources to implement this program, including by preparing a building to be used as a sanctuary space, developing relevant policies, and engaging with interfaith and non-religious partners.

106.123.    Westminster Presbyterian had for so many years been able to minister effectively and provide services, events, and resources to its community because people were able to go to the church campus without fear. Now, it can no longer promise safety to its community or to the organizations it hosts. In the weeks following the rescission of the 2021 Mayorkas Memo, Westminster Presbyterian has tried keep the church spaces safe and protected by incurring great costs to purchase security cameras and spending hours preparing and attending trainings, meetings, and webinars to understand the legal implications of the new policy. Westminster Presbyterian has also been requiring church members to be onsite for events to ensure that it is present in case an immigration enforcement action occurs. That means that Westminster Presbyterian's members are often working longer days and, for evening events, incurring other costs such as for childcare.

107.124.    The rescission of sensitive locations protections prevents Westminster Presbyterian from being able to offer community services that it can guarantee are safe for all community members to attend, irrespective of immigration status. Westminster Presbyterian provides

programming to welcome and serve the entire community, including immigrant neighbors, and if it can no longer do so safely, its ability to carry out its mission ~~and,~~ beliefs, and core activities is jeopardized. Defendants' rescission of sensitive locations protections is also at odds with Westminster Presbyterian's core beliefs that all individuals should be able to safely access essential services, including healthcare and education.

~~108.~~125.    The rescission of sensitive locations protections has also made it harder for Westminster Presbyterian to minister to its congregants and offer them the support they need. Westminster Presbyterian has members who are healthcare workers, teachers, and individuals who work with farmworkers. For many of them, those positions are not just jobs, but their vocations, which the rescission of the 2021 Mayorkas Memo and the risk of immigration enforcement threaten to obstruct. When congregants come to the church for counsel, advice, and comfort, Westminster Presbyterian is restricted in offering these services.

~~109.~~126.    Westminster Presbyterian believes that everyone should be able to worship without fear and to access their programs without fear. The rescission of protections for sensitive locations harms individuals in Westminster Presbyterian's community deeply and harms Westminster Presbyterian's ability to serve community members in accordance with the tenets of its faith.

127.    **Plaintiff National Education Association ("NEA")** is the largest labor union in the United States. NEA has more than 3 million members who work at every level of education—including educators and staff in preK-12 public schools and higher-education institutions, retired educators, and individuals training to become educators—and serve over 50 million students around the country. Nearly one of every 100 people in the United States is an NEA member.

128.    NEA's structure consists of the national organization and state and local affiliates. NEA has state affiliates in all fifty U.S. states, as well as local affiliates in more than 14,000

communities across the country. NEA's individual members are members of all three levels of the association: local, state, and national.

129.      Given the size of NEA's membership, many members are or were noncitizens themselves, including legal permanent residents and recipients of DACA, TPS, and various forms of visas. NEA members—including teachers and other school staff—work daily with immigrant students, families, and communities across the country, and many work in school districts with very high concentrations of students from immigrant families.

130.      The rescission of sensitive locations protections in January 2025 has had a significant negative effect on NEA members, including burdens imposed by student absenteeism, student misbehavior and lack of participation in class, and increased stress and anxiety for members themselves and their students arising from the threat of immigration enforcement occurring at their schools. These repercussions have harmed NEA members' ability to educate their students and ensure safe and supportive classrooms for all.

131.      For example, EM is a high school history teacher in Virginia, a member of NEA, and, in the spring semester of 2025, he became his local NEA-affiliate union's building representative. His high school includes approximately 40% white students, 40% Black students, and the remainder of students are a mix of Hispanic, Asian, and other ethnic groups. Before January 2025, EM and his colleagues took it for granted that ICE enforcement would not occur at their school. Even during the first Trump administration, there was some concern about deportations and ICE, but the sense was that it was a border issue, and that there was not a threat of deportation by the time students arrived in Virginia.

132.      The day after Defendants revoked sensitive locations protections in January 2025, EM met with the school principal to share his and fellow educators' concerns about facing ICE raids on school grounds or in classrooms during the school day. The English Learning teachers

were especially fearful their classes would be targeted because they work with students who are recent immigrants, including those without legal status. After EM expressed those concerns to the principal, district administrators held an all-staff meeting at EM's school to address the revocation of the sensitive locations policy memo and the ensuing outrage among his colleagues and fellow NEA members. At that meeting, district administration explained the district's procedures related to immigration enforcement on school property.

133.    After Defendants revoked sensitive locations protections in January 2025, there was an immediate change in the tone and tenor of EM's school community. Some recently immigrated students began preemptively leaving school for fear of ICE interactions. Several of those students did not come to school for most of the spring semester for fear of ICE enforcement at or near EM's school.

134.    EM has noticed a significant decline in interest and participation in class by recent immigrant students. Numerous recent immigrants appear checked out and refuse to study, turn in assignments, or complete tests due to their feelings of hopelessness. Several students asked EM "why they should bother about school if they're going to get picked up." In recent months, EM has heard immigrant students make comments indicating they no longer feel secure and safe as immigrants in the U.S., and that they fear that they are going to be deported. EM's students are well aware that churches and schools are no longer places of refuge, and EM has overheard several students voice their worries to one another that ICE could "just come grab them in class now." This fear of enforcement has made it more difficult for EM to keep students focused on class discussion and assignments. EM also oversees two student clubs, and he noticed a marked decrease in participation in those clubs by recent immigrant students following the rescission of the memo.

135.    Additionally, during the spring semester of 2025, parents of recent immigrant

students at EM's school regularly expressed concern about being able to reach their student or their student being able to reach them if one of them was detained by immigration enforcement.

136.    Overall, since January 2025, EM's recent immigrant students have shown a marked increase in fear and anxiety, which has changed the way students talk about themselves and others. They express concerns that it is only a matter of time until they are deported or their plans are upended. Some of the students seemed to have given up early in the spring semester and now view their time as temporary and fleeting. EM is deeply demoralized by these impacts on his students, and all of this has impacted his ability to be an effective educator. EM has had to spend additional time and energy to get his students to turn in work and stay up to date with the curriculum, including by contacting the families of students who have missed school. The fear of immigration enforcement has also resulted in EM needing to allow students more time to complete assignments after hours, resulting in increased work hours and anxiety for him. EM and his colleagues continue to talk about the threat of immigration enforcement occurring on campus this fall semester.

137.    Another NEA member, KC, is a Speech Pathologist in a California Elementary School. KC provides speech and language services to students with disabilities who have a need for her services, as indicated by the student's Individualized Education Plan ("IEP"). About 50% of the students at KC's school are Hispanic, some of whom recently immigrated.

138.    Immediately following the rescission of the 2021 sensitive locations memo, KC's school district and local NEA union provided information to students and families about their rights on school property. In the subsequent weeks, there were numerous rumors about ICE roving the neighborhood surrounding KC's school. At this time, many immigrant families kept their children home from school for over a week. KC feels very protective of her students, all of whom have special needs. When students don't attend school, it interferes with their progress

and wellbeing, which is counterproductive for the students and the community. These students will be future employees of the community, so when they are intimidated out of getting access to the special education services they need and are entitled to by law, it hurts the future community as well.

139.        KC was part of two separate special education evaluations during the Spring 2025 semester, in which immigrant parents discussed their fears for the safety of their children at school. These meetings were highly emotional, with the parents and professionals alike in tears. Although their children desperately needed help through special education services to be successful as students, the parents agonized over whether signing IEPs, providing more of their information to the school, and receiving special education services for their children put their families more at risk for immigration enforcement. Before this spring—and in her eight years as a speech language specialist—KC never heard a family question signing an IEP because of their fear of immigration enforcement. The principal of KC's school had to take additional time in each of these meetings to explain the school's policy about immigration enforcement, reassuring parents that the school district does not collect information on immigration status and that no one would have access to their child without a judicial warrant. She also shared that they would be informed if anyone came requesting information or access to their child even if they were denied access, as was the case when ICE went to a school in Los Angeles and lied about why they were there. The level of anxiety and stress was palpable in the room during these conversations, and it was clear that parents would not have signed the IEP without these assurances. Prior to the rescission of sensitive locations protections, parents had never raised these issues as concerns, let alone barriers, to accessing special education services. The fears and anxiety around this issue are causing parents to consider refusing services that are legally protected at the state and national level.

140.    After the revocation of the sensitive locations memo, KC learned that one parent would not allow their child to ride the school bus. KC understood that this was due to their fear of immigration enforcement, even though it was extremely difficult for the parent to get their child to school without the bus. This parent went to great lengths to get their child transferred to a different school that would not require the bus, rather than entrusting their child to be transported to school without the parent.

141.    On the first day of professional development for the upcoming Fall 2025 semester, KC asked administrators for guidance on possible immigration enforcement, because she and other educators were particularly worried about potential enforcement in the public areas near the school. It is disheartening and devastating to KC as an educator that immigration raids at schools have become such a risk that they need to be a part of back-to-school meetings. Her concern and worry about immigration raids occurring at school has made it harder for her and her colleagues to focus on their work.

142.    KC also worries about immigration enforcement appearing at school-sponsored events, like back-to-school night, that are open to the public at her school. Prior to the rescission of the sensitive locations policy, KC and other school administrators and staff did not have these concerns. They want to hold events to build community, but KC sees cancelling the events as the only way to protect the students and their families from immigration enforcement that may occur at the school. KC also worries that families won't come to events due to fear of immigration enforcement. Overall, the revocation of the sensitive locations policy has greatly increased KC's and her colleagues' stress and workloads, and it has created significant barriers to student learning, development, and safety.

143.    Another NEA member, TS, is a high school teacher in Pennsylvania who teaches special education courses and world history. Approximately 10% of the students in her high

school are English language learners. Since the rescission of the sensitive locations memo in January 2025, her school has provided no information or guidance regarding immigration enforcement. This lack of guidance from TS's school regarding potential immigration enforcement has increased her stress because she does not know how she should respond in case of an enforcement action at her school.

144.    TS has seen the impact of students' fear of immigration enforcement at her school. Since the rescission of sensitive locations protections, Hispanic students are afraid to engage in classroom conversation, don't discuss their home lives, and are more conscious about their accents. Students have told TS that they fear immigration enforcement at the school and prefer to bring less attention to themselves, so they participate less and speak less about their families. In the spring semester, students who could be subject to immigration enforcement began to attend class more irregularly. One Hispanic student, AB, was a sophomore and a recipient of special education services, including access to one-on-one academic support, the school's resource room, a case manager, and a counselor. AB was also learning English as a second language, giving him access to a dual-language paraprofessional aid. AB stopped attending school after the revocation of sensitive locations protections, and he failed to attend school for the remainder of the spring semester.

145.    Because AB was a student requiring special education, several meetings were held after he stopped coming to school. He and his mother indicated in those meetings that he stopped coming to school because he is too afraid to leave his house given the increased threat of immigration enforcement. TS tried to move AB to a cyber learning platform for the rest of the semester after he continued to express his fear of deportation and ICE enforcement. The attempt to move AB to cyber learning led to additional meetings, effort, and time for TS. Participation in cyber learning proved to be impossible, so AB did not receive any instruction for the remainder

of the spring semester. Consequently, AB did not pass any of his classes in Spring 2025, and he was not advanced to junior status because of his lack of attendance.

146.    Another of TS's students was a junior during Spring 2025. That student has an undocumented immediate family member. Even though the student previously had good attendance at school, following the revocation of the sensitive locations memo, they missed between twelve to twenty class days during the spring semester because they were afraid to come to school. TS could often see that student's anxiety and fear on their face.

147.    TS has seen how students' fear of ICE enforcement at school impacts their learning and development—in her classroom, she has witnessed increased failure to attend classes, talking back to teachers, decreased academic attention, and other rule breaking. All of this disrupts her teaching and the learning environment not only for the students fearful of ICE enforcement, but for the class as a whole. As the result of the threat of immigration enforcement at her school, TS has had to spend extra time and effort engaging with families, working with school administration to assist students, and managing the classroom and individual students. The situation also increases TS's own stress and anxiety, on top of educating her students.

148.    Another NEA member, NS, is an English as a Second Language (ESL) teacher in a high school in Texas where 20% of the students in that district are English learners and many students are part of immigrant families. After the revocation of sensitive locations protections in January 2025, her district provided no guidance to educators about what they should do in case of immigration enforcement at their school. There has been immigration enforcement near NS's school, including one guardian of a student who was picked up near an elementary school adjacent to NS's school. This arrest generated fear among both students and educators, as well as confusion about what they should do if immigration enforcement officials came to their school. This lack of direction is frustrating for NS and other educators at her school.

60

149.      In her entry level ESL class for Fall 2025, NS would normally have fifteen to twenty students enrolled by the start of the school year in mid-August. As of early September 2025, she has had only two newcomers enroll in her ESL class, which is much fewer than normal. This low enrollment threatens the security of NS's position as an ESL teacher.

150.      RC, another member of NEA, held leadership positions in the union as a student. She graduated in May 2025 and now lives and works as an educator in the Western United States. RC is not a U.S. citizen but is authorized to work in the U.S. through the Optional Practical Training (OPT) program that allows non-citizens to work for up to twelve months following graduation.

151.      RC learned about the revocation of sensitive locations protections in January 2025 through the news media. Although she is living and working in the United States legally, as a non-citizen she feels especially vulnerable and at risk of immigration enforcement at her school.

152.      As these NEA member stories illustrate, the end of sensitive locations protections has led to decreased student attendance and participation, increased misbehavior, and negative education outcomes. This in turn impacts NEA members both by increasing workloads and stress and also by threatening job loss. In multiple states, including Texas and California, school funding is tied to average daily student attendance. The increase in student absenteeism due to the end of sensitive locations protections leads to school funding cuts which will negatively impact NEA members.

153.      NEA firmly believes that public education is the gateway to opportunity, and that *all* students have the human and civil right to a quality public education that develops their potential, independence, and character. The rescission of protections for sensitive locations disrupts this mission and harms NEA members (including educators and school staff) and countless individuals served by NEA members across the country.

154.    **Plaintiff American Federation of Teachers** is a national labor union that started as a formation of eight local affiliates but today represents 1.8 million members spanning more than 40 state federations and 3,000 local affiliates across the country. AFT members are members of all three levels of affiliation: national, state, and local.

155.    AFT has five divisions that represent the broad diversity of AFT's membership: pre-K through 12th-grade teachers; paraprofessionals and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals. In addition, AFT represents approximately 80,000 early childhood educators and nearly 250,000 retiree members. Although their professions are diverse, the common thread uniting AFT members is public service. Whether they are serving kids in a classroom, patients in a hospital, or students at a university, AFT members are dedicated to enhancing individuals' and communities' well-being and to fighting for a more equitable society.

156.    AFT's mission is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare and public services for all students, their families, and their communities. AFT does so by ensuring its members receive fair pay and benefits for their critical work, and by fighting for better working conditions so that AFT members are well-prepared and supported to provide the high-quality services that the public depends on. To advance its mission, AFT's core activities include community engagement, organizing, collective bargaining, and policy advocacy. AFT's core activities also involve providing support and resources for its members, including trainings, webinars, and guidance on issues important to its members.

157.    AFT hosts a wide range of events to support its affiliates and members that are designed to strengthen the union, build leadership capacity, and provide professional

development. They include division-specific conferences and meetings that provide union leadership and professional development training, policy updates, and networking for members in each sector. AFT and its affiliates frequently coordinate public rallies and demonstrations to raise awareness of important issues impacting its members.

158.    AFT maintains multiple channels of communication with its members so it can understand their needs and provide resources and effective support, including through one-on-one conversations with members; regular communications with the officers of its local affiliates who are on the ground and have consistent contact with members; town halls; and a national convention every two years, during which delegates from local affiliates convene and decide AFT's policies and priorities. AFT also frequently communicates with its members through newsletters, webinars, and trainings.

159.    AFT is a member-run union supported by staff. AFT's funding comes directly from its members. Its leadership is chosen by and from among its members, and members set the union's policy. The AFT National Convention is the highest decision-making body of the AFT and takes place every two years. At the convention, union delegates who represent local affiliates and state federations come together to establish the policy of the union. AFT's national agenda is determined through resolutions voted on either by delegates at the AFT National Convention or by the AFT's Executive Council. The Executive Council is AFT's governing body between conventions, and it is composed of AFT members elected by delegates at the convention. Each AFT division also has a steering body called a "program and policy council" (PPC). The PPCs include representatives from local affiliates nationwide and meet throughout the year to discuss and align the work of the division with AFT policy.

160.    Historically, and as a practice, AFT has spoken on behalf of members to all branches of the federal government, particularly when members are being harmed by policy

changes. For example, AFT members rely on AFT to represent their interests at the federal level in the legislative branch. AFT advocates for federal legislation that protects its members' interests. Beyond the legislative branch, AFT engages directly with federal agencies in the executive branch to advance its mission. AFT also acts on behalf of its members in the judicial branch by supporting litigation and filing amicus briefs in cases that impact its members.

161. AFT as an organization has been concretely harmed by Defendants' rescission of sensitive locations protections, as the policy change has directly impacted AFT's ability to carry out its mission and core activities. Many AFT members are directly affected by changes in immigration policy. AFT members include recipients of Deferred Action for Childhood Arrivals (DACA), Temporary Protected Status (TPS) holders, visa holders, permanent residents, and individuals living in households with mixed immigration statuses. Due to the rescission, AFT's staff has had to change the way they provide support to their members and the resources that they offer. For example, they have created numerous Know Your Rights ("KYR") materials and conducted KYR trainings and town halls for their members on topics including the rescission of the sensitive locations policy, the rights of noncitizens when interacting with immigration enforcement, and how their members can continue to protect their students, patients, and communities. Since the rescission, KYR training sessions that were traditionally conducted in person have transitioned to online platforms due to concerns of low participation stemming from fears of immigration enforcement. However, this approach still limits attendance, as community members without access to Wi-Fi or computers are excluded.

162. Additionally, following the rescission of the sensitive locations policy, AFT developed and shared new professional development resources for its members, such as lesson plans, blogs, and webinars, focused on immigration. These resources were developed by AFT and its partners to help educators create safe and inclusive classrooms where students can thoughtfully explore

discussions on immigration.

163. A crucial part of AFT's mission as a labor union is to build power through organizing and advocating on behalf of the organization and its members, which includes supporting members in attending rallies, protests, and other demonstrations where they can express themselves and their views on various workplace, social, and political issues. Given that sites of demonstrations like this were previously considered sensitive locations but are no longer protected from immigration enforcement, AFT noncitizen members are exercising more caution when picketing or attending public actions, which not only restricts the members' right to freely express themselves but also harms AFT's mission to empower their members to advocate for themselves. Despite having work authorization, AFT noncitizen members are fearful of being subjected to immigration enforcement themselves. Some members who work at colleges or universities are aware that immigration enforcement has targeted noncitizens with temporary status or even green cards. They are afraid that they will be targeted as well, particularly if they participate in public demonstrations or protests. When a portion of AFT members do not feel comfortable protesting and demonstrating for their rights, AFT's ability to carry out its mission and core activities of organizing and advocacy is severely diminished.

164. For example, after the rescission of sensitive locations protections, noncitizen union members from a higher education AFT local affiliate in Oregon told their union that they did not want to participate in a picket line to protest working conditions because they feared immigration enforcement would occur there. AFT members reported feeling unsafe engaging in concerted action to improve their working conditions because they knew that they would not be protected from immigration enforcement due to the rescission of the protections for sensitive areas. Additionally, a higher education affiliate in New York reported that after the rescission of sensitive locations protections, participation in public actions coordinated by the union affiliate

decreased. This directly impairs AFT's core activities as an organization.

165. AFT members are directly and concretely harmed by Defendants' rescission of sensitive locations protections, as many of them provide regular educational or healthcare services to individuals who are vulnerable to immigration enforcement. AFT members who work in schools, childcare facilities, and other educational institutions have seen a decrease in the number of students attending school because they or their parents are vulnerable to immigration enforcement. Additionally, students who do come to school have expressed serious anxiety about the possibility that they or their families will be arrested and detained, which has interfered with their ability to focus in class and learn from their teachers. Families have had to make emergency plans to prepare in case parents are detained while they are taking their children to school. This fear has directly impacted educators' ability to carry out their mission, which is to teach and provide high-quality education to the students. Instead of focusing on the curriculum, AFT members who are educators need to provide extra support to students dealing with anxiety and other mental health concerns related to the fear and trauma of immigration enforcement.

166. For example, one AFT member ("AFT Member A") in Missouri who is a public high school teacher for English language learners has observed changes in student behavior and increased fear of immigration enforcement resulting from the rescission of sensitive locations protections. She has observed students who are depressed or anxious, withdrawing into themselves, or acting lethargic and woozy from the trauma of dealing with the uncertainty of immigration enforcement. The heightened threat of immigration enforcement in formerly safe spaces weighs on the students, and it affects AFT Member A as well and her ability to teach.

167. Another AFT member ("AFT Member B"), a public high school history teacher in California, has observed significant changes in his students' and their parents' behavior since the rescission of the sensitive locations policy. The student population at AFT Member B's high

66

school is majority Hispanic and Latino, many from mixed-status families or undocumented. Reports of immigration enforcement at schools has created fear and anxiety for students. AFT Member B observed that his students are aware they "fit the profile and look the part," and they worry anyone could be taken by immigration enforcement at any moment—even at school. This heightened sense of fear has led some students at AFT Member B's school to question the value of doing well in school, knowing they have to live in fear of detention or deportation, which could limit their future opportunities. AFT Member B has had to adapt to the emotional needs of students who are suffering from the trauma of the constant threat of immigration enforcement and develop strategies to boost morale and empower his students in the classroom so that the promise of education is met.

168. AFT Member B has also observed that both parents and students are no longer participating in previously normally attended school activities. For example, this past spring, several students' parents did not attend their own children's high school graduation out of fear that immigration enforcement would target the celebration. During a recent in-person back-to-school night, AFT Member B noticed lower attendance from students' parents as well. AFT Member B worries that parental absence from school activities and events will impact his ability to teach effectively. Barriers to communication between parents and teachers can present significant challenges for teachers in addressing students' needs in the classroom.

169. To address the fears of his students and their parents, AFT Member B and some of his colleagues patrol areas near schools in their communities every morning and afternoon to ensure that students can attend school safely. AFT Member B takes this measure in addition to his regular teaching responsibilities to provide a sense of security for families who are scared to send their children to school.

170. Healthcare providers have reported that patients are skipping appointments, choosing

67

telehealth appointments, or foregoing critical medical procedures out of fear of immigration enforcement at the healthcare facility. AFT members who work in healthcare facilities have had to change the way they practice healthcare because their patients do not always feel safe seeking care at their locations anymore. For example, members have had to learn how to respond if ICE comes to the location and how they can best protect their patients. Many members see it as their duty to protect the community members they serve, but they feel that it is not possible to guarantee their patients' safety given the increased risk of immigration enforcement at healthcare facilities.

171. AFT believes that education and healthcare are critical institutions in a functioning society and therefore must be safe and welcoming places to all in order to serve the best interests of the community. AFT also affirms that AFT members have the right to freely express themselves on matters of significance to them through concerted public action. The rescission of protections for sensitive locations has sown panic and anxiety in schools and healthcare facilities and chilled the critical advocacy work of AFT members, harming AFT members and undermining the mission of the AFT.

172. **Plaintiff Amy Lomanto** is the Head of School at Guidepost. Amy has lived in Portland, Oregon, for the last twenty-nine years, and has been with Guidepost since June 2025. Prior to joining Guidepost, Amy worked as an Early Childhood Specialist at ICF Oregon, a consulting firm, where she worked with the U.S. Department of Health and Human Services Office of Head Start. She has bachelor's and master's degrees in human development and early childhood education. As the Head of School at Guidepost, Amy oversees the school's leadership and management and works with Guidepost's corporate headquarters to ensure the school's mission, vision, and goals are achieved. She also works individually with children at the school as needed and provides training and resources for Guidepost teachers.

173. Guidepost Montessori in South Beaverton—one of over eighty Guidepost Montessori locations worldwide—is a private, early childhood education center, whose mission is to guide and empower each child as they achieve their own independence. Guidepost Montessori takes a holistic approach to child development, nurturing the central aspects of human life that equip and enable a person to succeed—in academics, in a career, in pursuing rewarding friendships and relationships, and in life as a whole. To this end, Guidepost focuses on instilling in young children a love of learning, a love of effort, a love of leading one's own life, and a love of connecting with others. The school has a diverse population and many of the families that form the Guidepost community in Beaverton are of mixed immigration status, including visa holders.

174. Guidepost has fifteen staff members (not including Plaintiffs Amy Lomanto and Hanna Mae Anderson), comprised of five lead teachers, five assistant teachers, and seven "floating" guides and campus support personnel. Amy oversees this staff and works alongside Plaintiff Hanna Mae Anderson, the Assistant Head of School. Guidepost's South Beaverton location opened about six years ago, and has capacity for seventy-six children, which it currently fills.

175. Amy heard about the rescission of sensitive locations protections in January 2025 and immediately began worrying. As an educator, she understood the impact of trauma in young children and realized that the policy rescission would likely place children "in the line of fire" of witnessing and experiencing traumatic events. She worried that educators would no longer be able to keep kids and families in their care safe. She hoped, nonetheless, that this line would not be crossed, and that ICE would not show up to schools and other sacred spaces. Additionally, because Guidepost serves a relatively affluent community, Amy never expected that Guidepost would become the target of such an enforcement action.

176. On July 15, 2025, however, her fears became reality—while working in her office that morning, parents suddenly came running inside saying that there were police in the parking lot.

69

When Amy exited the building, she encountered a raucous scene of officers yelling and screaming. Most wore masks that obscured their faces. She also counted at least seven enforcement vehicles. Because it was during morning drop-off hours, young children were present in the parking lot and on the school playground in the immediate vicinity. Disturbed and anxious for the children's safety, Amy immediately began filming the incident as she approached the officers to inquire about their purpose and ask for identification. It was at that point that Amy realized the officers were from ICE. In response to her question, an officer told her it was none of her business and to move away from him. When Amy insisted it was her business because she was the Head of School and needed to ensure everyone was safe, the officer forcefully grabbed her by the arm and shoved her against a car, heavily bruising her arm.

177.  One of the lead teachers initiated a soft lockdown of the school. A "soft lockdown" is a protocol where in an emergency, the teachers and staff take the children inside the classrooms and clear outside spaces. School staff quickly began moving the children inside and to the back of the school, where they locked the doors and drew the shades. Even inside, the teachers and children could hear shouting from the parking lot, and it was loud and scary for the children. The teachers played music and sang to attempt to drown out the noise. The lockdown lasted for about forty-five minutes.

178.  Meanwhile, Amy continued filming outside while an ICE officer repeatedly battered the car window of a father—a respected chiropractor in the community—who had just dropped his child off at school. After shattering the father's window, the officers pulled him out of the car and forced him into their own vehicle. The officers repeatedly threatened Amy that they would arrest her as well if she did not stop filming. After the officers left the school premises with the father of the student, Amy immediately entered the building to ensure the child and the rest of the students were safe. She spent the next several hours contacting parents and Guidepost's

70

corporate office to explain the situation. Parents were extremely upset, and representatives from Guidepost's corporate office traveled to the school for the next few days to lend support. The night following the incident, the school held a parent meeting, and five therapists volunteered their time for anyone who needed their services.

179.  There were no preexisting policies or procedures in place at Guidepost to respond to a situation like this. Because the school serves a predominantly affluent community, the incident came as a shock to the school community—many of the parents reported never feeling endangered by ICE until that day. Many parents expressed fear for the safety of their young children, and throughout the week following the incident, various parents chose to not send their children to school, leaving Amy and school administrators to wonder whether they would return at all.

180.  Since the incident, Amy and other teachers have witnessed persisting negative effects on the students, including significantly higher rates of emotional dysregulation. Young children often cannot communicate their feelings as directly as older children or adults, and so their feelings manifest in ways such as not listening to the teachers, being unable to sit still during circle time, and acting out in the classroom. Amy has a "regulation station" in her office, which provides a quiet environment and objects like fidget toys for students to use to emotionally regulate. Previously, just one or two students would visit Amy's office in a week. But in the immediate weeks following the incident, she saw close to twenty. The child of the parent whom ICE arrested especially struggled, wondering where his father was and crying much more than normal, particularly during goodbyes at school drop-off.

181.  Guidepost itself has also been severely impacted by the ICE incursion. Teachers and parents have been asking for more support since the incident, with teachers needing to "tap out"—leave the classroom to collect themselves and have another teacher step in to temporarily

support the children—more often. This usually occurs when a teacher can identify they are feeling overwhelmed and moving into a space of dysregulation. Guidepost encourages teachers to take time to collect themselves, as research supports the need for children to have regulated adults in order to learn self-regulation themselves. Additionally, because of the lingering effects of the ICE incursion on the teachers and students, teachers have requested extra assistance in the classroom, and parents have likewise asked Amy and other school administrators for insight and help, noticing their children acting out more at home.

182. Moreover, various families who were looking into enrolling their children at Guidepost ultimately elected not to, citing the ICE incursion as their reason not to enroll. Additionally, in tours the school has provided since the incident, parents regularly ask about what happened that day, what the school is doing to keep children safe, and what the school would do with a child if their parent were arrested by ICE. To better protect the children in its care, Guidepost has since installed more locks around the facility, added wider-range security cameras, and provided education for parents and school staff on related topics including Know Your Rights presentations and documents, and the difference between judicial and administrative warrants. But these measures only go so far to assuage parents' concerns, as they cannot prevent another enforcement action from happening.

183. Amy's ability to effectively run the school and administer to the needs of its students, families, and staff has been severely impacted by ICE's violent and chaotic activity at the school. The rescission of protections for sensitive locations interferes with her duties, disrupts children's education and development, and harms her and all those with whom she interacts in her role as Head of School.

184. Plaintiff **Hanna Mae Anderson** is the Assistant Head of School at Guidepost. She was born and raised in the Portland Metropolitan area and has lived in Oregon her whole life. She has

over ten years of experience in the education field, including extensive experience in elementary schools and as a teacher at special needs schools. Her position at Guidepost is her first leadership position at the preschool level and she has held this position since September 2024. Her main responsibilities at Guidepost involve supporting and managing day-to-day operations of the school, upholding the Montessori mission, and fostering a high-quality learning environment for students. Her other responsibilities include curriculum development, staff training, parent engagement, enrollment, and working to maintain a respectful and collaborative school community.

185. When the sensitive locations policy was rescinded, Hanna was concerned about other schools and programs, but she never expected that her school would be directly impacted by the new immigration policies. All that changed on July 15, 2025.

186. The morning of July 15, Hanna was on her way to work when she started receiving messages from the teachers group chat discussing the need to go into a "soft lockdown" due to immigration enforcement at the school. When Hanna arrived at Guidepost, she was unable to park in the school parking lot because of the number of cars, so she had to go across the street. By the time she got to the door, Plaintiff Amy Lomanto, the Head of School, greeted her and explained that the parent of a student had been violently arrested by ICE in the parking lot during drop-off. Hanna immediately started assisting Amy to speak with parents, contact the regional Guidepost leadership, speak with teachers to assess the day's programming, and decide when to lift the lockdown. Even after management decided it was safe enough to move around and lift the lockdown, none of the teachers wanted to leave the lockdown rooms, and they decided to continue with alternate programming, such as dance parties and other ways for children to physically move and process emotions.

187. Over the next couple of weeks, Hanna spent significant time meeting with Guidepost

parents, helping them process the incident and reassuring them that the school would do everything it could to keep their children safe. The Guidepost leadership team has held many community gatherings to talk about what happened and process the incident. Hanna has had one-on-one meetings with almost every parent of the 76 students enrolled in the school. This has wreaked an extreme emotional toll on her and the rest of staff, especially on top of the usual work that they need to perform to continue functioning as a school. Hanna has worked through most weekends since the incident just to catch up on other administrative work. The staff has also been creating and implementing new security protocols for access to the school and surveillance of the property. In addition to all this, for the two weeks after the incident, Hanna had to arrive to school as early as 7:00 AM just to manage media reporters, who would camp outside the school hoping they could speak to someone, and that added more distress to the community.

188.  In the weeks following the incident, student attendance at Guidepost was around 20% lower than usual. Hanna noticed that some classrooms were emptier than others, and some parents notified the school that they had decided to keep their children at home. Hanna noticed that it was the immigrant families that had the biggest reservations about returning to school. Additionally, the children who kept attending expressed a lot of emotional distress and anxiety, so in the days after the incident, the school continued to adjust its usual programming and curriculum to hold dance parties so that the young children could have an outlet for their emotions.

189.  This experience has impacted Hanna personally as well. Since the incident, she has had increased levels of anxiety and feels that she needs to be at school at all times in case another arrest happens. Hanna feels significant unease when away from the school because she cannot let this happen again without her being there. Throughout the month following the incident, she also

experienced night terrors in which a parent was taken again, leaving a helpless child behind.

190. The rescission of the sensitive location protections gave rise to ICE's violent and disproportionate actions at Guidepost. This has impacted Hanna's ability to perform her regular job as leadership staff and has caused her severe psychological harm.

191. Plaintiff **Lauren Fong** is a Toddler Lead Guide at Guidepost, where she teaches two-year-old students. She loves working with children and has been at Guidepost since 2020, working her way up to her current role and recently completing her Montessori residency and certification.

192. Until the Guidepost Enforcement, Lauren was not aware that protections for sensitive locations such as schools and churches had been rescinded. When the incident happened, one of her first thoughts was that the officers must have made a mistake. Since then, she has been wrestling with the reality that the location of the incident was no mistake; the ICE officers who violently arrested her student's father chose to do so in front of his school and at the height of morning drop-off time, inciting fear in the entire school community.

193. The morning of the Guidepost Enforcement, Lauren was in her classroom welcoming students during the drop-off period. When Lauren was notified that ICE was making an arrest in front of the school, her first thought was that it could not be true—it felt like a nightmare. She was then informed that ICE had specifically arrested the father of one of her students, "D". Lauren was in shock and struggled to process the news. At the same time, she was still in charge of her classroom, and she had to compartmentalize her own emotions to focus on keeping her young students calm and engaged. She felt unable to teach her normal curriculum and instead focused on just getting through the day and doing her best to maintain a positive environment for her students, despite her own intense feelings about the incident. She also tried to be particularly attentive to how D was feeling and to ensure the child was supported. There was an especially

difficult moment for her when D saw other students being picked up by their parents and asked if his father was coming to get him.

194.  The day after the Guidepost Enforcement, Lauren came to school in a haze and felt like she was having an out-of-body experience trying to deal with the trauma and figure out what next steps she should take as a teacher. For the rest of the week, she did not have the capacity to lead normal lessons; she felt like she was in survival mode.

195.  Since the arrest, Lauren has made herself available for additional meetings to help parents process the arrest and how it makes them feel about their children's safety. The day after the Guidepost Enforcement, Lauren attended an after-school meeting that brought together staff, parents, and administrators to discuss what happened and what they could do next. Parents with green cards were asking if they were still safe, and there was no easy answer to that question. Lauren has also adopted an open-door policy to allow parents to process their feelings with her so they can work through their anger, fear, and confusion together.

196.  As D's teacher, Lauren has observed changes in his behavior since the incident. D has always had a close emotional attachment to both of his parents, but since his father was detained, he has cried for his parents much more often, particularly for his father. Lauren continues to see the impact of his arrest on D's behavior in class. For example, he is more upset and struggles to feel secure at nap time, when he appears to be missing his parents.

197.  Lauren also continues to work through her own trauma from the Guidepost Enforcement. She struggles to understand how armed officers could choose to conduct a violent arrest on school grounds, separating a student from his father during his routine drop-off and making the decision to expose other young children to their aggression. Experiencing this incident firsthand has opened her eyes to the extent of injustice that is occurring, and she feels strongly that she must do what she can to maintain a safe environment for her students and use her voice to stand

up for them.

198. While Lauren is proud of how her school community has rallied together in the aftermath of the Guidepost Enforcement, she struggles with the knowledge that this kind of violence may happen again at any time. She is also deeply concerned with how less privileged schools with fewer resources are being impacted by similar arrests. She has heard that ICE will be hosting a hiring event in Portland soon and is concerned that another violent enforcement action will occur on school grounds. Her trust in law enforcement has diminished, and she feels that there are no longer any spaces that are truly safe.

199. Plaintiff **Caroline Keating Medeiros** is a parent whose child attends Guidepost. She is an attorney who works full time, and her husband also has a full-time job. She is a United States citizen and her contact with the immigration system is through her clients and her job as an immigration attorney. She and her husband chose to enroll their child at Guidepost after doing research about Montessori programs and seeing the school's offer for extended hours, which would accommodate her and her husband's work hours and enable them to continue with their careers.

200. Caroline learned about the rescission of protections for sensitive locations during the first days of the Trump administration as news was shared among the immigration attorney community, as it came with a large number of executive orders and policies that were being rolled out. Many of her clients expressed safety concerns and hesitation about sending their children to school because they felt they could be at risk of detention, so she provided materials and helped them figure out family plans for preparing for an emergency. But she never considered that her own child's school would be the site of an ICE enforcement operation.

201. Caroline was not present during the Guidepost Enforcement, but her husband had dropped off their child at the school earlier that morning. She learned about the incident when

another parent texted her asking for help since she was an immigration attorney. Caroline called the school immediately and spoke to Plaintiff Amy Lomanto and the affected family. At that moment, she learned that her child had been playing outside with the rest of her class during ICE's incursion. Her daughter's teacher later explained to Caroline that when she heard yelling from the parking lot, she peeked through the fence and saw masked, armed officers, so she panicked and signaled to the other teacher that they should take the children inside. Caroline's daughter similarly told her that the teacher lined all the kids up, and they ran inside. Over the following days, her daughter received two incident reports for scratching other children, which indicated to Caroline that her daughter was still struggling with the emotions of that day in a non-verbal way, particularly because her daughter rarely acts out or gets physical with other children.

202.  Caroline also experienced significant emotional distress after the incident. While she attended many meetings with the school and the other Guidepost parents to process the enforcement, this was not sufficient to calm her anxiety. She restarted therapy after the incident to cope with what happened. She and her husband discussed pulling their child from school, but they ultimately decided not to for now because of the impact it would have on their family's balance of life. She is now concerned that another enforcement action could happen again. She lives with the fear that if ICE shows up again, they will again use excessive force or employ firearms and a stray bullet could injure or kill a child playing in their school playground; and that child could be hers.

203.  Caroline now believes that if violent immigration enforcement can happen at her child's school, it can happen anywhere, and children should never be put at risk in this way. Caroline and her daughter have been harmed by the ending of protections to sensitive locations.

**CLAIMS FOR RELIEF**

## COUNT I

## Violation of the First Amendment of the United States Constitution

## Interference with Freedom of Association and Facially Overbroad

(For All Plaintiffs Pineros Y Campesinos Unidos Del Noroeste, Augustana Lutheran Church, Our Lady of Guadalupe Parish; San Francisco Interfaith Council, Westminster Presbyterian Church, and American Federation of Teachers Against All Defendants)

110.204.  Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

111.205.  The right to expressive association is "implicit in the right to engage in activities protected by the First Amendment." *Roberts v. Jaycees*, 468 U.S. 609, 622 (1984). A group that "engage[s] in some form of expression, whether it is public or private," has a protectable right of expressive association. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

112.206.  The First Amendment extends to all persons in the United States, not just citizens. *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1064 (9th Cir. 1995).

113.207.  The above Plaintiffs and their members engage in protected conduct and expressive association for political, social, economic, educational, religious, and cultural ends. For example, PCUN and its members hold rallies, outreach events, and other programming to organize around social justice issues and support the Oregon Latinx community. Augustana Lutheran Church, Our Lady of Guadalupe Parish, San Francisco Interfaith Council and its members, and Westminster Presbyterian Church also hold religious ceremonies and services, as well as educational, legal, and cultural events for their diverse communities. AFT and its affiliates organize various events for their members, including rallies, protests and demonstrations.

114.208. The above Plaintiffs and their members wish to continue engaging in their First Amendment-protected activities and association to the fullest extent possible, but because of Defendants' conduct, are deterred from doing so.

~~115.~~209.  Defendants' rescission of sensitive locations protections enables immigration enforcement to target sensitive locations and events commonly associated with expression, directly and substantially interfering with the ability of Plaintiffs and their members to associate freely.

~~116.~~210.  Following the rescission of protections for sensitive locations, Defendants have shown that immigration enforcement actions will be carried out to punish individuals at sensitive locations from engaging in expressive activity with which Defendants disagree.~~50~~569  The rescission of sensitive locations protections has already led to fear and discouragement of participation in planned protests, events, and activities, as well as religious ceremonies.

~~117.~~211.  Defendants' rescission of sensitive locations protections and adoption of "common sense" enforcement is also facially overbroad because it creates an unacceptable risk of the suppression of ideas. *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 949 (9th Cir. 1997).

~~118.~~212.  Defendants' actions do not serve a compelling governmental interest, nor do they reflect the least restrictive means of engaging in immigration enforcement activities in or near protected areas. Indeed, Defendants have carried out their immigration policies for thirty years while protections for sensitive locations were in place; there is no reason Defendants cannot continue to obtain advance approval to conduct immigration enforcement activities near or at

---

~~50 *See, e.g.*, Prem Thakker, *DHS Detains Palestinian Student from Columbia Encampment*, Zeteo (Mar. 9, 2025), https://zeteo.com/p/breaking-dhs-detains-palestinian (indicating arrest occurred at Columbia University housing); Larry Neumeister, *Immigration Officials Arrest Second Person Who Participated in Pro-Palestinian Protests at Columbia*, Associated Press (Mar. 14, 2025), https://apnews.com/article/columbia-university-mahmoud-khalil-ice-arrests-3a8db6e646b786a721089a6f0bc8d9fc ("On Thursday, ICE agents also visited the university-owned residences of two other students at Columbia University, but did not make any arrests.").~~

69 *See, e.g.*, Prem Thakker, *DHS Detains Palestinian Student from Columbia Encampment*, Zeteo (Mar. 9, 2025), https://zeteo.com/p/breaking-dhs-detains-palestinian (indicating arrest occurred at Columbia University housing); Larry Neumeister, *Immigration Officials Arrest Second Person Who Participated in Pro-Palestinian Protests at Columbia*, Associated Press (Mar. 14, 2025), https://apnews.com/article/columbia-university-mahmoud-khalil-ice-arrests-3a8db6e646b786a721089a6f0bc8d9fc ("On Thursday, ICE agents also visited the university-owned residences of two other students at Columbia University, but did not make any arrests.").

sensitive locations absent any exigent circumstances.

119.213.  Defendants' rescission of protections for sensitive locations chills Plaintiffs' and their members' conduct and ability to associate, causing them significant harm in violation of the First Amendment of the United States Constitution.

120.214.  Defendants' rescission of protections for sensitive locations also chills the speech of anyone who would otherwise engage in expressive conduct at the protected areas, which are now vulnerable to immigration enforcement.

## COUNT II

**Violation of the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb–2000bb-4**

(For Augustana Lutheran Church, Our Lady of Guadalupe Parish, San Francisco Interfaith Council, and Westminster Presbyterian Church Against All Defendants)

121.215.  Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

122.216.  42 U.S.C. § 2000bb protects the free exercise of religion by ensuring that even "neutral" laws that "may burden religious exercise" are prohibited.

123.217.  The "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

124.218.  Defendants' rescission of protections for sensitive locations permits ICE and CBP agents to conduct immigration enforcement activity, including arrests, investigations, and surveillance, at and near houses of worship, locations where houses of worship provide community services, and during religious ceremonies.

125.219.  Such conduct has deterred and will continue to deter membership, attendance, and

participation in religious services and related events for all individuals, including lawful permanent residents and U.S. citizens. ICE enforcement will also be likely to disrupt activities and events held by places of worship, including religious ceremonies. The conduct has impacted the free exercise rights of members of the Augustana Lutheran Church; Our Lady of Guadalupe Parish, San Francisco Interfaith Council, and Westminster Presbyterian Church. Plaintiffs' core work of carrying out religious ceremonies and providing pastoral care to parishioners to further their faith has been disrupted by the need to now prioritize maintaining the safety of their sanctuaries.

126.220.  Defendants' actions do not serve a compelling governmental interest, nor do they reflect the least restrictive means of engaging in immigration enforcement activities in or near protected areas. Indeed, Defendants have enforced their immigration policies for thirty years while protections for sensitive locations were in place; there is no reason Defendants cannot continue to get advance approval to conduct immigration enforcement activities near or at sensitive locations absent any exigent circumstances.

127.221.  Defendants' actions cause Plaintiffs significant harm, including chilling Plaintiffs' conduct and ability to freely exercise their religions.

128.222.  Defendants' rescission of protections for sensitive locations thus substantially burdens the exercise of religion in violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(b).

## COUNT III

### Violation of the Administrative Procedure Act – 706(2)(A) Arbitrary and Capricious Agency Action

(For All Plaintiffs Against All Defendants)

129.223.  Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

130.224. The APA requires courts to hold unlawful or set aside agency final action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

131.225. Defendants' rescission of the 2021 Mayorkas Memo through the 2025 Huffman Memo constitutes final agency action within the meaning of the APA. 5 U.S.C. § 704. Defendants' nine-sentence rescission provided no explanation for departing from more than thirty years of consistent policies limiting immigration enforcement around sensitive locations. Nor did Defendants' rescission consider the reliance interests of individuals and organizations, including Plaintiffs and their members, who for decades have depended on enforcement limits at sensitive locations to feel safe and secure when accessing essential services at these sites.

132.226. The 2025 Huffman Memo is the Defendants' "last word" on immigration enforcement at sensitive locations and activities, and it has the legal effect of denying substantive and procedural protections that were in place for over thirty years, including as provided in the 2021 Mayorkas Memo.

133.227. Defendants issued the 2025 Huffman Memo without considering important relevant factors, including the facts and reasoning supporting the 2021 Mayorkas Memo and prior memos or why those past policies were not sufficient; what circumstances necessitated the sudden departure or why the public policy and safety concerns cited by past agency heads no longer applied; evaluation of alternative approaches; or the impact of conducting immigration enforcement activities near or at sensitive locations on affected stakeholders, including religious organizations, healthcare providers, social services providers, and schools, as well as the people who have come to rely on them.

134.228. The 2025 Huffman Memo is also not in accordance with law because it violates First Amendment rights and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*

For the reasons above, the 2025 Huffman Memo is also arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law in violation of the APA. 5 U.S.C. § 706(2)(A).

## COUNT IV

### Violation of the Administrative Procedure Act – 706(2)(B)

### Action Contrary to Constitutional Rights

(For ~~All Plaintiffs~~Pineros Y Campesinos Unidos Del Noroeste, Augustana Lutheran Church, Our Lady of Guadalupe Parish; San Francisco Interfaith Council, Westminster Presbyterian Church, and American Federation of Teachers Against All Defendants)

~~135.~~229.  Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

~~136.~~230.  The APA requires courts to hold unlawful or set aside agency final action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

~~137.~~231.  Defendants' 2025 Huffman Memo, which rescinds and supersedes the 2021 Mayorkas Memo, constitutes final agency action within the meaning of the APA. 5 U.S.C. § 704.

~~138.~~232.  Defendants rescinded the 2021 Mayorkas Memo and issued the 2025 Huffman Memo, which interferes with and chills individuals' rights to free speech, freedom of association, and free exercise of religion. As alleged above, the conduct has impacted these First Amendment rights of the above Plaintiffs and/or their members.

~~139.~~233.  The 2025 Huffman Memo violates the First Amendment and is thus "contrary to constitutional right, power, privilege, or immunity" in violation of the APA, 5 U.S.C. § 706(2)(B).

### PRAYER FOR RELIEF

Plaintiffs pray for the following relief:

~~140.~~234.  An order declaring Defendants' rescission of protections for sensitive locations unconstitutional, void, and of no effect;

84

141.235.  An order declaring that the 2025 Huffman Memo is unlawful because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

142.236.  An order declaring that Defendants' rescission of protections for sensitive locations violates the Religious Freedom Restoration Act.

143.237.   An order vacating the 2025 Huffman Memo in its entirety;

144.238.  An order enjoining Defendants from taking any immigration enforcement actions that are not authorized in accordance with the 2021 Mayorkas Memo;

145.239.  An order awarding Plaintiffs costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable statute or regulation; and

146.240.   An order granting such further relief as the Court deems just, equitable, and proper.

##

#

/

Dated: ~~April 28~~September 9, 2025          Respectfully submitted,

/s/                                                      ~~Stephen W Manning~~

_____

STEPHEN W MANNING, OSB No. 013373
stephen@innovationlawlab.org,
smanning@ilgrp.com
~~ESTHER H SUNG, Cal.~~TESS HELLGREN, OSB No. ~~255962*~~191622
~~esther.sung@justiceactioncenter.org~~
tess@innovationlawlab.org
~~KAREN C TUMLIN, Cal~~RACHEL LANDRY, Mass. No. ~~234961~~713320*
rachel@innovationlawlab.org
NELLY GARCIA ORJUELA, OSB No. 223308
nelly@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042
~~karen.tumlin@justiceactioncenter.org~~

Attorneys for Plaintiffs

~~HILLARY LI, Ga.~~LUBNA A. ALAM, DC No. ~~898375~~982169**
~~hillary.li@justiceactioncenter~~lalam@nea.org
~~LAURA FLORES-PERILLA, Cal No. 355645*~~
KATHERINE E. LAMM, DC No. 1006319**
~~laura.flores-perilla@justiceactioncenter~~klamm@nea.org
~~BRANDON GALLI-GRAVES, Tx No. 24132050*~~
~~brandon.galli-graves@justiceactioncenter.org~~
NATIONAL EDUCATION ASSOCIATION
1201 16th Street NW
Washington, DC 20036
(202) 822-7035
~~JUSTICE ACTION CENTER~~

~~STEPHEN W MANNING, OSB No. 013373~~
~~stephen@innovationlawlab.org,~~
~~smanning@ilgrp.com~~
~~TESS HELLGREN, OSB~~BRANDON GALLI-GRAVES, Tx. No. ~~191622~~24132050*
~~tess@innovationlawlab~~brandon.galli-graves@justiceactioncenter.org
ESTHER H SUNG, Cal. No. 255962*
esther.sung@justiceactioncenter.org
KAREN C TUMLIN, Cal. No. 234961*
karen.tumlin@justiceactioncenter.org
~~RACHEL LANDRY, Mass~~HILLARY LI, Ga. No. ~~713320~~898375*
hillary.li@justiceactioncenter.org
LAURA FLORES-PERILLA, Cal. No. 355645*
laura.flores-perilla@justiceactioncenter.org
JUSTICE ACTION CENTER
PO Box 27280
Los Angeles, CA 90027
Telephone: +1 323-450-727

DANIEL MCNEIL, D.C. No. 455712**
~~rachel@innovationlawlab~~dmcneil@aft.org
~~NELLY GARCIA ORJUELA, OSB No. 223308~~
CHANNING COOPER, Md. No. 1212110182**
~~nelly@innovationlawlab~~ccooper@aft.org
AMERICAN FEDERATION OF TEACHERS
555 New Jersey Avenue, N.W.
Washington, D.C. 20001
~~INNOVATION LAW LAB~~
~~333 SW 5th Ave., Suite 200~~
~~Portland, OR 97204-1748~~
Telephone: +1 ~~503-922-3042~~202-879-4400

Attorneys for National Education
Association                                    Attorneys for American Federation of Teachers
PO Box 27280
Los Angeles, CA 90027
Telephone: +1 323-450-7272

Attorneys for Plaintiffs
*Pro hac vice applications forthcoming

*Pro hac vice
**Pro hac vice applications forthcoming