STEPHEN W MANNING, OSB No. 013373
stephen@innovationlawlab.org,
smanning@ilgrp.com
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

BRANDON GALLI-GRAVES,
Tx. No. 24132050*
brandon.galli-graves@justiceactioncenter.org
JUSTICE ACTION CENTER
PO Box 27280
Los Angeles, CA 90027
Telephone: +1 323-450-727

*Pro hac vice

Additional Counsel on Signature Page

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| PINEROS Y CAMPESINOS UNIDOS DEL NOROESTE, et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> KRISTI NOEM, et al., <br><br> *Defendants.* | Case No. 6:25-cv-699-AA <br><br><br> PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF FACTS ................................................................................... 2

III.    LEGAL STANDARD ........................................................................................... 4

IV.     ARGUMENT ........................................................................................................ 5

        A.      Plaintiffs Have Article III Standing. .................................................... 5

                1.      Plaintiffs Suffer Injury in Fact. .................................................. 6

                2.      Plaintiffs' Injuries Are Traceable to the Policy Rescission. ....... 14

                3.      Plaintiffs' Injuries Are Redressable.......................................... 17

        B.      The Court Has Jurisdiction Over the APA Claims. ............................. 18

                1.      The Huffman Memorandum Constitutes Final Agency Action. ............... 19

                2.      The Huffman Memorandum Is Not Committed to Agency
                        Discretion by Law and Is Reviewable. ...................................... 22

        C.      The Huffman Memorandum Violates RFRA and the First Amendment. ............. 26

                1.      The Huffman Memorandum Substantially Burdens the Religious
                        Plaintiffs' Religious Exercise and Plaintiffs' Right to Associate. ............. 27

                2.      The Huffman Memorandum Furthers No Compelling Government
                        Interest and Does Not Use the Least Restrictive Means.......................... 33

V.      CONCLUSION.................................................................................................... 37

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Gardner,*
    387 U.S. 136 (1967)................................................................................................19

*Alcaraz v. I.N.S.,*
    384 F.3d 1150 (9th Cir. 2004) ...........................................................................25

*Apache Stronghold v. United States,*
    101 F.4th 1036 (9th Cir. 2024) ............................................28, 29, 20, 31

*Arcara v. Cloud Books, Inc.,*
    478 U.S. 697 (1986)..............................................................................................32

*Armstrong v. Davis,*
    275 F.3d 849 (9th Cir. 2001) ...............................................................................7

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................................................4

*ASSE Int'l, Inc. v. Kerry,*
    803 F.3d 1059 (9th Cir. 2015) ..........................................................................24

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................................................4

*Bennett v. Spear,*
    520 U.S. 154 (1997)........................................................................................19, 22

*Bowen v. Roy,*
    476 U.S. 693 (1986)..............................................................................................31

*Boy Scouts of Am. v. Dale,*
    530 U.S. 640 (2000)................................................................................27, 32, 36

*Brinkman v. Liberty Tax Serv.,*
    No. CV 10-192-HU, 2010 WL 5158537 (D. Or. Sep. 24, 2010).............................17

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014)..............................................................................................30

*Candice E. v. Berryhill,*
    No. 6:18-CV-01261-YY, 2019 WL 2550318 (D. Or. 2019) .....................................9

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

*Chapman v. Pier 1 Imports (U.S.), Inc.*,
631 F.3d 939 (9th Cir. 2011) .................................................................................6

*Church v. City of Huntsville*,
30 F.3d 1332 (11th Cir. 1994) .............................................................................10

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971)..............................................................................................22

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)................................................................................................10

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)...............................................................................8, 9, 12, 13

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)........................................................................................14, 16

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020)..........................................................................................22

*Dousa v. United States Dep't of Homeland Sec.*,
662 F. Supp. 3d. 1123. (S.D. Cal. 2023)..............................................................30

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)..............................................................................................24

*Enesco Corp. v. Price/Costco Inc.*,
146 F.3d 1083 (9th Cir. 1998) ...............................................................................5

*Escobar Molina v. Dep't of Homeland Sec.*,
2025 WL 3465518 (D.D.C. Dec. 2, 2025)............................................................10

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)..............................................................................................19

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)...............................................................................12, 13, 14, 17

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)..............................................................................................20

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000).................................................................................9, 11, 17

*Guam v. Guerrero*,
290 F.3d 1210 (9th Cir. 2002) .............................................................................28

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)................................................................................12, 13

*Heckler v. Chaney*,
470 U.S. 821 (1985)..........................................................................……24

*Hunt v. Washington State Apple Advert. Comm'n*,
432 U.S. 333 (1977)..................................................................................11

*Immigrant Defs. L. Ctr. v. Noem*,
145 F.4th 972 (9th Cir. 2025)…….......................................................13, 24

*Jajati v. U.S. Customs & Border Prot.*,
102 F.4th 1011 (9th Cir. 2024)..................................................................25

*Kenney v. Glickman*,
96 F.3d 1118 (8th Cir. 1996) ....................................................................24

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ......................................................................5

*Laird v. Tatum*,
408 U.S. 1 (1972)..............................................................8, 9, 10, 12, 33

*Larson v. Valente*,
456 U.S. 228 (1982)..................................................................................17

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)...........................................................................5, 6, 16

*Lyng v. Northwest Indian Cemetery Protective Ass'n*,
485 U.S. 439 (1988)..................................................................................31

*M.S. v. Brown*,
902 F.3d 1076 (9th Cir. 2018) ..................................................................17

*Mack v. Warden Loretto FCI*,
839 F.3d 286 (3d Cir. 2016) (abrogated on other grounds by *Ziglar v. Abbasi*,
582 U.S. 120 (2017)) ................................................................................30

*Maya v. Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011) .............................................................14, 15

*Mendez-Gutierrez v. Ashcroft*,
340 F.3d 865 (9th Cir. 2003) ....................................................................26

*Nat. Grocers v. Rollins*,
157 F.4th 1143 (9th Cir. 2025) ...................................................................6

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

*Nat. Res. Def. Council v. U.S. Env't Prot. Agency,*
  38 F.4th 34 (9th Cir. 2022) ...................................................................................14

*Navajo Nation v. U.S. Forest Service,*
  535 F.3d 1058 (9th Cir. 2008) ..............................................................................30

*Oklevueha Native Am. Church of Hawaii, Inc. v. Holder,*
  676 F.3d 829 (9th Cir. 2012) ................................................................................12

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.,*
  465 F.3d 977 (9th Cir. 2006) ...........................................................................20, 21

*Ortega-Melendres v. Arpaio,*
  836 F. Supp. 2d 959 (D. Ariz. 2012) ..................................................................7, 10

*Pablo Sequen v. Albarran,*
  --- F. Supp. 3d ----, No. 25-CV-06487-PCP, 2025 WL 3724878 (N.D. Cal.
  Dec. 24, 2025)......................................................................................................25

*Perez Perez v. Wolf,*
  943 F.3d 853 (9th Cir. 2019) ................................................................................23

*Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of
  Homeland Sec.,*
  767 F. Supp. 3d 293 (D. Md. 2025)..............................8, 12, 15, 17, 18, 28, 32, 36

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.,*
  908 F.3d 476 (9th Cir. 2018) ................................................................................22

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984)........................................................................................27, 35

*Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.,*
  343 F.3d 1036 (9th Cir. 2003) ................................................................................5

*Sherbert v. Verner,*
  374 U.S. 398 (1963)..............................................................................................31

*Shroyer v. New Cingular Wireless Servs., Inc.,*
  622 F.3d 1035 (9th Cir. 2010) ................................................................................5

*Spencer Enters., Inc. v. United States,*
  345 F.3d 683 (9th Cir. 2003) ................................................................................25

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016)................................................................................................6

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

*Students for Fair Admission, Inc. v. President & Fellows of Harvard Coll.*,
 600 U.S. 181 (2023) ............................................................................................9

*Summers v. Earth Island Inst.*,
 555 U.S. 488 (2009) ............................................................................................9

*Susan B. Anthony List v. Driehaus*,
 573 U.S. 149 (2014) ......................................................................................10, 11

*The Presbyterian Church (U.S.A.) v. United States*
 870 F.2d 518 (9th Cir. 1989) ................................................................12, 13, 32

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
 578 U.S. 590 (2016) ..........................................................................................20

*United States v. Hardman*,
 297 F.3d 1116 (10th Cir. 2002) .........................................................................29

*United States v. Hoffman*,
 436 F. Supp. 3d 1272 (D. Ariz. 2020) ..........................................................36, 37

*United States v. Texas*,
 599 U.S. 670 (2023) ............................................................................................8

*Warth v. Seldin*,
 422 U.S. 490 (1975) ............................................................................................6

*Webster v. Doe*,
 486 U.S. 592 (1988) ..........................................................................................26

*Wilson v. Lynch*,
 835 F.3d 1083 (9th Cir. 2016) ...........................................................................22

*Wisconsin v. Yoder*,
 406 U.S. 205 (1972) ..........................................................................................31

**Statutes**

5 U.S.C. § 553 ............................................................................................................22

5 U.S.C. § 701 ............................................................................................................23

5 U.S.C. § 702 ......................................................................................................19, 22

5 U.S.C. § 704 ............................................................................................................22

5 U.S.C. § 706 ......................................................................................................19, 26

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

6 U.S.C. § 202 .............................................................................................................23

8 U.S.C. § 1357 ...........................................................................................................23

42 U.S.C. § 2000bb-1(b) .............................................................................................27

**Other Authorities**

8 C.F.R. § 287.8 ..........................................................................................................24

Federal Rule of Civil Procedure 12(b)(1) ....................................................................5

Federal Rule of Civil Procedure 12(b)(6) ....................................................................4

*No school for MPS rest of the week; Apparent ICE presence at Roosevelt High School causes chaotic scene*, KSPT (Jan. 7, 2026), https://kstp.com/kstp-news/top-news/apparent-ice-presence-at-roosevelt-high-school-causes-chaotic-scene/ ...........................................................................................................8

Madeleine Ngo, *ICE Arrests Disrupt Schools, Prompting Fear Among Families*, N.Y. Times (Dec. 17, 2025).............................................................................................7

U.S. Customs & Border Protection, *DHS Protected Areas FAQs* (last modified Mar. 14, 2025), https://www.cbp.gov/border-security/dhs-protected-areas-faqs [https://perma.cc/23HK-SQ63]...............................................................................22

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

## I.    INTRODUCTION

Schools, churches, hospitals, and civic gatherings are places where adults and children can learn, worship, heal, and come together in solidarity. For more than thirty years, the federal government tightly circumscribed civil immigration enforcement at these "sensitive locations," recognizing that in all but limited exigent circumstances Department of Homeland Security ("DHS") "can accomplish [its] enforcement mission without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more."

On January 20, 2025, Defendants abruptly reversed course, eschewing more than three decades of consistent agency guidance, restrictions on enforcement, and protections for sensitive locations. This new policy removes virtually all limitations on agents' authority and allows them to conduct immigration enforcement in any location, including "in America's schools and churches," subject only to their "common sense" and approval from certain supervising officers.

Defendants argue that their new policy is not materially different from past policy. Yet since Defendants' policy change, agents have descended on and around schools, churches, hospitals, and peaceful demonstrations across the country in an unprecedented and ever-increasing dragnet. It is having the expected result: people, regardless of their immigration status, now fear attending these formerly sacred locations. Plaintiffs' injuries are concrete and continuing: for Plaintiffs and their members, this policy has resulted in congregants staying home from religious services; churches and social service organizations receiving fewer donations and less funding; families avoiding school and students struggling to learn; educators experiencing reduced enrollment and increased workloads, stress, and fear of job loss; union members having their speech chilled; individuals being forced to abandon necessary healthcare; and emotional

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

and psychological trauma. These actions violate Plaintiffs' constitutional and statutory rights, impairing their core missions and activities, and inflicting acute harm on them, their constituents, and their members.

This Court has jurisdiction to review the legality of Defendants' rescission of protections for sensitive locations. Plaintiffs have sufficiently pled that they have standing, and that Defendants' conduct violates the Administrative Procedure Act, the Religious Freedom Restoration Act, and their First Amendment rights. The Court should reject the government's attempt to evade judicial review and deny Defendants' motion to dismiss.

## II.    STATEMENT OF FACTS

From at least 1993 to 2025, the government applied an immigration nonenforcement policy at or near "protected areas," also referred to as "sensitive locations." Amended Complaint ("Compl."), Dkt. 29, ¶¶ 33–49.

This policy was embodied in a series of memoranda, beginning with a memo issued in 1993 by Immigration and Nationality Service ("INS") Acting Associate Commissioner James Puleo, which set out the "policy of [INS] to attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies." *Id.* ¶ 36. The memorandum required "advance written approval" from one of four Assistant or Executive Assistant Directors for any enforcement action "likely to involve apprehensions" at such areas, as well as a weighing of "[t]he availability of alternative measures," "[t]he importance of the enforcement objective," and "measures which [could] be taken to minimize the impact on operation of the school or place of worship." *Id.* Where "exigent circumstances require[d] a deviation from this policy," the matter was required to be reported up the chain of command immediately following the enforcement action. *Id.* ¶ 37. All officers were

to be "well-versed in and able to apply" the criteria for engaging in actions required by exigent circumstances. *Id.*

From 2007 to 2013, Immigration and Customs Enforcement ("ICE") issued five more memoranda cementing this practice, *id.* ¶¶ 38–46, reiterating the principle "that great care and forethought [should] be applied before undertaking any investigative or enforcement type action" at schools and "venues where children and their families may be present." *Id.* ¶ 42. Agents' conduct was to be "safe and respectful of all persons" and personnel were to be "cognizant of the impact of their activity ... and act with an appropriate level of compassion in light of the location," including "avoid[ing] unnecessarily alarming local communities." *Id.* ¶¶ 42, 44.

In 2021, DHS Secretary Alejandro Mayorkas issued a superseding memorandum to ICE and Customs and Border Protection ("CBP") (the "Mayorkas Memorandum"), reaffirming the "fundamental" principle that DHS "can accomplish [its] enforcement mission without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more." *Id.* ¶ 47. The memorandum thus set out DHS's "obligation to refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area." *Id.* ¶ 48.

Like its predecessors, the Mayorkas Memorandum required ICE and CBP officers to obtain prior approval from agency headquarters for enforcement actions in or near sensitive locations, except in limited exigent circumstances, which instead required consultation with headquarters following the action. *Id.* ¶ 49. These "limited circumstances" included national security threats, hot pursuit of a personally observed "border crosser" or a person posing a public-safety threat, or imminent risk of destruction of evidence related to a criminal case. *Id.* ¶ 49. The memorandum also required that all enforcement actions "in or near a protected area ...

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing the protected area." Declaration of Benjamin T. Hickman ("Decl."), Dkt. 52, Ex. 3, at 4.

On January 20, 2025, Acting DHS Secretary Benjamine Huffman issued a new memorandum (the "Huffman Memorandum") ending this longstanding policy and revoking the Mayorkas Memorandum, replacing "bright line rules" of nonenforcement at sensitive locations with law enforcement officers' "discretion along with a healthy dose of common sense." Compl. ¶ 53; Decl. Ex. 4. Similarly, on January 31, 2025, then-Acting ICE Director Caleb Vitello issued a memorandum (the "2025 Vitello Memorandum," together with the Huffman Memorandum, the "2025 Memoranda") granting ICE officials case-by-case discretion on "whether, where, and when to conduct an immigration enforcement action in or near a protected area." Compl. ¶ 54, Decl. Ex. 5, at 2.

Plaintiffs filed suit on April 28, 2025, alleging that Defendants' rescission of protections for sensitive locations violated their First Amendment rights of expressive association, the Religious Freedom Restoration Act ("RFRA"), and the Administrative Procedure Act ("APA"). Plaintiffs' amended and supplemental complaint added individual and labor union plaintiffs representing educators, healthcare providers, students, and their families around the nation.

## III. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint need allege only "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court may consider materials incorporated by reference into a complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's

claim." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (cleaned up). On a motion to dismiss, the Court must take all allegations of material fact as true and construe all facts in the light most favorable to the non-moving party. *Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1085 (9th Cir. 1998). A motion should be denied if the complaint alleges any cognizable legal theory. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the lack of subject matter jurisdiction, including as to standing. Such challenges "may be facial or factual," with a facial challenge "confining the inquiry to allegations in the complaint ...." *Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.*, 343 F.3d 1036, 1040 n. 2 (9th Cir. 2003).[1]

## IV.    ARGUMENT

### A.    Plaintiffs Have Article III Standing.

Plaintiffs have individual, associational, and organizational standing. Under each theory, Plaintiffs allege an "injury in fact" that is "fairly traceable to the challenged action" and "likely" to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "[W]here (as here), Plaintiffs seek non-monetary relief ... and the scope of relief available does not differ among each plaintiff ... it suffices if at least one Plaintiff has Article III

---

[1] Defendants provide neither arguments nor evidentiary support to factually challenge Plaintiffs' allegations. *See Savage*, 343 F.3d at 1040 n.2 (noting a factual challenge occurs "[o]nce the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly before the court"). Although Defendants have provided a declaration with exhibits, the only new exhibit offered is a hearing transcript that is not cited as a factual matter. *See* Decl., Ex. 6; Mot. at 8. Otherwise, Defendants' exhibits include only policy documents that were already cited in Plaintiffs' Amended Complaint and therefore are incorporated by reference. *Khoja*, 899 F.3d at 1002.

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

standing as to each of the claims at issue." *Nat. Grocers v. Rollins*, 157 F.4th 1143, 1156 (9th Cir. 2025).

All Plaintiffs—individuals and organizations representing their members and themselves —suffer concrete and particularized harms traceable to Defendants' rescission of protections for sensitive locations that are redressable by this Court.

### 1. Plaintiffs Suffer Injury in Fact.

Plaintiffs sufficiently plead injury in fact. An injury in fact must be "concrete and particularized" and "actual or imminent," not "conjectural or hypothetical." *Lujan*, 504 U.S. at 560. To be concrete, an injury "must actually exist," that is, it must be "real, and not abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (cleaned up). To be particularized, an injury "must affect the plaintiff in a personal and individual way." *Id.* An organization may demonstrate standing either on behalf of itself due to harm caused to the organization as an entity (organizational standing) or on behalf of its members who have individual standing (associational standing). *Warth v. Seldin*, 422 U.S. 490, 511 (1975). To establish standing for prospective relief, a plaintiff must allege a "real and immediate threat" of future injury. *See Chapman v. Pier 1 Imports (U.S.), Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (citation omitted).

### a) Guidepost Plaintiffs Suffer Cognizable Injuries.

Plaintiffs Lomanto, Anderson, Fong, and Madeiros ("Guidepost Plaintiffs") sufficiently allege they suffered impairment to their jobs (Lomanto, Anderson, and Fong; together "Guidepost Education Professionals") and emotional injuries when Defendants violently detained a Guidepost student's father in the school parking lot in clear view of children, parents, and staff. *E.g.*, Compl. ¶¶ 180–83 (Lomanto); 187–90 (Anderson); 193–98 (Fong); 201–03

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

(Madeiros). Guidepost Education Professionals subsequently faced increased student behavioral and attendance issues, *id.* ¶¶ 180, 188, 196; increased need for support from staff and parents, *id.* ¶¶ 181, 187, 195; and emotional trauma from their experiences protecting students during the ICE incursion, *id.* ¶¶ 189, 194, 197.

Guidepost Plaintiffs plausibly allege they face a "real and immediate threat" of future injury. Guidepost Plaintiffs allege their injuries were a direct result of the 2025 Huffman Memorandum's rescission of longstanding policy limiting immigration enforcement at sensitive locations. *See* Compl. ¶¶ 53–55, 176–78. Courts have found injuries are likely to recur where, like here, "the defendant had, at the time of the injury, a written policy, and ... the injury 'stems from' that policy." *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001); *see also Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 979 (D. Ariz. 2012), *aff'd sub nom. Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012).

The threat of future enforcement at Guidepost is therefore neither "conjectural" nor "hypothetical," *see* Mot. at 20–21. Indeed, ICE has continued aggressive enforcement at sensitive locations, including schools, since the Guidepost encounter. *See* Compl. ¶¶ 59–62.[2] On January 7, 2026, mere hours after an ICE officer shot and killed Renee Good in Minneapolis, immigration agents showed up less than three miles away at Roosevelt High School, where they blocked portions of the road and chased, tackled, and fired pepper spray and other chemical irritants at students and staff.[3]

---

[2] *See also* Madeleine Ngo, *ICE Arrests Disrupt Schools, Prompting Fear Among Families*, N.Y. Times (Dec. 17, 2025), https://www.nytimes.com/2025/12/17/us/politics/ice-arrests-schools.html.

[3] *No school for MPS rest of the week; Apparent ICE presence at Roosevelt High School causes chaotic scene*, KSPT (Jan. 7, 2026), https://kstp.com/kstp-news/top-news/apparent-ice-presence-at-roosevelt-high-school-causes-chaotic-scene/.

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

Defendants' argument against standing relies on three inapposite cases: *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), *Laird v. Tatum*, 408 U.S. 1 (1972), and *United States v. Texas*, 599 U.S. 670 (2023). *Clapper* and *Laird* are irrelevant to Guidepost Plaintiffs' claims, as those plaintiffs did not allege they were ever subject to the challenged policy. *See Clapper*, 568 U.S. at 411; *Laird*, 408 U.S. at 10 (rejecting claim based on allegations of chilling effect "without more" caused by government action). Guidepost Plaintiffs' harms, by contrast, are a direct result of immigration enforcement at their school.

Defendants' invocation of *Texas* likewise fails. *See* Mot. at 20. The Supreme Court's holding that the states lacked standing to challenge "an insufficient number of arrests or ... prosecutions," *Texas*, 599 U.S. at 678, has no bearing on Plaintiffs' standing to challenge enforcement actions and policies that directly violate their rights. *See Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, 767 F. Supp. 3d 293, 315 (D. Md. 2025) ("[t]he lack of standing [in *Texas*] ... was based not on a general principle that Article II bars lawsuits relating to Executive Branch policies governing arrests or prosecutions," but rather that decisions *not* to arrest or prosecute do not exercise coercive power over individuals' liberty or property). *Texas'* holding that Article III standing requires "much more" when a plaintiff's "asserted injury arises from the government's unlawful regulation (or lack of regulation) of someone else," 599 U.S. at 678, also does not help Defendants. Guidepost Plaintiffs have themselves been directly affected by enforcement. They continue to work at or send children to school, and thus face "real and immediate threat" of future injury resulting from enforcement authorized by the Huffman Memorandum.

      **b)     PCUN, SFIC, NEA, and AFT Suffer Cognizable Injuries for Associational Standing.**

Defendants do not challenge (or even acknowledge) harms pled by PCUN, SFIC, NEA, and AFT ("Associational Plaintiffs") on behalf of their members. *See* Mot. at 18–20. Defendants forfeit such arguments by failing to raise them in their motion to dismiss. *See, e.g.*, *Candice E. v. Berryhill*, No. 6:18-CV-01261-YY, 2019 WL 2550318, at *3 (D. Or. 2019) (defendant's failure to address an issue is a concession of the issue).

Regardless, Associational Plaintiffs have standing. An organization may bring a case on behalf of its members if (1) at least one member would have standing to sue in their own right, (2) the interests at stake are germane to the organization's purposes, and (3) "neither the claim asserted, nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Associational Plaintiffs meet these requirements.

At least one member of each Associational Plaintiff "ha[s] suffered or [will] suffer harm," *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009), and they "would otherwise have standing to sue in their own right," *Students for Fair Admission, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). As with Guidepost Plaintiffs, Associational Plaintiffs' members allege both ongoing harms and "real and immediate threat" of future harms from immigration enforcement at or near sensitive locations due to the 2025 Memoranda. *See* Compl. ¶¶ 65–67, 101–15, 129, 132–70 (including loss of funding and other financial harms; decreased attendance; cancelled events; personal fear of enforcement at sensitive locations, including for non-citizen NEA members working in schools; and increased workloads and stress from changed student behavior in response to possible immigration enforcement at their locations). Defendants' reliance on *Clapper*, *Laird,* and *Texas* is thus similarly unavailing. *See supra*, Section IV.A.1.a.

9

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

Furthermore, the Huffman Memorandum exposes Associational Plaintiffs' members to enforcement at or near sensitive locations that they frequent as they engage in the lawful and unavoidable activities of daily life. *See, e.g.,* Compl. ¶¶ 64–71 (PCUN members seeking medical care, sending their children to school, attending church); *id.* ¶¶ 132–70 (NEA and AFT members working at schools; AFT members working in healthcare settings and attending demonstrations). Associational Plaintiffs' members therefore cannot avoid future injury by simply avoiding illegal conduct, just as Guidepost Education Professionals could not avoid being harmed while simply performing their jobs. *See, e.g.*, *Melendres*, 695 F.3d at 998 (plaintiffs had standing to challenge traffic stop policy targeting Latino individuals because "[e]xposure to this policy while going about one's daily life ... constitutes ongoing harm and evidence that there is sufficient likelihood that the Plaintiffs' rights will be violated again."). *Accord Church v. City of Huntsville*, 30 F.3d 1332, 1338 (11th Cir. 1994) (same); *Escobar Molina v. Dep't of Homeland Sec.*, 2025 WL 3465518, at *16 (D.D.C. Dec. 2, 2025) (same). *But cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (holding plaintiff lacked standing to enjoin future chokeholds by police department because demonstrating threat of future injury required, among other things, assumption he would commit another legal violation).

Additionally, contrary to Defendants' argument, Associational Plaintiffs meet the standard required for pre-enforcement review for preventive injunctive relief under *Clapper*, *Laird*, and *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (requiring threatened enforcement be "sufficiently imminent" to sustain a pre-enforcement challenge). Defendants rely on *Mennonite Church USA v. U.S. Dep't of Homeland Sec.*, where the court found plaintiffs failed to make the "requisite showing of a 'credible threat'", based in part on a record limited to just three instances of immigration enforcement in or near places of worship. 778 F. Supp. 3d 1,

9 (D.D.C. 2025). The Amended Complaint here, by contrast, alleges ongoing, nationwide immigration enforcement at or near sensitive locations following the Huffman Memorandum. *See, e.g.*, Compl. ¶¶ 58–62 (enforcement operations at schools or churches in Georgia, North Carolina, California, and Oregon). These allegations are sufficient to establish a robust pattern of enforcement on which this Court can find that threatened enforcement is "sufficiently imminent," *Susan B. Anthony List*, 573 U.S. at 158, to confer standing on Associational Plaintiffs' members at this stage of the litigation.

Second, the interests at stake in this case are germane to each organization's purpose. *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977) (interests are germane when they are "central to the ... purpose" of the organization). PCUN is a membership organization that "advocates for and empowers Oregon farmworkers and Latinx families to advance their communities' goals" and works to promote "immigrant rights[.]" Compl. ¶ 16. SFIC advocates on behalf of its constituents to ensure they can offer spiritual comfort and coordinate services for impacted community members. *Id.* ¶ 19. NEA is committed to advocating for its membership of education professionals and to ensuring the values of public education are made real for all students across the country, irrespective of immigration status. *Id.* ¶¶ 21–22. AFT advocates on behalf of its members who work in education and healthcare to protect and promote high-quality public education and healthcare as critical institutions that must be accessible to all, and advancement of its interests requires the participation of its members through organizing, including attending rallies and demonstrations. *Id.* ¶¶ 22, 171. The harms to each organization's members are squarely germane to their purposes.

Third, "neither the claim asserted, nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth*, 528 U.S. at 181 (citing *Hunt*, 432 U.S.

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

at 343). Prospective relief of the sort sought here typically does not require individual participation because it can "reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 839 (9th Cir. 2012) (quoting *Warth*, 422 U.S. at 515).

### c) Augustana, OLG, PCUN, WPC, and AFT Suffer Cognizable Injuries for Organizational Standing.

Plaintiffs Augustana, OLG, PCUN, WPC, and AFT ("Organizational Plaintiffs") each sufficiently allege direct and ongoing harms to their organizations caused by the rescission of protections for sensitive locations. An organization suing on its behalf must satisfy the three basic requirements of standing (injury in fact, causation/traceability, and redressability). *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982); *see also Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

Organizational Plaintiffs each allege harms including decreased attendance at services and events, Compl. ¶¶ 68, 97, 120–21, 161, 163–65, 168, 170. Defendants argue that Plaintiffs' standing cannot be based on threat of enforcement to third parties, but the Ninth Circuit has held decreased attendance at worship services due to a chilling effect on third-party congregants is sufficient to show injury in fact. *The Presbyterian Church (U.S.A.) v. United States* 870 F.2d 518, 522 (9th Cir. 1989). Rejecting the argument that the injuries did "not derive from coercive action by the [government]," the court determined that the "concrete, demonstrable decrease in attendance," although derived from a chill on congregants, was a "distinct and palpable" injury to the churches. *Id.* (cleaned up). Indeed, another district court hearing a challenge to the Huffman Memorandum held that "reductions in attendance [that] cause injury" to religious organizations are not merely "an abstract chilling effect" as in *Clapper* or *Laird*. *Philadelphia Yearly Meeting*, 767 F. Supp. 3d at 312–14. OLG and WPC both allege decreased attendance at

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

core church activities. Compl. ¶¶ 97, 120. Similarly, PCUN and AFT allege decreased attendance at rallies, causing distinct injury to the organizations' core purposes of advancing their members' interests through organizing. Compl. ¶¶ 68, 164.

Organizational Plaintiffs likewise allege forced diversion of resources caused by or resulting in harm to preexisting core activities, *id.* ¶¶ 68–71, 76–80, 88, 90–99, 121, 123. For an organization, cognizable harms include diversion of resources, *Havens Realty*, 455 U.S. at 379, so long as the diversion is caused by, or results in, harm to the organization's pre-existing core activities. *See, e.g.*, *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 988 (9th Cir. 2025). *C.f. Hippocratic Med.*, 602 U.S. 367 at 395–96. Although Defendants claim that Plaintiffs are "'manufactur[ing]' standing by diverting resources to address 'their fears of hypothetical future harm,'" Mot. at 13 (quoting *Clapper*, 568 U.S. at 416), Organizational Plaintiffs' allegations are a far cry from the "costs incurred to protect against 'hypothetical' future [government action]" that *Clapper* held were insufficient to confer standing, 568 U.S. at 416. Specifically, Organizational Plaintiffs allege the rescission of sensitive locations protections forces them, in order to continue core preexisting activities, to spend time and money protecting members from threatened raids at sensitive locations, *e.g.*, Compl. ¶¶ 69, 92, 98–99, 123, and to adopt new duties and initiatives to minister to, protect, and educate vulnerable constituents, members, and students, *id.* ¶¶ 71, 77–79, 91, 93, 99, 123, 162. The diversion also directly impairs some core activities by forcing Plaintiffs to abandon or modify preexisting ministry and other religious activities because of resource deficiencies. *Id.* ¶¶ 80, 95, 99. Such harms have been held sufficient to establish organizational injury. *Immigrant Rights Ctr.*, 145 F.4th at 988 (diversion of resources to address "Remain in Mexico" policy's impact on core activities constituted injury).

## 2. Plaintiffs' Injuries Are Traceable to the Policy Rescission.

Traceability exists where "government action has caused or likely will cause injury in fact to the plaintiff." *Hippocratic Med.*, 602 U.S. at 385. The challenged action does not need to be the proximate cause, *see Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011), or the only cause of the plaintiff's injuries, *see Nat. Res. Def. Council v. U.S. Env't Prot. Agency*, 38 F.4th 34, 55 (9th Cir. 2022). Where actions by third parties are part of the causal chain, plaintiffs can demonstrate traceability by showing that the harms were caused by" the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019).

Plaintiffs' injuries are traceable to the rescission of the sensitive locations policy. Plaintiffs specifically allege that the rescission of the Mayorkas Memorandum resulted in decreased attendance; discontinuation of ministry services and immigrant-related programming; and stress and increased workloads relating to the new risk of enforcement at Plaintiffs' members' workplaces. *See, e.g.*, Compl. ¶¶ 66–68 (reduced participation in PCUN events and members avoiding medical care); *id.* ¶¶ 80, 83, 88, 97–98 (Augustana discontinuing pastor home visits; Augustana and OLG congregants declining to attend events and mass; and OLG discontinuing its Migrant Ministry program); *id.* ¶¶ 106, 110–11, 120 (SFIC members and WPC community members no longer feeling safe at churches); *id.* ¶¶ 130–131, 133–34, 136, 139, 141–42, 145, 147, 149, 150–151 (NEA members reporting increased workloads, stress, and difficulty engaging in their essential duties, along with personal fears of being detained while at school); *id.* ¶¶ 163–64, 165–69 (decreased participation by AFT members fearful of immigration enforcement at rallies and demonstrations; AFT members providing support beyond their core instructional duties to their students to address fear and avoidance of schools); *id.* ¶¶ 178, 180,

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

183, 187–89, 194–97, 202 (disruption, dysregulation, and emotional trauma among educators, students, and families caused by ICE incursion at Guidepost school); *id.* ¶¶ 175, 182, 185, 200 (Guidepost families declining enrollment due to ICE incursion). Furthermore, Plaintiffs present statements from constituents and members explicitly connecting the rescission to their own injuries and actions. *See id.* Such allegations are sufficient to survive a motion to dismiss. *Maya*, 658 F.3d at 1070.

Defendants offer three arguments against traceability, each of which is belied by Plaintiffs' allegations. First, Defendants argue that "third parties' subjective fear is the causal link between the possible government action and the injury," Mot. at 22, and that Plaintiffs' harms are too attenuated from the rescission of the policy (without explaining why), Mot. at 23–24. Both arguments ignore the harms Guidepost Plaintiffs and Associational Plaintiffs' members—none of whom is a third party as in *Clapper* or *Department of Commerce*—suffer as a direct result of the Huffman Memorandum. *See, e.g.*, Compl. ¶¶ 66–68, 83, 97–98, 106, 110–11, 120, 131, 133–34, 139, 164, 166, 168, 170, 175, 182, 185, 200. Many of Organizational Plaintiffs' injuries likewise stem directly from Defendants' policy. *See supra* Section IV.A.1.c. And even where Organizational Plaintiffs' harms *do* stem from their members' actions, Plaintiffs' pleadings surpass traceability requirements. Organizational Plaintiffs' claims do not "rest on speculation about the decisions of independent actors," Mot. at 22 (citing *Clapper*); rather, they are supported by their members' statements about decisions they made in response to Defendants' rescission of protections for sensitive locations. *See, e.g.*, Compl. ¶¶ 66–68, 83, 97–98, 175, 182, 185, 200. Indeed, Organizational Plaintiffs make a greater showing than in *Department of Commerce* because they allege "individuals have *already* stopped attending worship services and ministry programs as a direct result of the 2025 Policy." *Philadelphia Yearly Meeting*, 767 F.

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

Supp. 3d at 318 (emphasis added). Moreover, these declines are entirely a "predictable effect" of the 2025 Memoranda, *see Dep't of Com.*, 588 U.S. at 768, as the Mayorkas Memorandum recognized "the impact an enforcement action would have on people's willingness to be in the protected area and receive or engage in the essential services or activities that occur there." *See* Decl. Ex. 3 at 2.

Next, Defendants suggest Plaintiffs' injuries are instead caused by the administration's broader immigration enforcement efforts. Mot. at 22–23. But the Amended Complaint's acknowledgement of the broader political context pursuant to which the Huffman Memorandum was issued does not undermine Plaintiffs' express allegations—which the Court must accept as true for purposes of this motion—that their injuries are caused by the rescission of Defendants' longstanding policy and their concomitant expansion of enforcement at sensitive locations. *See* Compl. ¶¶ 66–68, 83, 97–98, 106, 110–11, 120, 131, 133–34, 139, 164, 166, 168, 170, 175, 182, 185, 200. *Mennonite Church* does not dictate a contrary conclusion. The district court credited numerous declarations—as opposed to a single statement in the Amended Complaint, Mot. at 23—attesting to fear of leaving home rather than fear of enforcement at sensitive locations to hold that plaintiffs had not established that declines in church attendance were traceable to the rescission of the sensitive locations policy. 778 F. Supp. 3d 1, 12 (D.D.C. 2025). *Mennonite Church* was also decided on a motion for preliminary injunction, requiring plaintiffs to satisfy a standard not applicable here. *See Lujan*, 504 U.S. at 561 ("[E]ach element [of standing] must be supported ... with the manner and degree of evidence required at the successive stages of the litigation.").

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

### 3. Plaintiffs' Injuries Are Redressable.

Plaintiffs more than sufficiently allege injuries that would be redressed by vacatur of the Huffman Memorandum. A plaintiff must demonstrate that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth*, 528 U.S. at 181. "If a defendant's action causes an injury, enjoining the action ... will typically redress that injury." *Hippocratic Med.*, 602 U.S. at 380. Further, "a plaintiff's burden to demonstrate redressability is relatively modest." *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) (cleaned up). Plaintiffs "need not show that a favorable decision will relieve their *every* injury," *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982), but rather, need only show that they "personally would benefit in a tangible way from the court's intervention," *Brinkman v. Liberty Tax Serv.*, No. CV 10-192-HU, 2010 WL 5158537, at *2 (D. Or. Sep. 24, 2010) (quoting *Warth*, 422 U.S. at 508).

Plaintiffs sufficiently allege the Huffman Memorandum is a but-for cause of their injuries and that vacatur is likely to redress Plaintiffs' harms. Defendants' argument that the Huffman Memorandum does not "materially differ" from the Mayorkas Memorandum and its vacatur therefore would not redress Plaintiffs' injuries, Mot. at 24–25, is untethered from the plain text of the documents. *See* Compl. ¶¶ 53–54. To the contrary, Plaintiffs' injuries would be favorably redressed by an order restoring the longstanding norm that sensitive locations are essentially off-limits to immigration enforcement.

The Amended Complaint identifies at least three key differences between the Mayorkas Memorandum and the Huffman Memorandum that caused Plaintiffs' injuries. The former centered on the "fundamental principle" that "[t]o the fullest extent possible, [agents] should not take an enforcement action in or near a location that would restrain people's access to essential

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

services or engagement in essential activities." Decl. Ex. 3 at 2. This principle established that nonenforcement at or near sensitive locations was the norm. The Mayorkas Memorandum cabined enforcement to limited exigent circumstances that are "meaningfully narrower" than the Huffman Memorandum, which includes no such restrictions. *Philadelphia Yearly Meeting*, 767 F. Supp. 3d at 318–19. The Mayorkas Memorandum also included mandatory reporting and approval requirements for every enforcement action at a sensitive location, and training obligations for all enforcement officers. Decl. Ex. 3 at 4–5.

The rescission eliminates these requirements, instead authorizing officers to use "discretion along with a healthy dose of common sense," Decl. Ex. 4 at 1, and to make "case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area ... either verbally or in writing," Decl. Ex. 5 at 2.

Considering the comprehensive safeguards the Mayorkas Memorandum maintained, Plaintiffs sufficiently allege that vacating its rescission is likely to address their injuries by reducing both the likelihood of imminent enforcement action at their sensitive locations and the level of fear over such actions. *See, e.g.*, Compl. ¶ 111 ("Individuals ... have stated they would return to the church if sensitive locations protections were reinstated."). Indeed, the district court in *Philadelphia Yearly Meeting* credited testimony expressing the same sentiment in holding that "redressability is satisfied if a favorable ruling would result in the removal of even one obstacle to the exercise of one's rights, even if other barriers remain." *Philadelphia Yearly Meeting*, 767 F. Supp. 3d at 319. The Amended Complaint establishes a non-speculative likelihood that Plaintiffs' injuries would be redressed by a favorable decision.

**B.     The Court Has Jurisdiction Over the APA Claims.**

Defendants have no explanation for the Huffman Memorandum's departure from over

three decades of policies limiting immigration enforcement around sensitive locations and fail to consider the reliance interests of Plaintiffs and their members. Compl. ¶ 225; *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) (requiring reasoned explanation for policy changes). For at least these reasons, the rescission was arbitrary and capricious in violation of the APA. 5 U.S.C. § 706(2)(A). And because the rescission violates the First Amendment and RFRA, *see infra* Section IV.C, the rescission is also contrary to law. 5 U.S.C. § 706(2)(A)–(B).

Defendants do not challenge the sufficiency of Plaintiffs' APA claims; rather, they only argue that this Court lacks jurisdiction to consider them. But the APA establishes a "basic presumption of judicial review" to parties "suffering legal wrong because of agency action." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); 5 U.S.C. § 702. Here, judicial review of Plaintiffs' APA claims is proper. The Huffman Memorandum constitutes final agency action as the culmination of the agency's decision-making process from which legal consequences flow. And given that discernible standards exist that give the Court law to apply, this is not a rare situation in which final agency action is unreviewable as committed to agency discretion. Because there is no evidence that Congress intended to insulate the Huffman Memorandum from judicial review, this Court should deny Defendants' motion.

### 1. The Huffman Memorandum Constitutes Final Agency Action.

The Huffman Memorandum constitutes final agency action because it "mark[s] the consummation of the agency's decision-making process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up). Defendants dispute only whether legal consequences flow from the Huffman Memorandum. *See* Mot. at 39. The "core question" is

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

whether the action "will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). Here, the answer is clearly yes.

The Huffman Memorandum has legal consequences for Plaintiffs because it removes protections directing ICE and CBP to refrain from immigration enforcement actions in or near sensitive locations to "the fullest extent possible," and requiring that such enforcement only occur in certain "limited circumstances." Compl. ¶ 48 (citing Mayorkas Memorandum). The Mayorkas Memorandum required that agents seek prior approval from headquarters for any enforcement operation in or near a sensitive location absent exigent circumstances; that agents conduct a post-action consultation for operations conducted due to exigent circumstances; that any enforcement action at or near a sensitive location be conducted in a non-public area to the fullest extent possible; and that agents be subject to a training and reporting scheme. *See id.* ¶ 49; Decl. Ex. 3 at 4. The Huffman Memorandum "eliminated all of the previous limitations and safeguards on DHS immigration enforcement actions in or near places of worship [and other sensitive locations] and permits them to occur subject only to the 'common sense' and 'discretion' of the officer or agent." *Philadelphia Yearly Meeting*, 767 F. Supp. 3d at 321. It thus "alters the legal regime" pursuant to which Defendants' officers conduct enforcement actions in or near sensitive locations, *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006), and "gives rise to direct and appreciable legal consequences," *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 598 (2016). Prior to 2025, there were protected areas that individuals could visit without fear of encountering immigration enforcement. Now, individuals may face the legal consequence of civil immigration arrests while they are seeking healthcare, practicing their faith, lawfully and peaceably assembling, or engaging with the education system; and the sensitive locations face disruptions and other tangible harms to operations from such

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

enforcement actions.

The practical and legal effects of the Huffman Memorandum are tangible. *See Or. Nat. Desert Ass'n*, 465 F.3d at 982. The rescission has directly impacted Plaintiffs' work and the lives of their members and constituents. For example, ICE activity at or near schools in OLG's area forced OLG to change its school dismissal routine. Compl. ¶ 97. Catholic Charities experienced a decline in requests for legal services and attendance at presentations because individuals no longer feel safe from immigration enforcement at church. *Id.* ¶ 106. AFT noncitizen members are more fearful of attending rallies and protests, and participation in public actions coordinated by a union affiliate has decreased. *Id.* ¶¶ 163–64. Other Plaintiffs are similarly impacted. *See, e.g.*, *id.* ¶¶ 65–70 (reduced immigrant community member engagement at PCUN events); *id.* ¶¶ 82–83, 89–90, 94, 97, 106, 110–12, 120 (Religious Plaintiffs experiencing declining attendance for services and events); *id.* ¶¶ 132–33, 134, 138, 141, 144–46, 149, 151, 165, 168 (NEA and AFT members describing students' and their own fear, needs for new training and guidance, and declining attendance and participation); *id.* ¶¶ 177, 179, 182, 188 (describing the Guidepost lockdown and children not attending or enrolling in school). These harms flowing from the rescission were exactly what the Mayorkas Memorandum and its predecessors warned about and tried to prevent. *E.g.*, Decl. Ex. 3 at 2 (recognizing the "impact an enforcement action would have on people's willingness to be in the protected area and receive or engage in the essential services or activities that occur there").

Relying on self-serving disclaimers in the Huffman Memorandum (and the Mayorkas Memorandum), Defendants argue the Huffman Memorandum "simply provide[s] general guidance" about officers' exercise of discretion and therefore "does not carry the force of law necessary to constitute final agency action." Mot. at 40–41. But "such a disclaimer by an agency

about what its statements do and do not constitute as a legal matter are not dispositive." *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 516 (9th Cir. 2018), *rev'd in part on other grounds*, 140 S. Ct. 1891 (2020). Indeed, CBP's website continues to confirm the mandatory nature of the now-rescinded protections by explaining how to report a "*violation*" of "the protected areas *policy*."[4] Therefore, the APA explicitly provides a cause of action to parties, such as Plaintiffs, who are "aggrieved by agency action." 5 U.S.C. § 702. Defendants' attempt to pass off this policy reversal as mere guidance cannot obscure its legal effect or finality.[5]

### 2. The Huffman Memorandum Is Not Committed to Agency Discretion by Law and Is Reviewable.

Defendants argue that this case presents a "rare circumstance[ ]" where review is barred as "committed to agency discretion by law." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971) (quoting 5 U.S.C. § 701(a)(2)); Mot. at 36. Not so. The APA's exception to judicial review in § 701(a)(2) must be read "narrowly" and is confined "to those rare administrative decisions traditionally left to agency discretion." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (cleaned up). Even when an agency has discretion, judicial review is available so long as there is a "meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830. Here, there is clear

---

[4] U.S. Customs & Border Protection, *DHS Protected Areas FAQs* (last modified Mar. 14, 2025), https://www.cbp.gov/border-security/dhs-protected-areas-faqs [https://perma.cc/23HK-SQ63] (emphasis added). Plaintiffs hereby notify Defendants that this webpage is subject to Defendants' document preservation obligations.

[5] The "legislative rule" test in *Wilson v. Lynch*, 835 F.3d 1083 (9th Cir. 2016), was about whether notice and comment rulemaking applied under 5 U.S.C. § 553 and does not supplant the *Bennett* test for final agency action. Indeed, *Institute for Fisheries Resources v. Hahn*—cited by Defendants—acknowledges that even if an action is not a legislative rule, "[t]o answer the question posed by 5 U.S.C. § 704, one still must apply the two-part test identified by the Supreme Court in *Bennett*." 424 F. Supp. 3d 740, 748 (N.D. Cal. 2019).

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

law to apply—under the APA, RFRA, and the Constitution—against which this Court can judge Defendants' rescission of the sensitive locations policy.

First, Defendants' arguments that immigration enforcement decisions involve considerable agency discretion do not shield the Huffman Memorandum from APA review. While Defendants undoubtedly enjoy "broad discretion in carrying out immigration laws," Mot. at 28–29, 6 U.S.C. § 202 does not reflect congressional intent to immunize Defendants from the APA and judicial review altogether, *see, e.g.*, *Dep't of Homeland Sec.*, 591 U.S. at 17–18 (reviewing Acting Secretary of Homeland Security's decision to terminate forbearance under Deferred Action for Childhood Arrivals ("DACA") program notwithstanding 6 U.S.C. § 202's grant of discretionary authority); *Perez Perez v. Wolf*, 943 F.3d 853, 861 (9th Cir. 2019) ("In several immigration cases, we have held that there are meaningful standards of review and have declined to apply § 701(a)(2)" (collecting cases)). Defendants cannot claim unfettered judgment over immigration enforcement policies and shield their actions from judicial review.

Indeed, contrary to Defendants' contentions, Mot. at 29, both Congress and Defendants' own regulations impose location-based restrictions on immigration enforcement power such that Defendants cannot show "'clear and convincing evidence' of a contrary legislative intent" to "restrict access to judicial review," *Immigrant Defs. L. Ctr.*, 145 F.4th at 989. For example, the Immigration and Nationality Act ("INA") circumscribes immigration officers' "powers without warrants," by limiting where officers may arrest, interrogate, and search "any [noncitizen] or person." 8 U.S.C. § 1357(a). The INA cabins DHS's warrantless arrest authority to locations only within "a reasonable distance from any external boundary of the United States," and excludes that authority from dwellings from locations where warrantless arrests may take place "for the purpose of patrolling the border to prevent the illegal entry of [noncitizens] into the United

23

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

States." And, as Defendants recognize, Mot. at 10, there are restrictions prohibiting warrantless entry to agricultural operations without the consent of the owner. 8 U.S.C. § 1357(a), (e). 8 C.F.R. § 287.8(f) similarly circumscribes when an immigration officer may enter "into the non-public areas of a business, a residence including the curtilage of such residence, or a farm or other outdoor agricultural operation."

Defendants' reliance on *Heckler v. Chaney*, 470 U.S. 821 (1985), is likewise unavailing. Heckler concerned individual enforcement decisions, *Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996) (explaining "that *Chaney* applies to individual, case-by-case determinations"), but Plaintiffs do not challenge any specific enforcement decision in this case but rather a sweeping policy change. Reviewing the Huffman Memorandum does not require this Court to second-guess any particular enforcement decision, but rather, to determine whether Defendants have sufficiently explained their rescission of a longstanding immigration policy and whether the new policy is lawful under the First Amendment and RFRA. Defendants' contention that the Court cannot review individual enforcement decisions because they require a "complicated balancing" of factors within their expertise, Mot. at 28, therefore is misplaced. *Heckler* does not render the Huffman Memorandum unreviewable.

Second, there is ample statutory law to apply that provides a "meaningful standard" to assess the lawfulness of Defendants' policy change. *See Chaney*, 470 U.S. at 830; *see also ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1068 (9th Cir. 2015) ("Even where statutory language grants an agency 'unfettered discretion,' its decision may nonetheless be reviewed if regulations or agency practice provide a meaningful standard by which this court may review its exercise of discretion."). The APA's arbitrary and capricious standard requires agencies to explain policy changes and consider reliance interests. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

(2016) ("The agency must at least display awareness that it is changing position and show that there are good reasons for the new policy."); *see also Jajati v. U.S. Customs & Border Prot.*, 102 F.4th 1011, 1017 (9th Cir. 2024) ("[J]udicial review under the APA concerns not only the particular outcome [an] agency reaches, but also the process in which the agency engages and the reasoning the agency articulates when it reaches that outcome."). This standard applies to Defendants' decision to cast aside thirty years of protections for sensitive locations. Moreover, RFRA provides law this Court can apply to prevent impermissible burdens on religious freedom. *See infra* Section IV.C.

The Mayorkas Memorandum and its predecessors also provide law to apply. *Alcaraz v. I.N.S.*, 384 F.3d 1150, 1161 (9th Cir. 2004) (holding there was "law to apply" based on the agency's "various memoranda through which" it implemented its policy). The Mayorkas Memorandum imposed requirements on when and how ICE and CPB enforcement could occur at sensitive locations. Decl., Ex. 3 at 3. The prior sensitive locations memoranda constitute law for this Court to apply in assessing whether the Huffman Memorandum is arbitrary and capricious. *See Spencer Enters., Inc. v. United States*, 345 F.3d 683, 688 (9th Cir. 2003) (an agency's decision may "be reviewed if regulations or agency practice provide a meaningful standard by which th[e] court may review its exercise of discretion"). Indeed, a district court in the Ninth Circuit recently applied this principle in holding that ICE's change in policy permitting immigration arrests at courthouses was reviewable. *Pablo Sequen v. Albarran*, --- F. Supp. 3d ----, No. 25-CV-06487-PCP, 2025 WL 3724878, at *6 (N.D. Cal. Dec. 24, 2025) ("ICE and [Department of Justice's Executive Office for Immigration Review]'s prior policies governing courthouse arrests and detention in holding facilities provide a standard.").

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

The Constitution provides law to apply. Plaintiffs claim that the Huffman Memorandum is contrary to their constitutional rights; that claim is reviewable under 5 U.S.C. § 706(2)(B) (authorizing a reviewing court to "hold unlawful and set aside agency action ... found to be ... contrary to constitutional right, power, privilege, or immunity"). Defendants do not carry their burden of establishing the unavailability of such review. "[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). This "heightened showing" of congressional intent is required "in part to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id.* (holding that a plaintiff may raise, under the APA, a constitutional challenge to discretionary agency action even where judicial review for statutory reasons was precluded). The INA contains no such clear intent to preclude judicial review of Plaintiffs' constitutional claim, nor do Defendants identify any authority that would foreclose this Court's review.

In sum, because Plaintiffs are not challenging individual enforcement or non-enforcement decisions and because there is law for the Court to apply in assessing Plaintiffs' claims, the APA claims are reviewable. *Cf. Mendez-Gutierrez v. Ashcroft*, 340 F.3d 865, 868 (9th Cir. 2003) (narrow exception to judicial review applies only where "no statutes, regulations, established agency policies, or judicial decisions" provide a meaningful standard).

**C.      The Huffman Memorandum Violates RFRA and the First Amendment.**

Religious Plaintiffs Augustana, OLG, SFIC, and WPC adequately plead that the Huffman Memorandum violates their rights under RFRA, and Plaintiffs PCUN, Augustana, OLG, SFIC, WPC, and AFT adequately plead that the Huffman Memorandum violates their rights under the First Amendment.

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

Pursuant to RFRA, Defendants cannot "substantially burden a person's exercise of religion" unless "[they] demonstrate[ ] that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). Religious Plaintiffs sufficiently allege that the Huffman Memorandum violates their rights under RFRA by substantially burdening their exercise of religion and those of their members, and Defendants cannot meet the high burden of showing that the Huffman Memorandum satisfies RFRA's narrow exceptions.

The Religious Plaintiffs, along with PCUN and AFT, adequately plead the Huffman Memorandum violates their First Amendment right to associate. The First Amendment protects freedom of association, meaning the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). A group that "engage[s] in some form of expression, whether it is public or private," is protected by the First Amendment and has a protectable right of expressive association. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). Like RFRA, to state an expressive association claim, the challenged state action must "significantly affect" or "burden" Plaintiffs' desired expression, *id.* at 649–50, 653, 658–59, which Plaintiffs allege here. The burden then shifts to the government to justify that such actions were taken in pursuit of a compelling government interest using the least restrictive means. *See id.* Defendants cannot demonstrate that the Huffman Memorandum is narrowly tailored to further a compelling government interest pursuant to RFRA or the First Amendment.

The motion to dismiss the RFRA and First Amendment claims should thus be denied.

1. **The Huffman Memorandum Substantially Burdens the Religious**

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

**Plaintiffs' Religious Exercise and Plaintiffs' Right to Associate.**

For Plaintiffs' RFRA and First Amendment claims, Plaintiffs allege the government's conduct has substantially burdened religious exercise or expressive association, respectively.

***RFRA.*** With respect to RFRA, Religious Plaintiffs can establish a substantial burden under RFRA in three ways, by showing that government policy either: (1) prevents access to religious exercise, *Apache Stronghold v. United States*, 101 F.4th 1036, 1043 (9th Cir. 2024); (2) has a "tendency to coerce individuals into acting contrary to their religious beliefs," *id.* at 1055; or (3) "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs," *Guam v. Guerrero*, 290 F.3d 1210, 1222 (9th Cir. 2002). The Huffman Memorandum substantially burdens Religious Plaintiffs' religious exercise by preventing them from accessing ministry, worship, and service that are tenets of their religious beliefs; coercing their members into choosing between attending worship and risking immigration enforcement; and pressuring them to modify their ministry, worship, and service activities in ways that violate their religious beliefs.

First, the Huffman Memorandum has prevented members from attending worship at Augustana, OLG, and SFIC member organizations, and religious leaders from providing pastoral care and ministry. Compl. ¶¶ 80, 82 (Augustana); *id.* ¶ 97 (OLG); *id.* ¶¶ 110–11, 115 (SFIC). The Huffman Memorandum has also chilled participation in community-facing services the Plaintiff organizations offer, which are a core part of the churches' practices of their faith. *E.g.*, *id.* ¶ 83 (Augustana); *id.* ¶¶ 88, 90 (OLG); *id.* ¶¶ 106–07, 110–11, 114 (SFIC); *id.* ¶¶ 120–24 (WPC).

Such impacts—even where the government policy or conduct does not directly compel or prohibit religious exercise—have been recognized by the Ninth Circuit as a substantial burden on religious exercise. In *Mockaitis v. Harcleroad*, a Catholic priest pursued a RFRA claim after the

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

district attorney recorded an incarcerated suspect's confession to the priest. 104 F.3d 1522, 1524–27 (9th Cir. 1997), *overruled on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997). The court held there was "no question" that recording the confession substantially burdened the priest's exercise of religion, notwithstanding that the recording did not compel or prohibit any behavior by the priest, because recording meaningfully prevented the priest's access to the religious exercise of taking confession. *Id.* at 1530. Courts elsewhere have similarly found that coercion is not necessary to constitute a substantial burden where it prevents access to religious exercise. *See, e.g.*, *United States v. Hardman*, 297 F.3d 1116, 1126–27 (10th Cir. 2002); *Philadelphia Yearly Meeting*, 767 F. Supp. 3d at 329–32.

The Huffman Memorandum also substantially burdens Religious Plaintiffs' religious exercise by coercing Religious Plaintiffs' members into "acting contrary to their religious beliefs," *Apache Stronghold*, 101 F.4th at 1055, by forcing them to choose between attending worship services and risking immigration enforcement. Defendants argue that "the 2025 Guidance does not prohibit Plaintiffs from exercising their religion by pitting their faith against a government ... penalty," Mot. at 29, but this is exactly what it does. Members of Augustana's and OLG's congregations and members of SFIC member organizations are no longer attending worship services due to fear of immigration enforcement and potential arrest and detention—a government penalty. Compl. ¶ 82 (Augustana); *id.* ¶ 97 (OLG); *id.* ¶¶ 110–11 (SFIC). Similarly, fear of this risk is what chills attendance at Religious Plaintiffs' community events and thus precludes the church from serving community members in accordance with the tenets of their faith. *Id.* ¶¶ 119–20, 126 (WPC); *id.* ¶ 83 (Augustana); *id.* ¶¶ 86, 88, 90 (OLG); *id.* ¶¶ 106–08, 111, 114 (SFIC). Indirectly coercing individuals to change their behavior or risk a "severe"

government penalty constitutes a substantial burden under RFRA. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720 (2014).

Finally, the Huffman Memorandum significantly pressures the Religious Plaintiffs into modifying their behavior and religious practices. For example, Augustana locked its doors and ceased providing sanctuary, and OLG suspended its Migrant Ministry program. Compl. ¶¶ 72, 76, 78, 88. WPC has spent significant resources on instituting security protocols and has seen attendance at events for community members sharply decline. *Id.* ¶¶ 120, 123. Courts have recognized similar cessations in religious practice in response to government conduct as a substantial burden on religious exercise. *See, e.g.*, *Dousa v. United States Dep't of Homeland Sec.*, 662 F. Supp. 3d. 1123, 1153–54. (S.D. Cal. 2023); *Mack v. Warden Loretto FCI*, 839 F.3d 286, 304 (3d Cir. 2016) (abrogated on other grounds by *Ziglar v. Abbasi*, 582 U.S. 120 (2017)).

Defendants' narrow definition of "substantial burden" that protects only against government-compelled or -prohibited activity finds no support in the law of this circuit. Defendants first rely on *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058 (9th Cir. 2008), for its recitation of the scope of substantial burden. Mot. at 27. But that definition was overruled in *Apache Stronghold* "to the extent that it defined a 'substantial burden' under RFRA as imposed *only* when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." 101 F.4th at 1043 (cleaned up). *Apache Stronghold* expanded the definition of substantial burden to include "preventing access to religious exercise." *Id.* Defendants' reliance on decades-old, out-of-circuit case law, to the extent those decisions cannot be reconciled with *Apache Stronghold*, likewise is unavailing. *See* Mot. at 27 (citing *Doe v. Irwin*, 615 F.2d 1162, 1168 (6th Cir. 1980)).

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

Defendants also argue that Supreme Court precedent in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), *Sherbert v. Verner*, 374 U.S. 398 (1963), *Hobby Lobby*, and *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988) demonstrate there is no substantial burden on Plaintiffs' religious exercise because there is no direct prohibition on religious activities, *see* Mot. at 27–28, and no indirect coercion "pitting their faith against a government benefit or penalty," Mot. at 29. This argument ignores both the expanded substantial burden definition under *Apache Stronghold* and the indirect coercion on Plaintiffs' members. Plaintiffs are not limited to showing direct prohibition or indirect coercion; they can and do allege the Huffman Memorandum prevents their access to religious exercise in accordance with *Apache Stronghold*. *See supra* Section IV.A. And in any event, Plaintiffs' members are indeed coerced by the Huffman Memorandum to forgo church attendance or risk being subject to immigration enforcement and arrest. *See supra id.*

*Lyng* and *Bowen v. Roy*, 476 U.S. 693 (1986) are also inapposite. Both cases turned on whether the alleged substantial burden—which did not consist of direct coercion or prohibition of religious activities—was the product of "incidental effects" caused by the government conducting its "internal affairs." *Id.* at 448, 450–51; *Roy*, 693 U.S. at 699–700 (plurality op.). Defendants here are not conducting activities like paving government land (*Lyng*) or issuing Social Security numbers for internal recordkeeping (*Roy*) that have no direct effects on individuals—they are crafting immigration enforcement actions to physically detain and deport individuals who are actively engaged in religious exercise. This is not merely an "internal affair" with "incidental effects."

***First Amendment.*** Plaintiffs PCUN, Augustana, OLG, SFIC, WPC, and AFT sufficiently plead a substantial burden under the First Amendment. The Huffman Memorandum violates

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

Plaintiffs' First Amendment right to expressive association by imposing concrete, demonstrable burdens on their expressive activities that far exceed the "subjective chill" insufficient to state a claim. The government action need not directly regulate the right to associate to be infringing. For example, the Supreme Court has "applied First Amendment scrutiny to a statute regulating conduct which ha[d] the incidental effect of burdening the expression of a particular political opinion." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 702 (1986) (citing *United States v. O'Brien*, 391 U.S. 367 (1968)). It has also applied such scrutiny to "statutes which, although directed at activity with no expressive component, impose a disproportionate burden upon those engaged in protected First Amendment activities." *Id.* at 704. In any event, courts "give deference to an association's view of what would impair its expression." *Boy Scouts,* 530 U.S.at 653 (making clear "a State, or a court, may not constitutionally substitute its own judgment for that of the Party." (citation omitted)). This Court likewise should reject Defendants' skepticism that Plaintiffs' expressive association has not been burdened.

Here, Plaintiffs allege the rescission of protections for sensitive locations has led to decreased attendance and participation in church and social services, school, healthcare appointments, and demonstrations. Compl. ¶¶ 68–69, 82–83, 88, 90, 97, 106–14, 120–24, 161, 163–70. Defendants' argument that Plaintiffs merely allege a "chill" ignores these myriad allegations that courts recognize as a substantial burden on the right to associate. *See The Presbyterian Church (U.S.A.)*, 870 F.2d at 522 (holding that immigration surveillance resulted in "distinct and palpable" injury to churches' right to associate in the form of "concrete, demonstrable decrease in attendance at those worship activities"); *see also Philadelphia Yearly Meeting*, 767 F. Supp. 3d at 314 (finding that plaintiffs "alleged an objective harm in the form of a reduction in attendance at worship services and ministry programs" resulting from the Huffman

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

Memorandum). Indeed, review of the challenged government action and its alleged effects in *Laird*, a case on which Defendants principally rely, underscores why this case is different. Unlike the conduct in *Laird*, which had no outward-facing consequences, resulting in the Court rejecting First Amendment claims, the Huffman Memorandum has produced widespread effects extending beyond the "subjective chill" *Laird* held was insufficient to sustain such claims.

Defendants' remaining argument—that Plaintiffs' First Amendment injuries cannot be the result of the Huffman Memorandum because there is no "material difference," Mot. at 35, between it and the Mayorkas Memorandum—is likewise meritless. *See supra* Section IV.A.3. Plaintiffs plausibly allege that the Huffman Memorandum substantially burdens their First Amendment association rights.

### 2. The Huffman Memorandum Furthers No Compelling Government Interest and Does Not Use the Least Restrictive Means.

Because Plaintiffs more than sufficiently allege substantial burdens to their religious exercise and expressive association, Defendants must show that the challenged government conduct furthers a compelling government interest using the least restrictive means. *See Hobby Lobby*, 573 U.S. at 726. However, the only reasons Defendants provided for the recission of consistent protections for sensitive locations are laid out in the Huffman Memorandum, and do not carry Defendants' burden. *See* Compl. ¶¶ 53–54. As demonstrated below, Defendants cannot meet either element of this standard. In fact, until January 2025, Defendants enforced their immigration policies for more than thirty years while respecting and affording protections for sensitive locations. Requiring, among other things, advance approval from agency headquarters (or its delegate) to conduct immigration enforcement activities near or at sensitive locations absent any exigent circumstances is a reasonable alternative means. The existence of this

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

longstanding alternative framework demonstrates that the Huffman Memorandum is not the least restrictive means of achieving any purported government interest.

### a) Defendants Do Not Meet Their Burden of Demonstrating a Compelling Government Interest.

Defendants have not demonstrated that the Huffman Memorandum furthers a compelling government interest to defeat either Plaintiffs' RFRA or First Amendment claims. RFRA requires Defendants to "demonstrate that the compelling interest ... is satisfied through application of the challenged [policy] 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006). Thus, a court must look "beyond broadly formulated interests justifying the general applicability of government [policies] and scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants." *Id.* at 431. This inquiry requires a court "to look to the marginal interest in enforcing" the challenged policy against the parties in the case before it. *Hobby Lobby*, 573 U.S. at 727. As for the First Amendment, while the right to expressive association is not absolute, government infringement must be "justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623.

Defendants do not meet either burden. Defendants assert that "uniform" immigration enforcement is a sufficiently compelling interest to sustain their burden but cite no authority that supports this proposition. Defendants' cited cases deal only with the *tax code*, not immigration enforcement. Mot. at 31 (citing *United States v. Lee*, 455 U.S. 252 (1982) and *Iowaska Church of Healing v. Werfel*, 105 F.4th 402 (D.C. Cir. 2024)). Furthermore, Defendants' interest in uniformity is undermined—rather than advanced—by the Huffman Memorandum. Case-by-case

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

enforcement at sensitive locations—guided by nothing more than agents' individual "discretion" and a "healthy dose of common sense"—encourages *more* inconsistent application of "enforcement of generally applicable laws," not less. Decl. Ex. 4 at 1; Decl. Ex. 5 at 1; Mot. at 31.

Defendants' argument additionally ignores that "RFRA operates by mandating consideration, under the compelling interest test, of exceptions" to uniform rules. *Gonzales*, 546 U.S. at 436 (2006). Rather than assert a "general interest in uniformity," Defendants must "explain[ ] why the denied exemptions could not be accommodated." *Id.* at 435. In fact, Defendants acknowledge that in *Gonzales*, the Supreme Court did not recognize a uniformity interest, in part because the existence of a "longstanding exemption" from the Controlled Substances Act for religious use of peyote made such an explanation more difficult. *See* Mot. at 31–32; *Gonzales*, 546 U.S. at 436–37. Defendants make no effort to articulate any "marginal" compelling interest in enforcing immigration policy through enforcement at or near religious institutions. *See Hobby Lobby*, 573 U.S. at 727; *Gonzales*, 546 U.S. at 435–36. Nor could they show any "marginal" compelling interest in "restrain[ing] people's access to essential services or engagement in essential activities," Decl. Ex. 3 at 2, or in detaining individuals, including children, at or near their houses of worship. *See Hobby Lobby*, 573 U.S. at 727; *see also Gonzales*, 546 U.S. at 435–36.

*Gonzales* is instructive here. As Defendants' own exhibits demonstrate, until rescission of the sensitive locations policy in January 2025, Defendants had a longstanding exception for sacred religious spaces from 'uniform' immigration enforcement. *See, e.g.*, Decl. Ex 1; Decl. Ex. 2, Decl. Ex. 3; Compl. ¶¶ 36–47 (exception beginning in 1993 with issuance of Puleo). Indeed, that Defendants maintained such a longstanding exception now undermines any explanation they

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

could provide "why the denied exemptions could not be accommodated." *Gonzalez*, 536 U.S. at 435; *see also United States v. Hoffman*, 436 F. Supp. 3d 1272, 1287–88 (D. Ariz. 2020); *Philadelphia Yearly Meeting*, 767 F. Supp. 3d at 332.

These reasons reinforce why Defendants' interest in uniform immigration enforcement (assuming such uniformity is even advanced by the rescission) do not outweigh Plaintiffs' First Amendment association rights. "[T]he associational interest in freedom of expression has been set on one side of the scale, and the State's interest on the other." *Boy Scouts*, 530 U.S. at 659 (balancing interests to hold "[t]he state interests embodied in New Jersey's public accommodations law do not justify such a severe intrusion on the Boy Scouts' rights to freedom of expressive association"). The Court should conclude the same here, given Defendants' asserted uniformity interest fails to hold water.

### b) The Huffman Memorandum is Not the Least Restrictive Means.

Defendants also fail to demonstrate that the Huffman Memorandum is the least restrictive means under RFRA and the First Amendment for pursuing its interests in immigration enforcement. *See Hobby Lobby*, 573 U.S. at 728 ("HHS has not shown that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion"). Nor could they, because Defendants enforced immigration laws while simultaneously limiting activity at sensitive locations for over thirty years. Compl. ¶¶ 33–50. Accordingly, that longstanding policy is a less restrictive means of pursuing their interest in immigration enforcement. *Gonzalez*, 536 U.S. at 435; *see also Philadelphia Yearly Meeting*, 767 F. Supp. 3d at 333 (DHS policy of nonenforcement at or near sensitive locations provided less restrictive means for pursuing the government's immigration priorities); *see also Hobby Lobby*, 573 U.S. at 732; *Mockaitis*, 104 F.3d at 1530–31; *Hoffman*, 436 F. Supp. 3d at 1289.

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

## V. CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss the Amended Complaint.

Dated: January 22, 2026

Respectfully submitted,

*/s/ Brandon Galli-Graves*

STEPHEN W MANNING, OSB No. 013373
stephen@innovationlawlab.org, smanning@ilgrp.com
TESS HELLGREN, OSB No. 191622
tess@innovationlawlab.org
RACHEL LANDRY, Mass. No. 713320*
rachel@innovationlawlab.org
NELLY GARCIA ORJUELA, OSB No. 223308
nelly@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

STANLEY YOUNG, CA No. 121180*
syoung@cov.com
JEHAN A. PATTERSON, D.C. No. 1012119*
jpatterson@cov.com
SABRINA MCGRAW, CA No. 334120*
smcgraw@cov.com
AMBER LOWERY, D.C. No. 1780982*
alowery@cov.com
ANALESE BRIDGES, D.C. No. 90029992*
abridges@cov.com
EVAN CHIACCHIARO, D.C. No. 90037819*
echiacchiaro@cov.com
Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: +1-202-662-5129

BRANDON GALLI-GRAVES, Tx. No. 24132050*
brandon.galli-graves@justiceactioncenter.org
ESTHER H SUNG, Cal. No. 255962*
esther.sung@justiceactioncenter.org
KAREN C TUMLIN, Cal. No. 234961*
karen.tumlin@justiceactioncenter.org
HILLARY LI, Ga. No. 898375*
hillary.li@justiceactioncenter.org
LAURA FLORES-PERILLA, Cal. No. 355645*
laura.flores-perilla@justiceactioncenter.org
EMILY SATIFKA, Nj. No. 330452020*
emily.satifka@justiceactioncenter.org
JUSTICE ACTION CENTER
PO Box 27280
Los Angeles, CA 90027 Telephone: +1 323-450-727

Attorneys for Plaintiffs

DANIEL MCNEIL, D.C. No. 455712**
dmcneil@aft.org
CHANNING COOPER, Md. No. 1212110182*
ccooper@aft.org
AMERICAN FEDERATION OF TEACHERS
555 New Jersey Avenue, N.W.
Washington, D.C. 20001
Telephone: +1 202-879-4400

Attorneys for Plaintiff American Federation of Teachers

LUBNA A. ALAM, DC No. 982169*
lalam@nea.org
KATHERINE E. LAMM, DC No. 1006319*
klamm@nea.org

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

Attorneys for Plaintiffs

NATIONAL EDUCATION ASSOCIATION
1201 16th Street NW
Washington, DC 20036
(202) 822-7035

Attorneys for Plaintiff National Education Association

*Pro hac vice
**Pro hac vice application forthcoming

38

**CERTIFICATE OF SERVICE AND COMPLIANCE**

I certify that this brief complies with the applicable word-count limitation under LR 7-2(b) because it contains 10,985 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

Dated: January 22, 2026                         Respectfully submitted,

                                                 */s/ Brandon Galli-Graves*

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS