STEPHEN W MANNING, OSB No. 013373
stephen@innovationlawlab.org,
smanning@ilgrp.com
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

JEHAN A. PATTERSON, D.C. No. 1012119*
jpatterson@cov.com
STANLEY YOUNG, CA No. 121180*
syoung@cov.com
SABRINA MCGRAW, CA No. 334120*
smcgraw@cov.com
AMBER LOWERY, D.C. No. 1780982*
alowery@cov.com
ANALESE BRIDGES, D.C. No. 90029992*
abridges@cov.com
EVAN CHIACCHIARO, D.C. No. 90037819*
echiacchiaro@cov.com

*Pro hac vice

Additional counsel on last page

COVINGTON & BURLING LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: +1-202-662-5129

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| PINEROS Y CAMPESINOS UNIDOS DEL NOROESTE; AUGUSTANA LUTHERAN CHURCH; OUR LADY OF GUADALUPE PARISH; SAN FRANCISCO INTERFAITH COUNCIL; WESTMINSTER PRESBYTERIAN CHURCH; NATIONAL EDUCATION ASSOCIATION; AMERICAN FEDERATION OF TEACHERS; AMY LOMANTO; HANNA MAE ANDERSON; LAUREN FONG; and CAROLINE KEATING MEDEIROS, <br><br> *Plaintiffs,* <br><br> v. <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; RODNEY S. SCOTT in his official capacity as Commissioner of Customs and Border Protection; U.S. CUSTOMS AND BORDER PROTECTION, <br><br> *Defendants.* | Case No. 6:25-cv-699 <br><br><br> **PLAINTIFFS NATIONAL EDUCATION ASSOCIATION AND AMERICAN FEDERATION OF TEACHERS' MOTION FOR STAY UNDER 5 U.S.C. § 705** <br><br> REQUEST FOR ORAL ARGUMENT <br><br> EXPEDITED HEARING REQUESTED |

# TABLE OF CONTENTS

CERTIFICATION OF COMPLIANCE WITH LR 7-1 ................................................. 1

MOTION ................................................................................................................ 1

MEMORANDUM OF LAW IN SUPPORT ............................................................. 1

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 3

I.      Immigration enforcement presence and activity at sensitive locations have
        escalated in recent months .......................................................................... 7

II.     Fear of immigration enforcement devastates the delivery of education and
        healthcare services ....................................................................................... 9

III.    AFT and NEA members face significant challenges performing their jobs because
        their workplaces are now targets for immigration enforcement ....................... 13

LEGAL STANDARD .............................................................................................. 17

ARGUMENT .......................................................................................................... 18

I.      Plaintiffs are likely to succeed in proving that the 2025 Huffman Memo is
        arbitrary and capricious ................................................................................. 19

        1.      Defendants failed to provide reasoned explanation for rescinding
                longstanding protections for sensitive locations ................................... 21

        2.      Defendants failed to consider obvious alternatives ............................... 23

        3.      Defendants failed to consider reliance interests ................................... 25

II.     Plaintiffs NEA and AFT face irreparable harm without the requested relief .................. 26

III.    The equities and public interest favor Plaintiffs ............................................. 33

IV.     The court should stay the Huffman Memorandum .......................................... 36

CONCLUSION ........................................................................................................ 37

*Plaintiffs NEA and AFT's Motion for 5 U.S.C. § 705 Stay*

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AFT v. Dep't of Ed.*,
   779 F. Supp. 3d 584 (D. Md. 2025) ..................................................................... 34

*All. for the Wild Rockies v. Petrick*,
   68 F.4th 475 (9th Cir. 2023) ............................................................................. 23

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
   522 U.S. 359 (1998) ......................................................................................... 19

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) .......................................................................... 18

*Arizona Dream Act Coalition v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) .......................................................................... 26

*Bennett v. Spear*,
   520 U.S. 154 (1997) ......................................................................................... 19

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 (1962) ......................................................................................... 23

*Cabrera v. U.S. Dep't of Lab.*,
   792 F. Supp. 3d 91 (D.D.C. 2025) ..................................................................... 36

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ........................................................................ 33, 34

*Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*,
   840 F.2d 701 (9th Cir. 1988) ......................................................................... 28, 29

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ......................................................................................... 20

*City & County of San Francisco v. U.S. Citizenship & Immigration Services*,
   981 F.3d 742 (9th Cir. 2020) .................................................................. 23, 25, 35

*Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum.
   Servs.*,
   780 F. Supp. 3d 897 (N.D. Cal. 2025) ............................................................... 31

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
   603 U.S. 799 (2024) ......................................................................................... 36

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)........................................................................................19, 21

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020)..........................................................................20, 23, 24, 25, 26

*District of Columbia v. USDA*,
  444 F. Supp. 3d 1 (D.D.C. 2020).................................................................36

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) .....................................................................33

*Edmo v. Corizon, Inc.*,
  935 F.3d 757 (9th Cir. 2019) ........................................................................30

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016)...............................................................................19, 20

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)...............................................................................20, 22

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992)......................................................................................35

*Immigrant Defs. L. Ctr. v. Noem*,
  145 F.4th 972 (9th Cir. 2025) .................................................................17, 37

*Judulang v. Holder*,
  565 U.S. 42 (2011)................................................................................20, 23

*Motor Vehicle Mfr. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)....................................................................19, 20, 21, 24

*Nat'l TPS All. v. Noem*,
  150 F.4th 1000 (9th Cir. 2025) .....................................................................37

*Nat'l TPS All v. Noem.*,
  773 F. Supp. 3d 807 (N.D. Cal. 2025) ..........................................................36

*Nat'l TPS All. v. Noem*,
  No. 25-5724, 2026 WL 226573 (9th Cir. Jan. 28, 2026)...........................23, 24, 37

*National Wildlife Federation v. National Marine Fisheries Service*,
  886 F.3d 803 (9th Cir. 2018) ........................................................................26

*Oregon Council for Humans. v. United States DOGE Serv.*,
  794 F. Supp. 3d 840 (D. Or. 2025) ...............................................................32

*Plaintiffs NEA and AFT's Motion for 5 U.S.C. § 705 Stay*

*Philadelphia Yearly Meeting v. U.S. Dep't of Homeland Sec.*,
 25-cv-0243-TDC (D. Md. Feb. 3, 2026)......................................................19, 34

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*,
 313 F. Supp. 3d 62 (D.D.C. 2018) ...........................................................20

*Saravia for A.H. v. Sessions*,
 905 F.3d 1137 (9th Cir. 2018) ...............................................................18

*SEC v. Chenery Corp.*,
 332 U.S. 194 (1947)..............................................................................20

*Stormans, Inc. v. Selecky*,
 586 F.3d 1109 (9th Cir. 2009) ...............................................................33

*Thomas v. Cnty. of L.A.*,
 978 F.2d 504 (9th Cir. 1992) ................................................................30

*Trump v. CASA, Inc.*,
 606 U.S. 831 (2025)..........................................................................36, 37

*U.S. Army Corps. of Eng'rs v. Hawkes Co., Inc.*,
 578 U.S. 590 (2016)..............................................................................19

*Valle del Sol Inc. v. Whiting*,
 732 F.3d 1006 (9th Cir. 2013) ...............................................................31

*Washington v. United States Dep't of Health & Hum. Servs.*,
 No. 6:25-CV-01748-AA, 2025 WL 3002366 (D. Or. Oct. 27, 2025) ...................25

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008)............................................................................18, 26

**Statutes**

5 U.S.C. § 704..................................................................................19

5 U.S.C. § 705..................................................................................17

**Other Authorities**

Conrad Wilson & Holly Bartholomew, *'Daddy, Police!: New Video Shows
 Masked ICE Agents Arrest Father Outside Child's School in Beaverton*, OPB
 (July 21, 2025), https://www.opb.org/article/2025/07/21/new-video-ice-
 agents-arrest-father-beaverton-preschool/ ...............................................2

Holly Bartholomew, *Gresham Family Detained by Immigration Officers While Seeking Medical Care for their 7-Year-Old*, OPB (Jan. 23, 2026), https://www.opb.org/article/2026/01/23/gresham-family-seeking-medical-care-child-detained-immigration-officers/. ...............................................................................2

Elizabeth Shockman, *Minneapolis School Cancel Classes After Border Patrol Clash Disrupts Dismissal at Roosevelt*, MPR News (Jan. 8, 2026), https://www.mprnews.org/story/2026/01/08/after-border-patrol-clash-at-roosevelt-minneapolis-schools-cancel-classes. ........................................................2

## CERTIFICATION OF COMPLIANCE WITH LR 7-1

Pursuant to Local Rule 7-1, the parties made a good faith effort through telephone conference to resolve the dispute and were unable to do so. Defendants oppose this motion and the request for expedited hearing.

## <u>MOTION</u>

Pursuant to 5 U.S.C. § 705, Plaintiffs National Education Association ("NEA") and American Federation of Teachers ("AFT") respectfully move to stay the 2025 Huffman Memorandum pending the conclusion of this litigation.

## <u>MEMORANDUM OF LAW IN SUPPORT</u>

### INTRODUCTION

In recent months—and escalating in the past several weeks—immigration enforcement agents have made startling incursions into cities and towns around the country, including unprecedented and unrestrained surges in and around vital community institutions such as schools and healthcare facilities. Plaintiffs—unions of educators and healthcare workers—move to stay a 2025 Department of Homeland Security ("DHS") memorandum abruptly revoking longstanding protections against immigration enforcement in and around "sensitive locations," including schools, healthcare facilities, places of worship, community organizations, and any place where children gather. For thirty years, DHS and its predecessor agencies restricted immigration enforcement in and around these locations.

Then, on January 20, 2025, then-acting DHS Secretary Benjamine Huffman rescinded this policy with the "Huffman Memorandum," which eliminated the guardrails developed over

the past thirty years to constrain immigration enforcement in sensitive locations with officers'

"common sense." Declaration of Benjamin T. Hickman ("Hickman Decl."), Dkt. 52, Ex. 4.

Defendants' rescission of these protections has profoundly harmed communities across the

country. Once-safe spaces such as schools, hospitals, and places of worship are now feared by

community members, regardless of immigration status, because of the real possibility of

encounters with immigration enforcement agents, including erroneous enforcement against U.S.

citizens and lawful permanent residents. Such fears have been reinforced by images of

Immigration and Customs Enforcement ("ICE") agents smashing in the car window of a father

dropping his child off at an Oregon daycare;[1] a family detained in an Oregon hospital parking lot

while seeking emergency medical care for their daughter;[2] and students and teachers of

Roosevelt High School in Minneapolis assaulted with tear gas[3]—all actions made possible by the

Huffman Memorandum's elimination of "bright line rules" protecting sensitive locations from

civil immigration enforcement.

Defendants' January 2025 actions rescinding the operative 2021 memorandum issued by

then-DHS Secretary Alejandro Mayorkas ("Mayorkas Memorandum") and permitting

immigration enforcement constrained by nothing but an individual officer's "common sense" are

---

[1] Conrad Wilson & Holly Bartholomew, *'Daddy, Police!: New Video Shows Masked ICE Agents Arrest Father Outside Child's School in Beaverton*, OPB (July 21, 2025), https://www.opb.org/article/2025/07/21/new-video-ice-agents-arrest-father-beaverton-preschool/.

[2] Holly Bartholomew, *Gresham Family Detained by Immigration Officers While Seeking Medical Care for their 7-Year-Old*, OPB (Jan. 23, 2026), https://www.opb.org/article/2026/01/23/gresham-family-seeking-medical-care-child-detained-immigration-officers/.

[3] Elizabeth Shockman, *Minneapolis School Cancel Classes After Border Patrol Clash Disrupts Dismissal at Roosevelt*, MPR News (Jan. 8, 2026), https://www.mprnews.org/story/2026/01/08/after-border-patrol-clash-at-roosevelt-minneapolis-schools-cancel-classes.

as unlawful as they are unjust. They violate the most basic requirements of the Administrative

Procedure Act ("APA") by summarily dismissing thirty years of precedent establishing a default

of nonenforcement at sensitive locations where community members receive and provide

essential services.

Plaintiffs request expeditious action to prevent deep and broadening irreparable injury.

They are prepared to meet as fast a briefing and argument schedule as is ordered by this Court,

which also has ample discretion to issue a temporary restraining order while considering this

motion. Based on Plaintiffs' likelihood of success on the merits, the irreparable harm to Plaintiffs

and their members, and the public interest in preserving the sanctity of sensitive locations,

Plaintiffs respectfully request the Court stay the Huffman Memorandum and restore the status

quo ante under 5 U.S.C. § 705.

## STATEMENT OF FACTS

For three decades preceding January 20, 2025, the federal government maintained a

policy under which certain "sensitive locations"—including schools, healthcare facilities, houses

of worship, and essential community gathering spaces—were considered generally off limits for

civil immigration enforcement in recognition of the compelling countervailing interests. The

government maintained and reiterated this policy through a series of at least seven separate

memoranda, issued by Republican and Democratic administrations alike. Each memorandum

made exceptions for exigent circumstances, but otherwise reinforced a general policy of

nonenforcement at sensitive locations unless stringent pre-approval and post-hoc reporting

procedures were followed.

The first sensitive locations memorandum, the "Puleo Memorandum" issued in 1993,

stressed that it was agency policy "to avoid apprehension of persons and to tightly control

investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies." Hickman Decl. Ex. 1, at 5. The memo required advance approval of any enforcement action that might encroach on such sensitive locations and post-hoc reporting to a superior if exigent circumstances required "a deviation" from the default rule of nonenforcement. *Id.* at 6. Subsequent memoranda largely reiterated this, requiring advance approval for most enforcement actions; elaborating on the required procedures for such pre-approval and/or the authorities who could grant it; requiring post-hoc reporting for enforcement under exigent circumstances; and expanding and/or elaborating on what qualified as a "sensitive location." *See, e.g.*, 2007 "Forman Memorandum," Declaration of Tess Hellgren ("Hellgren Decl.") Ex. 42 (expanding default rule of nonenforcement to include "venues generally where children and their families may be present"); 2011 "Morton Memorandum," Hickman Decl. Ex. 2 (including, *inter alia*, "a site during the occurrence of a public demonstration, such as a march, rally, or parade"); 2021 Mayorkas Memorandum, Hickman Decl. Ex. 3 (including, *inter alia*, social services establishments such as crisis centers and domestic violence shelters).

These memoranda also further explained the default nonenforcement policy. The 2007 Forman Memorandum noted that the "presence of our law enforcement agents" at or near "schools, or in venues where children's activities occur, has always been a point of particular sensitivity, especially given the public's interest in ICE's mission." Hellgren Decl. Ex. 42. The Forman Memorandum therefore instructed "[a]ll employees" to "be cognizant of the sensitivity of engaging in arrests or other enforcement activities where children are present." *Id.* The 2008 Myers Memorandum likewise noted that "restraint" in enforcement or investigative actions "at or near sensitive community locations" helps "strike[] a balance between our law enforcement responsibilities and the public's confidence in the way ICE executes its mission," and directed

personnel "to be cognizant of the impact of their activity" and to "act with an appropriate level of compassion in light of the location while exercising their authority." Hellgren Decl. Ex. 43. The 2011 Morton Memorandum further emphasized the importance of ICE officers and agents "mak[ing] substantial efforts to avoid unnecessarily alarming local communities" and "mak[ing] every effort to limit the time at or focused on the sensitive location." Hickman Decl. Ex. 2.

This unbroken string of memoranda emphasized the need for "great care and forethought" before enforcement at sensitive locations (Forman Memorandum), the importance of "restraint" to maintain the "public's confidence" (Myers Memorandum), and avoidance of actions that would cause "significant disruption to . . . the sensitive location" (Morton Memorandum). *See* Hellgren Decl. Ex. 42–43; Hickman Decl. Ex. 2. Like preceding memoranda, the 2021 Mayorkas Memorandum required prior approval of enforcement actions in or near a protected area in non-exigent circumstances and post-action reporting in exigent circumstances. It further provided a non-exhaustive list of sensitive locations or "protected areas"; provided examples exigent circumstances, such as "the hot pursuit of a personally observed border-crosser" or a national security threat; and required that "[t]o the fullest extent possible, any enforcement action in or near a protected area should be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing the protected area." Hickman Decl. Ex. 3 at 4. The Memorandum also required training and full documentation of any enforcement action taken in or near a protected area, including a situational report of what occurred during and immediately after the enforcement action.

All these requirements were in service of "[t]he foundational principle" that enforcement should not occur at or near a sensitive location because it "would restrain people's access to

*Plaintiffs NEA and AFT's Motion for 5 U.S.C. § 705 Stay*

essential services or engagement in essential activities." *Id.* at 2. The Mayorkas Memorandum

observed that "if we take an action at an emergency shelter, it is possible that noncitizens,

including children, will be hesitant to visit the shelter and receive needed food and water, urgent

medical attention, or other humanitarian care." *Id.* The Memorandum therefore stressed:

> We can accomplish our enforcement mission without denying or limiting
> individuals' access to needed medical care, children access to their schools, the
> displaced access to food and shelter, people of faith access to their places of
> worship, and more. Adherence to this principle is one bedrock of our stature as
> public servants.

*Id.*

For decades, educators and healthcare workers relied on these protections shielding

sensitive locations from routine immigration enforcement. Before January 2025, many had never

experienced or even heard of immigration enforcement at or near schools or healthcare facilities.

*See* A-A-Decl.¶7; A-B-Decl.¶6; A-H-Decl.¶5; A-N-Decl.¶7; C-A-Decl.¶7; E-F-Decl.¶7; H-M-

Decl.¶6; H-R-Decl.¶ 6; J-G-Decl.¶7; J-R-Decl.¶6; K-D-Decl.¶7; K-G-Decl.¶5; L-B-E-Decl.¶6;

L-V-Decl.¶7; M-A-Decl.¶6; M-D-Decl.¶6; M-G-Decl.¶7; M-L-S-Decl.¶7; N-A-Decl.¶7; P-S-

Decl.¶5; S-A-Decl.¶7; S-D-Decl.¶8; S-G-T-Decl.¶6; S-R-Decl.¶8; T-S-Decl.¶6; T-K-Decl.¶7; T-

W-Decl.¶8. Sensitive locations protection were even incorporated into the educational

curriculum for some teachers. A-W-B-Decl.¶6; C-T-Decl.¶8.

The one-page Huffman Memorandum did away with the Mayorkas Memorandum's

detailed policies and procedures set out for pre-approval and post-hoc reporting of enforcement

in and around sensitive locations, instead simply noting that immigration enforcement officers

"frequently apply enforcement discretion to balance of a variety of interests," and instructing that

"[g]oing forward, law enforcement officers should continue to use that discretion along with a

healthy dose of common sense." Hickman Decl. Ex. 4. The Huffman Memorandum further stated

that "[i]t is not necessary . . . for the head of the agency to create bright line rules regarding where our immigration laws are permitted to be enforced." *Id.* The Huffman Memorandum did not proffer a justification for upending either the decades-long default rule of nonenforcement in sensitive locations, or the agency's "obligation to refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area." Hickman Decl. Ex. 2 at 3. It does not detail what circumstances necessitated the sudden departure, nor why the extensive public policy, humanitarian considerations, or safety concerns cited by past agency heads no longer apply.

The rescission of the Mayorkas Memorandum immediately sent many educators and healthcare providers scrambling to understand what this meant for their schools and hospitals, while others have raced to respond as it has become clear that no space is safe from immigration enforcement anymore. A-R-Decl.¶¶7–8; C-A-Decl.¶7; K-G-Decl.¶18; L-B-E-Decl.¶8; N-S-Decl.¶9; S-C-Decl.¶8; T-S-Decl.¶8. L-B-E-Decl.¶8; N-S-Decl.¶9; AFT Decl.¶26. Many employers leapt to provide training and "know your rights" materials to educate staff on how to respond to immigration enforcement at or near their sensitive location. *See, e.g.*, K-C-Decl.¶18; L-B-E-Decl.¶9; S-G-T-Decl.¶9; S-T-Decl.¶18. Some educators noticed an immediate change in their school community, including students preemptively staying home for fear of immigration enforcement at their school. C-C-Decl.¶8; E-M-Decl.¶11; M-L-S-Decl.¶18; S-T-Decl.¶15; T-K-Decl.¶14; T-S-Decl.¶10.

## I.    Immigration enforcement presence and activity at sensitive locations have escalated in recent months.

Since the rescission, and particularly since December 2025, educators nationwide report increased immigration enforcement presence near schools, including agents in vehicles parked near school buildings and in school parking lots, taking photos of staff cars, patrolling campus

perimeters, and lurking at school bus stops. A-A-Decl.¶9; A-B-Decl.¶10; A-W-B-Decl.¶8; C-T-Decl.¶9; D-B-Decl.¶8; H-R-Decl.¶9 (using drones to look in buildings); H-M-Decl.¶9; IFO Decl.¶¶5–6, 8; J-L-Decl.¶8; J-G-(IL Educator)-Decl.¶10; K-D-Decl.¶9; K-W-Decl.¶10; M-A-Decl.¶8; M-D-¶11; M-G-Decl.¶9; M-L-S-Decl.¶¶9, 15; N-A-Decl.¶9; S-G-Decl.¶¶9–10; S-T-Decl.¶13; S-G-T-Decl.¶8; T-K-Decl.¶9; NEA Decl.¶17; *see also* Hellgren Decl. Ex. 1–39. Educators also describe instances of immigration enforcement officers detaining parents at and around school bus stops or students while walking to school, C-D-Decl.¶10; M-A-Decl.¶8; M-L-S-Decl.¶¶12–13; S-R-Decl.¶¶9, 11; Hellgren Ex. 14, 16, 30, 33-34, colliding with staff members' cars going to school or on school grounds, L-V-Decl.¶11; M-L-S-Decl.¶16; S-R-Decl.¶9, detaining an exchange student at a high school, H-R-Decl.¶10, stopping a bus of special education students and asking for their documents, P-S-Decl.¶9, and even shooting a reporter within a half-block of a school, A-R-Decl.¶13. These are not isolated incidents, but a pattern of activity.

An incident on January 7, 2026, at Roosevelt High School in Minneapolis (where NEA and AFT members work as educators) is one of the most prominent examples of recent immigration enforcement activity at a school. Federal immigration agents entered the high school grounds shortly after school dismissal and detained an individual who did not appear to be affiliated with the school. R-H-S-E-Decl.¶6. But rather than leaving, a large group of agents, dressed in combat gear with masks and firearms, pushed further onto school property, shoving back educators who rushed outside to protect students who were still on school grounds. *Id.* at ¶¶9–10. Agents quickly escalated their force, tackling an educator unprovoked and deploying chemical irritants. *Id.* at ¶11; Hellgren Decl. Ex. 9. Witnesses captured the terrifying scene on video, and NEA and AFT members felt the effects immediately. C-M-Decl.¶6 ("I was shocked to

learn that schools were now fair game"); K-W-Decl.¶11 (the incident "showed me that ICE

would cross a line ... firing tear gas and rubber bullets at children"); T-W-Decl.¶16 ("this

changed everything for me"); SR Decl.¶13 (the incident was a "turning point"); J-R-Decl.¶6. *See*

*also* A-A-Decl.¶11; A-B-Decl.¶12; E-F-Decl.¶¶15–16, 19.

Healthcare workers also report a recent increase in immigration enforcement presence at

healthcare facilities, including in hospital parking lots, near emergency departments, and in

private patient care areas. J-K-Decl.¶7; K-G-Decl.¶15; S-C-Decl.¶¶11, 15; S-D-Decl.¶19;

Hellgren Decl. Ex. 3, 21, 36, 37. This presence includes direct enforcement activity on hospital

grounds. In January 2026, federal immigration agents detained a family as they were trying to

take their seven-year-old to the emergency room. K-G-Decl.¶15. Recent news reporting has

uncovered that many new federal immigration enforcement offices are planned for locations

close to healthcare and childcare centers. Hellgren Decl. Ex. 40.

## II.    Fear of immigration enforcement devastates the delivery of education and healthcare services.

Fear of immigration enforcement at school is causing significant student absenteeism in

many schools around the country. This has forced a shift to virtual learning for as many as 40%

of all students in some schools, A-A-Decl.¶14, while others have received no instruction at all,

with serious negative effects on their academic progress. A-W-B-Decl.¶12. Supporting students

who are absent or learning virtually has increased many educators' workloads, as they must

communicate with the students at home and find new ways to help them learn, all while also

teaching in person. A-A-Decl.¶14; A-W-B-Decl.¶11; H-H-Decl.¶¶12–13; J-G-Decl.¶17; J-Z-

Decl.¶¶14–16; K-D-Decl.¶17; M-A-Decl.¶14; M-D-Decl.¶13; P-S-Decl.¶12; T-K-Decl.¶13; NEA

Decl.¶¶20–22. Student attendance has plummeted in some schools, such as in one English as a

Second Language (ESL) class where only two of thirty-five students attended when immigration

enforcement was prevalent, C-T-Decl.¶21; *see also* Hellgren Decl. Ex. 10, 16. In one school, 50% of multilingual students shifted to virtual learning, H-M-Decl.¶13, while enrollment in a bilingual class in another school dropped from twenty-five to twelve students. A-B-Decl.¶12; *see also* A-A-Decl.¶14; A-B-Decl.¶12; C-A-Decl.¶9; E-F-Decl.¶¶15–16, 19; M-G-Decl.¶10; P-C-Decl.¶10; S-A-Decl.¶10; S-R-Decl.¶13. Enrollment declines threaten both educational quality and individual job security. A Texas ESL teacher whose class enrollment dropped from twenty-four students to five is concerned that she will not have a job next school year due to decreasing enrollment. N-S-Decl.¶16; *see also* C-T-Decl.¶22; D-B-Decl.¶11; K-D-Decl.¶18; M-L-S-Decl.¶22; P-S-Decl.¶11; S-T-Decl.¶17; NEA Decl.¶21. Some universities and faculty members also shifted to hybrid models as students became too afraid to attend in person. G-M-Decl.¶¶10-11; H-H-Decl.¶10; N-A-Decl.¶9. Students' fear of immigration enforcement at school is also leading to low-income children no longer receiving needed food, critical supplies, and health care services that are provided in schools. A-A-Decl.¶15; A-W-B-Decl.¶14; C-D-Decl.¶¶15-16; J-G-Decl.¶11; M-A-Decl.¶15; P-S-Decl.¶15.

Students are terrified and cannot focus on learning, some even sharing that they fear agents will come and take them away, T-K-Decl.¶12, resulting in trauma and potential long-term impacts on their academic progress and mental health. A-A-Decl.¶¶12–13. One elementary student told her teacher, "[I]f ICE comes and grabs me, make sure to let my parents know." K-W-Decl.¶12. Another educator's students have asked her, "[W]hat if ICE ... comes to the school?" C-R-D-Decl.¶9; *see also* Maria Heavener Decl.¶14 ("[A] sixth grader told me that she was worried that immigration officers would shatter the windows and force their way into the school."); M-H-Decl.¶12 ("Several students have asked whether ICE can come onto our campus. I can no longer reassure them that campus is safe from ICE."). Some students have shared fears

that ICE will seize their parents at school pick-up, C-A-Decl.¶10, or will be unable to pick them

up, T-K-Decl.¶10, and others have asked teachers if they are safe when they hear sirens, L-B-E-

Decl.¶10, or when an unknown adult enters the classroom, H-R-Decl.¶14, *see also* M-H-

Decl.¶13. The fear extends to U.S. citizen students. A 14-year-old citizen told his teacher,

"[W]hy are you telling me it's ok when it's not," expressing "fear that he will get detained by

[ICE] simply because of the color of his skin and making statements like, 'why should I try.'" A-

R-Decl.¶22. College students have also expressed difficulty in concentrating on their work

because of immigration enforcement action near their campus. N-A-Decl.¶12; M-G-Decl.¶14

(students withdrawn and less focused on work); H-H-Decl.¶11 (student being unable to attend

class—even virtually—feeling "physically ill" from the fear of immigration enforcement near

their campus).

 Beyond teaching, therefore, educators must talk to students about fear and trauma, even if

they lack experience or training in therapy or social work. E-W-Decl.¶16; L-B-E-Decl.¶11

(educators asked to do "double-duty to both teach students as well as address their mental health

needs."); S-G-Decl.¶15. Meanwhile, mental health care providers are overwhelmed by the

increased demand in schools. H-M-Decl.¶14.

 Behavioral problems have increased, making work more difficult for educators as

traditional behavior management methods fail because students no longer feel safe at school.

NEA Decl.¶18; A-B-Decl.¶9; C-D-Decl.¶18; M-L-S-Decl.¶24. Teachers report unprecedented

"acting out," A-H-Decl.¶10; C-C-Decl.¶9; K-W-Decl.¶12, students having difficulty regulating

their emotions, C-M-Decl.¶7; K-D-Decl.¶15, "decreased academic attention and other rule

breaking" that "disrupts my teaching," T-S-Decl.¶14, and anxiety-driven behavior issues, A-B-

Decl.¶9. Such an environment can have "serious long-term effects on the well-being and

academic progression" of students exposed to the threat of immigration enforcement. H-R-Decl.¶¶15–16; *see also* M-L-S-Decl.¶25; Hellgren Decl. Ex. 20, 39.

Special education students face compounded harms, making their teachers' work more difficult. A school psychologist reports that evaluations are in greater demand and more complex due to the additional stressors on the children. H-R-Decl.¶15. One special education teacher reports that one student who was too afraid to attend due to immigration enforcement near school was "engaging in severe instances of self-harm . . . because they cannot access their calming tools or comfort items," while "[another] has a developmental cognitive disorder and has been having an increase of seizure activity and aggressive behavior." L-V-Decl.¶14. Special education evaluation meetings at one school left parents and professionals "in tears," agonizing over whether signing Individual Education Plans (IEPs) puts families at risk. The speech-language pathologist present had never heard a family question signing an IEP because of their fear of immigration enforcement. K-C-Decl.¶15; *see also* L-B-E-Decl.¶16 (families reluctant to sign IEP forms for fear of immigration enforcement); T-K-Decl.¶15 (educator switching to virtual IEP meetings for parents reluctant to attend in-person, resulting in additional work for educator); T-S-Decl.¶16 (larger numbers of parents avoiding IEP meetings for fear of immigration enforcement at school).

Special education students who switch to virtual schooling pose particular challenges for educators because they must follow their students' IEPs when simultaneously offering in-person instruction to other students. P-S-Decl.¶12 (special education teacher estimating a 30-50% increase in workload). Absent students also miss out on the additional special education services they need, and it is "very difficult to make up that time." T-K-¶14. When special education students are absent for many days at a time, their educators and care providers must convene

multiple time-consuming team IEP meetings and even use their own time to conduct home visits to continue providing these students with a free and appropriate public education. L-V-Decl.¶18; A-W-B-Decl.¶15.

Fear of immigration enforcement at healthcare facilities interferes with medical care and burdens public health. Patients are delaying or avoiding medical care because they fear immigration enforcement activity at the hospital. S-C-Decl.¶10; S-D-Decl.¶23. In Oregon, families have told pediatric and neonatal nurses they are afraid to bring their children to the hospital for care. K-G-Decl.¶15.

Healthcare workers have observed worsened health conditions among patients who have delayed care due to fears of immigration enforcement at hospitals. S-C-Decl.¶10; S-D-Decl.¶23; Hellgren Decl. Ex. 8, 21, 37. Delays in medical treatment often result in longer hospital stays, greater use of intensive care and other hospital resources, and possible permanent or long-lasting harm to patients. S-C-Decl.¶10. Together, this burdens the healthcare system through increased bed utilization and reduced capacity—similar to the strains that healthcare workers witnessed during the COVID-19 pandemic. *Id.* The fear of immigration agents detaining patients or their visiting family members has led to medical personnel instituting password requirements for visitors and discontinuing the practice of taking patients outside for fresh air and exercise. S-D-Decl.¶22.

III.  **AFT and NEA members face significant challenges performing their jobs because their workplaces are now targets for immigration enforcement.**

Educators and healthcare workers are under heightened pressure, stress, and fear at work since the revocation of sensitive locations protections. Educators must adopt new policies and measures to protect students, support students who are scared to come to school and staying home, and manage their students' and their own fears of enforcement at school. Educators

attempt to mitigate the harms of absenteeism by providing virtual learning options, but virtual learning is generally not a sufficient replacement for in-person school, *see* H-M-Decl.¶9; J-P-Decl.¶13; L-V-Decl.¶16; M-A-Decl.¶13; T-S-Decl.¶13, and is overly burdensome and not sustainable for already strained teachers, *see* A-H-Decl.¶13; H-M-Decl.¶¶11–12; J-P-Decl.¶14; K-D-Decl.¶17; K-W-Decl.¶¶14–15; M-L-S-Decl.¶¶18–21; P-S-Decl.¶13; S-T-Decl.¶11; NEA Decl.¶22.

Beyond supporting the learning of students who do not feel safe coming to school, educators have taken on numerous additional responsibilities in their efforts to mitigate the fears of immigration enforcement at sensitive locations to encourage students to come to school, to be able to focus in school, or to enjoy the normal parts of a school day. *See* C-M-Decl.¶8; D-K-Decl.¶¶15–16; H-M-Decl.¶14; J-L-Decl.¶12; J-P-Decl.¶13; K-D-Decl.¶17; K-W-Decl.¶13; L-B-E-Decl.¶12; L-V-Decl.¶11; T-W-Decl.¶17; NEA Decl.¶¶18–19. Children fear being outside during the school day and at pick-up and drop-off, which disrupts classroom routines. Twenty families at one Maine school, for example, requested indoor recess, meaning teachers "have had to give up [their] lunch and preparation periods to supervise those alternative recesses inside the school building, costing [them] needed break time and causing work duties to take place uncompensated, outside the school day." L-B-E-Decl.¶17; *see also* C-A-Decl.¶10 (students afraid to have parents pick them up because they fear ICE will take their parents at school pick-up area); E-F-Decl.¶¶15–16 (stopping outdoor time for preschoolers after Roosevelt High School incident); K-W-Decl.¶13 (unable to conduct environmental science outdoors because children scared to go outside); M-L-S-Decl.¶14 (teachers taking personal time to walk children home heavy immigration enforcement presence near school); S-G-T-Decl.¶10 (unable to focus on safe

play during recess because constantly watching for ICE agents; some students refusing to go to recess).

Educators and healthcare workers also fear for their own safety due to the possibility of enforcement at their workplaces. On January 12, 2026, agents drove into a paraprofessional teacher's car as she headed to work, smashed her window, released tear gas, and detained her. L-V-Decl.¶11; *see also* S-R-Decl.¶9 (describing report that agents rammed a teacher's car on her way to school). Other educators are being followed by immigration enforcement when they arrive or depart their school. M-L-S-Decl.¶17. One teacher shared that he fears being physically injured or even killed if immigration enforcement activity occurs at his school. A-N-Decl.¶19. During a recent heightened immigration enforcement presence in a hospital emergency department, medical trainees reported they were afraid of being questioned or detained while providing patient care. S-C-Decl.¶15. Multiple educators report that they or their colleagues of color carry passports to prove their U.S. citizenship. K-W-Decl.¶16; M-G-M-Decl.¶11; S-R-Decl.¶15; NEA Decl.¶23. Other educators report taking over duties for colleagues who are worried they will be targeted due to their race, ethnicity, or nationality. S-G-T-Decl.¶13 (taking over bus and recess duty for educators afraid to be outside); A-A-Decl.¶16 (teachers of color afraid to come to work); *see also* R-H-S-E-Decl.¶15 (concerned for colleagues of color who feel unsafe at school); C-R-D-Decl.¶11 (colleagues expressing concern about ICE at school); M-A-Decl.¶17 (colleagues who may be perceived as non-citizens are scared). Some healthcare workers of color also now carry citizenship documentation due to fear of being questioned or detained by immigration enforcement officers at the hospital. K-G-Decl.¶11; S-C-Decl.¶14.

Healthcare workers experience anxiety daily when reporting to work and now must engage in heightened vigilance, including monitoring who enters clinical spaces, avoiding

certain entrances, and taking back stairwells to avoid possible interactions with immigration enforcement officers. S-C-Decl.¶13; S-D-Decl.¶22. Healthcare workers report being intimidated when immigration enforcement agents have tried to access confidential patient information in violation of workers' legal and ethical obligations to protect the health, dignity, and privacy of their patients. K-G-Decl.¶8; S-D-Decl.¶14; AFT Decl.¶25. These tense interactions have caused healthcare workers distress and potentially place their licenses at risk should immigration enforcement officers compromise patient privacy. S-D-Decl.¶¶11, 14–15; K-G-Decl¶8; AFT Decl.¶25.

The cumulative impact has created a mental health crisis among Plaintiffs' members. One teacher states: "I have seen colleagues cry who I have never seen cry before. I have not slept well since winter break . . . . I feel that I am at a breaking point from the stress." K-W-Decl.¶¶16–18. Many educators feel intense distress at being unable to protect students and provide a safe space for growth and learning. *See* E-W-Decl.¶9. *See also* L-B-E-Decl.¶15 (increased anxiety medication and therapy sessions; colleagues also needing to increase mental health services); C-R-D-Decl.¶¶16–17 (exhausted from emotional toll; sought help from therapist for fears about not being able to protect students); P-S-Decl.¶18 ("I can feel myself being traumatized in real time, along with my colleagues"); S-G-T-Decl.¶14 (colleague cries regularly because so overwhelmed; "trauma and stress that our teachers, students, and staff are experiencing is rapidly wearing us down"). The inability to guarantee student safety at school weighs heavily on educators, undermining their core goal of creating safe spaces for learning. *See* C-R-D-Decl.¶15 ("Knowing that I cannot guarantee students' safety *in my own classroom* is a day-to-day [anxiety] that wears me down") (emphasis in original); C-M-Decl.¶¶9, 14 ("I don't feel that I can tell families that the school is a safe place anymore"; "I don't feel I can guarantee their safety, which is devastating to

me"); K-W-Decl.¶17 ("It has always been my goal to make a safe space for my students who may not have one, and now I cannot provide that for them at school").

A psychiatric nurse describes similar trauma from seeing patients delay care due to fear of immigration enforcement at heretofore protected locations: "I carry that sadness, frustration, and even anger with me. These urgent healthcare crises are also physically and mentally exhausting because they require more time and attention." S-D-Decl.¶¶23–24.

The rescission of the sensitive locations policy has effected another fundamental and devastating change: severing the crucial bond of trust between schools and families and between patients and medical institutions. Families "have withdrawn from trusting relationships that we have worked hard to build." T-W-Decl.¶15. "Only one family came to parent teacher conferences in October 2025, whereas normally almost all… would come." C-T-Decl.¶20. Families avoid special education and nurse services because they fear completing requisite paperwork will expose them to enforcement. L-B-E-Decl.¶16. Parents forgo medical care for their children because of immigration enforcement activity at hospitals. K-G-Decl.¶15. Medical professionals carry an emotional burden as they see patients who let their conditions deteriorate and arrive only in crisis. "It is emotionally difficult to see patients suffer when their fear of immigration enforcement kept them from coming to the hospital for help." S-D-Decl.¶¶23–24.

## LEGAL STANDARD

Section 705 of the APA authorizes a court to "issue all necessary and appropriate process to postpone the effective date of [the] agency action or to preserve status or rights pending conclusion of the review proceedings" "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. Administrative stays under 5 U.S.C. §

705 "turn on the same factors as preliminary injunctions." *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 983 (9th Cir. 2025).

A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of [a stay], that the balance of equities tips in his favor, and that [a stay] is in the public interest." *Saravia for A.H. v. Sessions*, 905 F.3d 1137, 1142 (9th Cir. 2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). As an alternative to this test, a stay is appropriate if "serious questions going to the merits were raised and the balance of the hardships tips sharply in the plaintiff's favor," thereby allowing preservation of the last uncontested status quo when complex legal questions require further inspection or deliberation. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). For the reasons discussed below, Plaintiffs NEA and AFT meet all these requirements.

## ARGUMENT

The Court should stay the Huffman Memorandum, which has unleashed immigration enforcement at and near schools and medical facilities, fundamentally disrupting Plaintiffs' members' delivery of educational and health care services and inflicting severe, ongoing harm.

A stay is warranted under the relevant factors. First, the Huffman Memorandum is a textbook example of arbitrary and capricious agency action, offering zero explanation for rescinding over thirty years of unbroken bipartisan policy protecting sensitive locations from routine civil immigration enforcement. The rescission fails to even acknowledge, let alone consider, reasonable alternatives to wholesale elimination of the prior policy, and likewise ignores the reliance interests that educators, healthcare workers, and entire communities have cultivated in the justified expectation that schools, hospitals, and places of worship remain safe places in all but exigent circumstances. Second, the rescission inflicts acute and ongoing irreparable harm on Plaintiffs' members via disrupted learning environments, increased

workloads, and severe emotional and psychological trauma, and to AFT's organizational

missions. Third, the equities and public interest overwhelmingly favor a stay, as a return to the

Mayorkas Memorandum will not prevent Defendants from pursuing immigration enforcement

priorities. The public interest is served when federal agencies comply with bedrock

administrative law requirements.

I.    **Plaintiffs are likely to succeed in proving that the 2025 Huffman Memo is arbitrary and capricious.**

Plaintiffs are likely to succeed in proving that the 2025 Huffman Memo was not the

product of reasoned decision-making.[4] *See, e.g.*, *Allentown Mack Sales & Serv., Inc. v. NLRB*,

522 U.S. 359, 374 (1998) ("Not only must an agency's decreed result be within the scope of its

lawful authority, but the process by which it reaches that result must be logical and rational.").

The APA requires that agencies exercise their authority on an informed basis, ground their

justifications on neutral and rational principles, and "offer genuine justifications for important

decisions." *Dep't of Com. v. New York*, 588 U.S. 752, 756 (2019); *see also Motor Vehicle Mfr.*

*Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48–49 (1983). Where an

---

[4] This Court can review Plaintiffs' APA claim because the Huffman Memorandum is final agency action. 5 U.S.C. § 704. The Huffman Memorandum represents the "consummation of the agency's decisionmaking process," because there is neither subsequent agency action nor text in the Memorandum itself that indicates the Memorandum is of a "merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). The Huffman Memorandum is also an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* As another federal court held, the Huffman Memorandum "necessarily" constitutes final agency action "because it materially redetermined the rights and obligations of immigration officers by removing the restrictions and limitations of" the Mayorkas Memorandum. Mem. Op. at 10, 18, *Philadelphia Yearly Meeting v. U.S. Dep't of Homeland Sec.*, 25-cv-0243-TDC (D. Md. Feb. 3, 2026), ECF No. 92 (denying Defendants' motion to dismiss on all APA claims relevant here). The Huffman Memorandum also satisfies the second *Bennett* prong because of its "direct and appreciable legal consequences"—i.e., exposing individuals to civil immigration arrests. *U.S. Army Corps. of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 598 (2016).

agency changes its previous position—especially when doing so "abandon[s] its decades-old

practice," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 218 (2016)—a "more detailed

justification" is required, *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The

agency must "show that there are good reasons for the new policy" and explain the need "for

disregarding facts and circumstances that underlay or were engendered by the prior policy."

*Encino Motorcars*, 579 U.S. at 221–22. And "when an agency rescinds a prior policy its reasoned

analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'"

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *State

Farm*, 463 U.S. at 42) (alterations in original).

      Because "courts retain a role, and an important one, in ensuring that agencies have

engaged in reasoned decisionmaking," *Judulang v. Holder*, 565 U.S. 42, 53 (2011), review of

whether an agency's action reflects reasoned decision-making "is to be searching and careful,"

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part on

other grounds as recognized in Califano v. Sanders*, 430 U.S. 99 (1977). It is the reviewing

court's task to examine the proffered reasons— "or, as the case may be, the absence of such

reasons." *Judulang*, 565 U.S. at 53. A court may not "attempt itself to make up for [any]

deficiencies" in an agency's reasons, *State Farm*, 463 U.S. at 43, but "must judge the propriety

of the agency's action based 'solely [on] the grounds invoked by the agency' when it made the

challenged decision," *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d

62, 72 (D.D.C. 2018) (alteration in original) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196

(1947)).

      The nine-sentence Huffman Memo—issued mere hours into a new administration—fails

to provide *any* explanation for Defendants' upheaval of over thirty years of unbroken agency

policy protecting sensitive locations. It fails to consider reasonable alternatives, and it likewise fails to consider the serious reliance interests engendered by the historical protections. For each of these reasons, the Huffman Memo is arbitrary and capricious.

### 1. Defendants failed to provide reasoned explanation for rescinding longstanding protections for sensitive locations.

The 2025 Huffman Memorandum fails the APA's reasoned decision-making requirement at the threshold: it provides *no* explanation, let alone a reasonable one, for DHS's decision to rescind over thirty years of protections limiting immigration enforcement at or near sensitive locations. Although it dispensed with longstanding agency policy, the Huffman Memorandum did not consider any of the facts and reasoning supporting the Mayorkas Memorandum or prior sensitive locations memoranda. These were "important aspect[s] of the problem" that the Huffman Memorandum was required to consider. *State Farm*, 463 U.S. at 43; *see also Dep't of Com.*, 588 U.S. at 756 (APA requires agencies to provide "genuine justifications for important decisions . . . that can be scrutinized by courts and the interested public.").

Past memoranda unanimously recognized "the importance of [sensitive locations] to the well-being of people and the[ir] communities" and "the impact an enforcement action would have on people's willingness to be in the protected area and receive or engage in the essential services or activities that occur there." Hickman Decl. Ex. 3 at 2; *accord* Hellgren Decl. Ex. 44 at 1; Hickman Decl. Ex. 2 at 2; Hellgren Decl. Ex. 43 at 2; Hellgren Decl. Ex. 42 at 1; Hickman Decl. Ex. 1 at 2. Past memoranda likewise emphasized the importance of maintaining "the public's confidence in the way ICE executes its mission," Hellgren Decl. Ex. 43 at 1, because "[t]he presence of [immigration officers] conducting enforcement activities at or near schools, places of worship, and certain other community locations has been a sensitive issue," Hellgren Decl. Ex. 44 at 1; *accord, e.g.*, Hickman Decl. Ex. 2 at 2–3 ("This policy is meant to ensure that

ICE officers and agents . . . make substantial efforts to avoid unnecessarily alarming local communities); Hellgren Decl. Ex. 42 at 1 ("The presence of . . . agents conducting investigative activity at schools, or in venues where children's activities occur, has always been a point of particular sensitivity, especially given the public's interest in ICE's mission."). Indeed, prior policy explicitly admitted that DHS "can accomplish [its] enforcement mission without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more." Hickman Decl. Ex. 3 at 2. The Huffman Memo fails to acknowledge any of this, much less explain why the agency now disagrees. Yet where a "new policy rests upon factual findings that contradict those which underlay its prior policy," "more detailed justification" is required. *F.C.C.*, 556 U.S. at 515.

The only statement in the Huffman Memo acknowledging the agency's about-face is the assertion that "it is not necessary . . . for the head of the agency to create bright line rules" regarding immigration enforcement. Hickman Decl. Ex. 4. But again, it does not explain why that is now the case, or why—after decades of agency justifications arriving at the precise opposite conclusion—officers now need no guidance other than a "healthy dose of common sense." *Id*. It does not detail what circumstances necessitated the sudden departure, nor why the extensive public policy, humanitarian considerations, or safety concerns cited by past agency heads no longer apply.[5]

---

[5] The considerations and concerns cited by past agency heads were rightfully warranted: citizens and noncitizens alike now fear attending these locations. *See, e.g.*, Maria Heavener Decl.¶¶14–16; G-M- Decl.¶11; S-R- Decl.¶¶13–14; N-A- Decl.¶¶11–13; P-C- Decl.¶¶8–10; AWB Decl.¶20.

*Plaintiffs NEA and AFT's Motion for 5 U.S.C. § 705 Stay*

In short, this single conclusory sentence is not a sufficient explanation for why the agency decided to sweep away over twenty pages of detailed justifications, explanations, and guidelines developed through at least seven separate memoranda over three decades. *See City & County of San Francisco v. U.S. Citizenship & Immigration Services*, 981 F.3d 742, 749–50, 762 (9th Cir. 2020) (finding Defendants' expansion of the definition of "public charge" in the Immigration and Nationality Act arbitrary and capricious because the government had previously offered comprehensive and substantiated reasons for the original rule, but failed to explain why those reasons and analysis were no longer satisfactory to justify the new rule). Where, as here, "no findings and no analysis . . . justify the choice made," the APA "will not permit" a court to uphold the agency's action. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962); *accord Judulang*, 565 U.S. at 64 ("[Courts] must reverse an agency policy when we cannot discern a reason for it," and doing so on that basis); *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th Cir. 2023) ("[A]n agency's action can only survive arbitrary or capricious review where it has articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.") (cleaned up).

### 2.  Defendants failed to consider obvious alternatives.

The Huffman Memorandum is similarly devoid of any mention, much less analysis, of "alternatives that are within the ambit of the existing policy." *Regents.*, 591 U.S. at 30 (cleaned up). The Mayorkas Memorandum, for example, comprised at least four distinct pieces: (1) a "foundational" nonenforcement policy, (2) a list of examples of areas considered "protected areas," (3) a list of examples setting out limited exigent circumstances allowing for enforcement at sensitive locations, and (4) training and reporting requirements. Before "completely nullifying the [policy] altogether," *Nat'l TPS All. v. Noem*, No. 25-5724, 2026 WL 226573, at *21 (9th Cir.

Jan. 28, 2026) (Mendoza, J., concurring, joined by Wardlaw, J.), Defendants were required to consider the possibility of maintaining any of these core aspects of the prior policy, *see id.*, *State Farm*, 463 U.S. at 51.

Indeed, courts routinely find agency actions that nullify prior policy wholesale without considering more narrowly drawn action to be arbitrary and capricious. In *State Farm*, the Supreme Court held that the National Highway Traffic Safety Administration's ("NHTSA") rescission of a rule requiring *either* automatic seatbelts or airbags in new cars on the ground that automatic seatbelts were too easily defeated (by detaching them) was arbitrary and capricious because NHTSA failed to consider a rule that would require airbags only. Because the airbag was an "alternative within the ambit of the existing standard[, the] . . . rule may not be abandoned without any consideration whatsoever of an airbags-only requirement." *State Farm*, 463 U.S. at 51; *see also Regents*, 591 U.S. at 30 (holding failure to consider alternative within the ambit was sufficient, by itself, to make the decision arbitrary and capricious). A majority of a Ninth Circuit panel recently provided similar reasoning in *National TPS Alliance v. Noem*. There, Judges Mendoza and Wardlaw concurred that Secretary Noem's failure to consider alternative options short of "completely nullifying" Temporary Protected Status for Venezuelans and Haitians was arbitrary and capricious, particularly because various "less disruptive" solutions within the ambit of the policy could have "addressed her concerns." 2026 WL 226573, at *21–23.

The Huffman Memorandum did not consider maintaining or even modifying any of the central characteristics of the Mayorkas Memorandum, nor did it consider any "less disruptive" or "more moderate approaches." *Id.* at *21. At bare minimum, the Huffman Memorandum's considerations of alternatives "within the ambit" of the Mayorkas Memorandum should have included maintaining the general nonenforcement policy while modifying the list of protected

areas, the exigent circumstances allowing for enforcement, or the training and reporting requirements. Defendants also should have considered providing more detailed guidance to agents and officers than simply authorizing them to use "discretion along with a healthy dose of common sense," Hickman Decl. Ex. 4, particularly because "common sense" was already required by previous memoranda, Hellgren Decl. Ex. 42 at 1, *see also, e.g.*, Hickman Decl. Ex. 2 at 2 (requiring exercise of "sound judgment"). These omissions "alone render[ Defendants'] decision arbitrary and capricious." *Regents*, 519 U.S. at 30.

### 3. Defendants failed to consider reliance interests.

Finally, the Huffman Memorandum is arbitrary and capricious because it fails to consider the serious reliance interests on over thirty years of unbroken federal policy largely prohibiting immigration enforcement at sensitive locations. *See, e.g.*, *Washington v. United States Dep't of Health & Hum. Servs.*, No. 6:25-CV-01748-AA, 2025 WL 3002366, at *18 (D. Or. Oct. 27, 2025) ("'When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" (quoting *Regents*, 591 U.S. at 30)); *City & County of San Francisco*, 981 F.3d at 749–50, 761 (9th Cir. 2020) (recognizing the "serious reliance interests" engendered by over two decades of reliance on prior guidance); *Washington*, 2025 WL 3002366, at *18.

The Huffman Memorandum ignored that citizens and noncitizens alike have long relied on the protections surrounding sensitive locations to safely obtain or provide education, seek or provide critical medical services, engage in protected speech, and exercise their religious convictions. Past sensitive locations memoranda explicitly analyzed these interests, *see, e.g.*, Hickman Decl. Ex. 3 at 2; Hellgren Decl. Ex. 44 at 1; Hickman Decl. Ex. 2 at 2. By contrast, the Huffman Memorandum fails even to mention them. This has profoundly impacted Plaintiffs'

members around the nation by reducing attendance in schools; forcing educators to spend extra hours to educate scared students who are staying home or have switched to virtual learning options; requiring overburdened educators to spend even more time creating alternative arrangements and caring for their students; causing patients to forgo needed appointments and healthcare workers to make impossible choices regarding the safety and privacy of their patients; and causing fear, anxiety, and trauma to students, educators, patients, and healthcare workers alike. *See infra* Section II.

"[B]ecause DHS was not writing on a blank slate, it *was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33 (internal quotation marks and citations omitted) (emphasis in original). The Huffman Memorandum does none of this, and is thus arbitrary and capricious for that reason as well.

## II.      Plaintiffs NEA and AFT face irreparable harm without the requested relief.

Plaintiffs face ongoing irreparable injury if the Huffman Memorandum is not stayed. *See National Wildlife Federation v. National Marine Fisheries Service*, 886 F.3d 803, 819 (9th Cir. 2018) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). Intangible injuries such as emotional distress, which generally lack an adequate legal remedy, qualify as "irreparable harm." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (limiting professional opportunities was intangible injury and constituted irreparable harm). Plaintiffs and their members face irreparable harm from the deleterious impact of the Huffman Memorandum on schools and healthcare facilities, including drastic changes to members' work responsibilities and associated stress due to impacts of immigration enforcement at or near these sensitive locations, the resulting negative effects on members' mental and physical health, and injuries to AFT's ability to carry out its mission.

The prospect of unfettered immigration enforcement activity at or near schools—as authorized by the Huffman Memorandum—has "changed the very fabric of . . . schools." Hellgren Decl. Ex. 26. The Huffman Memorandum's elimination of an effective safe harbor shielding schools and other sensitive locations from routine enforcement activity has altered the very nature of those "essential services and activities" the federal government long sought to protect, Hickman Decl. Ex. 3 at 2, fundamentally transforming students' and teachers' experiences at school. NEA member E-M, for example, witnessed "an immediate change in the emotional tone and tenor of my school community" following rescission of the sensitive locations policy. E-M-Decl.¶11. Indeed, NEA and AFT members report disruptive changes in their students' behavior and attitudes caused by fear of immigration enforcement at schools after the change in policy. *E.g.*, C-C-Decl.¶¶8-9; C-D-Decl.¶16; C-T-Decl.¶16; L-B-E-Decl.¶14; T-S-Decl.¶10; T-W-Decl.¶15.

Many NEA and AFT members have reported significant negative impacts to their workloads, job responsibilities, and work experiences in schools. Chronic absenteeism stemming from recently escalating enforcement activity near schools—authorized by the Huffman Memorandum—and the resulting fear increases Plaintiffs' members' workloads, requiring many to work extra hours to ensure their students do not fall behind. A-R-Decl.¶¶23, 26; C-D-Decl.¶14;  C-T-Decl.¶18; D-K-Decl.¶14; E-M-Decl.¶¶11, 15; E-W-Decl.¶13; J-P-Decl.¶12; J-V-Decl.¶14; J-Z-Decl.¶¶14-16; M-A-Decl.¶14; M-G-Decl.¶12; NEA Decl.¶22; P-C-Decl.¶¶10-11; P-V-Decl.¶¶7-8; S-A-Decl.¶10; S-T-Decl.¶16; T-K-Decl.¶14. This includes creating new lesson plans and learning materials, often on extremely short notice, that can be delivered through hybrid or virtual teaching methods and tailored to specific student needs and accommodations. P-S-Decl.¶12 (creating individualized hybrid learning plans for students with IEPs); K-W-Decl.¶14

(adding virtual learning doubled workload); A-H-Decl.¶13; H-H-Decl.¶13; K-D-Decl.¶17; L-S-Decl.¶13; NEA Decl.¶22; S-M-Decl.¶11. Parents are afraid to attend school functions as well, increasing NEA members' workloads as they find ways to engage with families while accommodating their fears. *See* A-W-B-Decl.¶¶18–19 (describing cancellation of trunk-or-treat event and shifting an entire day of parent-teacher conferences to an inferior virtual mode); *see also, e.g.*, C-C-Decl.¶10; C-T-Decl.¶20; T-K-Decl.¶16; NEA Decl.¶19; AFT Decl.¶22. Teachers must expend significant time and effort addressing students' and parents' fears about immigration enforcement at school and their resulting mental health needs, on top of their normal teaching responsibilities. A-R-Decl.¶¶22–24; C-M-Decl.¶8; E-W-Decl.¶14; L-B-E-Decl.¶14; S-M-Decl.¶12; AFT Decl.¶21; NEA Decl.¶18.

Further, many have been forced to take on additional, non-teaching responsibilities to keep students and colleagues safe from possible immigration enforcement activity on and near school grounds. L-B-E-Decl.¶17 (teachers must supervise alternative indoor recess for families afraid that students who are outside will be subject to immigration enforcement); K-D-Decl.¶14 (teachers must develop contingency plans for immigration enforcement activity during recess and dismissal); M-H-Decl.¶16 (teacher must develop safety plans). Finally, plaintiffs' members must navigate these injuries while being forced to worry about whether they will face reassignment or job loss due to precipitous declines in enrollment and attendance at some members' schools, which was brought on by the Huffman Memorandum making schools fair game for civil immigration enforcement. *See* J-Q-Decl.¶15 (at least one ESL position will be eliminated); C-T-Decl.¶22; J-V-Decl.¶16; N-S-Decl.¶¶15–16; S-T-Decl.¶17; AFT Decl.¶16; NEA Decl.¶21; *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.,* 840 F.2d 701, 709–10 (9th Cir. 1988) (teacher's loss of job satisfaction and emotional distress following reassignment to non-teaching

duties is an irreparable injury). These injuries—individually and cumulatively—are similar to those the Ninth Circuit found constituted irreparable harm to the teacher in *Chalk*, and they cannot be remedied without a stay of the Huffman Memorandum.

Defendants' recent escalation of immigration enforcement actions on or near school grounds and school bus stops—all unleashed by the Huffman Memorandum—has traumatized teachers and students alike. Plaintiffs' members are responsible for their students' physical and emotional safety. *See* A-R-Decl.¶26 (teacher's focus is on keeping students safe); C-M-Decl.¶¶13–14 (describing nightmares about having to protect students from ICE); J-L-Decl.¶10 (bus driver's job is to ensure students' safe transportation between home and school); AFT Decl.¶15 (educators act *in loco parentis* during school); NEA Decl.¶16 (educators' duty to keep students safe at school). The burden of this responsibility in the face of ongoing and potential immigration enforcement—highlighted by immigration enforcement agents' visible presence at, around, and on established routes to and from school grounds—has caused Plaintiffs' members psychological distress. S-M-Decl.¶16 (increased medication and therapy due to anxiety); P-S-Decl.¶18 (therapist suggested medication for resulting anxiety); K-W-Decl.¶18 (at "breaking point from the stress" and afraid they will need to take time off); C-M-Decl.¶¶13–14 (nightmares and marital stress); M-G-Decl.¶15 (anxiety); E-M-Decl.¶10 (mental health affected by stress); A-R- Decl.¶29 (same); C-T-Decl.¶23 (same); J-P-Decl.¶16 (same); K-D-Decl.¶20; D-K-Decl.¶16 (same); A-H-Decl.¶19 (same, including lost sleep). Some members report negative effects on their physical health as well. S-M-Decl.¶17 (difficulty managing diabetes due to anxiety).

The mental and emotional strain has also negatively impacted some NEA and AFT members' performance at work. H-H-Decl.¶15 (difficulty concentrating in class due to anxiety); S-T-Decl.¶22 ("less present and energized" while teaching due to stress and concern); A-B-

Decl.¶13 (same); C-D-Decl.¶19 (same); C-M-Decl.¶12 (same); T-K-Decl.¶17 (same). Such emotional injuries and psychological distress constitute irreparable harm. *See Edmo v. Corizon, Inc.*, 935 F.3d 757, 797–98 (9th Cir. 2019) ("Emotional injuries, psychological distress … may constitute irreparable harm."); *see also Thomas v. Cnty. of L.A.*, 978 F.2d 504, 511 (9th Cir. 1992) (established irreparable harm based in part on emotional injuries).

Plaintiffs' members who have been present during immigration enforcement activity on or near school grounds likewise report ongoing emotional trauma. M-H-Decl.¶7–12. Additionally, some NEA and AFT members are themselves afraid of being targeted or injured by aggressive immigration enforcement on or near school grounds, even those who are citizens. S-R-Decl.¶¶14–15 (carries U.S. passport due to fear of being approached by immigration enforcement agents while assisting with student drop-off and pickup); G-M-Decl.¶11 (carries U.S. passport due to fear); J-Q-Decl.¶14 (fears for her and her colleagues' safety at work); S-G-T-Decl.¶13 (took over bus duty for teacher afraid to be outside at dismissal); K-W-Decl.¶16 (aware that Hispanic colleagues carry passports because they fear immigration enforcement officers targeting them); NEA Decl.¶23. These educators must continue to meet their students' needs and address their fears while terrified for their own safety, contributing to their emotional and psychological distress. *E.g.*, G-M-Decl.¶16 (both educator and educator's students now have "significant fear and stress in places that we used to consider safe"); S-R-Decl.¶¶12, 15 (describing students' and educator's own "anxiety").

AFT members working in hospitals and healthcare facilities also face major transformations in their workplaces, disrupting what "is supposed to be a sacred space and a place of healing." S-D-Decl.¶13. Members report "increased fear and vigilance among patients and healthcare workers" that interferes with medical care, S-C-Decl.¶16. One member's hospital

now requires passwords for visitors and no longer takes patients for walks around the hospital grounds to avoid interactions with immigration enforcement agents, S-D-Decl.¶22. Immigration enforcement agents have entered hospitals and healthcare facilities demanding—or, in some cases, accessing without permission—private patient information, forcing healthcare workers to choose between violating their ethical obligations and putting their own safety at risk. S-D-Decl.¶¶10–11 (agent approached nurse at hospital entrance and demanded access to private patient information); K-G-Decl.¶8 (agents viewed patient data without permission and intimidated nurses who objected); *id.*¶10 (agents entered secure units without proper escorts); AFT Decl.¶25 (same). AFT members also report new required duties in response to on-site immigration enforcement. S-C-Decl.¶8 (task force to address changes to hospital operations). These changes cause AFT members working in hospitals and healthcare facilities emotional distress, as they must contend with a constant environment of fear, negative impacts on their patients, and fear for their own safety. S-C-Decl.¶¶15–16 (experiencing daily anxiety at work, including fear of being detained because of their ethnicity); K-G-Decl.¶¶9, 11–12 (Native American nurse now requires medication to manage anxiety due to immigration agent presence in hospital; nurses of color report anxiety and fear, including from interactions with immigration enforcement agents); J-K-Decl.¶12 (physician experiencing "ongoing moral distress" that they cannot provide safe, confidential patient care).

Further, AFT is suffering ongoing irreparable injury to its mission in the absence of a stay. Irreparable harm to an organization occurs where Defendants' actions cause "serious 'ongoing harms to [its] organizational missions,'" *Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, 780 F. Supp. 3d 897, 925 (N.D. Cal. 2025) (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)). AFT's mission is "to champion

fairness, democracy, and economic opportunity in and through high-quality public education, as well as healthcare and public services for students, their families, and communities their members serve." AFT Decl.¶6. AFT advances this mission through its members organizing and advocating at their workplaces. *Id*.¶34. Rescission of protections for sensitive locations, however, has chilled the speech of educators and healthcare workers, with AFT members "silencing themselves out of fear that they will be targeted by immigration enforcement at rallies, picket lines, or other demonstrations held at their worksites, including schools and hospitals." *Id*.; *see also* F-M-Decl.¶15. This severely hampers AFT's ability to carry out its mission, as AFT "relies on members' speech about the issues that matter to them" to effectuate change. AFT Decl.¶35. Each lost opportunity for effective advocacy due to the Huffman Memo's chill on AFT member speech represents irreparable harm to the organization. *See Oregon Council for Humans. v. United States DOGE Serv.*, 794 F. Supp. 3d 840, 892 (D. Or. 2025) (irreparable harm from canceling programs for teachers as "[N]o amount of money damages will allow Plaintiffs to recover these lost opportunities.").

A stay of the Huffman Memorandum is necessary to both immediately mitigate these ongoing irreparable harms and to prevent further deterioration of learning and healthcare environments across the country. The presence of immigration enforcement agents near schools—and the constant threat that this could lead to enforcement actions or related altercations at school or close by—traumatizes students and teachers, exacerbating existing behavioral issues and damaging communities meant to be safe spaces for learning. Overworked educators will continue to face inordinate pressures and stress without a stay, further damaging their mental and physical health. As these educators inevitably take time off to recover, their colleagues must shoulder more of the burden, straining school environments already near their

breaking points. Immigration enforcement activity near hospitals, meanwhile, is causing patients to delay or forgo care, often resulting in longer hospitalizations with more intensive treatment needs and worse outcomes when care is finally sought. *See* AFT Decl.¶23. This increases the strain on the healthcare system and impacts care for all patients, S-C-Decl.¶10, ultimately placing further stress on healthcare workers. Sensitive locations protections for schools and healthcare facilities must be restored to prevent these severe and needless consequences.

## III.    The equities and public interest favor Plaintiffs.

The balance of equities and the public interest, which merge here where the government is a party, weighs in favor of granting a stay of the Huffman Memorandum. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). The court must "balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009). The public interest in accessing sensitive locations where essential services are provided is paramount, as Defendants have historically recognized. When the relief sought is squarely within the public interest, there can be no harm to the government, as "the public interest is served by [the government's] compliance with the APA." *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

Here, the harms caused to NEA and AFT members, and AFT itself, by the Huffman Memorandum's revocation of protections for sensitive locations far outweigh any harm to Defendants by a return to a policy of limited enforcement at such locations that existed for more than three decades.

NEA and AFT members have described the impact of increased immigration enforcement at or near their schools, including: severe disruptions to the stability of their school environments; fear that they or school community members will be taken by immigration enforcement agents at or near school or school bus stops; disruptive student behavior; increased

job responsibilities to meet the educational needs of their students while also ensuring the provision of critical mental health and social supports to students and families; offering new learning supports for students who are staying home or learning virtually; and attendant emotional injury and psychological distress. *See supra* Section II. Similarly, in healthcare settings, AFT members have reported that increased immigration enforcement activity near hospitals is causing patients to skip or delay care; emotionally burdening providers and adding stress to their jobs; forcing members to fear violating patient privacy and professional obligations during confrontations with immigration enforcement; and creating anxiety that healthcare workers themselves may be targeted by immigration enforcement. *Id.* AFT's mission and programming have been significantly impaired because of the Huffman Memorandum, and those injuries persist. *Id.*

By contrast, a stay of the Huffman Memorandum will not preclude the government from implementing its immigration enforcement priorities at non-sensitive locations. Indeed, even a return to the Mayorkas Memorandum will not fully bar Defendants from conducting enforcement at sensitive locations provided they adhere to its limits, procedures, and standards; and the bounds of the law under the Fourth Amendment and the Immigration and Nationality Act. *See AFT v. Dep't of Ed.*, 779 F. Supp. 3d 584, 622 (D. Md. 2025) (finding that enjoining Department of Education letter would "not impede the government's ability to enforce civil rights law or to implement the President's policy priorities" within the bounds of the law); *see also* Mem. Op. at 57, *Philadelphia Yearly*, Civil Action No. 25-0243-TDC (D. Md Feb. 24, 2025), ECF No. 60 (enjoining enforcement of the Huffman Memo as to plaintiffs' houses of worship and explaining that "pursuant to the [Mayorkas Memo], DHS will be required to avoid enforcement actions in or near places of worship 'to the fullest extent possible' and may undertake such enforcement

actions only under one of the 'limited circumstances' identified in the Mayorkas

Memorandum[.]".

    The public interest likewise warrants a stay of the Huffman Memorandum. The public

has an interest in being able to access sacred spaces, build community, receive essential social

services, and foster the growth and healthy development of children. Immigration enforcement at

or near schools tears apart the social fabric of the community that schools seek to build.

Immigration enforcement near hospitals and healthcare settings likewise undermines public

health and safety. The public interest is also served by ensuring the government complies with

the law. *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992) ("[t]he APA sets forth the

procedures by which federal agencies are accountable to the public and their actions subject to

review by the courts."). Here, Defendants abruptly departed from a decades-long policy of

nonenforcement at sensitive locations, which recognized in its most recent iteration that

nonenforcement at or near sensitive locations (absent exigent circumstances) is necessary to

ensure that immigration enforcement does not "deny[ ] or limit[ ] individuals' access to needed

medical care, children access to their schools, the displaced access to food and shelter, people of

faith access to their places of worship, and more." Hickman Decl. Ex. 3 at 2. The Huffman

Memorandum summarily dispensed with that reasoning without proper consideration of the

harms that animated the original policy and a plan to mitigate those harms. *See City and County*

*of San Francisco*, 981 F.3d at 762 (affirming that DHS rule was arbitrary and capricious when

DHS failed to consider the adverse effects on health and adequately explain the change in policy

from its previous guidance). The fallout of that hasty, ill-conceived decision is evident in the

stark and ongoing consequences that Plaintiffs and their members have detailed.

    The public interest and equities therefore strongly favor Plaintiffs.

**IV.    The court should stay the Huffman Memorandum.**

Plaintiffs NEA and AFT appropriately request a § 705 stay of the Huffman Memorandum. Additionally, applying traditional equitable principles, a stay of the Huffman Memorandum is necessary to fully remedy plaintiffs NEA's and AFT's harms.

The APA's link between relief and the challenged agency action applies to both vacatur under § 706 and the stay relief sought here under § 705. "The text and history of the APA authorize vacatur"—and stay—of agency action universally. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 829 (2024) (Kavanaugh, J., concurring); *see also Nat'l TPS All v. Noem.*, 773 F. Supp. 3d 807, 866–67 (N.D. Cal. 2025) (observing that "where agency action is challenged as a violation of the APA, nationwide relief is commonplace"). "[J]ust as vacatur under § 706 is not a party-specific remedy … neither is a stay under § 705 [as] [b]oth provisions specify what courts are authorized to do with respect to *agency actions*, not parties." *Cabrera v. U.S. Dep't of Lab.*, 792 F. Supp. 3d 91, 106 (D.D.C. 2025) (emphasis in original); *see also District of Columbia v. USDA*, 444 F. Supp. 3d 1, 48 (D.D.C. 2020) (explaining that vacatur relief under the APA is "ordinarily read as an instruction to vacate, wherever applicable, unlawful agency rules," and thus it follows that Section "705 must be read to authorize relief from agency action for any person otherwise subject to the action, not just as to plaintiffs"). Because the APA authorizes remedies that run to the final agency action that is challenged, the scope of remedy sought here is thus appropriately a universal stay of the Huffman Memorandum.

Consideration of traditional equitable principles strengthens this conclusion. In *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025), the Supreme Court affirmed that the Judiciary Act of 1789 authorizes injunctive relief to the extent that the remedy "administer[s] complete relief between the parties." (emphasis in original). While the Supreme Court drew a clear distinction between

principles governing the scope of general equitable relief and the vacatur remedy explicitly

authorized by the APA, *see id.* at 847 n.1, the Ninth Circuit has "understood the Court's

'complete-relief principle for crafting injunctive relief' to 'provide[ ] some useful guidance for

crafting interim equitable relief' in the APA context," *Nat'l TPS All. v. Noem*, 150 F.4th 1000,

1028 (9th Cir. 2025) (alterations in original; quoting *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th

972, 995-96 (9th Cir. 2025)).

Applying the complete-relief principle here, a stay of the Huffman Memorandum

universally is necessary to remedy Plaintiff AFT and NEA's harms. NEA has over 3 million

members in over 14,000 communities across the country; AFT has over 1.8 million members in

over 3,000 local affiliates across all fifty states, Guam, and Puerto Rico. NEA Decl.¶¶5– 6; AFT

Decl.¶3. In addition to NEA and AFT members working at every level of education in schools

and higher education institutions, AFT's members also work in healthcare facilities, childcare

centers, and social services establishments – all locations that have historically enjoyed

longstanding sensitive locations protections and currently suffer harm. NEA Decl.¶¶13, 15– 24;

AFT Decl.¶¶5, 8– 11. The size and diversity of their membership thus puts Plaintiffs AFT and

NEA in an even more compelling posture than the membership organization in *Nat'l TPS All.*;

there, the Ninth Circuit still concluded that a full § 705 stay of the challenged agency action was

necessary because relief had to run to all 84,000 of Plaintiffs' members located across all 50

states. 150 F.4th at 1028.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion to stay the 2025

Huffman Memorandum pending the conclusion of this litigation.

Dated: February 12, 2026                          Respectfully submitted,

/s/ Jehan Patterson

STEPHEN W MANNING, OSB No. 013373
stephen@innovationlawlab.org,
smanning@ilgrp.com
TESS HELLGREN, OSB No. 191622
tess@innovationlawlab.org
RACHEL LANDRY, Mass. No. 713320*
rachel@innovationlawlab.org
NELLY GARCIA ORJUELA, OSB No.
223308
nelly@innovationlawlab.org
INNOVATION LAW LAB
333 SW 5th Ave., Suite 200
Portland, OR 97204-1748
Telephone: +1 503-922-3042

BRANDON GALLI-GRAVES, Tx. No.
  24132050*
brandon.galli-graves@justiceactioncenter.org
ESTHER H SUNG, Cal. No. 255962*
esther.sung@justiceactioncenter.org
KAREN C TUMLIN, Cal. No. 234961*
karen.tumlin@justiceactioncenter.org
HILLARY LI, Ga. No. 898375*
hillary.li@justiceactioncenter.org
LAURA FLORES-PERILLA, Cal. No.
355645*
laura.flores-perilla@justiceactioncenter.org
EMILY SATIFKA, Nj. No. 330452020*
emily.satifka@justiceactioncenter.org
JUSTICE ACTION CENTER
PO Box 27280
Los Angeles, CA 90027
Telephone: +1 323-450-7272

   Attorneys for Plaintiffs

LUBNA A. ALAM, DC No. 982169*
lalam@nea.org
KATHERINE E. LAMM, DC No. 1006319*
klamm@nea.org
NATIONAL EDUCATION ASSOCIATION
1201 16th Street NW
Washington, DC 20036

JEHAN A. PATTERSON, D.C. No.
1012119**
jpatterson@cov.com
STANLEY YOUNG, CA No. 121180**
syoung@cov.com
SABRINA MCGRAW, CA No. 334120**
smcgraw@cov.com
AMBER LOWERY, D.C. No. 1780982**
alowery@cov.com
ANALESE BRIDGES, D.C. No.
90029992**
abridges@cov.com
EVAN CHIACCHIARO, D.C. No.
90037819**
echiacchiaro@cov.com
MARIAM OLADIPO, D.C. No. 90028347**
moladipo@cov.com
COVINGTON & BURLING LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: +1-202-662-5129


DANIEL MCNEIL, D.C. No. 455712*
dmcneil@aft.org
CHANNING COOPER, Md. No.
1212110182*
ccooper@aft.org
AMERICAN FEDERATION OF
TEACHERS
555 New Jersey Avenue, N.W.
Washington, D.C. 20001
Telephone: +1 202-879-4400

Attorneys for American Federation of
Teachers

*Pro hac vice
**Pro hac vice applications forthcoming

(202) 822-7035

Attorneys for National Education Association

**CERTIFICATION OF COMPLIANCE WITH LR 7-2(b)**

This brief complies with the applicable word-count limitation under Local Rule 7-2(b) because it contains 10,834 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

Dated: February 12, 2026                    Respectfully submitted,

                                            /s/ Jehan Patterson