# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

FRIDLEY PUBLIC SCHOOL DISTRICT,
INDEPENDENT SCHOOL DISTRICT 14;
DULUTH PUBLIC SCHOOL DISTRICT,
INDEPENDENT SCHOOL DISTRICT 709;
and EDUCATION MINNESOTA,

          Plaintiffs,

v.

MARKWAYNE MULLIN,[1] *in his official capacity as Secretary of the U.S. Department of Homeland Security*; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Custom Enforcement*; MARCOS CHARLES, *in his official capacity as Acting Executive Associate Director, Enforcement and Removal Operations*; DAVID EASTERWOOD, *in his official capacity as Acting Director, Saint Paul Field Office, U.S. Immigration and Customs Enforcement*; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection*, GREGORY BOVINO, *or his successor, in his official capacity as Commander of the U.S. Border Patrol*; and THOMAS HOMAN, *in his official capacity as White House Executive Associate Director of Enforcement and Removal Operations*,

          Defendants.

Case No. 26-cv-1023 (LMP/LIB)

**ORDER DENYING PLAINTIFFS' MOTION FOR A STAY OR PRELIMINARY INJUNCTION**

---

[1]    The Court takes judicial notice of the fact that Markwayne Mullin was confirmed as the Secretary of Homeland Security on March 23, 2026, while this matter was pending. Accordingly, Secretary Mullin is substituted in place of former Secretary of Homeland Security Kristi Noem pursuant to Federal Rule of Civil Procedure 25(d).

Sean Ouellette, Elena Goldstein, Allyson R. Scher, and Paul R.Q. Wolfson, **Democracy Forward Foundation, Washington, D.C.**; Amanda M. Cialkowski and Kathleen K. Curtis, **Nilan Johnson Lewis PA, Minneapolis, MN**; David M. Cialkowski, June P. Hoidal, Michael J. Laird, Jeffrey J. Harrington, Molly F. Billion, and Katja Lange, **Zimmerman Reed LLP**; and Kevin C. Riach, **The Law Office of Kevin C. Riach, Minneapolis, MN**, for Plaintiffs.

David W. Fuller, **United States Attorney's Office, Minneapolis, MN**; and Jessica Lundberg, **United States Department of Justice, Washington, D.C.**, for Defendants.

Chelsea A. Walcker and Irina Vaynerman, **Groundwork Legal, St. Louis Park, MN**; Lauren R. Goldman, Mark J. Cherry, and Iason G. Togias, **Gibson, Dunn & Crutcher LLP, New York, NY**; Katherine M. Marquart and Matt A. Getz, **Gibson, Dunn & Crutcher LLP, Los Angeles, CA**; and Katharine M. Janes, **Gibson, Dunn & Crutcher LLP, Washington, D.C.**, for Amici Interfaith Action of Greater Saint Paul, First Universalist Church, Minnesota Council of Churches, Minnesota Rabbinical Association, Bishop Kevin Kenney, Rabbi Harold Kravitz, the Right Reverend Craig Loya, Reverend Jen Crow, and Reverend Ben Connelly.

Angela M. Vichick and Caitlin C. McHugh, **Womble Bond Dickinson (US) LLP, Denver, CO**; Jay Strandjord, **Forsgren Fisher McCalmont Demarea Tysver LLP, Minneapolis, MN**; and Mary C. Lawson, **Council of the Great City Schools, Washington, D.C.**, for Amicus Council of the Great City Schools.

Joseph D. Weiner, **Minnesota Attorney General's Office, St. Paul, MN**, for Amicus Minnesota State Colleges and Universities.

---

From 1993 until early 2025, immigration enforcement activity at or near certain "sensitive" or "protected" locations, like schools and places of worship, was generally discouraged under federal agency guidance. In January 2025, the U.S. Department of Homeland Security ("DHS") rescinded the previous guidance and broadly directed its agents to use their discretion in choosing whether to engage in enforcement operations at such locations. Plaintiffs Fridley Public School District ("FPSD"), Duluth Public School District ("DPSD"), and Education Minnesota ("EdMN") (collectively, "Plaintiffs") assert that DHS's implementation of the new guidance violated the Administrative Procedure Act

2

("APA") and has caused and will continue to cause them substantial and irreparable harm. *See generally* ECF No. 1.  Plaintiffs now move the Court, while this matter is pending, to stay the implementation of the new policy guidance pursuant to Section 705 of the APA or, alternatively, to preliminarily enjoin its implementation.  ECF No. 32.  Defendants (collectively, the "Government") oppose Plaintiffs' motion on multiple grounds.  *See generally* ECF No. 68.

The Court first notes what it does *not* decide here.  The Court makes no final determination on the merits of Plaintiffs' claims, nor does the Court offer its opinion as to the wisdom of DHS's policy guidance or the sincerity of the harm Plaintiffs allege.  Rather, the Court narrowly decides only whether Plaintiffs have met their burden to show that they are entitled to entry of a stay or a preliminary injunction.  Having considered the parties' arguments and the record at this stage, the Court concludes as a matter of law that Plaintiffs have not met that burden.  Accordingly, Plaintiffs' motion is denied.

## BACKGROUND

Determining the contours of DHS's policy guidance governing immigration enforcement at "protected locations" is key to analyzing Plaintiffs' claims.  The Court therefore begins by discussing the foundation and development of the policy guidance before turning to the factual allegations underlying Plaintiffs' motion.

### I.    Statutory Framework

The United States Government "has broad, undoubted power over the subject of immigration." *Arizona v. United States*, 567 U.S. 387, 394 (2012).  As an exercise of that power, Congress established an "extensive and complex" framework governing

immigration in the Immigration and Nationality Act ("INA"), *id.* at 395, and charged DHS with the "administration and enforcement" of this country's immigration laws, 8 U.S.C. § 1103(a)(1). A "principal feature" of this enforcement responsibility is the "broad discretion" accorded to DHS and its sub-agencies, including U.S. Customs and Border Protection ("CBP") and U.S. Immigration and Customs Enforcement ("ICE"), to identify and remove noncitizens who may not enter or remain in the United States, *Arizona*, 567 U.S. at 396–97, and to "prioritize its enforcement efforts" in pursuit of the Executive Branch's "foreign-policy objectives," *United States v. Texas*, 599 U.S. 670, 679–80 (2023) (citation omitted).

DHS's broad enforcement authority is subject to only a few location-based statutory rules. For example, DHS is prohibited from entering "onto the premises of a farm or other outdoor agricultural operation" to investigate potential immigration-related offenses "without the consent of the owner" or "a properly executed warrant." 8 U.S.C. § 1357(e). Conversely, immigration officials' authority is more expansive when conducting enforcement-related activities "within a reasonable distance from any external boundary of the United States." *See id.* § 1357(a)(3). Otherwise, no specific statutory or regulatory provisions limit DHS's authority to engage in immigration enforcement activity based on location. *See generally id.*

## II. DHS Guidance Governing Immigration Enforcement at "Protected Locations"

### A. Initial Implementation (1993–2008)

In May 1993, the Immigration and Nationality Service ("INS"), DHS's predecessor agency, issued policy guidance (the "1993 Guidance") stating, in relevant part, that INS's

policy was "to attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies" (the "Protected Locations Policy" or "Policy"). ECF No. 28-1 at 2.[2] The 1993 Guidance established a requirement that any immigration enforcement operations that were "likely to involve apprehensions on the premises of schools" receive "advance written approval" by certain high-level INS officials.[3] *Id.* The 1993 Guidance acknowledged, however, that "exigent circumstances" could arise such that receiving written authorization prior to entering onto the premises of a school was impractical. *Id.* at 3. In those cases, immigration officers were required to report the situation to a high-level official "immediately" and "explain the exigency requiring the officer's action, any steps which were taken to secure supervisory authorization in the absence of written approval . . . , the seriousness of the suspected violation, whether the facility was in operation (e.g., were classes in session), and other pertinent facts." *Id.*

Despite these procedural requirements, the 1993 Guidance noted that the Policy was "an internal statement of procedure" which did "not affect the scope of authority of [INS] officers under the [INA]." *Id.* at 4.

---

[2]    Unless otherwise noted or apparent from context, the Court cites to the page numbers found in the headers generated by the CM/ECF filing system.

[3]    To determine the "appropriateness of a proposed action," INS officials were required to consider: (1) the "availability of alternative measures which would achieve the enforcement objective," such as "making the arrest off the premises"; (2) the "importance of the enforcement objective in the context of [INS] priorities"; (3) "[m]easures which can be taken to minimize the impact on operation of the school"; and (4) "[w]hether the action has been requested or approved by managers of the institution involved." ECF No. 28-1 at 2–3.

**B.      Additional Guidance and Clarification (2008–2021)**

In July 2008, October 2011, and January 2013, DHS issued additional guidance (respectively, the "2008 Guidance," "2011 Guidance," and "2013 Guidance") clarifying the Protected Locations Policy. *See* ECF Nos. 28-2, 28-3, 28-4. The 2008 Guidance, issued by ICE, stated that the Protected Locations Policy as implemented in 1993 remained "in effect," *id.* at 3, and that enforcement actions at "sensitive locations" like schools were "discouraged," *id.* at 2. The 2008 Guidance directed ICE to "refrain from conducting enforcement actions or investigative activities at or near" such locations "except in limited circumstances," such as "terrorism-related investigations" and "matters of public safety." *Id.* at 2–3. The 2008 Guidance also "reminded" ICE agents "to be cognizant of the impact of their activity, exercise good judgment and act with an appropriate level of compassion in light of the location while exercising their authority in such circumstances." *Id.* at 3. Still, the 2008 Guidance noted that "ICE policies and procedures do not specifically preclude enforcement actions or investigative activities" at sensitive locations. *Id.*

The 2011 Guidance, also issued by ICE, added greater specificity regarding the boundaries and requirements of the Protected Locations Policy. *See* ECF No. 28-3 at 2–4. The covered "enforcement actions" included arrests, interviews, searches, and surveillance. *Id.* at 2. The 2011 Guidance further clarified that the Policy was "designed to ensure that these enforcement actions do not occur at nor are focused on sensitive locations such as schools" unless "exigent circumstances exist," "other law enforcement actions have led officers to a sensitive location," or "prior approval is obtained." *Id.* The 2011 Guidance also more specifically defined the types of "exigent circumstances" that

justified carrying out enforcement actions at sensitive locations without prior approval as those involving: (1) "a national security or terrorism matter"; (2) "an imminent risk of death, violence, or physical harm to any person or property"; (3) "the immediate arrest or pursuit of a dangerous felon, terrorist suspect, or any other individual(s) that present an imminent danger to public safety"; or (4) an "imminent risk of destruction of evidence material to an ongoing criminal case." *Id.* at 3–4. Like the 2008 Guidance, the 2011 Guidance was "meant to ensure that ICE officers and agents exercise sound judgment when enforcing federal law at or focused on sensitive locations," but noted that the Policy was "not intended to categorically prohibit lawful enforcement operations when there is an immediate need for enforcement action" due to the existence of "exigent circumstances." *Id.* at 3.

The 2013 Guidance, issued by CBP, largely reiterated the guidelines set forth in the 2011 Guidance and previous memoranda, including the requirements to seek prior approval for enforcement actions absent exigent circumstances. *See* ECF No. 28-4 at 2–3. The 2013 Guidance restated that when circumstances precluded obtaining prior approval, immigration agents were "expected to exercise sound judgment and common sense" and to report those circumstances and any related enforcement activity "immediately through the respective chain of command." *Id.*

## C.    2021 Guidance (October 2021–January 2025)

In October 2021, DHS issued new policy guidance (the "2021 Guidance") again refining and clarifying the boundaries and requirements of the Protected Locations Policy. See ECF No. 28-5 at 3–6. The 2021 Guidance states that it was DHS's "obligation to

refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area"—defined, as relevant here, as a "school"[4] or other "place where children gather" like a "school bus stop"—if it "would restrain people from accessing the protected area to receive essential services or engage in essential activities." *Id.* at 3–4. The 2021 Guidance also expanded the scope of enforcement actions affected by the Policy to include, without limitation, "arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance." *Id.* at 5.

As with the previous guidance, the 2021 Guidance "recognize[d] that there might be limited circumstances under which an enforcement action needs to be taken in or near a protected area," including, but not limited to, situations where: (1) the "enforcement action involves a national security threat"; (2) there is "an imminent risk of death, violence, or physical harm to a person"; (3) the "enforcement action involves the hot pursuit of an individual who poses a public safety threat"; (4) there is "an imminent risk that evidence material to a criminal case will be destroyed"; and (5) a "safe alternative location does not exist." *Id.* at 4–5. As before, if no such "exigent circumstances" existed, the immigration officer was required to seek "prior approval from their Agency's headquarters . . . before taking an enforcement action in or near a protected area." *Id.* at 5. But the 2021 Guidance required that specific information be included in post-enforcement reports done in

---

[4]    As used in the 2021 Guidance, "school" is broadly defined as "a pre-school, primary or secondary school, vocational or trade school, or college or university." ECF No. 28-5 at 3.

8

situations where, due to exigent circumstances, an enforcement action was conducted "in or near a protected area" without prior approval, including:

> identification of the protected area; the reason(s) why the enforcement action was taken there; whether or not prior approval was obtained and, if not, why not; the notification to headquarters (or headquarters' delegate) that occurred after an action was taken without prior approval; a situational report of what occurred during and immediately after the enforcement action; and[] any additional information that would assist in evaluating the effectiveness of this guidance in achieving our law enforcement and humanitarian objectives.

*Id.* at 5–6.

Notwithstanding its broadening of the Protected Locations Policy, the 2021 Guidance states, as did the guidance it superseded, that it "d[id] not limit an agency's or employee's statutory authority" and "[was] not intended to, d[id] not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.*

### D.    Current Guidance (January 2025–present)

On January 20, 2025, then-Acting Secretary of Homeland Security Benjamine C. Huffman issued a memorandum (the "Huffman Memo") "supersed[ing] and rescind[ing]" the 2021 Guidance "effective immediately." ECF No. 28-6 at 2. The Huffman Memo noted that immigration officers "frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location," and that it is "not necessary" for DHS to "create bright line rules regarding where our immigration laws are permitted to be enforced." *Id.* Instead, the Huffman Memo directed that, "[g]oing forward, law enforcement officers should continue to use that discretion along with a healthy dose of common sense." *Id.*

On January 31, 2025, then-Acting Director of ICE Caleb Vitello issued a follow-up memorandum (the "Vitello Memo"). ECF No. 28-8 at 2–3. The Vitello Memo reiterates the directive stated in the Huffman Memo and charges ICE's Assistant Field Office Directors ("AFODs") and Assistant Special Agents in Charge ("ASACs") with "responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area," *id.* at 3, including schools, *see id.* at 2 n.1. The Vitello Memo also notes that "AFODs and ASACs may provide authorization for such actions either verbally or in writing." *Id.* at 3.

The Huffman Memo and Vitello Memo (together, the "2025 Guidance") both contain similar disclaimers that were articulated in prior guidance. The Huffman Memo states: "This memorandum is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." ECF No. 28-6 at 2. Similarly, the Vitello Memo states: "This guidance does not, is not intended to, and may not be construed to create or modify any right or benefit, substantive or procedural, enforceable at law by any party against the United States, its agencies, its officers, or any person." ECF No. 28-8 at 3.

## III.    Factual Background

The Government at this stage largely does not dispute the factual allegations in Plaintiffs' complaint or Plaintiffs' recitation of the relevant facts in their opening brief and exhibits. *See generally* ECF No. 68. Plaintiffs, for their part, largely do not dispute the factual information offered by the Government in its responsive brief and exhibits. *See*

*generally* ECF No. 85. The Court therefore draws the relevant facts from both parties' filings, including Plaintiffs' complaint.

### A. Operation Metro Surge

In December 2025, DHS initiated "Operation Metro Surge," a large-scale immigration enforcement action focused primarily on the Minneapolis-St. Paul metropolitan area. ECF No. 1 ¶ 48; *see* ECF No. 70 ¶¶ 5, 8; ECF No. 71 ¶¶ 6–7. Approximately 3,000 ICE agents and more than 1,000 CBP agents were assigned to Operation Metro Surge. ECF No. 70 ¶ 8; ECF No. 71 ¶ 7.

Among other things, these DHS agents engaged in immigration enforcement activity at or near schools and school bus stops in Minnesota, including the arrest and surveillance of students, their parents or guardians, and school staff, in some cases in the presence of students. *See, e.g.*, ECF No. 28-12 ¶ 12; ECF No. 28-25 ¶ 11; ECF No. 28-32 ¶¶ 3–5; ECF No. 28-40 ¶ 9; ECF No. 28-47 ¶¶ 5–7. DHS agents also used parking lots belonging to FPSD schools as staging areas for nearby enforcement activity, ECF No. 28-47 ¶¶ 8–10, and patrolled around schools in FPSD and DPSD (collectively, the "School Districts") during school hours, *id.* ¶ 11; ECF No. 28-48 ¶ 6. These and other incidents that occurred during Operation Metro Surge were widely reported in local and national news media. *See, e.g.*, ECF 28-9 at 3; ECF No. 28-18 at 2–3; ECF No. 28-19 at 4–5; ECF No. 28-39 at 2–3; ECF No. 28-45 at 2–13.

By early March 2026, DHS had withdrawn nearly all the additional agents sent to Minnesota as part of Operation Metro Surge, and David Easterwood, the Acting Director

Attachment 1, Page 11 of 38

of ICE's St. Paul Field Office, reports that the remaining DHS agents are focused on "developing criminal investigations." *See* ECF No. 70 ¶¶ 9–11; ECF No. 71 ¶¶ 7–10.

### B.     Plaintiffs' Allegations

FPSD serves approximately 2,800 students across 6 schools in and around Fridley, Minnesota. ECF No. 1 ¶ 15. DPSD serves approximately 9,100 students across 21 schools in and around Duluth, Minnesota. *Id.* ¶ 16. EdMN is a union that advocates for public education in Minnesota and has more than 89,000 members, including nearly all of Minnesota's public-school teachers and other education support professionals. *Id.* ¶ 17.

As the enforcement incidents occurred at or near schools and school bus stops, and news of those incidents spread, many of the School Districts' students and staff and EdMN's members began reporting that they were afraid to come to school because of the potential for encounters with DHS agents. *See* ECF No. 28-40 ¶ 21; ECF No. 28-47 ¶ 19; ECF No. 28-48 ¶ 7. Attendance at FPSD schools dropped by approximately 33%, and on two different days in January 2026, FPSD had to cancel classes because so many students and staff were absent. ECF No. 28-47 ¶¶ 19, 21. DPSD also saw decreased attendance, including in its adult English Language Learner courses which "are now almost empty." ECF No. 28-48 ¶¶ 7–8. This has placed a strain on the School Districts' budgets and resources because, under Minnesota law, state funding is allocated on a per capita basis to schools based on the number of enrolled students. *See* ECF No. 28-47 ¶ 24; ECF No. 28-48 ¶ 10. And when a student is absent from school for fifteen consecutive days, the student must be unenrolled, Minn. Stat. § 120A.37, subd. 9. Since the beginning of December 2025, FPSD has had to unenroll at least 20 students due to excessive consecutive

absences, and 92 other students either have transferred out of FPSD or have moved out of the state of Minnesota, including some who have left the United States entirely. ECF No. 28-47 ¶ 25. These unenrollments and departures from FPSD are "far higher than usual." *Id.* DPSD has "at least one student who is facing unenrollment" because of excessive absences and "[s]everal more students [who] have been absent for multiple consecutive days." ECF No. 28-48 ¶ 9.

The School Districts implemented several changes to address these concerns and to minimize disruption to their operations and their students' education, but those changes imposed other resource constraints. For example, FPSD began providing door-to-door transportation to accommodate requests from families who "did not feel comfortable waiting at school bus stops where they might encounter immigration agents," but door-to-door transportation "requires additional logistical work and is more costly." ECF No. 28-47 ¶ 20. And after the 2025 Guidance was issued, all Plaintiffs diverted resources to develop protocols and to train their members about how to manage potential disruptions caused by immigration enforcement at or near their schools, even before Operation Metro Surge. *See id.* ¶ 34; ECF No. 28-48 ¶ 14; ECF No. 28-40 ¶ 6.

The School Districts and other schools where EdMN's members teach also offered remote-learning options for students who were reluctant to attend school in person. ECF No. 28-47 ¶ 26; ECF No. 28-28 ¶ 12; ECF No. 28-40 ¶ 15. But this requires the School Districts to expend additional financial and staff resources, and teachers are required to divert time from regular instruction to support remote students and to redesign curricula to accommodate remote instruction. *See* ECF No. 28-47 ¶ 27; ECF No. 28-48 ¶ 12; ECF

No. 28-40 ¶ 15.  Further, Plaintiffs state that remote learning is less effective than in-person instruction and, as a result, when students who used remote-learning options return to school in person, teachers are required to invest additional time and resources to support those students.  *See* ECF No. 28-40 ¶ 16; ECF No. 28-47 ¶ 28; ECF No. 28-48 ¶ 13.

## IV.    Procedural Background

Plaintiffs filed suit on February 4, 2026, alleging that the Government violated the APA because the changes to the Protected Locations Policy under the 2025 Guidance are arbitrary and capricious, ECF No. 1 ¶¶ 87–92, and because DHS did not engage in the notice-and-comment rulemaking process, *id.* ¶¶ 94–102.  Plaintiffs ask the Court to declare the issuance of the 2025 Guidance unlawful and to permanently enjoin it from being further implemented.  *Id.* at 32.  On February 23, 2026, Plaintiffs moved to stay the implementation of the 2025 Guidance under Section 705 of the APA or, alternatively, to preliminarily enjoin its implementation, which would effectively reinstate the 2021 Guidance.  *See* ECF No. 32.

The parties briefed the issues raised in Plaintiffs' motion.  ECF Nos. 27, 68, 85.  The Court also received unopposed motions to appear as amicus curiae and briefing from several religious organizations and leaders, ECF Nos. 42, 44-1; the Council of the Great

Attachment 1, Page 14 of 38

City Schools, ECF Nos. 63, 65-1; and Minnesota State Colleges and Universities, ECF Nos. 81–82.[5] The Court held a hearing on April 8, 2026. ECF No. 90.

## ANALYSIS

Section 705 of the APA authorizes federal courts to stay an agency action or to postpone its effective date to "preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Likewise, the "primary function of a preliminary injunction" is to "preserv[e] the status quo until the district court has an opportunity to grant full effective relief." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022). Accordingly, because a Section 705 stay and a preliminary injunction offer substantively the same relief, courts analyze requests for a Section 705 stay under the legal standard applied to requests for a preliminary injunction.[6] *See Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995 (9th Cir. 2025) ("[T]he factors used to determine whether to issue a § 705 stay under the APA are the same equitable factors used to consider whether to issue a preliminary injunction."); *see also, e.g.*, *B & D Land & Livestock Co. v. Conner*, 534 F. Supp. 2d 891, 905 (N.D. Iowa 2008); *Busboom Grain Co., Inc. v. Interstate Com. Comm'n*, 830 F.2d 74, 75 (7th Cir. 1987).

---

[5]    As discussed at the hearing on Plaintiffs' motion for a stay or preliminary injunction, the Court, in its discretion, grants the motions to appear as amici curiae (ECF Nos. 42, 63, 81). The Court has reviewed and considered amici's briefs (ECF Nos. 44-1, 65-1, 82) in deciding Plaintiffs' motion.

[6]    The parties appear to agree that a request for a Section 705 stay is analyzed under the standard applied to a request for a preliminary injunction. *See* ECF No. 27 at 25–26; ECF No. 68 at 17–18.

A preliminary injunction "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To demonstrate entitlement to a preliminary injunction, Plaintiffs must show: (1) that they are likely to succeed on the merits of their claims; (2) that they are likely to suffer irreparable harm if they do not receive preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Tumey*, 27 F.4th at 664 (quoting *Winter*, 555 U.S. at 20). Plaintiffs' burden is "heavier" here because granting a preliminary injunction would have "the effect of awarding [them] substantially the relief [they] could obtain after a trial on the merits." *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 946 (8th Cir. 2023) (citation omitted).

## I.    Likelihood of Success on the Merits

Although the Government opposes Plaintiffs' motion on the merits, *see* ECF No. 68 at 38–51, the Government also challenges Plaintiffs' Article III standing to seek a preliminary injunction, *see id.* at 18–36. The Court therefore "must first decide whether [P]laintiffs have standing," *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 913 (8th Cir. 2025), because a "plaintiff that is unlikely to prevail on the question of standing is unlikely to prevail on the merits and, accordingly, 'is not entitled to a preliminary injunction,'" *Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 45 (D.D.C. 2020) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)).

Federal court jurisdiction under Article III is limited to "cases and controversies." *Missouri v. Yellen*, 39 F.4th 1063, 1067 (8th Cir. 2022) (citation omitted). The case-or-controversy requirement is "fundamental to the judiciary's proper role in our system of

16

government," and federal courts may review executive actions only "when necessary to redress or prevent actual or imminently threatened injury to persons caused by . . . official violation of law." *Murthy v. Missouri*, 603 U.S. 43, 56–57 (2024) (internal quotation marks omitted) (citations omitted); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) ("The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches.").  "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006).

To satisfy the "irreducible constitutional minimum" required to establish standing, a plaintiff must (1) have suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.  *Arc of Iowa v. Reynolds*, 94 F.4th 707, 710 (8th Cir. 2024) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  Plaintiffs, as the parties invoking federal court jurisdiction, bear the burden of establishing these elements.  *Spokeo*, 578 U.S. at 338. At the preliminary injunction stage, courts assume "the complaint's allegations are true" and view them "in the light most favorable" to the plaintiff, *Dakotans for Health v. Noem*, 52 F.4th 381, 386 (2022), and the plaintiff must make a "clear showing" that it is "likely" to establish each element of standing, *Murthy*, 603 U.S. at 58 (quoting *Winter*, 555 U.S. at 22).

To establish injury-in-fact, Plaintiffs must show that they suffered "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not

17

conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (internal quotation marks omitted) (citation omitted). When a plaintiff seeks prospective relief, such as an injunction, the plaintiff must establish a "sufficient likelihood of future injury." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

Further, for standing purposes, "an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm *because of* the defendant's violation of federal law." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426–27 (2021) (emphasis added). In other words, a plaintiff has no standing to sue merely because it believes the defendant's conduct is unlawful. *See Hippocratic Med.*, 602 U.S. at 381 (noting that a plaintiff "does not have standing to challenge a government regulation simply because the plaintiff believes that the government is acting illegally"). Agency actions that "require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements." *Id.* at 382; *see Diamond Alt. Energy LLC v. EPA*, 606 U.S. 100, 114 (2025) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)) ("When a plaintiff is the 'object' of a government regulation, there should 'ordinarily' be 'little question' that the regulation causes injury to the plaintiff."). By contrast, when a plaintiff "challenges the government's unlawful regulation (or lack of regulation) of *someone else*," the plaintiff "may have more difficulty establishing causation—that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else." *Hippocratic Med.*, 602 U.S. at 382 (internal quotation marks omitted) (citations omitted).

Attachment 1, Page 18 of 38

Plaintiffs each assert that the changes to the Protected Locations Policy implemented by the 2025 Guidance have and will continue to harm them in various ways, and that staying further enforcement of the 2025 Guidance would prevent further harm. *See* ECF No. 85 at 8–16. Regardless of the harm alleged, however, the analysis must remain focused on the specific conduct that Plaintiffs challenge here (the implementation and enforcement of the 2025 Guidance) and the relief that Plaintiffs seek (effectively, the reinstatement of the 2021 Guidance). Therefore, before turning to Plaintiffs' arguments relating to standing, it is crucial to understand precisely what the 2025 Guidance changed regarding the Protected Locations Policy relative to the 2021 Guidance.

### A.      Differences Between the 2021 Guidance and the 2025 Guidance

Plaintiffs imply, but carefully avoid expressly stating, that the Protected Locations Policy as articulated by the 2021 Guidance effectively prevented, if not prohibited, DHS from conducting immigration enforcement activity at or near schools. *See, e.g.*, ECF No. 1 ¶ 28 ("The federal government has had a long-standing policy and practice, dating back to at least the early 1990s, to refrain from immigration enforcement operations in or near schools or other 'sensitive' or 'protected' locations."); ECF No. 27 at 13 ("[E]ducators from Minnesota and across the country cannot recall any immigration enforcement actions near schools and school bus stops when federal policy protected those locations."). Plaintiffs state that "DHS's decision to rescind the Protected Locations Policy has predictably increased immigration enforcement operations in previous protected areas." ECF No. 27 at 7.

Attachment 1, Page 19 of 38

The prior guidance, however, did not categorically preclude such activity. For example, the 2021 Guidance directed DHS only "to refrain, *to the fullest extent possible*, from conducting a law enforcement action in or near a protected area," and further states that the phrase "'to the fullest extent possible' recognizes that there might be limited circumstances under which an enforcement action needs to be taken in or near a protected area." ECF No. 28-5 at 4 (emphasis added). Indeed, since the Protected Locations Policy was first introduced in 1993, such enforcement actions were never categorically prohibited, even if they were discouraged as a matter of internal policy. *See* ECF No. 28-1 at 4 (1993 Guidance stating that it "does not affect the scope of authority of [INS] officers" under the INA); ECF No. 28-2 at 2–3 (2008 Guidance reaffirming the 1993 Guidance and stating that "ICE policies and procedures *do not specifically preclude* enforcement actions" at schools (emphasis added)); ECF No. 28-3 at 3 (2011 Guidance stating the "policy *is not intended to categorically prohibit* lawful enforcement operations when there is an immediate need for enforcement action" (emphasis added)); ECF No. 28-4 at 2 (2013 Guidance stating the "policy *does not summarily preclude* enforcement actions" at schools (emphasis added)).

It is true that the prior guidance discouraged such activity and laid out specific guidelines for how and under what circumstances DHS would engage in, and who could authorize, such enforcement activity. Those guidelines are what most clearly differ between the 2025 Guidance and the prior guidance. For instance, the 2021 Guidance required that "an Agent or Officer must seek prior approval from their Agency's headquarters . . . before taking an enforcement action in or near a protected area." ECF No. 28-5 at 5. The 2025 Guidance, by contrast, states that "AFODs and ASACs may

provide authorization" for such enforcement actions. ECF No. 28-8 at 2–3. Likewise, the 2025 Guidance, unlike the prior guidance, does not specifically articulate or define any "exigent circumstances" that may justify immigration enforcement actions at or near protected areas without prior approval. *Compare* ECF No. 28-6 (Huffman Memo stating that it "is not necessary . . . for the head of [DHS] to create bright line rules regarding where our immigration laws are permitted to be enforced"), *and* ECF No. 28-8 (Vitello Memo stating the same), *with* ECF No. 28-5 at 4–5 (2021 Guidance articulating "exigent circumstances" justifying an immigration enforcement action at or near a protected area without prior approval). But the 2025 Guidance nonetheless directs DHS officers to use their enforcement discretion "with a healthy dose of common sense," ECF No. 28-6 at 2, and charges AFODs and ASACs with "responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area," ECF No. 28-8 at 3. This direction is similarly acknowledged in the 2021 Guidance and other preceding guidance. *See* ECF No. 28-5 at 3–4 (2021 Guidance stating the determination of whether to conduct immigration enforcement activity at or near a "protected area" "requires an analysis of the facts and the exercise of judgment"); *see also* ECF No. 28-4 at 2–3 (2013 Guidance stating that DHS "Agents and Officers are expected to exercise sound judgment and common sense" when "situations arise that call for enforcement actions at or near [protected locations] without prior written approval").

    The 2025 Guidance, in short, did not change DHS's ability or authority to engage in enforcement activity at or near protected areas. What *has* changed, evidently, is DHS's

21

willingness—not its authority—to conduct immigration enforcement activity at or near protected areas like schools. But such immigration enforcement has always been subject to DHS's judgment and discretion, even under the 2021 Guidance. *See, e.g.*, ECF No. 28-5 at 3–5.

With that context in mind, the Court turns to analyzing Plaintiffs' arguments relating to the threshold issue of standing.

### B.    The School Districts

The School Districts offer three separate theories of injury. First, specific to FPSD, they assert that "DHS agents have repeatedly encroached on [FPSD's] property" since the implementation of the 2025 Guidance. ECF No. 85 at 8–9. Second, both School Districts argue that immigration enforcement operations at and near schools and school bus stops following the issuance of the 2025 Guidance have caused substantial decreases in school attendance. *Id.* at 9. Third, they argue that the 2025 Guidance has forced them to expend resources to adjust their operations. *Id.*

#### i.    Intrusions on FPSD Property

FPSD argues that "[i]nstrusions on property have long been justiciable injuries." ECF No. 85 at 8. It is true that unauthorized physical entry by law enforcement on a private person's or entity's property "is a trespass at common law." *Oliver v. United States*, 466 U.S. 170, 183 (1984). And the Court acknowledges that "with respect to the concrete-harm requirement in particular," the inquiry focuses on "whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (quoting *Spokeo*, 578 U.S.

at 341). FPSD's "trespass" theory therefore ostensibly fits within the category of a traditionally recognized harm.

It is not clear, however, that this constitutes a cognizable injury in the specific context of Plaintiffs' claims. For example, FPSD is a state governmental entity, *see* Minn. Stat. § 118A.01, subd. 2, not a private person or entity, and FPSD does not allege that its schools' parking lots are private property. And other than broad statements of law that trespass is a traditionally recognized harm for standing purposes, *see* ECF No. 85 at 8, Plaintiffs cite no authority for the proposition that such a "trespass" in the specific context of the facts FPSD alleges—that is, an "intrusion" onto what is presumably publicly owned property by federal agents, for the purpose of conducting statutorily authorized enforcement activity—is similarly recognized as a traditional harm for purposes of standing. In fact, nowhere do Plaintiffs expressly allege that any of DHS's activity on FPSD's property, by itself, was unlawful.[7] As such, it is questionable whether DHS engaging in enforcement activity on FPSD's property constitutes the type of "invasion of a legally protected interest" necessary to demonstrate injury in fact for standing purposes. *See Spokeo*, 578 U.S. at 339 (citation omitted).

---

[7]     Notably, in the criminal context, trespass on school property in Minnesota includes only: (1) a person being inside a school building or on a school building's roof without permission, and (2) a person being on school property within one year after being told by the school principal to leave and not to return. *See* Minn. Stat. § 609.605, subd. 4. There are no allegations that DHS agents ever entered any FPSD school building, nor that the principal of any FPSD school ever told DHS to leave and not to return, to the extent such an instruction would be enforceable at law.

Even assuming this is a cognizable harm, however, the traceability of that harm to the implementation of the 2025 Guidance is further in question. It may be true, as Plaintiffs suggest, that immigration enforcement activity at or near schools was rare, if not nonexistent, before the 2025 Guidance was implemented. *See* ECF No. 27 at 13. But the 2025 Guidance does not direct or encourage DHS agents to conduct immigration enforcement activity at any specific location or to target any specific locations for such activity, including the previously designated "protected areas." *See generally* ECF Nos. 28-6, 28-8. And as discussed above, such enforcement activity at or near "protected areas" was never categorically prohibited, even under the 2021 Guidance. *See* ECF No. 28-5 at 4–5. It cannot reasonably be said, therefore, that the issuance or implementation of the 2025 Guidance, rather than the broader increases in immigration enforcement during Operation Metro Surge, was the direct cause of the "intrusions" on FPSD's property. Instead, this harm flows more directly, if not entirely, from DHS's policy decision to engage in enforcement activity at or near schools—a decision which was not prohibited even by the 2021 Guidance.

For similar reasons, the harm FPSD alleges would not be redressed by reinstating the 2021 Guidance. That is because the enforcement activity on FPSD's property was not categorically precluded under the 2021 Guidance,[8] *see* ECF No. 28-5 at 4–5, nor is it prohibited by law, *see generally* 8 U.S.C. § 1357. Instead, whether DHS agents would

---

[8]    It is worth noting again that the 2021 Guidance expressly stated it was "not intended to, d[id] not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law." ECF No. 28-5 at 6.

engage in immigration enforcement activity at or near "protected areas" under the 2021

Guidance was subject to the judgment and discretion of DHS officials, *see* ECF No. 28-5

at 4–5, as it is under the 2025 Guidance, *see* ECF No. 28-8 at 2–3.  Even if the Court were

to grant Plaintiffs the relief they request and effectively reinstate the 2021 Guidance, the

Court could not direct DHS or its officials as to how they may exercise their enforcement

discretion under the 2021 Guidance.  Nor could the Court order DHS to return to the

immigration enforcement priorities of prior administrations and DHS officials.[9]  *Cf. Texas*,

599 U.S. at 680 ("[F]ederal courts are generally not the proper forum for resolving claims

that the Executive Branch should make more arrests or bring more prosecutions.").  In

other words, reinstating the 2021 Guidance would not by itself have the legal effect of

preventing any future "intrusions" on FPSD's property by DHS agents, and Plaintiffs'

suggestion to the contrary is rooted in speculation about how DHS would exercise its

judgment and enforcement discretion under the 2021 Guidance.  Ultimately, this Court

cannot "undo anything other than the narrow differences between" the 2021 Guidance and

---

[9]     To illustrate the point, consider a counterfactual.  If the 2025 Guidance was never issued, meaning the 2021 Guidance was still in effect, and DHS nonetheless engaged in exactly the same enforcement activity as Plaintiffs allege, would Plaintiffs have a cause of action under the APA to challenge that activity?  Almost certainly not.  This is because DHS is broadly "charged with the administration and enforcement" of our country's immigration laws, 8 U.S.C. § 1103(a)(1), and the manner in which DHS exercises its broad discretion "when devising arrest and prosecution policies . . . leaves courts without meaningful standards for assessing those policies," *United States v. Texas*, 599 U.S. 670, 680 (2023); *see also* 5 U.S.C. § 701(a)(2) (barring judicial review under the APA of an agency action that is "committed to agency discretion by law").

Attachment 1, Page 25 of 38

the 2025 Guidance, ECF No. 69 at 55:2–18,[10] and "it is questionable that any substantive distinctions between the memoranda deter the kinds of immigration enforcement actions that the plaintiffs seek to prevent," *Mennonite Church USA v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 1, 12 (D.D.C. 2025).

For these reasons, the Court concludes that FPSD is unlikely to establish standing based on its trespass theory of harm.

### ii.    Decreased Attendance

The School Districts argue that increased enforcement operations at and near schools and school bus stops have "deterred families from sending their children to school, causing large drops in attendance" at the School Districts.  ECF No. 85 at 9.  They argue that this decreased attendance negatively affects them in two ways.

First, the School Districts assert that the decreased attendance "'directly . . . interfere[s]' with the school districts' duty-bound missions to educate their students."  *Id.* (alteration in original) (quoting *Hippocratic Med.*, 602 U.S. at 394).  In support of this argument, Plaintiffs cite *New England Synod v. Department of Homeland Security*, a recent decision involving a challenge to the 2025 Guidance brought by several religious organizations.  No. 25-cv-40102-FDS, 2026 WL 412329, at *5–6 (D. Mass. Feb. 13, 2026).  In assessing standing, the court noted that "a decline in attendance at religious services can constitute an injury to a religious organization in certain circumstances."  *Id.* at *8

---

[10]    This document is a copy of the transcript of a hearing on a motion to preliminarily enjoin the 2025 Guidance in *Denver Public Schools v. Noem*, No. 1:25-cv-00474-DDD-KAS (D. Colo. June 9, 2025).

(collecting cases).  But the court explained that this conclusion was rooted in the "long tradition of churches and religious organizations suing based on injury to their religious exercise," which is constitutionally protected under the First Amendment, and that decreased attendance at religious services therefore "has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts."  *Id.* (internal quotation marks omitted) (quoting *TransUnion*, 594 U.S. at 432).

Here, the School Districts cite no authority for the proposition that there is a tradition of recognizing decreased student attendance at public schools, by itself, as a "basis for a lawsuit in American courts."  *TransUnion*, 594 U.S. at 432.  While the Court shares Plaintiffs' belief that education is manifestly important, public-school education is not recognized as a "fundamental right or liberty."  *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35–38 (1973) ("Education, of course, is not among the rights afforded explicit protection under our Federal Constitution.  Nor do we find any basis for saying it is implicitly so protected."); *cf. Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955, 967 (8th Cir. 2015) (citation modified) (holding that no "relevant precedent support[s] the proposition that a parent's ability to choose where his or her child is educated within the public school system is a fundamental right or liberty").  And the School Districts "must show far more than simply a setback to [their] abstract social interests" to establish standing.[11]  *Hippocratic Med.*, 602 U.S. at 394 (citation omitted).

---

[11]    This harm also appears to belong more appropriately to the School Districts' students, as the ones purportedly deprived of educational opportunities, not the School Districts themselves.  But the School Districts do not purport to bring suit on their students' behalf.  *See* ECF No. 1 ¶¶ 15–16; *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[A]

27

Second, the School Districts argue that decreased attendance harms them because it "cost[s] the districts money." ECF No. 85 at 9. More specifically, the School Districts are at risk of losing funding because Minnesota law requires them to unenroll students with too many consecutive absences. *See* ECF No. 28-47 ¶¶ 24–25; ECF No. 28-48 ¶¶ 9–10; *see also* Minn. Stat. § 120A.37, subd. 9. "Monetary costs are of course an injury." *Texas*, 599 U.S. at 676. And because the School Districts have students who remain at risk of unenrollment due to excessive absenteeism, *see* ECF No. 28-47 ¶¶ 24–25; ECF No. 28-48 ¶ 9, they have shown a "sufficient likelihood of future injury," *Hippocratic Med.*, 602 U.S. 367, 381.

It is not clear, however, that this decreased attendance and the potential loss of enrollment-based funding is traceable to the 2025 Guidance rather than the more generalized fears of the School Districts' students and their families about broader immigration enforcement policy changes and activity, specifically during Operation Metro Surge. *See, e.g.*, ECF No. 1 ¶ 9 ("School districts and teachers across Minnesota have reported significant reductions in attendance rates since the onset of 'Operation Metro Surge.'"); *id.* ¶ 69 ("Fridley Schools' attendance rate has dropped nearly one-third during the surge."); *id.* ¶ 77 ("Duluth Schools has seen increased absenteeism among its students from immigrant communities because, due to the threat of ICE enforcement near school grounds and bus stops, they do not feel safe coming to school."); ECF No. 28-47 ¶ 19 (stating that immigration enforcement activity during Operation Metro Surge "had a

---

plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.").

28

chilling effect on the willingness of [FPSD's] staff and students to come to school"); ECF No. 28-48 ¶ 7 (stating DPSD "currently has many students who are absent from school due to safety concerns related to immigration enforcement near school grounds and bus stops"). Again, the analysis here must remain focused on the specific conduct Plaintiffs challenge: implementation of the 2025 Guidance, not Operation Metro Surge or immigration enforcement activity more broadly. And as already discussed, immigration enforcement activity at or near schools was not categorically prohibited under the 2021 Guidance, *see* ECF No. 28-5 at 4–5, nor does the 2025 Guidance direct or encourage DHS agents to target schools for immigration enforcement activity,[12] *see* ECF No. 28-8 at 2–3.

Likewise, the School Districts are unlikely to establish redressability as it relates to their allegations of decreased attendance. To the extent families are afraid to send their students to school because of concerns about immigration enforcement, restoring the 2021 Guidance would not abate those concerns because, as discussed above, it would not have the legal effect of preventing any future immigration enforcement at or near schools and school bus stops. *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) (citation omitted) ("[R]edressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining the exercise of its power*."). Further, the School Districts' students and their families are "independent actors" who are not parties before this Court, and the "exercise of [their] broad and legitimate discretion" as to whether to send their children to school, regardless

---

[12] Nor, for that matter, do Plaintiffs allege that Operation Metro Surge specifically or exclusively targeted schools or other protected areas. *See* ECF No. 1 ¶¶ 48–50.

29

of the outcome here, is something the Court cannot "presume either to control or to predict." *Lujan*, 504 U.S. at 562 (citation omitted).

Accordingly, the Court concludes that the School Districts are unlikely to make a clear showing that they can satisfy the elements of standing as it relates to their allegations of decreased student attendance.

### iii.    Resource Expenditures

Finally, the School Districts argue that the "'money, time, and resources' [they] must spend to mitigate the disruption caused by the rescission [of the Protected Locations Policy]—including the hours spent preparing remote lessons to educate students afraid to attend school in person—are cognizable injuries." ECF No. 85 at 9 (quoting *Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 524 (2026) (Barrett, J., concurring)). As noted above, monetary costs may constitute a cognizable harm for standing purposes. *See Texas*, 599 U.S. at 676. In the specific context of Plaintiffs' claims, however, these resource expenditures are insufficient to confer standing.

The School Districts no doubt believed it was necessary, if not their duty, to expend or divert resources to "mitigate the disruption" caused by increased immigration enforcement activity at or near their schools, *see* ECF No. 85 at 9, including by offering remote learning, delivering food to students' families, patrolling their schools to anticipate and respond to potential immigration enforcement activity, and increasing communication to students and their families, *see* ECF No. 1 ¶¶ 70–71, 73, 77–78. By no means does the Court intend to second-guess those choices or to diminish the difficult circumstances that led to them. But the 2025 Guidance, by its terms, legally does not "regulate, constrain, or

30

compel any action" by the School Districts. *Clapper*, 568 U.S. at 419. In other words, the School Districts, for understandable and even admirable reasons, *chose* to implement these measures; the 2025 Guidance did not *require* them to do so. And the School Districts "cannot manufacture standing by voluntarily incurring costs." *Bost*, 146 S. Ct. at 522 (internal quotation marks omitted) (citation omitted). Moreover, at least some of the School Districts' anticipated resource expenditures—for example, "devot[ing] more resources to remediate the harm" of students' "academic and social setbacks" resulting from remote learning, ECF No. 1 ¶ 70—are speculative on this record.

Separately, the School Districts are unlikely to establish traceability and redressability for the same reasons already discussed. The resource expenditures and diversions the School Districts allege are more accurately traced to a generalized increase in immigration enforcement activity, and because the enforcement activity underlying the School Districts' claims was not precluded under the 2021 Guidance, reinstating the 2021 Guidance would not redress those expenditures.

In sum, the School Districts have not shown a cognizable harm that is both traceable to the 2025 Guidance itself and redressable by this Court. Instead, the School Districts' alleged harms flow directly from DHS's enforcement activity during Operation Metro Surge at or near schools, which they do not squarely challenge here. And in any event, the relief they seek would not remedy those harms or make them less likely to occur in the future. The Court therefore concludes that the School Districts have not made a "clear showing" that they are "likely" to establish each element of standing relating to any of their alleged harms. *Murthy*, 603 U.S. at 58 (quoting *Winter*, 555 U.S. at 22).

### C.    EdMN

EdMN asserts claims both on its own behalf and on behalf of its members.  ECF No. 1 ¶ 17.  Therefore, EdMN either must establish its own individual standing, or it must establish standing "as the representative of its members."  *Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (citation omitted).

### i.    Individual Standing

EdMN argues that the 2025 Guidance "harms EdMN itself because it 'perceptibly impairs' the organization's core activities and drains its resources."  ECF No. 85 at 14 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).  EdMN also argues that it "has had to divert hours of time and resources to train members about how to handle immigration enforcement near schools and to answer member questions about the threat of such enforcement," which has resulted in EdMN staff spending "less time on their usual duties, like assisting members with labor rights matters."  *Id.* at 14–15.

The Supreme Court has held that this kind of "harm" is not cognizable.  For instance, in *Hippocratic Medicine*, several medical associations sought to enjoin FDA guidance relaxing the conditions of use for mifepristone, which the medical associations thought to be unsafe.  *See* 602 U.S. at 376.  The medical associations asserted standing based on "incurring costs" to "conduct their own studies on mifepristone so that the associations [could] better inform their members . . . about mifepristone's risks," and contended they were "forced" to "expend considerable time, energy, and resources" to engage in "public advocacy and public education."  *Id.* at 394.  All of this, the medical associations argued, caused them "to spend 'considerable resources' to the detriment of other spending

32

priorities." *Id.* (citation omitted).    The Supreme Court rejected this argument and explained that the associations could not "manufacture [their] own standing" by "expending money to gather information and advocate against the [FDA's] action." *Id.*

EdMN's argument is not materially different from the medical associations' argument in *Hippocratic Medicine*. Indeed, the Supreme Court squarely rejected Plaintiffs' argument under *Havens* that "standing exists when an organization diverts its resources in response to a defendant's actions" because "that theory would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Hippocratic Med.*, 602 U.S. at 394–95. Although EdMN's resources here may not have been diverted strictly to "oppose" the 2025 Guidance, this is a similarly insufficient theory of harm.

Moreover, as with the School Districts, the 2025 Guidance, by its own terms, does not "require or forbid" any action by EdMN. *See id.* at 382. Said another way, while EdMN believed it was necessary to expend resources to "train members about how to handle immigration enforcement near schools," ECF No. 85 at 15, EdMN was not compelled to do so by the 2025 Guidance. Even if this constituted a cognizable harm, it is questionable whether it could be called "fairly traceable" to the specific conduct Plaintiffs challenge here: implementation of the 2025 Guidance.

Finally, even if EdMN could demonstrate a cognizable harm that is traceable to the issuance of the 2025 Guidance, EdMN's argument fails on redressability for the reasons already discussed. That is, reinstating the 2021 Guidance would not have the effect of eliminating any threat of immigration enforcement activity at or near schools. *See* ECF

33

No. 69 at 55:2–18 (noting that the court "could not undo anything other than the narrow differences between" the 2021 Guidance and the 2025 Guidance, which "would not redress" the plaintiff's alleged harm); *Mennonite Church*, 778 F. Supp. 3d at 12 ("[I]t is questionable that any substantive distinctions between the memoranda deter the kinds of immigration enforcement actions that the plaintiffs seek to prevent.").

### ii.    Representational Standing

To establish representational (or associational) standing, EdMN must demonstrate that: (1) its members would otherwise have standing to sue on their own; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief sought requires its individual members to participate in the lawsuit. *Fair Admissions*, 600 U.S. at 199.  EdMN's representational standing argument fares no better than its individual standing argument.

EdMN first asserts that EdMN's members would have standing because the 2025 Guidance "exposes EdMN's noncitizen members to a credible threat of arrest and surveillance in and near their schools."  ECF No. 85 at 15; *see also, e.g.*, ECF No. 28-12 ¶ 10; ECF No. 28-13 ¶¶ 15–16.  But as a general matter, a plaintiff "does not have standing to challenge a government regulation simply because the plaintiff believes that the government is acting illegally." *Hippocratic Med.*, 602 U.S. at 381.

For example, in *Laird v. Tatum*, the plaintiffs brought a class action seeking to enjoin the Army's alleged "surveillance of lawful and peaceful civilian political activity." 408 U.S. 1, 2 (1972).  The district court dismissed the plaintiffs' complaint, concluding that the plaintiffs had not presented a "justiciable claim for relief." *Id.* at 2–3.  The Court of

34

Appeals reversed the district court, concluding that the citizens "presented a justiciable controversy" by alleging a "chilling effect on the exercise of their First Amendment rights" caused "not by any specific action of the Army against them, but only by the existence and operation of the intelligence gathering and distributing system." *Id.* at 3 (citation modified). The Supreme Court disagreed and explained that allegations of a subjective "chilling effect aris[ing] merely from [an] individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual" are inadequate to show a "specific present objective harm or a threat of specific future harm." *Id.* at 11, 13–14.

The same principle applies here. As an initial matter, the 2025 Guidance by itself does not direct the arrest or surveillance of any specific individuals. And the 2025 Guidance does not direct where any such arrests or surveillance should occur. *See generally* ECF Nos. 28-6, 28-8. Nor, for that matter, is it clear that EdMN's members have a "legally protected interest," *Spokeo*, 578 U.S. at 339 (citation omitted), in remaining free from immigration enforcement activity at or near schools. Indeed, the 2021 Guidance expressly disclaimed that it created such a "right or benefit." ECF No. 28-5 at 6. And, importantly, such enforcement activity is not inherently unlawful. *See generally* 8 U.S.C. § 1357. As in *Laird*, the fears of EdMN's members that they may be "expose[d]" to "a credible threat of arrest and surveillance in and near their schools," ECF No. 85 at 15, arises from their "knowledge that [DHS] was engaged in certain activities" and "might in the future take some other and additional action detrimental to [them]," *Laird*, 408 U.S. at 11.

35

EdMN also asserts that its members have been "force[d]" to "double their workloads by preparing and delivering online lessons for students afraid to come to school" and have experienced emotional distress from answering their students' "questions about the threat of immigration enforcement near schools and bus stops." ECF No. 85 at 15 (internal quotation marks omitted) (citation omitted). As it relates to increased workloads, this is not caused by the 2025 Guidance but rather the decisions of schools where EdMN members teach to offer remote learning during Operation Metro Surge. *See, e.g.*, ECF No. 1 ¶ 79; ECF No. 28-40 ¶ 15. And while the Court believes that EdMN's members have suffered a significant emotional toll while helping students and their families process their fears relating to DHS's enforcement activity, that is essentially the type of harm found insufficient to establish standing in *Laird* and other Supreme Court decisions. *See* 408 U.S. at 11; *see also Hippocratic Med.*, 602 U.S. at 381 (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982)) (explaining that plaintiffs may not sue "merely because their legal objection is accompanied by a strong moral, ideological, or policy objection to a government action").

For these reasons, the Court concludes that EdMN has not made a "clear showing" that it is "likely" to establish each element of standing, whether individually or as a representative of its members. *Murthy*, 603 U.S. at 58 (quoting *Winter*, 555 U.S. at 22).

**D.      Conclusion**

None of the Plaintiffs has demonstrated a cognizable harm that is both traceable to the specific conduct they challenge—issuance and implementation of the 2025 Guidance— and redressable by this Court. Without such a showing, they are left with claims "based

36

only on an asserted right to have the Government act in accordance with law," which is insufficient to establish standing. *Hippocratic Med.*, 602 U.S. at 381 (internal quotation marks omitted) (citation omitted). Accordingly, because the Court concludes that Plaintiffs have not shown they are likely to establish standing, the Court also must conclude that Plaintiffs are unlikely to prevail on the merits.[13] *See Nw. Immigrant Rts. Project*, 496 F. Supp. 3d at 45.

## II.    Remaining Preliminary Injunction Factors

Because none of the Plaintiffs have demonstrated they are likely to establish standing, they necessarily are "not entitled to a preliminary injunction." *Id.* (quoting *Food & Water Watch*, 808 F.3d at 913). The Court therefore need not reach the remaining preliminary injunction factors. *See Murthy*, 603 U.S. at 56 (analyzing only plaintiffs' standing to seek a preliminary injunction and, because the plaintiffs had not established standing, explaining that there was no "jurisdiction to reach the merits of the dispute").

---

[13] Because the Court concludes that Plaintiffs are unlikely to establish standing, the Court need not reach the other issues relating to the likelihood-of-success factor, including whether Plaintiffs are likely to prevail on the merits as to whether the 2025 Guidance is a final agency action subject to judicial review under the APA, *see* ECF No. 68 at 36–29, and if so, whether it is arbitrary and capricious, *see* ECF No. 27 at 26–30.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings in this matter,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for a Stay Under 5 U.S.C. § 705 or,

in the Alternative, a Preliminary Injunction (ECF No. 32) is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: May 6, 2026                          *s/Laura M. Provinzino*
                                            Laura M. Provinzino
                                            United States District Judge